IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

```
FILED

APR - 7 2011

CLERK, U.S. DISTRICT COURT
        NORFOLK, VA
```

**ACTIVEVIDEO NETWORKS, INC.,**

**Plaintiff,**

**v.**

**CIVIL ACTION NO. 2:10cv248**

**VERIZON COMMUNICATIONS, INC.,**
**VERIZON SERVICES CORP.,**
**VERIZON VIRGINIA INC., and**
**VERIZON SOUTH INC.**

**Defendants.**

## *MEMORANDUM OPINION AND ORDER*

This matter stems from ActiveVideo Networks, Inc.'s ("ActiveVideo") claims against

Verizon Communications Inc., Verizon Services Corp., Verizon Virginia Inc., and Verizon South

Inc. (collectively, "Verizon"), alleging that Verizon has infringed five patents, in violation of 35

U.S.C. § 271(a)-(c), by making, using, providing, offering to sell, and/or selling within the

United States interactive television systems, devices, and/or services, including the Verizon FiOS

system and services, that are covered by one or more claims of ActiveVideo's patents; and

Verizon's claims against ActiveVideo, alleging that ActiveVideo has infringed four patents, in

violation of 35 U.S.C. § 271(a)-(c), by making, causing to be made, using, providing, offering to

sell, and/or selling within the United States interactive television systems, devices, services,

methods, and/or processes, including ActiveVideo's CloudTV system, that are covered by one or

more claims of Verizon's patents.

1

The matter before the Court is the claim construction of several terms found in U.S.
Patent Nos. 5,526,034 (the "'034 patent"), 5,550,578 (the "'578 patent"), 6,100,883 (the "'883
patent"), 6,034,678 (the "'678 patent"), and 6,205,582 (the "'582 patent"), held by ActiveVideo,
and U.S. Patent Nos. 5,682,325 (the "'325 patent"), 6,169,542 (the "'542 patent"), 6,381,748 (the
"'748 patent"), and 7,561,214 (the "'214 patent"), held by Verizon. The Court conducted a
hearing on March 23, 2011 to construe the following terms: (1) *"headend"*; (2) *"assignable
television communication"*; (3) *"interactive controller"*; (4) *"interactive session"*; (5) *"node"*;
(6) *"individually assignable processors"*; (7) *"common channel"*; (8) *"level 1 gateway"*; (9)
*"level 2 gateway"*; (10) *"video still image"*; (11) *"data processing network information"*; (12)
*"interactive element"*; and (13) *"multiplex channel associated with the first anchor channel"*.[1]
The Court now construes the disputed terms as a matter of law under *Markman v. Westview
Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996).

## I. BACKGROUND AND PROCEDURAL HISTORY

This case involves cable television systems that have two-way communication
capabilities with the user. Traditional cable television systems were unable to provide

---

[1] Prior to the hearing, the Court entered an order declining to construe the following nine
terms as either being defined within the patent specification or as clear based upon the plain and
ordinary meaning of the term: (1) *"television information signal"*; (2) *"interactive mode"*; (3)
*"assignable module"*; (4) *"data communication(s) link"*; (5) *"assigning one of a plurality of
television information signals carried by the cable distribution network to the requesting home
interface controller to satisfy the request"*; (6) *"broadband communication though [sic] the
network between a broadband server operated by the selected service provider and the
subscriber's terminal"*; (7) *"broadband communication link through the network between one
of the information service provider systems associated with the selected service provider and
the one terminal"*; (8) *"anchor channel"*; and (9) *"superimposing the first indication over the
display of the first anchor channel; including with the first indication a second indication"*.
The Court hereby incorporates the Order of March 23, 2011 into this Opinion by reference.

2

subscribers with interactive television services, such as video on demand, due in part to bandwidth limitations which are insufficient to provide individual subscribers with traditional television channels in addition to interactive information services that function independently from all other subscribers.  Furthermore, the traditional systems, in which signals originated at the headend, would require complex switching mechanisms in order to provide separate interactive television services to thousands of subscribers simultaneously.

On July 16, 2010, ActiveVideo filed a First Amended Complaint in the United States District Court for the Eastern District of Virginia, alleging that the Verizon FiOS system, which provides interactive television services, infringes at least one claim of each of the '034, '578, '883, '678, and '582 patents, which are directed to methods and systems relating to interactive delivery of information services to subscriber televisions over a cable distribution network.  On December 2, 2010, Verizon filed an Answer to ActiveVideo's First Amended Complaint and First Amended Counterclaims against ActiveVideo, seeking, *inter alia*, declaratory judgments of non-infringement and invalidity of the '034, '578, '883, '678, and '582 patents and alleging that ActiveVideo infringed the '325, '542, '748, and '214 patents.

The '034 patent was issued to ActiveVideo in 1996.  The '034 patent describes an interactive home information system having a node in television communication and data communication with a group of home interface controllers.  The '034 patent includes forty (40) claims, but ActiveVideo only asserts infringement of Claims 1, 4, 8, and 11.  The Parties dispute terms in Claims 1, 4, and 8, but Claim 1, the only independent claim asserted, is representative of the other claims.

Claim 1 provides as follows:

3

An interactive television information system, for providing interactive cable television service over a cable television system distribution network, the interactive television system comprising:

> an information source means for supplying a plurality of information services;

> a plurality of home interface controller means, each such home interface controller means providing an output in communication with an associated subscriber television and having (i) a cable television system distribution network signal input for *television information signals* and input selection means for selecting a given one of the *television information signals* at the signal input and (ii) a data transceiver operative through the cable television system distribution network signal input for conducting data communications over the cable television system distribution network;

> *node* means, in television communication with the information source means and in television communication and data communication with a group of the home interface controller means over the cable television system distribution network, for selecting and providing information services obtained from the information source means to each home interface controller means in the group based on data obtained over the cable television system distribution network from each such home interface controller means;

> wherein the *node* means includes (a) activity detection means for determining whether a given home interface controller means is to be placed in an *interactive mode* and (b) signal assignment means for causing, on an affirmative determination by the activity detection means, the input selection means of the given home interface controller means to select a given *television information signal* present at the signal input, so that signal assignment is accomplished on a demand basis for those home interface controllers determined to be placed in an interactive mode.

The '578 patent was also issued to ActiveVideo in 1996.  The '578 patent describes an

interactive television information system coupled to a cable television system having a headend

for supplying information services and an information service distribution network for delivering

information services to subscriber televisions.  The '578 patent has ten (10) claims, but

ActiveVideo only asserts infringement of Claims 8 and 9, and the Parties dispute terms in both

claims. Claim 8, the only independent claim asserted, is representative.

4

Claim 8 provides as follows:

An interactive television information system coupled to a cable television system having (i) an information source means available at a *headend* for supplying a plurality of information services, and (ii) an information service distribution network, for delivering the information services to subscriber televisions, the system comprising:

a plurality of home interface controllers, one such home interface controller associated with each subscriber television, for providing an output in communication with the subscriber television and having (i) a signal output for *television information signal* and (ii) a data transceiver operative over a *data communications link* to the *headend*;

a plurality of subscriber selection devices, one device associated with each home interface controller and in communication with the data transceiver, for permitting subscriber interaction; and

a plurality of *interactive controllers*, disposed at the *headend*, each *interactive controller* (i) in television communication with the information source means and (ii) in *assignable television communication* over the network with an assigned home interface controller and (iii) in assignable data communication over the *data communications link* with the assigned home interface controller, so that the *interactive controller* furnishes the information service interactively over the network to the assigned home interface controller and its associated television.

The '883 patent was issued to ActiveVideo in 2000 and is a continuation of the '578

patent. The '883 patent has fifty-five (55) claims, but ActiveVideo only asserts infringement of

Claims 1, 11, 13, 15, 22, 26 (which depends on independent Claim 24 and dependent Claim 25),

and 30. The Parties dispute terms in Claims 1, 13, 24 and 25. Claims 1 and 13 are the only

independent claims asserted and are representative of the other claims.

Claim 1 provides as follows:

A method for providing interactive service on a cable television system that distributes television signals from a cable *headend* over an information service distribution network to a plurality of subscriber television sets, said method comprising:

detecting at a *node* on the information service distribution network a request, from a home interface controller associated with one of the subscriber television sets,

for an information service in an *interactive mode*;

controlling at a processor in the *node*, in response to detection of the request, an *interactive session* with the requesting home interface controller;

providing an information signal capable of full motion video responsive to the *interactive session* through the information service distribution network to the subscriber television set associated with the requesting home interface controller for display of an image produced by the information signal; and

receiving data communications at the processor from the requesting home interface controller during the *interactive session* representative of commands interactive with the image on the associated subscriber television set.

Claim 13 provides as follows:

An interactive television information system for use over an information service distribution network that delivers information services from a *headend* to subscriber televisions, the interactive television information system comprising:

a plurality of home interface controllers, each such home interface controller being associated with a subscriber television and having a data transceiver, the plurality of home interface controllers, each operative over a *data communications link*;

activity detection means, at a *node* on the information service distribution network, for determining from communications received over the *data communication link* whether a given home interface controller is to be placed in an *interactive mode*; and

a processor, responsive to said activity detection means, coupled to the *data communication link* and in communication with the information service distribution network for providing an information signal, the information signal being capable of full motion video in the *interactive mode*, for transmission on the information service distribution network and viewable reception only in the subscriber television associated with the home interface controller to be placed in *interactive mode*, said processor controlling an *interactive session* with the home interface controller to be placed in *interactive mode*.

The '678 patent was also issued to ActiveVideo in 2000 and is a continuation of the '883

patent. The '678 patent has seven (7) claims, but ActiveVideo only asserts infringement of

Claims 1 and 2.  The Parties dispute terms in Claims 1, which is the only independent claim

asserted.

Claim 1 provides as follows:

> A method for interactive delivery of information services to subscriber televisions over a
> cable distribution network comprising the steps of:
>
>> receiving at a *node* over a *data communication link* a request for an *interactive
>> session* from a home interface controller associated with a subscriber television;
>>
>> *assigning one of a plurality of television information signals carried by the
>> cable distribution network to the requesting home interface controller to satisfy
>> the request*;
>>
>> informing the requesting home interface controller of the assigned *television
>> information signal* over the *data communication link*;
>>
>> receiving at the *node* over the *data communication link* a request for an
>> information service from the home interface controller associated with the
>> subscriber television; and
>>
>> putting the information service on the assigned *television information signal*.

The '582 patent was issued to ActiveVideo in 2001.  The '582 patent describes an

interactive cable system having a plurality of assignable interactive controllers which

communicate with subscribers through an information service distribution network, a frame

server is provided for interfacing with a plurality of subscribers.  The '582 patent includes nine

(9) claims, but ActiveVideo only asserts infringement of Claims 5, 6, 7, 8, and 9.  The Parties

dispute terms in claims 5, 8, and 9, but Claim 5, the only independent claim asserted, is

representative of the other claims.

Claim 5 provides as follows:

> An interactive cable system comprising:

(i) an information service distribution network, for delivering information services from a *headend* to subscriber television;

(ii) a plurality of home interface controllers, each home interface controller associated with a subscriber television and having a data transceiver operative over a *data communications link* to the *headend*;

(iii) a plurality of subscriber selection devices, each such device associated with a home interface controller and in communication with the data transceiver thereof;

(iv) a plurality of *individually assignable processors*, disposed at the *headend*, in assignable data communication with an assigned home interface controller and in television communication over the network with the subscriber television associated with the assigned home interface controller, and

(v) a frame server in communication with a plurality of home interface controllers each assigned to one of a plurality of processes running in said frame server for interactive service, said processes receiving data communications from the subscribers associated with their respective assigned home interface controllers, said frame server generating interactive pages responsive to the data communications and supplying the interactive pages to the subscriber televisions associated with the assigned home interface controllers in digitally encoded television signals over the information service distribution network.

The '325 patent was issued to Verizon in 1997. The '325 patent describes routing and access control and billing functionalities in a video distribution network capable of providing subscribers with access to multiple information services providers. The '325 patent includes thirty-one (31) claims, but Verizon only asserts infringement of Claims 1 and 28. The Parties dispute terms in both claims and both claims are independent.

Claim 1 provides as follows:

A communication method comprising:

receiving a request for service from a subscriber's terminal at a *level 1 gateway* control element of a broadband communication network;

in response to the request for service, generating menu information listing a plurality of broadband information service providers available through the

8

broadband communication network;

transmitting said menu information from the *level 1 gateway* to the terminal;

visually displaying the menu to the subscriber;

receiving a selection of a service provider listed on the menu at the *level 1 gateway*; and

controlling the broadband communication network to establish *a broadband communication though the network between a broadband server operated by the selected service provider and the subscriber's terminal* and signaling communication between the subscriber's terminal and a *level 2 gateway* controlling operation of the server.

Claim 28 provides as follows:

In a system comprising:

communication network selectively providing broadband communications links;

a plurality of information service provider systems connected to the network, each provider system being capable of transmitting broadband digital information via a communication link through the network; and

a plurality of terminals for transmitting control signals upstream through the network in response to user inputs and for providing displays in response to information received through the network;

a gateway for:

(1) transmitting a menu of available service providers to one of the terminals for display,

(2) receiving a control signal from the one terminal representing a selection of one service provider from the menu, and

(3) controlling the network to establish a *broadband communication link through the network between one of the information service provider systems associated with the selected service provider and the one terminal.*

The '542 patent was issued to Verizon in 2001. The '542 patent describes a method of

9

delivering advertising through an interactive video distribution system. The '542 patent includes twenty-six (26) claims, but Verizon only asserts infringement of Claims 1 and 6. The Parties dispute one term in independent Claim 1 only.

Claim 1 provides as follows:

> A method of delivering advertising through a head end facility of an interactive video distribution system, said method comprising the steps of:
>
>> transmitting an advertisement to an interactive video subscriber unit in connection with an interactive video program;
>>
>> receiving, at said head end facility over a return path, a request to register said advertisement in a menu;
>>
>> generating an entry for said advertisement in said menu;
>>
>> communicating to said subscriber unit, said menu in a *video still image*;
>>
>> obtaining, at said head end facility over said return path, a selection request for said entry; and
>>
>> providing to said subscriber unit, in response to said selection request, supplementary advertising information associated with said advertisement.

The '748 patent was issued to Verizon in 2002. The '748 patent describes methods and an apparatus for accessing a network, such as the Internet, using a television and set top box. The '748 patent includes thirty-six (36) claims, but Verizon only asserts infringement of Claims 13 and 20. The Parties dispute terms in independent Claim 13 only.

Claim 13 provides as follows:

> A method of retrieving and retransmitting *data processing network information* in response to a user selection request, comprising:
>
>> transmitting first selection information to be displayed on a television;
>>
>> receiving a user selection request based on the transmitted first selection

10

information;

retrieving *data processing network information*, in a network format, corresponding to the user selection request;

transforming the *data processing network information* from the network format having a first *interactive element* to a television format having a second *interactive element*; and

transmitting the *data processing network information* in the television format to the television.

The '214 patent was issued to Verizon in 2009. The '214 patent describes a two-dimensional channel navigation technique in which a channel up or down key is used to allow a viewer to sequence vertically through anchor channels of a number of different broadcast providers, while a channel right or left key is used to allow the viewer to sequence horizontally through one or more multiplex channels associated with a given anchor channel from a given broadcast provider. The '214 patent includes seventeen (17) claims, but Verizon only asserts infringement of Claim 9, which contains a number of disputed terms.

Claim 9 provides as follows:

A method of providing channel selection, comprising:

providing a set of channels;

displaying a first *anchor channel* from the set of channels when selected;

providing a first indication that the first *anchor channel* is an *anchor channel*;

*superimposing the first indication over the display of the first <u>anchor channel</u>*;

*including with the first indication a second indication*, wherein the second indication is included when there is at least one *multiplex channel associated with the first <u>anchor channel</u>*;

receiving a first command to select from the second indication a first multiplex

11

channel of the at least one *multiplex channel associated with the first anchor channel*;

displaying the first multiplex channel;

providing for the selection of a second *anchor channel* from the set of channels through the use of a second command of a different type than the first command; and

performing at least one of:

> switching between multiplex channels associated with an *anchor channel* from the set of channels using commands of the same type as the first command;

> switching between *anchor channels* from the set of channels using commands of the same type as the second command; and

> switching from a multiplex channel associated with one *anchor channel* from the set of channels to a different *anchor channel* from the set of channels through a command of the same type as the second command.

## II. LEGAL STANDARD

Claim construction is "a question of law, to be determined by the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996). In construing claims, the Court must first look first to the intrinsic evidence in the record, i.e. the claims, the specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996). Claim construction begins with determining how a person of ordinary skill in the art understands a claim term as of the filing date of the patent application. *Phillips v. AWH Corp. et al.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005), *cert denied*, 126 S. Ct. 1332 (2006). In the unlikely event that the intrinsic evidence is insufficient to determine the acquired meaning of the claim language, the court may rely on extrinsic evidence, i.e. dictionaries, treatises, publications, and expert testimony. *See id.*; *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1585

(Fed. Cir. 1996).

### A.    Claim Language

The Court's claim construction analysis must begin with the words of the claim. "[T]he words of a claim 'are generally given their ordinary and customary meaning' . . . the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312-13 (quoting *Vitronics*, 90 F.3d at 1582). This ordinary meaning "may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1313. Thus, the Court need not provide a new definition or rewrite a term when the Court finds the term's plain and ordinary meaning is sufficient. *02 Micro Int'l. Ltd. v. Beyond Innovation Tech.* Co., 521 F.3d 1351, 1362 (Fed. Cir. 2008).

If the meaning of a term is not immediately apparent, courts must look to the written description and prosecution history to provide guidance as to the meaning of the claim terms. *Phillips*, 415 F.3d at 1314. In analyzing the claim language, the Court must analyze the context in which the term appears and other claims of the patent to gain insight on the patentee's intention for the claim definition. "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.*

### B.    Specification

The specification contains a written description of the invention, the manner and process of making and using it, and the best mode contemplated by the inventor of carrying it out. *See* 35 U.S.C. § 112. "It is always necessary to review the specification to determine whether the

13

inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics*,

90 F.3d at 1582; *see also Phillips*, 415 F.3d at 1315. However, there is a distinction between

using the specification to analyze claim terms and incorporating limitations from the

specification into the claim language. *Phillips*, 415 F.3d at 1323; *see also Liebel-Flarsheim Co.*

*v. Medrad, Inc.*, 358 F.3d 898, 904 (Fed. Cir. 2004).

### C.    Prosecution History

The prosecution history contains the complete record of all proceedings before the Patent

and Trademark Office ("PTO"), including any express representations made by the applicant

regarding the scope of the claims. The prosecution history is useful in determining how the

inventor understood the patent and invention, and may provide evidence that the inventor limited

the invention during the course of prosecution, thus restricting the scope of the claim language.

*Phillips*, 415 F.3d at 1317. However, the Court should not rely too heavily on the prosecution

history because it "represents an ongoing negotiation between the PTO and the applicant, rather

than the final product of that negotiation, [such that] it often lacks the clarity of the specification

and thus is less useful for claim construction purposes." *Id.*

### D.    Extrinsic Evidence

A court may also consider extrinsic evidence, "which consists of all evidence external to

the patent and prosecution history, including expert and inventor testimony, dictionaries, and

learned treatises." *Phillips*, 415 F.3d at 1317-19. However, extrinsic evidence should not be used

"to contradict claim meaning that is unambiguous in the light of the intrinsic evidence." *Id.* at

1324. Judges may consult such resources to better understand the underlying technology and to

aid in construing claim terms, "so long as the dictionary definition does not contradict any

14

definition found in or ascertained by a reading of the patent documents." *Id.* at 1322-23.

Extrinsic evidence has been found to be generally less reliable than intrinsic evidence and

accordingly should be considered in light of the intrinsic evidence. If analysis of the intrinsic

evidence will resolve any ambiguity, it is improper to consider extrinsic evidence in determining

the meaning of the claims. *Id.* at 1320.

## III. DISCUSSION

### A.   Stipulated Term Definitions

Prior to the *Markman* hearing, the Parties filed a Joint Pre-Hearing *Markman* Statement

indicating that the Parties agreed to the definitions of eight (8) claim terms. Accordingly, the

Court adopts the following term definitions:

1. The term *"cable television system"* appears in Claims 1, 4, and 8 of the '034 patent, Claim 8 of the '578 patent, and Claims 1 and 24 of the '883 patent. The parties agree that a *"cable television system"* is "an integrated system for delivery of any Information Service to subscribers for use in connection with their televisions, including conventional cable television systems utilizing coaxial cable for distribution primarily of broadcast and paid television programming, cable television systems using fiber optics and mixed fiber optic-coaxial cable, as well as other means for distribution of information services to subscribers."

2. The term *"information service"* appears in Claims 1 and 8 of the '034 patent, Claim 8 of the '578 patent, Claims 1, 13, 15, and 30 of the '883 patent, Claim 1 of the '678 patent, and Claims 5, 7, 8, and 9 of the '582 patent. The parties agree that an *"information service"* is "a service capable of being furnished to a television viewer having an interface permitting (but not necessarily requiring) interaction with a facility of the cable provider, including but not limited to an interactive information service, video on demand, Internet access, local origination service, community event service, classified advertising services, newspapers, advertising, and televised catalogue ordering."

3. The term *"network manager means"* appears in Claim 8 of the '034 patent. The parties agree that the term *"network manager means"* is governed by 35 U.S.C. § 112, ¶ and that its function is "assigning an available one of the multimedia processing means to furnish an information service, over the cable television

15

distribution network, to one of the home interface controller means based on data obtained from the one of the home interface controller means over the cable television system distribution network, so that assignment of multimedia processing means is accomplished on a demand basis" and the corresponding structure is net[work] manager 66a.

4.      The term *"television communication"* appears in Claim 8 of the '578 patent.  The parties agree that *"television communication"* means "providing an information service via a television information signal."

5.      The term *"information signal"* appears in Claims 1, 11, 13, 22, 24, and 30 of the '883 patent.  The parties agree that an *"information signal"* is "a signal that may be utilized by a television, directly or via a home interface controller, such as a set-top box, for video display, regardless of the form, including a standard NTSC-modulated rf carrier, an MPEG-compressed digital data stream, or any other format."

6.      The term *"frame server"* appears in Claim 5 of the '582 patent.  The parties agree that the term *"frame server"* is fully defined by the language of the "frame server" limitation in the claim, and as such, does not require additional construction.

7.      The term *"interactive pages"* appears in Claim 5 of the '582 patent.  The parties agree that *"interactive pages"* are "pages that permit user interaction, including still video frame images or a multimedia short script for interpretation by a local process such as a typical page of HTML data as practiced by conventional web browsers."

8.      The term *"television format"* appears in Claim 13 of the '748 patent.  The parties agree that a *"television format"* is "format for display on a television."

**B.      Disputed Terms in ActiveVideo's Patents**

1.      *"headend"*

The term *"headend"* appears in Claim 4 of the '034 patent, Claim 8 of the '578 patent, Claims 1, 13, and 24 of the '883 patent, and Claim 5 of the '582 patent.  ActiveVideo argues that a *"headend"* is "a facility within the television distribution network from which Television Information Services or Signals are distributed," while Verizon defines *"headend"* as a facility that originates and distributes broadcast television signals and potentially other signals."  Joint

16

Pre-Hr'g Markman Statement App. A, at 7. The primary distinction between the Parties' proposed constructions is whether broadcast television signals originate in the "*headend*."

In construing this term, the Court first looks to the claim language to determine whether broadcast television signals must originate in the "*headend*," or whether, as ActiveVideo claims, this definition unduly limits the term. *See Interactive Gift Express, Inc. v. Compuserve* Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("All intrinsic evidence is not equal however. First, we look to the claim language. Then we look to the rest of the intrinsic evidence, beginning with the specification and concluding with the prosecution history, if in evidence." (internal citations omitted)); *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998) ("Even within the intrinsic evidence, however, there is a hierarchy of analytical tools. The actual words of the claim are the controlling focus."). Claim 1 of the '883 patent is illustrative of the use of the term "*headend*" in the other asserted claims and provides: "A method for providing interactive service on a cable television system that distributes television signals from a cable *headend* over an information service distribution network to a plurality of subscriber television sets . . .". Nothing within the claim language indicates that broadcast television signals must originate at the "*headend*;" rather the claim reveals only that television signals in general are distributed from the "*headend*."

Accordingly, the Court turns to the common specification to determine whether a deviation from the claim language is warranted.[2] *See Interactive Gift Express*, 256 F.3d at 1331. The common specification does not speak to whether broadcast television signals must originate

---

[2]The '034, '578, '883, and '678 patents all share a common specification. The Court will thus refer to the specification of the '034 patent when construing the terms of these patents.

at the "*headend*;" however, Verizon alleges that because Figure 7 depicts broadcast signals as

originating at the "*headend*," the definition of "*headend*" must be so limited. *See* '034 patent fig.

7 (filed May 3, 1993). However, Verizon's proposed construction would impermissibly limit the

term "*headend*" based on a drawn embodiment. *See, e.g., Playtex Prods., Inc. v. Proctor &*

*Gamble Co.*, 400 F.3d 901, 907 (Fed. Cir. 2005) ("By its reliance on the figures, the district court

improperly limited claim 1 to a preferred embodiment. We have consistently advised against this

approach to claim construction. Claims of a patent may only be limited to a preferred

embodiment by the express declaration of the patentee . . .." (internal citations omitted)).

Furthermore, Figure 1, which depicts the preferred embodiment, clearly illustrates a television

information system in which network signals, or broadcast television signals, originate at the

National Processing Center rather than at the "*headend*," '034 patent fig. 1, and a definition

which would exclude the preferred embodiment is "rarely, if ever, correct and would require

highly persuasive evidentiary support, which is wholly absent in this case," *Vitronics*, 90 F.3d at

1583.

Because intrinsic evidence clearly establishes the meaning of this disputed term, extrinsic

evidence is unnecessary. Accordingly and in light of the intrinsic record, the Court finds that

"*headend*" is defined as "a facility within the television distribution network from which

television information services or signals are distributed."

### 2.     "*interactive controller*"

The term "*interactive controller*" appears in Claim 8 of the '578 patent. ActiveVideo

would define "*interactive controller*" to mean "equipment for providing Information Services

and for communicating with a home interface controller." Verizon, on the other hand, defines

18

"*interactive controller*" as "a processing unit assigned on a one-to-one basis to a home interface controller for providing two-way information services." Pre-Hr'g Markman Statement App. A, at 8. The primary contention between the Parties is whether the "*interactive controller*" must be assigned on a "one-to-one" basis to a particular home interface controller, or whether the "*interactive controller*" may be assigned to multiple home interface controllers at one time.

Beginning with the patent claims, Claim 8 of the '578 patent provides: "An interactive television information system coupled to a cable television system . . . , the system comprising: . . . a plurality of *interactive controllers*, disposed at the headend, each *interactive controller* (i) in television communication with the information source means and (ii) in assignable television communication over the network with an assigned home interface controller and (iii) in assignable data communication over the data communications link with the assigned home interface controller, so that the *interactive controller* furnishes the information service interactively over the network to the assigned home interface controller and its associated television." Verizon argues that because the "*interactive controller*" is in assignable television communication with **an** home interface controller, and in assignable data communication with **the** home interface controller, the claim language indicates that each "*interactive controller*" is assigned to only one home interface controller. However, it is well settled in patent law that the terms "an" and "the" do not suggest singularity. *See, e.g., Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1350-51 (Fed. Cir. 2005) ("Like the words 'a' and 'an,' the word 'the' is afforded the same presumptive meaning of 'one or more' when used with the transitional phrase 'comprising.'").

Furthermore, the construction that the "*interactive controller*" is not limited to

19

assignment to only one home interface controller is also supported by the doctrine of claim differentiation, as the '883 patent, which is a continuation of the '578 patent, contains a dependent claim that specifically provides for one-to-one assignment. *See* '883 patent claim 26 (filed Jun. 4, 1996) ("The interactive television information system according to claim 25 further comprising a network manager for assigning an available **one** of said processors to furnish interactive service to **one** of said home interface controllers in interactive mode based on data obtained from the data communication path so that assignment of processors to home interface controllers is accomplished on a demand basis." (emphasis added))[3]; *see also Free Motion Fitness*, 423 F.3d at 1351 ("The doctrine of claim differentiation 'create[s] a presumption that each claim in a patent has a different scope.'" (quoting *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998))).

Verizon also urges the Court to consider the common specification which describes an embodiment where "an individual MMC is assigned on a demand basis to each requesting home interface controller."[4] '034 patent col. 7 ll. 24-28. However, the common specification also clearly describes a "party-line" embodiment in which multiple home interface controllers share the same MMC. *See* '034 patent col. 12 ll. 21-30 ("In the case of many types of interactive television service, the home interface controller will have exclusive use of the assigned MMC, a 'private line' to it over the data communications link and the interactive trunk 42b. In the case of near video on demand, however, several home interface controllers may share the same time slot

---

[3]The Parties agree that the assignable processors provided in ActiveVideo's other patents-in-suit are equivalent to the **"interactive controller"** in the '578 patent.

[4]An "MMC" is a multimedia controller. *See* '034 patent col. 4 l. 20. The Parties agree that an MMC as described in the common specification is an *"interactive controller."*

on a movie, for example, and these subscribers would have a 'party-line' to the MMC."). Accordingly, the Court finds that the term "interactive controllers" should be properly construed to include the described "party-line" embodiment. *See, e.g., Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1364 (Fed. Cir. 2001) (holding that where the patent specification contained examples of both single and multiple dose administrations, the district court's refusal to read a single dose limitation from the specification into the claims was not error).

Because the Court finds that the intrinsic evidence supports a finding that the *"interactive controller"* need not be assigned on a "one-to-one" basis, the Court declines to consider any further extrinsic evidence in construing this term. Thus, the Court finds that *"interactive controller"* means "equipment for providing information services and for communicating with a home interface controller."

### 3. *"assignable television communication"*

The term *"assignable television communication"* appears in Claim 8 of the '578 patent. ActiveVideo's proposed construction of *"assignable television communication"* is "an Information Service provided via a Television Information Signal capable of being assigned to a home interface controller, such as by addressed data packets," while Verizon's proposed construction defines the term as "communication over a television channel/frequency dedicated to the home interface controller in response to a request for service." Pre-Hr'g Markman Statement App. A, at 8. The primary dispute among the parties is whether the communication must be delivered over a channel/frequency.

Beginning with the patent claims, Claim 8 of the '578 patent provides, in relevant part:

"An interactive television information system coupled to a cable television system . . . , the system comprising: . . . a plurality of interactive controllers, disposed at the headend, each interactive controller (i) in television communication with the information source means and (ii) in *assignable television communication* over the network with an assigned home interface controller . . ." ActiveVideo alleges that the term "television communication" is defined within the patent to mean "providing an information service via a television information signal" and therefore, the term "*assignable television communication*" cannot be limited to a particular type of signal, such as frequency. Verizon, on the other hand, seeks to limit the signal assignment to a channel/frequency which would exclude assignment of other signals such as digital data streams or addressed packets.

Looking to the common specification, the term "television communication" is clearly defined to include provision of services through "television information signals." '034 patent col. 5 ll.32-33. The term "television information signal" is also specifically defined as "any signal that may be utilized by a television for video display, regardless of the form, including a standard NTSC-modulated rf carrier, an MPEG-compressed digital data stream, or any other format." '034 patent col. 5 ll.33-37. This express definition indicates that the assignable signals are not limited to frequencies as Verizon suggests. *See Vitronics*, 90 F.3d at 1582 ("Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history."). Similarly, because "television information signals"are signals provided in any format, the Court sees no need to incorporate the additional modifier "such as by addressed data packets" to the

definition of "*assignable television communication*." *See Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) ("General descriptive terms will ordinarily be given their full meaning; modifiers will not be added to broad terms standing alone.").

Turning to the adjective "assignable," ActiveVideo argues that the Court should apply the plain and ordinary meaning of the term "assignable,"which merely means "capable of being assigned," rather than the term "dedicated" as suggested by Verizon. Though the meaning of "television communication" has been clearly defined within the common specification and agreed upon by the Parties, *see supra* Part III.A, the Court must look to the ordinary meaning of the modifier "assignable" to determine the meaning of the entire claim term, *see Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1372 (Fed. Cir. 2003) ("[S]imply because a phrase as a whole lacks a common meaning does not compel a court to abandon its quest for a common meaning and disregard the established meanings of the individual words.). "Dictionary definitions provide evidence of a claim term's 'ordinary meaning.'" *Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1350 (Fed. Cir. 2003); *see also Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. In such circumstances, general purpose dictionaries may be helpful." (citation omitted)).

The meaning of the word "assign" is "to set aside for a particular purpose" and the adjective prefix "–able" means "susceptible, capable, or worthy of a specified action." Webster's II New College Dictionary 67, 2 (2001). Therefore, the plain and ordinary meaning of "assignable" is "capable of being assigned" and not "dedicated" as Verizon suggests. As

23

mentioned in *supra* Part III.B.2 above, nothing within the patent specification requires the television communication to be assigned on a one-to-one basis to a requesting home interface controller, an arrangement which is connoted by use of the term "dedicated." *See id.* at 294 (defining the word "dedicated" as "used for a single, special electronic business application"). Accordingly, based on the patent claims and the term definitions as set forth in the common specification, the Court finds that the term *"assignable television communication"* means "an information service provided via a television information signal capable of being assigned to a home interface controller."

> 4.     *"interactive session"*

The term *"interactive session"* appears in Claims 1 and 13 of the '883 patent and Claim 1 of the '678 patent.  ActiveVideo defines *"interactive session"* as a "two-way communication session between devices in a network that is established at a certain time and torn down at a later time."  Verizon defines *"interactive session"* as "two-way communication over a channel/frequency assigned on a demand basis to an individual user."  Pre-Hr'g Markman Statement App. A, at 3.  As with the term "assignable television communication," the primary dispute between the parties is whether the provision of an *"interactive session"* must be limited to the assignment of a channel/frequency.

As always, the Court begins by examining the claim language.  Claim 1 of the '883 patent provides in relevant part:

> A method for providing interactive service on a cable television system . . ., said method comprising:
>
>     . . .

24

controlling at a processor in the node, in response to detection of the request, an *interactive session* with the requesting home interface controller;

providing an information signal capable of full motion video responsive to the *interactive session* through the information service distribution network to the subscriber television set associated with the requesting home interface controller for display of an image produced by the information signal; and

receiving data communications at the processor from the requesting home interface controller during the *interactive session* representative of commands interactive with the image on the associated subscriber television set.

Similarly, Claim 1 of the '678 patent provides, in relevant part: "A method for interactive delivery of information services to subscriber televisions over a cable distribution network comprising the steps of: receiving at a node over a data communication link a request for an *interactive session* from a home interface controller associated with a subscriber television . . ." In reviewing the claims, the Court finds that the claims do not shed light on whether the "*interactive session*" must be limited to a channel/frequency assignment. Therefore, the Court must look to the common specification to ascertain the scope of the claim term "*interactive session*." *See Gart v. Logitech, Inc.*, 254 F.3d 1334, 1341 (Fed. Cir. 2001) (noting that the court should consult the specification where "the language itself lacks sufficient clarity such that there is no means by which the scope of the claim may be ascertained from the language used").

Verizon alleges that the common specification supports its definition of "*interactive session*" because the it describes an embodiment that resolves assignment issues caused when multiple home interface controllers request to be placed in interactive mode simultaneously by allowing the first home interface controller to keep its assigned frequency until an interactive mode is no longer necessary. *See* '034 patent col. 3 ll.13-21. However, the common specification also indicates that the assignment of a frequency is merely one embodiment, and

25

that the information services can be provided "in a wide variety of formats." '034 patent col. 9 ll.145-65 ("FIG. 10 shows the allocation of frequency bands in the express trunks . . . These frequency assignments are merely illustrative, however. Moreover, the television communications and the data communications between node and subscriber home can be achieved in a wide variety of formats. . . . [F]or example, the signal could be provided as a compressed digital data stream on a time-shared basis or as addressed packets."). Therefore, the Court declines to limit the claim based upon the specific embodiment described in the specification. *See, e.g., Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1302-03 (Fed. Cir. 2007) ("The mere fact that a specification's examples of translation may involve a change in protocol from a higher to a lower level protocol does not establish that such a limitation should be imported into the claims.").

Verizon also urges the Court to consider the prosecution history in limiting an "*interactive session*" to assignment of a channel/frequency. Verizon argues that the applicant distinguished the Kuribayashi prior art reference during prosecution of the '678 patent in order to avoid rejection of certain claims. However, upon close review of the prosecution history, the Court finds that the applicant distinguished the Kuribayashi reference on the grounds that Kuribayashi failed "to disclose requesting, establishing or engaging in an *interactive session*" *at all*, and not that the Kuribayashi reference failed to disclose an "*interactive session*" provided via a frequency/channel. *See* VanNorman Decl. Ex. 29, at AVNW00001201. Verizon also argues that the applicant distinguished the Lovett prior art reference based on the fact that Lovett fails to assign a channel for the provision of the "*interactive session*." However, the prosecution history reveals that the applicant distinguished Lovett not on the basis of whether or not a channel is

26

assigned, but rather on whether the channel must be *dedicated* to a particular subscriber at all times, rather than being assigned on an on-demand basis. *See* VanNorman Decl. Ex. 30, at AVNW00001212-13. Therefore, neither the Kuribayashi nor the Lovett references cited to the patent examiner caused the applicant to disclaim an "*interactive session*" provided using signals other than a channel/frequency.

Though not a major dispute, the Parties also disagree on what is meant by the term "session," with ActiveVideo describing the session as being "established at a certain time and torn down at a later time," and Verizon claiming that the "session" is provided "on a demand basis." Nothing about ActiveVideo's construction connotes that the session must be initiated by the subscriber, as described in the asserted claims and the common specification. *See, e.g.*, '883 patent col. 19 ll.52-55 ("detecting at a node on the information service distribution network a request, from a home interface controller associated with one of the subscriber television sets, for an information service in an interactive mode"). Accordingly, the Court finds that Verizon's characterization of the "*interactive session*" as being provided "on a demand basis" properly conveys what is meant by "interactive session."

Having viewed all the intrinsic evidence, the Court finds that an "*interactive session*" need not be limited to the assignment of a channel/frequency, but rather encompasses a wide variety of signals. The Court also finds that the intrinsic record supports Verizon's claim that the "*interactive session*" is initiated "on a demand basis" by a requesting subscriber. Furthermore, because the meaning of "*interactive session*" is clear from the intrinsic evidence, the Court declines to consider any further extrinsic evidence in construing this term. Thus, the Court finds that "*interactive session*" means "two-way communication session between devices in a network

27

that is established on a demand basis."

### 5.    "*node*"

The term "*node*" appears in Claims 1 and 13 of the '883 patent and Claim 1 of the '678

patent. ActiveVideo seeks to define "node" as "equipment in a cable distribution network that

communicates with at least one home interface controller," while Verizon proposes to define

"node" as "equipment that logically lies between and communicates with a cable headend and a

small number of home interface controllers, that is physically connected and in close proximity

to each subscriber through one or more feeders, and that contains a substantially identical copy of

the data stored at a regional processing center."  Pre-Hr'g Markman Statement App. A, at 7.  The

difference in the Parties' proposed constructions reflects four disputes based upon the location of

the "node" and the proximity to subscribers, the number of home interface controllers connected

to the "node," and whether the "node" is required to contain a copy of data stored at the regional

processing center. The Court will address each of these proposed limitations in turn.

The Court begins by examining the language of the asserted claims to determine whether

any of the limitations that Verizon asserts are apparent from the claim language.  The relevant

portion of Claim 1 of the '883 patent provides as follows:

> A method for providing interactive service on a cable television system that distributes
> television signals from a cable headend over an information service distribution network
> to a plurality of subscriber television sets, said method comprising:
>
>> detecting at a *node* on the information service distribution network a request, from
>> a home interface controller associated with one of the subscriber television sets,
>> for an information service in an interactive mode;
>>
>> controlling at a processor in the *node*, in response to detection of the request, an
>> interactive session with the requesting home interface controller;

28

Similarly, Claim 1 of the '678 patent provides, in relevant part:

> A method for interactive delivery of information services to subscriber televisions over a cable distribution network comprising the steps of:
>
>> receiving at a *node* over a data communication link a request for an interactive session from a home interface controller associated with a subscriber television;
>>
>> . . .
>>
>> receiving at the *node* over the data communication link a request for an information service from the home interface controller associated with the subscriber television; . . .

Verizon first argues that the "*node*" "logically lies between" the headend and the home interface controllers and that the "*node*" is "physically connected and in close proximity" to each subscriber. Claim 1 of the '883 patent clearly indicates that communication between the cable headend and the subscribers takes place through the "*node*," however the claim language does not indicate where the "*node*" must be located or how the "*node*" is connected to each subscriber. Accordingly, the Court looks to the common specification for guidance on the location of the "*node*" within the cable distribution system.

Verizon argues that Figure 1 illustrates the "*node*" lying in between the headend and the home interface controllers within the distribution network. *See* '034 patent fig. 1. Though Verizon concedes that Figure 7 depicts an embodiment where the "*node*" is located at the headend rather than between the headend and the home interface controllers, Verizon draws a distinction between logical location and physical location, noting that the "*node*"in Figure 7 is nevertheless "logically" located between the headend and the subscribers. *See* '034 patent fig. 7. The Court finds that Verizon's distinction between "logical" and "physical" location is only likely to confuse, rather than clarify, the term for the jury. *See Sulzer Textil A.G. v. Picanol N.V.*,

29

358 F.3d 1356, 1366 (Fed. Cir. 2004) ("The meaning and scope of patent claim terms, as

determined by a district court's claim construction rulings, are legal issues central to most patent

cases. Thus, the district court normally will need to provide the jury in a patent case with

instructions adequate to ensure that the jury fully understands the court's claim construction

rulings and what the patentee covered by the claims."). Accordingly, the Court finds that

Verizon's proposed "logically located" construction is equally conveyed by construing the term

"*node*" to require communication between the headend and the home interface controllers.

Furthermore, given the depiction in Figure 7, which places the "*node*" at the headend, the Court

declines to construe the "*node*" as being in close proximity to the each subscriber.

In seeking to limit the term "*node*" to communicating with only a "small number" of

subscribers, Verizon relies on language in the specification of U.S. Patent No. 5,220,420 (the

"'420 patent"), a parent patent to the patents-in-suit, which indicates that the "*node*" serves a

"small group of homes." *See* '420 patent col. 2 ll. 52-58. Though it is unclear whether the

applicant of the '420 patent specifically disclaimed a "*node*" that is connected to more than a

"small number" of subscribers,[5] the Court need not engage in that inquiry because "[t]he

specification that is relevant to claim construction is the specification of the patent in which the

claims reside." *Young Dental Mfg. Co., Inc. v. Q3 Special Prods., Inc.*, 112 F.3d 1137, 1143

---

[5]In order for statements in a patent's specification to disclaim the scope of the claims, the disclaimer must be clear and apparent. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question."). The language that Verizon relies upon to limit the term "*node*" to communicating with a small number of subscribers arguably falls below this standard.

(Fed. Cir. 1997). Looking to the common specification, the summary of the invention provides that the *"node"* is in communication with "a group" of home interface controllers, but fails to comment on the relative size of the group. Therefore the Court declines to limit the term *"node"* to communicating with only a small group of subscribers. Furthermore, the Court does not adopt ActiveVideo's proposed limitation that the *"node"* communicate with "at least one" subscriber, as a group connotes *more* than one, rather than *at least* one.

Finally, Verizon seeks to impose the additional limitation that the *"node"* store "a substantially identical copy of the data stored at a regional processing center" by relying upon statements made in the specification of and during the prosecution of several parent applications to the patents-in-suit. As previously mentioned, the most relevant specification is the one in which the disputed claim is contained. *See Young Dental Mfg.*, 112 F.3d at 1143. Furthermore, "incorporation by reference does not convert the invention of the incorporated patent into the invention of the host patent." *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1553 (Fed. Cir. 1996). The common specification makes no mention of data stored at the *"node"* nor is this limitation reflected in the asserted claims. Thus, the Court declines to impute this limitation from the specification of the parent application, where the storage feature was specifically claimed, to the asserted claims in this case.

Verizon also argues that the applicant distinguished at least 16 separate prior art references based upon the feature of storage at the *"node"* during the prosecution of U.S. Patent No. 5,093,718 (the "'718 patent"), a parent application to the patents-in-suit. Although the prosecution history of a parent application may be used to disclaim the scope of a child application, disclaimer is not warranted where the claim language that was the subject of the

31

disclaimer in the parent is not present in the child. *See, e.g., Saunders Grp., Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007) ("The fact that the prosecution history relied upon was created in connection with the parent application would be unimportant if the claim language at issue were present in both patent applications."). As in *Saunders*, the claim language in the '718 patent specifically provided for a system that contained the limitation that each *"node"* contain "a complete copy of said video picture information which said subscriber associated with said *node* can display and interact with." '718 patent claim 1. In fact, the abstract of the '718 patent specifically indicates that each *"node"* contains "a substantially identical copy of the interactive video picture information and related data from a regional processing center." Accordingly, "[w]hen the purported disclaimers are directed to specific claim terms that have been omitted or materially altered in subsequent applications (rather than to the invention itself), those disclaimers do not apply." *Saunders Grp.*, 492 F.3d at 1333. In the patents-in-suit, rather than storing the data at the *"node,"* the interactive system is achieved by using an interactive controller or processor, such as the MMC. Furthermore, limiting the *"node"* to storing a copy of the data would be at odds with the requirement that the *"node"* be in communication with the headend in delivering interactive services to the subscriber. Accordingly, the Court finds that the term *"node"* as used in the '883 and '678 patents need not contain a substantially identical copy of data stored at a regional processing center.

Having reviewed the intrinsic evidence, the Court finds that the meaning of *"node"* is clear from the intrinsic record, including the prosecution history referenced by the Parties, and the Court declines to consider any further extrinsic evidence in construing this term. Accordingly, the Court finds that *"node"* means "equipment in a cable distribution network that

facilitates communication between the headend and a group of home interface controllers."

      **6.**    *"individually assignable processors"*

The term *"individually assignable processors"* appears in Claim 5 of the '582 patent. ActiveVideo advocates for the Court to construe the term *"individually assignable processors"* to mean "processors that are capable of being assigned to a home interface controller," while Verizon seeks to have the Court construe the term to mean "a processing unit assigned on a one-to-one basis to a home interface controller." Pre-Hr'g Markman Statement App. A, at 8. As with the term "interactive controller," the primary dispute among the Parties is whether *"individually assignable processors"* must be assigned on a "one-to-one" basis to a particular home interface controller, or whether the they can be assigned to multiple home interface controllers at once. *See* discussion *supra* Part III.B.2.

The '582 patent is unrelated to ActiveVideo's other patents-in-suit and thus, has a different specification from those patents. As always, the Court begins by analyzing the language of the asserted patent claim. Claim 5 of the '582 patent provides, in relevant part: "An interactive cable system comprising: . . . a plurality of *individually assignable processors,* disposed at the headend, in assignable data communication with an assigned home interface controller and in television communication over the network with the subscriber television associated with the assigned home interface controller . . ." As explained *supra* Part III.B.2 above, the claim language does not clearly indicate singular assignment. Similarly, as explained in *supra* Part III.B.3, the Court finds that the plain and ordinary meaning of "assignable" is "capable of being assigned." However, unlike the term "interactive controllers" claimed in the '034 family of patents, the term *"individually assignable processors"* includes the additional modifier

33

"individually." Verizon contends that this term means that the processors must be assigned on an individual basis to one home interface controller, while ActiveVideo argues that the term means that the plurality of *"individually assignable processors"* may be assigned individually to requesting home interface controllers rather than collectively. The Court must therefore look to the remainder of the intrinsic evidence for guidance.

Unlike in the common specification of the '034 family of patents, the '582 patent specification does not specifically disclose an arrangement in which *"individually assignable processors"* may be assigned to more then one home interface controller at once (e.g. the "party-line" embodiment). However, the fact that a particular embodiment was not disclosed does not necessarily preclude the patent claims from including that undisclosed embodiment. *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) ("[The Law] does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention."). Therefore, Verizon argues that the applicant specifically disclaimed assignment to multiple home interface controllers when he distinguished the Blahut prior art reference during prosecution of the '582 patent. During prosecution, the applicant interchanged the term *"individually assignable processors'* for the term "interactive controllers" in several claims of the '582 patent. In distinguishing the function of the processors in Blahut from the claimed *"individually assignable processors,"* the applicant stated: "The application processor [of Blahut] does not correspond to the plurality of *individually assignable processors* of the invention because it is not individually assignable. Rather, it appears that numerous users may be in communication with the application processor receiving interactive programming. There appears to be no suggestion of a processor that can be individually assigned to a

34

subscriber." VanNorman Decl. Ex. 35, at AVNW00002032.

After review of the prosecution history, the Court finds that the applicant clearly disclaimed processors that were not "individually assignable," meaning that the claimed processors are capable of being assigned on a one-to-one basis to a requesting home interface controller. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender."). Accordingly, the Court finds that the intrinsic evidence clearly establishes the meaning of this disputed term and it is therefore unnecessary to consider extrinsic evidence. As outlined above, the Court finds that *"individually assignable processors"* means "processors that are capable of being assigned on a one-to-one basis to a home interface controller."

### 7.   *"common channel"*

The term *"common channel"* appears in Claims 8 and 9 of the '582 patent. ActiveVideo contends that a *"common channel"* is "a single transmission path for carrying television signals," while Verizon alleges that a *"common channel"* is "a single digital channel dedicated for two-way communication between a frame server and subscribers." Pre-Hr'g Markman Statement App. A, at 9. The primary differences between the Parties' separate constructions is whether the *"common channel"* must be digital and whether it requires two-way communication.

Looking first to the claim language, Claims 8 of the '582 patent provides: "The interactive cable system of claim 7 further comprising a *common channel* transmitted throughout said

information service distribution network for carrying the digitally encoded television signals from said frame server."[6] Reading the plain language of the claims, the *"common channel"* appears to be a digital channel as Verizon suggests, since it carries only "digitally encoded television signals." Furthermore, in all other claims where the term *"common channel"* is referenced, it is also used to carry digital signals. *See* '582 patent claims 3, 4. Furthermore, this reading is supported by the patent specification which describes the *"common channel"* as a single "digital channel" used by all subscribers to connect to the frame server. *See* '582 patent col. 7 ll. 29-32. Therefore, the Court finds that a *"common channel"* as described in the '582 patent is a digital channel.

Verizon also contends that the *"common channel"* carries two-way communication between the frame server and subscribers. However, looking to the claim language, the *"common channel"* is required to only carry signals *from* the frame server, but the claim language does not speak to whether the *"common channel"* carries signals from the subscriber to the frame server. The specification further describes the *"common channel"* as transmitting video to the requesting subscriber, but does not indicate that the *"common channel"* also carries requests from the subscriber to the frame server where data is stored. *See* '582 patent col. 7 ll. 32-36. Accordingly, the Court finds that the *"common channel"* is required only to carry television signals from the frame server to subscribers and does not require two-way communication, as Verizon suggests. Furthermore, because intrinsic evidence clearly establishes the meaning of the term *"common channel,"* extrinsic evidence is unnecessary. Thus, the Court

---

[6]Claim 9 of the '582 patent is identical to Claim 8, except that the independent claim referenced is Claim 5 rather than Claim 7.

finds that *"common channel"* is defined as "a single digital channel for carrying television signals from a frame server to subscribers."

### C.     Disputed Terms in Verizon's Patents

#### 1.     *"level 1 gateway"*

The term *"level 1 gateway"* appears in Claim 1 of the '325 patent. Verizon proposes to define *"level 1 gateway"* as "one or more network elements that control network connectivity functions between subscribers and broadband information service providers;" whereas ActiveVideo defines the term as "telephone company equipment for managing a video dial-tone network." Pre-Hr'g Markman Statement App. A, at 4. Verizon's primary dispute regarding ActiveVideo's definition is that the *"level 1 gateway"* is not limited to telephone company equipment in a video dial-tone network, but rather may be adopted to a wide variety of distribution networks.

The Court begins its analysis by examining the claim language. Claim 1 of the '325 patent provides, in relevant part:

> A communication method comprising:
>
> receiving a request for service from a subscriber's terminal at a *level 1 gateway* control element of a broadband communication network;
>
> in response to the request for service, generating menu information listing a plurality of broadband information service providers available through the broadband communication network;
>
> transmitting said menu information from the *level 1 gateway* to the terminal;
>
> visually displaying the menu to the subscriber;
>
> receiving a selection of a service provider listed on the menu at the *level 1 gateway*; . . .

37

The claim language indicates that a *"level 1 gateway"* is equipment in a "broadband communication network," but nothing in the claim language limits the term to a video dial-tone network as ActiveVideo suggests. Accordingly, the Court turns to the patent specification for guidance.

Verizon argues that ActiveVideo seeks to impermissibly limit the construction of the term *"level 1 gateway"* to a particular embodiment in the patent. Specifically, Verizon notes that the Video Dial Tone Network depicted in figure 1 of the '325 patent is only one network in which the *"level 1 gateway"* is useable. *See* '325 patent col. 5 ll. 32-38. ActiveVideo, however, argues that while the patent describes three different networks that incorporate the *"level 1 gateway," see* '325 patent col. 4 ll. 26-30, in actuality each of the different network architectures are actually merely video dial tone networks with enhanced capabilities, *see* '325 patent col. 17 l. 65-col. 18 l. 2. *See also* '325 patent cols. 18-36 (describing the fiber-to-the-curb and hybrid fiber-coax networks). Looking to the patent specification, the abstract describes the *"level 1 gateway"* as "an interactive device in that subscribers can input information and receive display information from the Gateway to define or modify their own video dial tone service through the network." *See Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 965 n.2 (Fed. Cir. 2000) ("[I]n determining the scope of a claim, the abstract of a patent is a potentially useful source of intrinsic evidence as to the meaning of a disputed claim term."). This description indicates that the *"level 1 gateway"* is meant for use in a video dial tone network, rather than any video distribution network as Verizon contends.

Furthermore, the title of the '325 patent is *"Level 1 Gateway for Video Tone Networks."* *See Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (looking to the patent title

to interpret the scope of the claims). The term "video tone network" is not used elsewhere in the

patent; however, the term "video dial tone network" is used throughout to patent specification to

refer to the type of network in which the *"level 1 gateway"* is functioning. *See, e.g.*, '325 patent

col. 3 ll. 32-34 ("The present invention provides a number of the detailed network features

needed to offer a truly effective video dial tone service. In particular the present invention

provides a number of enhanced network functionalities through a gateway node, referred to as the

'*Level 1 Gateway*'."). A "video dial tone network" is merely a network in which telephone

companies are able to deliver video programming from external service providers to subscribers.

Accordingly, the Court finds the patent title's reference to the *"Level 1 Gateway* for Video Tone

Network" instructive in construing the term *"level 1 gateway."* Furthermore, the "other

networks" that Verizon relies upon to support its broader reading of the term *"level 1 gateway"*

merely differ in *how* the services are provided, rather than by the type of company that provides

those services. Finally, the Court is persuaded by ActiveVideo's extrinsic evidence which

indicates that the Federal Communications Commission ("FCC") envisioned the use of a two-

level gateway system for video dial tone networks as early as 1991. *See* Noona Decl. Ex. 23, at

3. Accordingly, the Court determines that *"level 1 gateway"* means "equipment in a video dial

tone network that controls network connectivity functions between subscribers and broadband

information service providers."

   **2.**   *"level 2 gateway"*

   The term *"level 2 gateway"* appears in Claim 1 of the '325 patent. Verizon defines *"level*

*2 gateway"* as "one or more network elements, under the control of a broadband information

service provider, that controls the transmission of broadband information between service

provider servers and subscriber terminals;" while ActiveVideo defines the term to mean "service

provider equipment for managing access to the service provider's media."   Pre-Hr'g Markman

Statement App. A, at 9.  The Parties' separate constructions reflect two primary contentions.

First, the parties dispute the function of the *"level 2 gateway"* as controlling the transmission of

broadband information versus managing access to the service provider's media.  Second, the

parties dispute whether the *"level 2 gateway"* is owned by the service provider or merely

controlled by the service provider. The Court addresses each limitation in turn.

The term *"level 2 gateway"* appears at the end of Claim 1 of the '325 patent cited above,

which provides, "A communication method comprising: . . . controlling the broadband

communication network to establish a broadband communication though the network between a

broadband server operated by the selected service provider and the subscriber's terminal and

signaling communication between the subscriber's terminal and a *level 2 gateway* controlling

operation of the server."  The claim language indicates that the function of the  *"level 2 gateway"*

is to control the operation of the server.  The specification provides more detail on the function of

the *"level 2 gateway,"* indicating that the *"level 2 gateway"* performs a multitude of tasks all

related to facilitating transactions between a broadband information service provider and

subscribers.  For example, the *"level 2 gateway"* can download and transmit menus to

subscribers, perform searches, signal the server to transmit information selected by the

subscriber, and record transactions between the subscriber and the service provider. *See* '325

patent col. 7 ll. 38-55.  Therefore, in construing the term *"level 2 gateway"* in light of the

specification, the Court finds that the function of the *"level 2 gateway"* is to facilitate transactions

between broadband information service providers and subscribers.  This definition encompasses

both "managing access to the service provider's media,"and also "control[ing] the transmission of broadband information between service provider servers and subscriber terminals," as well as the multitude of other services provided by the *"level 2 gateway"* as outlined in the specification. *See Johnson Worldwide Assocs.*, 175 F.3d at 991 ("Varied use of a disputed term in the written description demonstrates the breadth of the term rather than providing a limited definition.")

In determining the relationship between the *"level 2 gateway"* and the information service providers, ActiveVideo looks to the specification to argue that the *"level 2 gateway"* is provided by the information service provider, rather than merely controlled by the provider. A thorough review of the specification indicates that each service provider provides a *"level 2 gateway."* *See, e.g.,* '325 patent col. 10 ll. 37-39; col. 30 ll. 27-32. Furthermore, throughout the patent specification, the service provider references the *"level 2 gateway"* in the possessive tense. *See, e.g.,* '325 patent col. 7 ll. 22-27; col. 10 ll. 48-51; col. 12 ll. 37-39; col. 15 ll. 17-22; col. 24 ll. 20-22. There is no indication that the service provider controls the *"level 2 gateway"* in a configuration where it does not possess or operate the gateway. Therefore, the specification makes clear that the *"level 2 gateway"* is "service provider equipment."

The Court finds that because intrinsic evidence clearly establishes the meaning of the term *"level 2 gateway,"* it need not resort to extrinsic evidence, including the FCC documentation relied upon by ActiveVideo. Accordingly, the Court finds that a *"level 2 gateway"* is "service provider equipment for facilitating transactions between broadband information service providers and subscribers."

### 3.    *"video still image"*

The term *"video still image"* appears in Claim 1 of the '542 patent. Verizon construes

41

this term to mean "an image, at least a portion of which is not in motion." ActiveVideo, on the

other hand, defines *"video still image"* as a "static image for display on a television that is not

part of a full-motion video." Pre-Hr'g Markman Statement App. A, at 9. The primary

disagreement between the Parties' proposed constructions is whether a *"video still image"* may

include some motion.

Claim 1 of the '542 patent provides, in relevant part: "A method of delivering advertising

. . . , said method comprising the steps of: . . . generating an entry for said advertisement in said

menu; communicating to said subscriber unit, said menu in a *video still image*; . . ." The Parties'

dispute primarily surrounds the meaning of the word "still." Verizon argues that "still" means

that at least a portion of the image is not in motion, while ActiveVideo contends that "still"

means static. The Court begins by ascertaining the ordinary meaning of the term "still." *See*

*Laryngeal Mask Co. Ltd. v. Ambu*, 618 F.3d 1367, 1370 (Fed. Cir. 2010) ("The words of a claim

are generally given their ordinary and customary meaning as understood by a person of ordinary

skill in the art in question at the time of the invention when read in the context of the

specification and prosecution history."). The plain and ordinary meaning of the term "still" is

"devoid of movement." Webster's II New College Dictionary 1083. Verizon argues, that

notwithstanding this ordinary meaning, the *"video still image"* described in the '542 patent may

nevertheless contain some motion because the *"video still image"* is an interactive menu by

which subscribers can use a pointer to select the displayed options. '542 patent col. 11 ll. 11-14.

The pointer or selection tool described in the '542 patent specification does not undermine

the plain and ordinary meaning of "still." Just because a pointer or other selection tool is

superimposed onto a still image, does not mean that the still background image is somehow in

motion. The image itself remains stationary while the pointer or other tool is superimposed on top of and moved over the image. Thus, the intrinsic evidence in this case clearly establishes that a "*video still image*" does not have any portion of the image itself which is in motion. Therefore, the Court finds that the plain and ordinary meaning of "*video still image*" is "an image which is not in motion."

### 4.   "*data processing network information*"

The term "*data processing network information*" appears in Claim 13 of the '748 patent. Verizon requests that the Court define "*data processing network information*" as "information from a network that must be transformed for display on a television," whereas ActiveVideo would define the term to mean "a page (e.g., a Web page) for display on a network computer." Pre-Hr'g Markman Statement App. A, at 3. The primary dispute is whether the "*data processing network information*" must be generated externally (i.e. from a network such as the Internet or an Intranet) or whether it can be generated locally.[7]

The Court begins by examining the language of the claims. Claim 13 of the '748 patent provides, in relevant part:

> A method of retrieving and retransmitting *data processing network information* in response to a user selection request, comprising:
>
>     . . .

---

[7]Originally, Verizon interpreted ActiveVideo's proposed construction to limit the "*data processing network information*" to web pages from the Internet only, while excluding information retrieved from a private network, such as the Intranet. During the hearing, both Parties agreed that the "*data processing network information*" could come from the Internet or an Intranet. During the hearing, the Parties also agreed that "*data processing network information*" must be transformed from a network format to a television format, meaning that it could not automatically be displayed on a television. The Court will therefore incorporate these concessions into the definition of "*data processing network information*."

retrieving *data processing network information*, in a network format, corresponding to the user selection request;

transforming the *data processing network information* from the network format having a first interactive element to a television format having a second interactive element; and

transmitting the *data processing network information* in the television format to the television.

The claim language clearly indicates that the *"data processing network information"* must be transformed from a network format to a television format. The Parties do not appear to disagree on this point, though their characterizations of what this transformation means vary.[8] Claim 13 is not, however, clear on whether the *"data processing network information"* must be retrieved externally, from the Internet or an Intranet, or whether it may be generated locally as Verizon suggests.

Looking to the specification, the '748 patent describes the *"data processing network information"* as information retrieved from the Internet; however, the specification makes clear that the invention could be equally applied to other networks such as the Intranet. *See* '748 patent col. 1 l. 66 - col. 2 l. 3. Verizon argues that *"data processing network information"* also includes locally generated information such as menus and administrative information. However, upon examining the patent, although locally generated information may be selected from the menu presented to the user, this information does not constitute *"data processing network information"* because it is sent directly to the requesting user's television and does not require

---

[8]When *"data processing network information"* is in "network format" it is suitable for display on a network computer. Likewise, once the *"data processing network information"* is transformed to "television format" it has been transformed into a format for display on a television.

transformation from a network format to a television format. *Compare* '748 patent col. 5 ll. 47-56, *with* '748 patent col. 5 ll. 57-64. Accordingly, the Court finds that while *"data processing network information"* includes information retrieved from either the Internet or an Intranet, this term excludes locally generated information that does not require transformation from a network format to a television format. Accordingly, the Court finds it unnecessary to consult any extrinsic evidence and defines *"data processing network information* as "information from the Internet or an Intranet that must be transformed from a network format to a television format."

        5.    *"interactive element"*

    The term *"interactive element"* also appears in Claim 13 of the '748 patent. Verizon defines *"interactive element"* as "an element for user selection." On the other hand, ActiveVideo seeks to define *"interactive element"* as "a user-selectable symbol or other visual indicia." Pre-Hr'g Markman Statement App. A, at 5. The parties agree that the *"interactive element"* is an element for user selection, but disagree over whether this element must be visual in nature.

    Claim 13 of the '748 patent as quoted above, recites that data processing network information is transformed "from the network format having a first *interactive element* to a television format having a second *interactive element*." Because the claim language is unclear as to whether an *"interactive element"* must be visual, the Court resorts to the patent specification for clarification. The term *"interactive element"* is not used within the specification; however, the specification does describe the basic process by which the invention is practiced. *See* '748 patent col. 5 ll. 47-64. In general, the user is presented with a menu on his television screen and uses this menu to select information, such as a web page, that he wishes to have displayed. Once

the selection is obtained, the selected web page is translated into an Internet (or Intranet) address

and then processed to transform the web page from a network format to a television format. The

processed web page is then transmitted to the television set for display for the user. Based on

this description and the corresponding drawings, *see* '748 patent figs. 5-6, the first *"interactive*

*element"* described in Claim 13 corresponds to the web page hyperlink which is translated to an

Internet address, while the second *"interactive element"* corresponds to the selection number,

letter, or symbol which corresponds to the displayed hyperlink that the user may select using his

remote control or other device. *See also* '748 patent col. 6 ll. 55-65; col. 7 ll. 15-18.

The specification clearly indicates that while, the first and second *"interactive elements"*

need not both be symbols or other visual indicia (the first *"interactive element"* is a hyperlink),

they must nevertheless be visual since the user must be able to see which hyperlink corresponds

to the selected number, letter, or symbol in order to know what data he is selecting. Furthermore,

during prosecution of the European counterpart to the '748 patent, the applicant indicated that the

first *"interactive element"* was a hyperlink, while the second *"interactive element"* is a number,

letter, symbol, or other selectable visual indicia. *See* Noona Supplemental Decl. Ex. 37, at VZ

VID 040 00021649; *see also Caterpillar Tractor Co. v. Berco, S.P.A.*, 714 F.2d 1110, 1116 (Fed.

Cir. 1983) ("Though no authority is cited for the proposition that instructions to foreign counsel

and a representation to foreign patent offices should be considered, and the varying legal and

procedural requirements for obtaining patent protection in foreign countries might render

consideration of certain types of representations inappropriate, there is ample such authority in

decisions of other courts and when such matters comprise relevant evidence they must be

considered."). Accordingly, the Court finds that the term *"interactive element"* means "a visual

46

element for user selection."

6.     "*multiplex channel associated with the first anchor channel*"

The term "*multiplex channel associated with the first anchor channel*" appears in

Claim 9 of the '214 patent.  Verizon construes this term to mean "a channel associated with the

first anchor channel," while ActiveVideo defines the term as a  "secondary channel of the same

broadcast provider as the Anchor Channel."  Pre-Hr'g Markman Statement App. A, at 5.  The

primary difference between the Parties' constructions concerns what it means to be "associated

with," i.e. whether the phrase "associated with" means that the multiplex channel must originate

from the same broadcast provider as the anchor channel.

Again, the Court begins the claims construction analysis by examining the claim

language.  Claim 9 of the '214 patent provides, in relevant part:

A method of providing channel selection, comprising:

> providing a set of channels;
>
> displaying a first anchor channel from the set of channels when selected;
>
> providing a first indication that the first anchor channel is an anchor channel;
>
> superimposing the first indication over the display of the first anchor channel;
>
> including with the first indication a second indication, wherein the second indication is included when there is at least one *multiplex channel associated with the first anchor channel*;
>
> receiving a first command to select from the second indication a first multiplex channel of the at least one *multiplex channel associated with the first anchor channel*;
>
> displaying the first multiplex channel . . .

Verizon contends that a "*multiplex channel associated with the first anchor channel*" is merely

any channel that is associated with an anchor channel. ActiveVideo, however, argues that this definition does not clarify what it means for one channel to be "associated with" another channel. In order to expand upon this limitation, ActiveVideo urges the Court to look to the specification, which indicates that one channel is "associated with" another channel when the two channels originate from the same broadcast provider.

ActiveVideo first argues that the patentee identified the fact that the prior art channel navigation method fails to allow broadcast providers to maintain channel identity by keeping their multiplexed channels grouped together, as the primary problem addressed by the '214 patent. *See* '214 patent col. 1 ll. 55-59. Furthermore, ActiveVideo relies on the fact the '214 patent specification indicates that one of the objects of the invention was to "provide a channel navigation technique that preserves the existing branding investment broadcast providers have made in channel numbers, while also preserving the current user concept of channel numbers and providing efficient access to multiplexed channels originating from a common broadcast provider." '214 patent col. 2 ll. 34-40. Although, the fact that a patent specification indicates a particular object of the invention, does not necessarily mean that the invention must be limited to practice in a manner that achieves that objective, *see Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1355 (Fed. Cir. 2003) ("Absent a clear disclaimer of particular subject matter, the fact that the inventor may have anticipated that the invention would be used in a particular way does not mean that the scope of the patent is limited to that context."), the claims of the patent must nevertheless be read in light of the specification's "consistent emphasis on [the] fundamental feature of the invention," *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1324 (Fed. Cir. 2008).

In this case, the "Background of the Invention" section of the patent describes the

problems with the prior art as two-fold. First, in the linear channel navigation system, broadcast

providers were unable to maintain channel identity because channels which originated from the

same broadcast provider would not be grouped together due to frequency limitations. Second,

the linear channel navigation system did not permit users to access the multiplex channels in a

straightforward manner. Both of these disadvantages are associated with the fact that channels

from the same broadcast provider are not grouped together when a user navigates through the

available channels. Therefore, the *only* object of the invention identified in the patent

specification is to "provide a channel navigation technique that preserves the existing branding

investment broadcast providers have made in channel numbers, while also preserving the current

user concept of channel numbers and providing efficient access to multiplexed channels

originating from a common broadcast provider." '214 patent col. 2 ll. 34-40. Furthermore,

throughout the specification, the patentee emphasized the feature of providing multiplex channels

together with the anchor channel of the common broadcast provider. *See, e.g.*, '214 patent col. 2

ll. 44-51; col. 2 ll. 61-64 ("The on-screen display includes an anchor channel identifier which

identifies the broadcast provider supplying the currently-selected anchor channel and any

corresponding multiplex channels."); col 3 ll. 37-42 ("The invention provides a two-dimensional

channel selection technique which, through the use of both horizontal and vertical navigation,

preserves broadcast provider investment in branding of channel numbers, while at the same time

preventing the viewer confusion associated with the above-described one-dimensional linear

mapping approach."); *see also Verizon Servs. Corp.*, 503 F.3d at 1308 ("When a patent thus

describes the features of the 'present invention' as a whole, this description limits the scope of

the invention."). Accordingly, the Court finds it appropriate to limit "*multiplex channel associated with the first anchor channel*" as originating from a common broadcast provider as the anchor channel.

Having reviewed the intrinsic evidence and the pleadings of the Parties, the Court finds it unnecessary to resort to extrinsic evidence. Accordingly, the term "*multiplex channel associated with the first anchor channel*" means "a channel originating from a common broadcast provider as the first anchor channel."

## IV. CONCLUSION

For the foregoing reasons, the Court **FINDS** that the disputed terms in ActiveVideo's asserted patents are defined as follows: "*headend*" means "a facility within the television distribution network from which television information services or signals are distributed;" "*interactive controller*" means "equipment for providing information services and for communicating with a home interface controller;" "*assignable television communication*" means "an information service provided via a television information signal capable of being assigned to a home interface controller;" "*interactive session*" means "two-way communication session between devices in a network that is established on a demand basis;" "*node*" means "equipment in a cable distribution network that facilitates communication between the headend and a group of home interface controllers;" "*individually assignable processors*" means "processors that are capable of being assigned on a one-to-one basis to a home interface controller;" and "*common channel*" means "a single digital channel for carrying television signals from a frame server to subscribers."

The Court **FINDS** that the disputed terms in Verizon's asserted patents are defined as

follows: *"level 1 gateway"* means "equipment in a video dial tone network that controls network connectivity functions between subscribers and broadband information service providers;" *"level 2 gateway"* means "service provider equipment for facilitating transactions between broadband information service providers and subscribers;" *"video still image"* means "an image which is not in motion;" *"data processing network information* as "information from the Internet or an Intranet that must be transformed from a network format to a television format;" *"interactive element"* means "a visual element for user selection;" and *"multiplex channel associated with the first anchor channel"* means "a channel originating from a common broadcast provider as the first anchor channel."

The Clerk is **DIRECTED** to mail a copy of this Memorandum Opinion and Order to counsel for the parties.

**IT IS SO ORDERED.**

Raymond A. Jackson
**United States District Judge**

Norfolk, Virginia
April  7  , 2011

51