1          IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF VIRGINIA
2                  Norfolk Division

3

4
- - - - - - - - - - - - - - - - - -
5                                    )
    ACTIVEVIDEO NETWORKS, INC.,      )
6                                    )
            Plaintiff               )
7                                    )    CIVIL ACTION NO.
    v.                               )    2:10cv248
8                                    )
    VERIZON COMMUNICATIONS, INC.,    )
9    et al.,                         )
                                     )
10           Defendants.             )
- - - - - - - - - - - - - - - - - -
11

12

13
                    TRANSCRIPT OF PROCEEDINGS
14

15                     Norfolk, Virginia

16
                       July 14, 2011
17

18             DAY 3, AFTERNOON SESSION

19

20    BEFORE:  THE HONORABLE RAYMOND A. JACKSON
              United States District Judge
21

22

23

24

25

```
 1  APPEARANCES:

 2          MORGAN, LEWIS & BOCKIUS, LLP
            By:  Daniel Johnson, Jr.
 3               Michael J. Lyons
                 Nathan W. McCutheon
 4               Ahren C. Hsu-Hoffman
                 Dion Bregman
 5               Counsel for the Plaintiff
                      And
 6          KAUFMAN & CANOLES
            By:  Stephen E. Noona
 7               Local Counsel for the Plaintiff

 8

 9          SIMPSON THACHER & BARTLETT, LLP
            By:  Henry B. Gutman
                 Patrick King
10               Noah M. Leibowitz
                 John P. Frantz
11                    And
            KELLOGG HUBER HANSON TODD EVANS & FIGEL
12          By:  Michael K. Kellogg
                 Evan T. Leo
13               Counsel for the Defendants
                      And
14          HUNTON & WILLIAMS
            By:  Greg Stillman
15               Justin T. Arbes
                 Local Counsel for the Defendants
16

17

18                    *      *      *

19

20

21

22

23

24

25
```

JODY A. STEWART, Official Court Reporter

```
 1                     I N D E X

 2   PLAINTIFF'S
     WITNESSES                                    PAGE
 3
       GREG BROWN
 4         Cross-Examination By Mr. King          468
       NATALIE REGIS
 5         Direct Examination By Mr. Johnson      482
           Cross-Examination By Mr. King         534
 6     MICHAEL TAYLOR
           Direct Examination By Mr. Johnson     548
 7         Cross-Examination By Mr. King         569

 8

     DEFENDANT'S
 9   WITNESSES                                    PAGE

10     None

11

12                   E X H I B I T S

13
     PLAINTIFF'S
14   NO.            DESCRIPTION                   PAGE

15    290                 Document               494
      344                 Document               496
16    185                 Document               503
      59                  Document               511
17    26                  Document               513
      33                  Document               515
18    342                 Document               523
      341                 Document               525
19    97                  Document               526
      300                 Document               529
20    301                 Document               531
      89                  Document               554
21    23                  Document               558
      91                  Document               562
22

23   DEFENDANT'S
     NO.            DESCRIPTION                   PAGE
24
      566                 Document               542
25
```

```
 1                      AFTERNOON SESSION

 2            (Hearing commenced at 2:29 p.m.)

 3            (Jury in at 2:29 p.m.)

 4            THE COURT:  You may be seated.  The record will

 5   reflect that all jurors are back in the courtroom.  Counsel

 6   agree?  Counsel agree that all jurors are back?

 7            MR. KING:  I do.

 8            MR. JOHNSON:  Agreed, Your Honor.

 9            THE COURT:  You may continue.

10                      CROSS-EXAMINATION

11   BY MR. KING:

12   Q.  Welcome back, Mr. Brown.  Did you have a nice lunch?

13   A.  Yes.

14   Q.  We were talking about your work with Verizon before the

15   lunch break, and I'd like to continue with that, but first,

16   just want to ask a couple of general questions.  ActiveVideo

17   protects its confidential information, doesn't it?

18   A.  Yes.

19   Q.  And it takes steps to protect its confidential

20   information, correct?

21            MR. JOHNSON:  Objection, this is beyond the scope of

22   direct.  The witness was offered as a technical witness

23   specifically transaction --

24            THE COURT:  Sustained.

25            MR. KING:  Well, Your Honor --
```

```
 1              THE COURT:  Sustained.
 2    BY MR. KING:
 3    Q.  You entered a nondisclosure agreement to protect your
 4    confidential information, correct?
 5              MR. JOHNSON:  Same objection, Your Honor.
 6              THE COURT:  Well, that is overruled.  I mean, I
 7    think that to the extent he testified that there was one, and
 8    you can certainly ask about that.
 9    BY MR. KING:
10    Q.  You may answer.
11    A.  Can you repeat the question?
12              THE COURT:  Wait a minute.  Maybe I'm getting my
13    witnesses confused.  Only if this witness testified about the
14    nondisclosure agreement can you question him on it.  You are
15    limited to only the things he raised on direct examination.
16              MR. KING:  Okay.  He did discuss sharing
17    confidential information with Verizon, and I'm just exploring
18    whether or not that supposed -- that testimony is, you know,
19    consistent with their practices.
20              THE COURT:  Well, I'll let you proceed with caution,
21    but I'm going to see how far we go with any confidentiality
22    agreement.  He can testify about the confidentiality
23    agreement.  Continue.
24              MR. KING:  If I may ask the first two questions I
25    asked again, and with -- in light of the fact that it is
```

```
 1   going to be very narrow questions, just the nature of the
 2   protection of their confidential information.
 3              THE COURT:  If he knows.
 4   BY MR. KING:
 5   Q.  ActiveVideo does protect its confidential information,
 6   correct?
 7   A.  Yes.
 8   Q.  And ActiveVideo takes steps to protect its confidential
 9   information?
10   A.  Yes.
11   Q.  And in the relationship with Verizon, ActiveVideo
12   protected its confidential information, correct?
13   A.  Yes.
14   Q.  And you're not familiar with any instances where
15   ActiveVideo provided its proprietary confidential information
16   to a company without a nondisclosure agreement?
17              MR. JOHNSON:  Objection, Your Honor.
18              THE COURT:  Objection sustained.  You can ask him
19   about what he did with Verizon but not any other company.  We
20   are talking about Verizon.
21              MR. KING:  Okay.
22   BY MR. KING:
23   Q.  The client integration with Verizon was a collaborative
24   process?
25   A.  Yes.
```

1    Q.  And one of the reasons it was a collaborative process was

2    because ActiveVideo didn't have the tools in its labs to test

3    the Microsoft tools with Microsoft software?

4    A.  Correct.

5    Q.  So you're describing how Verizon did certain tests of

6    their lab that you weren't privy to, but the test in those

7    labs involved testing the equipment using the Microsoft

8    tools, if you know?

9           MR. JOHNSON:  Lack of foundation.

10          THE COURT:  Overruled.

11          THE WITNESS:  What was the exact question?

12   BY MR. KING:

13   Q.  Let me try it again.  It was one of the reasons they were

14   doing the test in the ActiveVideo labs because ActiveVideo

15   had the tools to test the Microsoft software?

16   A.  You mean the Verizon labs?

17   Q.  I'm sorry.  Is one of the reasons they do the test in the

18   Verizon labs because Verizon had the tools to test the

19   Microsoft software?

20   A.  Yeah.  We didn't have that Microsoft infrastructure in

21   our lab so we went to their lab.

22   Q.  Can we look at Defendant's Exhibit 81, and the same

23   exhibit that was introduced in the direct, and we'd like to

24   publish it to the jury.  If we could -- this is one of the

25   documents you talked about in your direct, do you recall?

1    A.  Yes.

2    Q.  Okay.  And if you take a look at the documents at the

3    bottom, those three documents listed at the bottom.

4    A.  Yes.

5    Q.  The first one was the one you were talking about the

6    attachment that we explored a little bit on your direct; is

7    that right?

8    A.  Yes.

9    Q.  Okay.  And what is the title of that document?

10   A.  ICTV set-top protocol, external.

11   Q.  External what does that mean?  Does that mean that you

12   shared externally with other people?

13   A.  We shared with people that we were going to do a set-top

14   report.

15   Q.  So it was a document that was prepared by ICTV for

16   external distribution?

17   A.  For -- for customers we were going to, we do a client

18   report.

19   Q.  To show that companies outside of ICTV?

20   A.  If they were going to develop the set-top software

21   themselves, we would share this document.

22   Q.  Well, let's take a look at Plaintiff's Exhibit 82.  This

23   is the ICTV set-top protocol, external?

24   A.  Yes.

25   Q.  This is the document we talked about before?

1   A.  Yes.

2   Q.  If you look at the bottom, you'll see across the bottom,

3   it says, "confidential - attorneys' eyes only."  You see

4   that?

5   A.  Yes.

6   Q.  That is not an ActiveVideo designation, is it?

7   A.  I believe that was --

8           MR. JOHNSON:  Your Honor, I object to this line of

9   questioning, it's inappropriate.  He understands the

10  discovery requirements.  He can't ask this witness --

11          THE COURT:  I'll sustain.

12          MR. KING:  The only reason I ask, Your Honor, is I

13  don't want the jury to be confused by the document to think

14  that some of the printing on the document is related to --

15          THE COURT:  Well, and we are not going to be

16  confused with these questions.  This witness has not

17  testified about any of this.  We leave it alone, let somebody

18  else --

19          MR. KING:  Okay.  I can ask it another way, Your

20  Honor.

21          THE COURT:  Not about the "confidential - attorney's

22  eyes only."

23          MR. KING:  Okay.  I can ask it another way.

24  BY MR. KING:

25  Q.  This document that ICTV shared with Verizon was not

1  designated confidential by ICTV, was it?

2          THE COURT:  If you know.

3          THE WITNESS:  I'm not sure.

4  BY MR. KING:

5  Q.  Well, ICTV -- some of the documents ICTV prepared would

6  say confidential on them, wouldn't they?

7  A.  At times, yes.

8  Q.  And proprietary at other times, correct?

9  A.  Yes.

10  Q.  And that's typically at the bottom of the document that

11  it would be a footer saying ICTV confidential or ICTV

12  proprietary, correct?

13  A.  Yes.

14  Q.  And this document doesn't have that?

15  A.  We have the copyright.

16  Q.  Has a copyright.  So if no one could take it and make a

17  copy of it without your permission, but it's not

18  confidential, correct?

19          MR. JOHNSON:  Objection, lack of foundation.

20          THE COURT:  Objection sustained.  Go to another line

21  of examination.  This witness did not dwell on proprietary

22  versus confidential.  Go to another line of inquiry dealing

23  with his technical experience.

24          MR. KING:  Okay.  I'd be happy to.  If we could turn

25  to the page -- page ending in 144 of the document.

1            THE WITNESS:  Yes.

2    BY MR. KING:

3    Q.  And if we could blow up that schematic there, the

4    diagram.  Okay.  So this is one of the diagrams that you

5    talked about quite a bit in your direct, correct?

6    A.  Yes.

7    Q.  We walked through that and you explained what was going

8    on here and how it worked?

9    A.  Yes.

10   Q.  Okay.  So the set-top, that box there on the top left,

11   that is the set-top client of ICTV, correct?

12   A.  That would be the software component talking to the

13   servers, yes.

14   Q.  That's the ICTV software component, correct?

15   A.  Yes.

16   Q.  Is talking to servers?

17   A.  Yes.

18   Q.  Okay.  And the servers are the ICTV BS1 and the ICTV STX,

19   correct?

20   A.  Yes.

21   Q.  Those are ICTV servers?

22   A.  Yes.

23   Q.  This is describing communications between the ICTV client

24   and ICTV servers, correct?

25   A.  Describing how we set up the interactive session, yes.

Brown, G. - Cross                                                    476

1    Q.  And it's describing -- it talks about negotiating

2    requests.  You see that, the third line down?

3    A.  Yes.

4    Q.  You are negotiating a request from the ICTV client and

5    the ICTV server, correct?

6    A.  Um, that's the second message.  The first request for the

7    interactive session is in the first message that goes to the

8    operations manager.

9    Q.  Okay.  And the negotiate accept is again a communication

10   back from ICTV server to the ICTV client, correct?

11   A.  Correct.

12   Q.  Okay.  That doesn't describe communications between the

13   ICTV client and external devices from other third parties?

14   A.  Correct.

15   Q.  Like Verizon servers, this isn't describing

16   communications between the ICTV server, -- the ICTV client

17   and Verizon servers, is it?

18   A.  No.  It shows how to set up an interactive session.

19   Q.  Between and ICTV client and the TV server?

20   A.  Correct.

21   Q.  You talked about the trial in Dallas, and the lab trial

22   in Dallas in your direct, correct?

23   A.  Yes.

24   Q.  Did you complete the client port on the Verizon platform

25   during that lab trial?

1    A.   The plant port was working with the RF distribution with

2    the manual channel change, Yes.

3    Q.   You completed the client report?

4    A.   On the Microsoft platform, yes.

5    Q.   Okay.  Well, I'll -- I won't do that right now.  Um, your

6    work in this project was focused on the client code, correct?

7    A.   Primarily, yes.

8    Q.   You didn't discuss any of Verizon's other technology

9    during this trial?

10   A.   When they showed me that other application they were

11   working on, the photo app, that was about all they mentioned

12   what they were working on.

13   Q.   So they showed you some applications, but you didn't

14   become familiar with the Verizon infrastructure?

15   A.   No.

16   Q.   Are you familiar with the FiOS architecture today?

17   A.   No.

18   Q.   Can we take a look at PX 399, and publish it to the jury.

19   This is another document that plaintiff's used in their

20   opening.

21           MR. JOHNSON:  Exhibit what?

22           MR. KING:  399.

23   BY MR. KING:

24   Q.   Di you recognize this document, Mr. Brown?

25   A.   Yes, from that meeting we had in October 2005.

Brown, G. - Cross                                                478

1    Q.  If we could go -- first, let me ask you a quick question

2    while we are here.

3          Now let's go to the next page, please.  Okay.  Can we

4    turn that so we can see it a little better.  So this is the

5    architecture that you described in your direct, right?

6    A.  Yes.

7    Q.  And this is, you said, I understand, was the FiOS

8    architecture?

9    A.  Well, this was our proposed server placement for their

10   architecture.

11   Q.  Oh, so this isn't the FiOS architecture?

12   A.  In 2005, I don't know if they had FiOS.

13   Q.  Okay.  So this is your proposal to Verizon about the

14   architecture you'd like to build to show off your product?

15   A.  To show them how to use our server placement to deliver

16   the streams over IP to the set-top box.

17   Q.  And Verizon, obviously, wasn't going to prepare a

18   proposal -- well, let me rephrase that.  ICTV prepared this

19   proposal for Verizon?

20   A.  Yeah.  At their request for the meeting to set up for the

21   IP video distribution, we put up this proposed architecture

22   to discuss at that meeting.

23   Q.  And this is the proposed architecture where you showed

24   how they might incorporate the ICTV technology into FiOS,

25   correct?

1    A.   The interactive sessions through the HeadendWare platform

2    on the release they were working on in 2005, which I don't

3    believe was FiOS.  I thought it was IOBI.

4    Q.   Now, this is not FiOS, is it?

5    A.   In 2005, I thought we were -- it mentioned they were --

6    had a different platform.  I don't remember FiOS in 2005.

7    Q.   Yeah.  So to the best of your knowledge, this is not the

8    FiOS platform, is it?

9         THE COURT:  I think he said he wasn't that confident

10   about it, Mr. King.

11        THE WITNESS:  I recall them as IOBI, not FiOS in

12   2005.

13   BY MR. KING:

14   Q.   Okay.  And I believe I heard other witnesses say that

15   IOBI is the same thing as FiOS?  Is that your understanding?

16   A.   I know what they called them in 2005.

17   Q.   Okay.  So this is IOBI, this isn't FiOS?

18   A.   Right.

19   Q.   Okay.  Let's take a look at the book at the VHO section.

20   Now, do you see that DSLAM?

21   A.   The DSLAM, yes.

22   Q.   DSLAM is used for DSL, correct?

23   A.   Yes.

24   Q.   And FiOS doesn't use DSL, does it?

25   A.   I'm not sure.

1    Q.   Okay.  If you can -- let's look at the ATM portion.  It's

2    the -- this is IP and ATM core.  You see that?

3    A.   Yes.

4    Q.   ATM is also used with DSL, correct?

5    A.   I'm not sure.

6    Q.   I just want to clarify one other thing.  During your

7    testimony earlier today you -- you were testifying that you

8    testified about the claims of any of ActiveVideo's patents?

9           MR. JOHNSON:  Objection, lack of foundation.

10          THE COURT:  Objection sustained.  You can ask him

11   questions but it's up to you to recall what he testified to.

12   BY MR. KING:

13   Q.   During your testimony today did you discuss the claims of

14   ActiveVideo's patents?

15   A.   We discussed the products that are a implementation of

16   Leo's ideas.

17   Q.   During your testimony today did you discuss the claims of

18   ActiveVideo's patents?

19          THE COURT:  He asked that question, and the Court's

20   going to answer it for you.  You don't recall whether that

21   was covered on direct examination or not --

22          MR. KING:  I want to clarify whether the witness's

23   understanding was that he was discussing the claims in the

24   patent.

25          THE COURT:  Well, he's answered it.  You have a

Brown, G. - Cross                                                       481

```
 1   question, put it to him.
 2   BY MR. KING:
 3   Q.  I'll try again.  I'll do my best.  During your testimony
 4   earlier today did you -- were you discussing the claims of
 5   the patent?
 6   A.  I don't think we talked specifically about claims.  We
 7   talked about Le's invention and how we deployed that in Santa
 8   Barbara, how we tried to deploy that with Verizon.
 9   Q.  Okay.
10   A.  So it's Leo's invention that we had been deploying all
11   these years in 1996 and before I got there.
12           MR. KING:  No further questions, Your Honor.
13           THE COURT:  Any redirect?
14           MR. JOHNSON:  The witness can be excused, Your
15   Honor.
16           THE COURT:  You may step down.  Now you say excused,
17   may this witness be personally excused or what?
18           MR. KING:  We'd like to recall him in our case, Your
19   Honor.
20           THE COURT:  All right.
21           MR. JOHNSON:  Sure.
22           THE COURT:  He'll be here.  Next witness.
23           MR. KING:  Thank you, Your Honor.
24           (Witness excused.)
25           THE COURT:  Next witness.
```

```
 1            MR. JOHNSON:  Oh, I'm sorry, Your Honor.  At this
 2    time we'd call Ms. Natalie Regis to the stand.
 3            THE COURT:  Mr. Johnson, you may recover that
 4    notebook.
 5            MR. JOHNSON:  Thank you.  May I approach?
 6            (Witness was sworn.)
 7             NATALIE REGIS, called by the Plaintiff, having been
 8    first duly sworn, was examined and testified as follows:
 9                          DIRECT EXAMINATION
10    BY MR. JOHNSON:
11    Q.  Would you state your name for the record, please.
12    A.  Natalie Regis.
13    Q.  Would you do me a favor?  You are going to have to take
14    that Mike and get a lot closer to it or we won't be able to
15    hear you.  Is that okay?
16    A.  Is that better?
17    Q.  I hope so.  Speak up.  Now, Mrs. Regis, for whom are you
18    employed?
19    A.  ActiveVideo Networks.
20    Q.  And how long have you worked with ActiveVideo?
21    A.  I've been with the company for about 11 years now.
22    Q.  And what position are you in?  What is your current
23    position?
24    A.  I work in the business development group as an account
25    manager.
```

1    Q.  And can you explain to the jury what you do as part of

2    the business development group.

3    A.  Right now my role is pre- and post-sales engineer, so I

4    go in, I tell a company how our product works, why they would

5    want to use it within their network.  And then after they

6    have it within their network, I go and make sure that

7    they are using it to its supposed abilities.

8    Q.  Can you give us your educational background.

9    A.  I have a Bachelor's degree in computer science.

10   Q.  And when you started at ICTV, what was your title?

11   A.  I was a field service engineer.

12   Q.  And tell the panel what a field service engineer does.

13   A.  My role when I first started was to support

14   installations, demos.  So I go out to the customer site,

15   install our equipment, and make sure it was working end to

16   end.

17   Q.  And was that your role in 2004?

18   A.  Yes, it was.

19   Q.  And what about 2005?

20   A.  Yes.

21   Q.  Now, did you have occasion to move into the business

22   development group?

23   A.  I did.  In 2006 I moved over.

24   Q.  And what were your duties in the business development

25   group?

```
 1   A.  I, again, support the field guys in their efforts to gain
 2   customers.
 3   Q.  And how would you provide that support?
 4   A.  I'd go in, I would work with customers on the technical
 5   side and explain to them how the system works, make sure they
 6   understood the technology.
 7   Q.  Now, in 2005, were you involved at all with Verizon?
 8   A.  I did.  I supported several demos and a couple of lab
 9   installs.
10   Q.  And when you say you supported a couple of demos, what do
11   you mean?
12   A.  We brought in a rack of equipment, and we would
13   demonstrate the applications on the platform to the folks at
14   Verizon.
15   Q.  All right.
16        THE COURT:  Mrs. Regis, could you slightly turn so
17   your voice will come a little bit out this way in addition to
18   the jury.
19        THE WITNESS:  Sure.
20        THE COURT:  We have get back here also.
21        THE WITNESS:  Sure.
22        THE COURT:  Thank you.
23   BY MR. JOHNSON:
24   Q.  Where was this first demonstration installed or done,
25   excuse me?
```

1  A.  In New York City.

2  Q.  And who was present besides yourself, if you recall?

3  A.  Honestly, I don't.  It was 2005.  It was a long time ago.

4  Q.  All right.  And did you do a second demonstration?

5  A.  I'm sure we did across the years but off the top of my

6  head, I don't have a time frame for a second demo.

7  Q.  Now, did you install a lab system for Verizon in New

8  York?

9  A.  We did.

10  Q.  And can you explain to the jury what a lab system is.

11  A.  It's similar to the Dallas system.  The difference would

12  be that we would integrate with the headend that was within

13  the Verizon network.  So it would be our equipment only in

14  the rack and then we would do integration with the existing

15  Verizon equipment.

16  Q.  And what would that enable Verizon to do?

17  A.  That would allow them to do some basic testing,

18  benchmarking as well as application development.  They'd be

19  able to show off to their executive team any applications

20  they built.

21  Q.  Now, when you say benchmarking, what do you mean?

22  A.  They would just be able to get some data points about how

23  the system worked within their network.

24  Q.  Now, did you -- did there come a time when you installed

25  a system in Dallas?

1   A.  Actually, the Dallas system we installed before New York,

2   about two weeks before.  It was the same exact set of

3   equipment, a rack, again, just our equipment that we tied

4   into the headend that they had in Texas.

5   Q.  And were you involved in both installations?

6   A.  I was.

7   Q.  Okay.  So what was the reason you installed the lab

8   system at Verizon?

9   A.  The first one in Dallas was mainly for set-top box

10  integration.  They were working on their Middleware and

11  integrating it with our set-top box clients.  In New York I

12  believe they had more executive teams that they wanted to

13  give demos to in New York.

14  Q.  Now, in connection with your delivery of these lab

15  systems, did you have installed the HeadendWare software?

16  A.  Yes.  The racks were prebuilt in our offices and then

17  shipped fully ready to be integrated.  So it was a pretty

18  plug and play once we got in place.

19  Q.  And can you explain for us what the HeadendWare

20  architecture was designed to do.

21  A.  Our equipment streams video down to a set-top box.

22  Q.  And able to manipulate that video in any way?

23  A.  There are applications that are specifically written that

24  allow for the video to be rendered within our system, and

25  then delivered down to the set-top box.

1   Q.  And what's the quality of the video that's delivered down

2   to the set-top box?

3   A.  It looks like any other channel.

4   Q.  Was -- did the delivery of this video require processing

5   power, the set-top box?

6   A.  No.  Our set-top box requirements are very slim.  We

7   allow for a session to be started, make sure we get the

8   keystrokes during that session, and then a mixture that when

9   the session ends control is given back to the proper

10  Middleware.

11  Q.  Now, did you have a name for your, the HeadendWare --

12  sorry, the lab system that you delivered to Verizon?

13          MR. KING:  Objection, Your Honor.  Calls for

14  irrelevant testimony.

15          THE COURT:  Overruled.

16          THE WITNESS:  The demo systems were dubbed as

17  Tasmanian devils.  We had three of them in rotation, and we

18  would ship them out in wooden crates, and so when they

19  arrived on the customer's doorstep, it looked like, you know,

20  the Tasmanian devil can swing out at any moment.  It had a

21  door on it, and then the rack was fully enclosed inside on

22  wheels, and we just rolled that out.

23  BY MR. JOHNSON:

24  Q.  Was it connected when it arrived?

25  A.  It was -- the demo systems themselves were always

```
 1   self-contained.  So they would have a cable headend within

 2   them.  The two lab systems that we later delivered to Verizon

 3   did not have this headend equipment.  We would connect into

 4   the Verizon headend systems.

 5   Q.  Did your Tasmanian devil have an operations manager?

 6   A.  It does.

 7   Q.  Explain to the jury what the operations manager does.

 8   A.  The operations manager is essentially the brains behind

 9   the system.  It would -- the set-top box would make the

10   request to the operations manager, and it would then assign

11   another piece of hardware from the system called the STX to

12   that set-top box to create the session that sent the video

13   down.

14   Q.  And what is a session processor?

15   A.  It is also known as an STX, but it is what creates the

16   video stream.

17   Q.  And does the set-top box talk to the STX?

18   A.  Yes, directly once the operations manager has connected

19   the two.

20   Q.  Okay.  And how does this connection take place?

21   A.  It's an assignment.  It's kind of a round robin, a lured

22   balance from the operations manager.

23   Q.  And what type of video setting is sent once a session has

24   been created?

25   A.  It's MPEG video, and it would be of whatever application
```

1    the session had been requesting.

2    Q.  Now, once you gave the -- your lab systems to Verizon,

3    what were they capable of doing with it, if you know?

4    A.  When I would leave the customer site, I would always make

5    sure that someone on site had access to the servers, knew how

6    to start and stop the process, anything that, you know, in

7    general day-to-day operations they might need to do, you

8    know, set up the session, put together applications, all

9    those things would be able to be done once the system was

10   delivered.

11   Q.  Was the system password protected?

12   A.  It was.

13   Q.  And did you give the password to somebody at Verizon?

14   A.  Yes.

15   Q.  Do you recall that person's name?

16   A.  In Dallas it was Brian Woodworth, I believe was his name.

17   In New York I believe I was working with Prabhakar.

18   Q.  Now, once the Verizon folks had the password, what would

19   that enable them to do?

20           THE COURT:  In New York you believe working with

21   whom?

22           THE WITNESS:  Prabhakar Mani.

23           THE COURT:  Prabhakar Mani?

24           MR. JOHNSON:  That is his name.  Prabhakar is hist

25   first and Mani is the second.

```
 1              THE COURT:  Okay.  Go on.
 2   BY MR. JOHNSON:
 3   Q.  Okay.
 4   A.  Again, once you're on the system, you're able to go in
 5   and stop and start the system, add any applications, handful
 6   of settings that I would teach folks to use if they needed
 7   to.
 8   Q.  Okay.  If you will, I'd like you to turn to Exhibit 323.
 9   A.  Okay.
10   Q.  And I'd like you to look at the second page, there is a
11   diagram on it, and let's publish that to the jury.  Do you
12   have the diagram in front of you?
13   A.  Yes.
14   Q.  And can you explain to us what this diagram shows?
15   A.  This would be the -- just the generic networking diagram
16   of the two lab installs in Dallas and New York.
17   Q.  And you were telling us about some of the equipment that
18   was installed there.  If you look on the right-hand side, it
19   says HeadendWare STX session processor.  Was that the STX you
20   just told us about?
21   A.  Yes.
22   Q.  Was that in the rack?
23   A.  Yes.
24   Q.  And the next one is a DigiMux?
25   A.  Yes.
```

1    Q.   And was that in the rack?

2    A.   Yes, it was.

3    Q.   Tell us what a DigiMux is.

4    A.   It actually takes the IP video from the STX and converts

5    it to QAM down to the set-top box.

6    Q.   And the next block is the HeadendWare operations manager.

7    Can you tell us, is this the operations manager you referred

8    to earlier?

9    A.   Yes, the brains of the system.

10   Q.   And it was part of the rack?

11   A.   Yes.

12   Q.   And next is something recalled RADD?

13   A.   That's a RADD, and it is a piece of Motorola equipment as

14   is the DAC6000, the KLS and the OM1000.

15   Q.   And what were they used for?

16   A.   They were all part of the Verizon infrastructure to

17   deliver television down to the set-top box.

18   Q.   So the rack you delivered to New York had -- was

19   configured with STX, the DigiMux and the operations manager

20   along with the other items highlighted?

21   A.   Again, our rack only contained the first three items.

22   The other three were existing Verizon infrastructure items.

23   Q.   Now, how long had you been delivering racks to customers

24   at the time you were responsible for installing racks for

25   Verizon?

1   A.  My first demo was about a month after I started.  So

2   since late 2000.

3   Q.  All right.  Prior to Verizon were there ever any

4   instances where you delivered more than one lab system?

5   A.  Not to my recollection.

6   Q.  Now, did you have an expectation as to how long Verizon

7   would keep the lab system?

8   A.  I didn't personally.

9   Q.  Did you have a -- did it come to your attention that

10  Verizon wanted to relocate the lab system to another

11  facility?

12  A.  I did get an e-mail from someone I had worked with in the

13  New York offices, and they'd asked for some power and some

14  other logistical items about the rack because they were

15  planning on moving it to New York.  I replied with an e-mail

16  asking if they needed help reinstalling it and bringing it

17  back up and online, and we didn't hear back from them.

18  Q.  Between the time -- when did you install these racks, the

19  rack in New York first, the month?

20  A.  April of 2005.

21  Q.  Now, between April of 2005 and January of 2006, did

22  anyone from Verizon ask you to pick up the rack?

23  A.  No.

24  Q.  Did you make any attempts to upgrade the rack?

25          MR. KING:  Objection, Your Honor, leading the

1   witness.

2           MR. JOHNSON:  Did you make any attempt?

3           THE COURT:  Objection overruled.

4           THE WITNESS:  We were engaged with the products

5   group in late 2005 and early 2006, and they were asking to

6   see a demo.  We reminded them that they actually had two

7   systems in their possession, and that if we could get in and

8   access the system that had been -- that we had been told had

9   been moved to New Jersey, that we would be happy to upgrade

10  it with our latest software and our latest and greatest

11  applications and give them a demo in their own, you know,

12  backyard.

13  BY MR. JOHNSON:

14  Q.  And if you will, let's first show you Exhibit 290.  Do

15  you have Exhibit 290 in front of you?

16  A.  I do.

17  Q.  Can you tell us what this refers to?

18  A.  This is the e-mail between Mary Harrington from Verizon

19  and myself where she asks me about the rack and how much

20  electricity it will need once they move it to their Basking

21  Ridge facility.

22  Q.  And is this the e-mail you used to respond on January 5,

23  2006?

24  A.  Yes.

25  Q.  Did you prepare this e-mail in your regular course of

1   business?

2   A.  Yes.

3   Q.  And does it appear to be accurate, as you sit here today?

4   A.  Yes.  I just -- I asked if I -- you know, if she needed

5   any help with the move, were they planning on bringing it

6   back up themselves.  Well, again, I had given them some basic

7   directions on how to power things down and power things up,

8   so I knew they had that capability.  But, you know, I sent

9   off our network operations group information and just made

10  sure they knew how to contact us if they didn't -- didn't

11  indeed need any help setting it up again.

12           MR. JOHNSON:  Your Honor, at this time I move 290

13  into evidence.

14           THE COURT:  Any objection?

15           MR. KING:  No objection, Your Honor.

16           THE COURT:  Be admitted.

17           (The document was received in evidence and marked as

18  Plaintiff's Exhibit No. 290.)

19  BY MR. JOHNSON:

20  Q.  Now, would you go to Plaintiff's 291.  Oh, I'm sorry.  I

21  meant to say 344.

22           THE COURT:  Mr. Johnson, do you have a notebook of

23  all the exhibits you are planning to use, another notebook?

24           MR. JOHNSON:  Yes, we do, Your Honor.

25           THE COURT:  I think it would assist the Court to

1   stop pulling these books again.

2          MR. JOHNSON:  All right.

3          THE COURT:  Okay.

4   BY MR. JOHNSON:

5   Q.  Okay.  Tell us what Exhibit 344 is, Mrs. Regis.

6   A.  344 is an e-mail chain between myself, Maitreyi from

7   Verizon and Bob Beyer from ActiveVideo, as well as Brent

8   Simon was added at the end from Verizon.

9   Q.  And what were you attempting to communicate with this

10  series of e-mails?

11  A.  We'd been given Maitreyi name by Brent Simon who wanted

12  to see this demo, and I reached out to her to see if I could

13  get into the Basking Ridge facility and actually update the

14  equipment.  She did not reply to me so about a week later,

15  Bob Beyer, who is the account rep for Verizon at the time,

16  reached out to her, as well, reiterating that we would really

17  like to get in and take a look at the system and upgrade it

18  and threw out a couple of suggested dates as we were quite

19  busy in 2006.

20         And we got a reply saying that they were unsure that

21  they would be able to support us on that date for an upgrade.

22  Q.  Did you prepare this e-mail string in the regular course

23  of business?

24  A.  I did.

25  Q.  And as you sit here today, does it appear to be accurate?

1    A.  Yes.

2            MR. JOHNSON:  Your Honor, I would move PX 344 into

3    evidence.

4            MR. KING:  No objection, Your Honor.

5            THE COURT:  Be admitted.

6            (The document was received in evidence and marked as

7    Plaintiff's Exhibit No. 344.)

8    BY MR. JOHNSON:

9    Q.  If you will, let's publish 344.  And let's go to the

10   e-mail at the bottom of the first page, that says from

11   Ms. Regis, addressed to Mr. Beyer.  It states, "I was given

12   your name and e-mail address by my colleague, Bob Beyer."

13           Between the installation in '05 and June of '06, did

14   anyone -- had you been able to communicate with folks at

15   Verizon about what was happening with this particular lab

16   system?

17   A.  Again, we were very busy in that time frame.  I didn't

18   personally reach out to look for the system.

19   Q.  All right.  So when you reached out, you indicated, as I

20   read this, that you wanted to upgrade the software?

21   A.  Yes.

22   Q.  And why did you want to do that?

23   A.  We had a new release, and it had a bunch of new hip

24   pieces of software that we wanted to make sure we were

25   showing our system to the best of our ability.

1   Q.  And what was that new release called?

2   A.  I believe in 2006 it would have been ActiveVideo.

3   Q.  It was called ActiveVideo?  Was it ActiveVideo Network?

4   A.  No.  That was just the ActiveVideo platform.

5   Q.  Okay.  And what was new and different about this

6   platform, if you know?

7   A.  We had addressed some scaleability questions.  We had

8   addressed a lot of just improvements to the overall system.

9   Q.  Now, you got a response from Mr. Krishnaswamy on June

10  13th.  Let's highlight that, part of the e-mail stream, at

11  the top.  Did Mr. Krishnaswamy ever get back to you to let

12  you know when you could come in and do this upgrade?

13  A.  Maitreyi is a woman and I don't recall ever getting a

14  response.  We never did get to upgrade that system.

15  Q.  So between 2005 and when it was returned, it was never

16  upgraded?

17  A.  No.

18  Q.  Now, you said there was another rack in Texas?

19  A.  Yes.

20  Q.  Now, was that still in Texas at the time?

21  A.  Yes.

22  Q.  And was that rack upgraded?

23  A.  No.

24  Q.  Now, did you ask to have the rack in New Jersey returned?

25  A.  We did not.

1    Q.  Did -- if you will, let's take a look at Exhibit 185.

2           MR. KING:  Objection, Your Honor.  This exhibit was

3    the subject of discussions in chambers and --

4           THE COURT:  Let me look at 185, first.

5           All right.  I'm not sure I can rule on your

6    objection yet because I don't know exactly what he is getting

7    ready to ask, Mr. King.  I understand what the subject he is

8    but I'm not sure exactly what he's getting ready to ask.

9           MR. KING:  Okay.  If you'd like, I'd like to have a

10   side bar to discuss it.

11          MR. JOHNSON:  Can I lay a foundation first?

12          THE COURT:  Let me find out before you lay the

13   foundation.  It is mid-afternoon.  I'm sure everybody could

14   stand a little stretch in place.  You can stand up, ladies

15   and gentlemen.

16          (Side-bar conference.)

17          THE COURT:  You all mentioned the changes you have.

18   I don't want them before the jury.  I don't want them on the

19   record.

20          Okay.  Now, what's the objection, Mr. King?  Step

21   right here.

22          MR. KING:  Judge, there are two objections.  The

23   first objection is the occupancy.  This is a document that

24   was a picture taken by an ActiveVideo employee who's

25   currently an employee, and he only produced for litigation a

1  grainy black and white copy of it.  And now two days ago, he

2  produced a color picture with a declaration from the

3  currently employee saying I took the picture, I can verify

4  this.

5          Now, if that guy took the picture and is an employee

6  and wants to verify, he'd like to see this document, he

7  should be here on the stand.  We should have had a chance to

8  depose him before.  It shouldn't be sprung on us at the last

9  minute.  That is my first objection.

10         THE COURT:  Let me see what the picture is.

11         MR. KING:  The second objection is 103, the document

12 is extremely inflammatory.  We tore this apart, and we

13 dropped it.  There is no evidence, and I think Mr. Johnson

14 will have to confirm, we've got no evidence that this is the

15 condition of the rack when it was shipped across country.

16         THE COURT:  Okay.  Let me see.  Where are you going

17 with this?

18         MR. JOHNSON:  If I might.

19         THE COURT:  Yes, sir.  I want to find out what you

20 are accusing me of dropping.  I don't know where he is going.

21 Where are you going with this?

22         MR. JOHNSON:  The rack was returned unexpectedly.

23 The picture was taken and provided to Mrs. Regis on the day

24 it happened, and she will testify this was the e-mail she

25 received showing this rack.  And then she will testify that

```
 1   the rack --

 2           THE COURT:  Do me a favor.  Hold it.  Don't address

 3   remarks to each other.  Always to me.  Even if you disagree

 4   with what is being said, talk to me, all right.

 5           MR. JOHNSON:  Now, the document is clearly relevant.

 6   It clearly comes in as a business record.  It was

 7   communicated to my client.

 8           THE COURT:  So what else did she say about the rack?

 9           MR. JOHNSON:  She can only say --

10           THE COURT:  She will say the rack was returned?

11           MR. JOHNSON:  The rack was turned, and this was the

12   condition it was in at the time.

13           THE COURT:  Okay.  So.

14           MR. JOHNSON:  She's not going to testify about

15   what --

16           THE COURT:  Anybody drop it?

17           MR. JOHNSON:  No, she can't testify to that.

18           THE COURT:  Okay.  Fine.  Look here.  I'm going to

19   let him proceed.  It's not worth quibbling about.  Objection

20   is overruled, and that is all we are going to be getting on

21   this document.

22           MR. JOHNSON:  That is fine.  The only reason that we

23   had a colored picture because it is cleaner.

24           THE COURT:  Well, I'm not concerned about that.

25   That black and white is clear to me.  So I don't know about
```

```
 1    the color.  Just move on.
 2           Now, let me tell you something, gentlemen.  I am
 3    reaching the end of my tolerance with you all scrapping with
 4    each other in this case.  Now, you are going to have to cut
 5    it out.  You've got two and a half weeks to go, and you just
 6    have to cut it out, simple as that.
 7           Now, move on.  Let's go.
 8           (End of side-bar conference.)
 9    BY MR. JOHNSON:
10    Q.  Before we move on, can we put up 344.  Do you have that
11    in front of you?
12    A.  Almost.  Yes.
13    Q.  Now, you see it bears the date is June 13, 2006?
14    A.  Yes.
15    Q.  And in this e-mail from Mr. Beyer, were you provided a
16    copy?
17    A.  Yes, I was on the e-mail chain.
18    Q.  Okay.  So did you participate in the decision -- strike
19    that.  Looking at this e-mail, there is a reference to
20    additional requests to have the lab system upgraded?
21    A.  Yes.
22    Q.  And was that responded to?
23    A.  I know that Brent -- it is actually Simon -- had
24    requested the demo and had given us Maitreyi's name in order
25    to upgrade the system.  I believe there were several other
```

1   e-mails back and forth between Bob and Brent in order to try

2   and resolve access to the system to upgrade it.

3   Q.  Now, if you will, let's go to Exhibit 185.  Do you have

4   that document in front of you?

5   A.  Yes.

6   Q.  And did you receive this document from a Craig Kugler on

7   or about November 14, 2006?

8   A.  Yes.

9   Q.  And who is Mr. Kugler?

10  A.  He was the SPV of customer service and operations.

11  Q.  And explain to the jury what the SPV of customer service

12  does.

13  A.  The -- I'm sorry, the senior vice-president was

14  overseeing the operations group as well as the customer

15  service group.  So as we had customers, he would make sure

16  that he was following the customer service protocols.

17  Q.  And was there anything that accompanied this particular

18  exhibit, this particular e-mail?

19  A.  Yes.  There are two pictures.

20  Q.  And did you review the e-mail on or about November 14,

21  2006 in the regular course of your business?

22  A.  Yes.

23  Q.  And is this e-mail accurate to the best of your

24  knowledge?

25  A.  Yes.

1    Q.  And the pictures that are shown, are those pictures the

2    same that you saw on or about November 16, 2006?

3    A.  Yes.

4    Q.  And are they accurate to the best of your knowledge?

5    A.  Yes.

6           MR. JOHNSON:  At this time, Your Honor, I would move

7    into evidence Exhibit 185.

8           THE COURT:  The document will be admitted.  The

9    Court's already had a bench conference on the document.  Any

10   objection is noted.

11          MR. KING:  Thank you.

12          (The document was received in evidence and marked as

13   Plaintiff's Exhibit No. 185.)

14   BY MR. JOHNSON:

15   Q.  All right.  Let's start with the first page.  And blow it

16   up.  Did you receive this information from Mr. Kugler?  It

17   says, "By the way, this is what we got back from Verizon.

18   Nice packing job"?

19   A.  Yes.

20   Q.  And let's show them the first picture.  Was that the

21   picture of the rack that was returned?

22   A.  Yes.

23   Q.  Let's show the second picture.  Who is the gentleman

24   standing in the picture, if you know?

25   A.  That is Bill Gerlack.  He was shipping and receiving at

1    the time.

2    Q.  And now before we leave, this crate, was this the

3    Tasmanian devil crates you were telling us about?

4    A.  Yes.

5    Q.  And was this a condition that the crate was in when you

6    left it?

7    A.  The crate, yes; the rack, no.  The rack is a bit in

8    disarray compared to when I left it in New York.

9    Q.  All right.  Let's move on.  Talk about the Texas rack.

10   Did you ever get that one back?

11   A.  We did eventually get that one back.

12   Q.  And did you have to make a request to try to get it back?

13   A.  We did.  We had started working with yet another group in

14   Massachusetts, and, again, they were asking for equipment

15   within their lab, and we reminded them that we were without

16   one of our systems that was still in Dallas and we'd asked

17   for some help to retrieve it.

18   Q.  And what year was this?

19   A.  This would have been 2007.

20   Q.  And were you able to find out where the rack was?

21   A.  I was.  I had asked for some names and numbers of the

22   folks that we had worked with previously, and as soon as I

23   sent an e-mail out, I got a reply and we got the rack back

24   shortly thereafter.

25   Q.  Let's take a look at Exhibit 186.  Do you have that

1    document in front of you?

2    A.   I do.

3    Q.   And did you receive this document in the regular course

4    of your business on or about December 5, 2007?

5    A.   Yes.

6    Q.   And --

7         THE COURT:  Mr. Johnson, she just testified that she

8    waited to get the information code, she waited to get the

9    rack back.  What is the necessity for wanting these?

10        MR. JOHNSON:  Well, the necessity for wanting these

11   is because it shows the additional effort she had to

12   undertake.

13        THE COURT:  She testified to that, just testified to

14   that.  She just testified.

15        MR. JOHNSON:  It took additional efforts but the

16   efforts I would like to establish were more than just normal.

17        THE COURT:  Well, the Court's ruled she just

18   testified to it.  Next question.  The Court is not admitting

19   186.  That is all.  So we can go right on to what happened

20   next.

21   BY MR. JOHNSON:

22   Q.   Did Mr. -- do you know who Mr. Paschetto is?

23   A.   Jim Paschetto was the engineer I was working with out of

24   Massachusetts.

25   Q.   And was he the person you contacted about getting the

```
 1   rack back?
 2   A.   Yes.
 3   Q.   And did he identify who had the racks?
 4   A.   He identified a handful of folks that I had worked with
 5   previously and refreshed my inbox with their names, e-mails
 6   and phone numbers.
 7   Q.   And who were they?
 8   A.   It was Prabhakar Mani, who we talked about, Enrique
 9   Velasco, terrible with names, Kiran and Shafiq.
10   Q.   Now, how did he communicate those names to you?
11   A.   He sent me an e-mail.
12   Q.   And was it from the e-mail account of Verizon?
13   A.   No.  He actually sent me an e-mail from his personal
14   account.
15   Q.   Had you ever received such an e-mail from Mr. Paschetto
16   from his personal account concerning business information?
17   A.   No, I had not.
18            MR. KING:  Objection, Your Honor.
19            MR. JOHNSON:  What's the objection?
20            MR. KING:  Relevance.
21            THE COURT:  The Court is going to overrule the
22   objection because I know we are going to move on.  You've got
23   the e-mail with the names of people she can contact.  Let's
24   move on to what happened next.
25   BY MR. JOHNSON:
```

1   Q.  Now, did they return the rack after you got this e-mail

2   from Mr. Paschetto?

3   A.  Yes.  I sent an e-mail to those four folks I just

4   mentioned and Enrique replied, and we received the rack

5   shortly thereafter.

6   Q.  Now, what date was this?

7   A.  It was sometime in December of 2007.

8   Q.  Now, this is the same rack that you delivered in 2005?

9   A.  In April 2005, yes.

10  Q.  Now, in your work as the technical consultant, had you

11  had any other situations where a client had kept your product

12  or kept your racks for almost three years?

13  A.  Not to my recollection.

14  Q.  Now, if you will, are you familiar with the AV platform?

15  A.  The ActiveVideo platform?

16  Q.  Yes.

17  A.  Yes.

18  Q.  And what does it enable one to do?

19  A.  It is similar to the HeadendWare platform.  It allows for

20  applications to be built and delivered from the headend down

21  to the set-top box as a video stream.

22  Q.  And if you will, go to DX, that is Defendant's 0858.  Do

23  you have that in front of you?

24  A.  Yes.

25  Q.  And tell us what it is.

1   A.  This is some stream captures of an application that

2   Cablevision wrote called Optimum Autos for the platform they

3   have deployed in New York.

4   Q.  And what does this screen capture shows?

5   A.  It shows an application that essentially allows for

6   classifieds for you to take a look at different cars, new and

7   used, compare those, allows you to do all this using your

8   remote on the television.

9        MR. JOHNSON:  Now, at this time we would move DX 858

10  into evidence.

11       MR. KING:  Objection, Your Honor, hearsay.

12       MR. JOHNSON:  It's the defendant's exhibit.

13       MR. KING:  I made my objection.

14       THE COURT:  First of all, the notebook you gave does

15  not have an 858 in it.  So you're going to have to pull it.

16       Okay.  Let me see if I can pull Defendant's 858,

17  take a look at it.

18       MR. KING:  Your Honor, I withdraw my objection.

19       MR. JOHNSON:  Your Honor, I believe it is the first

20  document in your binder.

21       THE COURT:  Oh, okay.  I was looking chronological.

22  These are blanks.

23       MR. KING:  I made the same mistake.

24       MR. JOHNSON:  It is easy to get confused here.

25       THE COURT:  All right.  Objection withdrawn, let's

JODY A. STEWART, Official Court Reporter

1    move on here.
2            MR. JOHNSON:  All right.  Now, this screen shot, can
3    you publish it first?
4            THE COURT:  You may.
5    BY MR. JOHNSON:
6    Q.  I see in the middle there's a picture of a truck.  It
7    says 2011 Ford F-150.  Is that a picture, is that a moving
8    picture or a still.
9    A.  I believe it is a movie playing with it or a video
10   playing within the window.
11   Q.  Okay.  And above it you see certain tabs, my auto, video,
12   find a card, et cetera?
13   A.  Yes.
14   Q.  And what do those tabs do, if you know?
15   A.  Again, you can navigate to them with remotes and choose
16   the different options right on your television.
17   Q.  Is this what is known as an app?
18   A.  Yes.  This is an application.
19   Q.  Now, I'd like you to turn to PX 59.  And can you tell us
20   what this?
21   A.  This is another application.  This is HSN interactive
22   shopping application.
23   Q.  And when you say HSN interactive shopping, what do you
24   mean?
25   A.  HSN, the Home Shopping Network on television, has a --

1    built an application for the platform that allows you to

2    actually buy with your remote on the television.

3    Q.  And is this a slide presentation that was prepared in the

4    ordinary course of business?

5    A.  Yes.

6    Q.  And are you familiar with it?

7    A.  Yes.

8    Q.  And does it appear to be accurate, to the best of your

9    knowledge?

10   A.  Yes.

11   Q.  And was it prepared in or about 2008?

12   A.  Sounds about right.

13        MR. JOHNSON:  We would move Exhibit 059 into

14   evidence, Your Honor.

15        MR. KING:  Objection, Your Honor.  It's hearsay and

16   obviously not proper business record.  It's specific event,

17   specific presentations, doesn't fall into the category of

18   business record.  To the extent he is offering it for the

19   truth of the matter asserted, we object.

20        THE COURT:  Well, several foundation questions you

21   have to satisfy to get it in, and I think he satisfied them.

22   When did she prepare them?  Let the Court find out.

23        Do you know where this document was prepared, Mrs.

24   Regis?

25        THE WITNESS:  Where it was prepared?

```
 1              THE COURT:  Yeah.
 2              THE WITNESS:  Our marketing department, I believe,
 3    prepared this.
 4              THE COURT:  And was it maintained by your marketing
 5    department?
 6              THE WITNESS:  I believe so.
 7              THE COURT:  Objection overruled.  Be admitted.
 8              (The document was received in evidence and marked as
 9    Plaintiff's Exhibit No. 59.)
10    BY MR. JOHNSON:
11    Q.  May we publish Page 2.  Let's go to the next page,
12    please.  All right, Mrs. Regis, can you explain to the jury
13    what's shown here?
14    A.  This is the home page of the HSN application.  Again, it
15    allows you to look at the featured product as well as what's
16    currently on television, and you can go deep into their
17    catalog, as well, under their different categories.  Pretty
18    similar to what their website offers today.
19    Q.  And did you -- did ActiveVideo develop a tool to build
20    applications such as this?
21    A.  We do.  We have what we call are aids to look at or
22    ActiveVideo editor to look at.  It allows you to essentially
23    drag and drop where you would like the videos and the buttons
24    and all of the images to be --
25    Q.  And did you give this AV tool kit to Verizon?
```

```
 1   A.  I did.  I shared it with Jim Paschetto and the group of

 2   people he was working with out of Massachusetts.

 3   Q.  And did -- when did you give this tool kit to

 4   Mr. Paschetto?

 5   A.  Sometime in 2007, I would guess.

 6   Q.  If you will, let's look at PX 26.  Can you tell us what

 7   PX 26 is?

 8   A.  It's an e-mail exchange between Jim Paschetto and I.  He

 9   had been working on building out some applications, one of

10   which was a mosaic application, and he wanted some video

11   clips in order to populate his application.  So we had

12   rendered some in what we call stitchable MPEG and delivered

13   to him for use in an application.

14   Q.  And this is July 27th, 2007?

15   A.  Yes.

16   Q.  And this was an e-mail from him to you?

17   A.  It was actually from me to him first and then he replied.

18   Q.  And is this document accurate, to the best of your

19   knowledge?

20   A.  Yes.

21   Q.  And was it prepared in the ordinary course of business?

22   A.  Yes.

23          MR. JOHNSON:  Your Honor, I would move into evidence

24   PX 26.

25          THE COURT:  Any objection?
```

Regis, N.- Direct                                                          513

```
1              MR. KING:  No objection, Your Honor.

2              THE COURT:  Exhibit 26 is admitted.

3              MR. JOHNSON:  Like to publish it to the jury, Your

4    Honor.

5              (The document was received in evidence and marked as

6    Plaintiff's Exhibit No. 26.)

7    BY MR. JOHNSON:

8    Q.  Okay.  In July had you been requested -- did

9    Mr. Paschetto make any requests regarding use of this AV

10   tool?

11   A.  Again, he'd started using it and started building

12   applications, and he'd asked us for some video clips to use

13   to populate some of his applications.

14   Q.  Now, did he offer any explanation why in July of 2007 he

15   wanted to work with your AVE tool?

16             MR. KING:  Objection, Your Honor, calls for hearsay.

17             THE COURT:  Sustained.  Sustained.

18   BY MR. JOHNSON:

19   Q.  Okay.  Did you have an understanding why he wanted to use

20   the tool?

21   A.  Um --

22             MR. KING:  Objection, Your Honor.  Same objection.

23             THE COURT:  Well, I'll permit her to -- she can

24   testify knowledgeable why you want it without telling us what

25   he said.  And the Court will permit the documents to come in,
```

```
 1    but we get into -- I'm not going to explain this.  This was
 2    hearsay.  That's why I sustained it.  Now, she can testify to
 3    the reason he wanted it, her understanding of what they were
 4    going to do with it, permit that, but that's overruled.
 5              MR. JOHNSON:  That is what I asked.
 6    BY MR. JOHNSON:
 7    Q.  Did you have an understanding?
 8    A.  Yes.  He and his team were looking to build applications
 9    and work together with us to bring some of these new
10    applications to their subscribers.
11    Q.  If you will go to PX 33.  Do you have that in front of
12    you?
13    A.  I do now.
14    Q.  And I see there's an e-mail dated August 6, 2007 from you
15    to NOC.  Who is NOC?
16    A.  It was our network operations center.
17    Q.  And did you prepare this e-mail on or about the date it
18    bears?
19    A.  Yes.
20    Q.  And is it accurate, to your knowledge?
21    A.  Yes.
22    Q.  And was it done in the regular course of business?
23    A.  Yes.
24    Q.  And the top there's an e-mail from Mr. Chuck Stobing?
25    A.  Yes.
```

1    Q.  And who is he?

2    A.  He was our network manager at the time.

3          MR. JOHNSON:  Your Honor, at this time I would move

4    in PX 33.

5          THE COURT:  Any objection?

6          MR. KING:  No objection, Your Honor.

7          THE COURT:  Be admitted.

8          (The document was received in evidence and marked as

9    Plaintiff's Exhibit No. 33.)

10   BY MR. JOHNSON:

11   Q.  This document says that, "The development team at Verizon

12   is starting to develop some applications using the AVE tool

13   set.  They would like to demonstrate to their executive team

14   what they are building sometime later this month.  They were

15   curious if they could ship us their application and have us

16   run it on a system in house that they can connect to using a

17   sling box.  Is this something we can -- we plan to support?

18   I know it has been suggested in other meetings as an option,

19   but I'm not sure where the project stands today."

20         Who communicated with you Verizon's request to use

21   your AVE tool to demonstrate as to their executives?

22   A.  That was Jim Paschetto.

23   Q.  Now, as of this date, was there a mutual nondisclosure

24   agreement in place with Verizon?

25   A.  I don't believe so.

1   Q.  And as of this date had you made any request from Verizon

2   to enter into such an agreement?

3   A.  I believe we had started down the path of trying to

4   figure out how we might work together.

5   Q.  Approximately how many times, if you can recall, prior to

6   August 2007 had you requested that a mutual nondisclosure

7   agreement be entered into?

8   A.  I honestly don't know off the top of my head.

9   Q.  More than five?

10  A.  Probably.

11        THE COURT:  Don't speculate.  She says she doesn't

12  know.  You can't speculate.

13  BY MR. JOHNSON:

14  Q.  Now, did you deliver the AVE tool without the NDA?

15  A.  I did.

16  Q.  And when did you deliver it, if you recall?

17  A.  Sometime before that July e-mail between Jim and I.

18  Q.  All right.  And Verizon took possession of it, to your

19  knowledge?

20  A.  Yes.

21  Q.  Did you see any applications that they developed using

22  your tool?

23  A.  I don't believe we ever got that far.

24  Q.  All right.  Did there -- did you have any meetings with

25  them discussing how this AVE tool worked?

```
1    A.  We did.  As the previous e-mail stated, I set up a weekly
2    call with them to make sure that I was able to answer any
3    questions, make sure that they were using the, you know, tool
4    kit as, you know, that had any issue.  We had questions back
5    and forth between Jim and I about certain applications and
6    how things might work within an application.
7    Q.  So these weekly meetings, how long did they last?  These
8    weekly phone calls, how long did they last?
9    A.  Probably about a year.
10   Q.  A year?  And who participated from your side?
11   A.  It was mostly Jim and I just doing our weekly sync up.
12   He brought some folks from his side in at times that were
13   also developing applications and/or talk more on the
14   technical level of architecture, and things like that, and
15   then I, in turn, would bring in the right people from my
16   side, whether it be from the engineering group or the
17   application building group to help out, as well.
18   Q.  And did you discuss the technical details of how you
19   build these applications?
20   A.  We did.
21   Q.  Did you -- was there any discussion about the
22   architecture?
23   A.  Yes.  We definitely talked about how specifically HSN
24   would fit within their application offering and in their
25   infrastructure.
```

Regis, N.- Direct                                          518

```
 1   Q.  If you will, please look at PX 47.  Do you have the
 2   document in front of you?
 3   A.  I do.
 4   Q.  And tell us what it is.
 5   A.  It looks like a meeting notice with an attachment of a --
 6   I'm guessing a diagram.  It just says architecture - Verizon.
 7   It is truncated.
 8   Q.  And did you send it out on March 3, 2008?
 9   A.  It looked like -- yes, it looks like that.
10   Q.  Does it look like or is it March?
11   A.  Yes, March 28 -- or March 3rd, 2008, yes.
12   Q.  Okay.  And did you send this e-mail out in the regular
13   course of business?
14   A.  Yes.
15   Q.  And is it accurate, to the best of your knowledge?
16   A.  Yes.
17   Q.  And did -- there is an attachment at PX 48.  I'd like you
18   to look at that and see if that was the attachment that
19   accompanied the e-mail?
20   A.  Yes.
21   Q.  And the attachment, this was the attachment accompanied
22   your e-mail?
23   A.  I believe so.  It looks like the same name.
24   Q.  I'm sorry?
25   A.  It looks like the same name from the attachment here to
```

Regis, N.- Direct                                                        519

1    the exhibit here.

2    Q.  And what does this attachment depict?

3    A.  This is an infrastructure drawing for us, Verizon and

4    HSN.

5    Q.  Who prepared it?

6    A.  Jim Gerlack.

7    Q.  And who is Jim Gerlack?

8    A.  He was network architect for ActiveVideo.

9    Q.  And what was the purpose for preparing this document, if

10   you know?

11   A.  Jim and I had just started to -- Jim Paschetto from

12   Verizon and I just decided -- started discussing what the

13   infrastructure might look like.  So in our weekly calls we

14   were delving deeper and deeper into the architecture.

15   Q.  Was Mr. Paschetto involved in the preparation of this

16   document?

17   A.  I don't believe so.

18          MR. JOHNSON:  At this time I'd like to move in, Your

19   Honor, Exhibits 47 and 48.

20          THE COURT:  Any objection to 47 and 48?

21          MR. GUTMAN:  No objection, Your Honor.

22          THE COURT:  They will be admitted.

23          And, ladies and gentlemen, we are going to take our

24   break 15 minutes early today, and then we are going to come

25   back and continue to the end of the day.  We will continue

1  when we come back.

2           (Jury out at 3:43 p.m.)

3           THE COURT:  Recess for 15 minutes.

4           (Recess from 3:43 p.m. to 4:01 p.m.)

5           (Jury in at 4:01 p.m.)

6           THE COURT:  Let the order reflect all the jurors

7  have returned to the courtroom.  Agreed?

8           MR. KING:  Yes.

9           THE COURT:  All right.  You may continue.

10 BY MR. JOHNSON:

11 Q.  Now, the diagram that we have on the screen, 48,

12 highlight the bottom left-hand corner.  You see the ICTV

13 confidential mark?

14 A.  Yes.

15 Q.  Was that mark on the diagram when you sent it to

16 Mr. Paschetto?

17 A.  Yes.

18 Q.  And why was that?

19 A.  Standard practice to put that on diagrams that we sent

20 out.

21 Q.  Now, the diagram that we are looking at, what does it

22 disclose, if you know?

23 A.  Again, it's showing what HSN would look like if their

24 application was deployed within the Verizon architecture on

25 the ActiveVideo platform.

Regis, N.- Direct                                                                521

```
 1   Q.  So if we -- are you familiar with the architecture?
 2   A.  Generally speaking.
 3   Q.  Okay.  So if we look in the middle we see ICTV AVDN with
 4   HSN in the VHO.  See that?
 5   A.  Yes.
 6   Q.  So there is a lot of acronyms.  What does AVDN mean?
 7   A.  ActiveVideo distribution network.
 8   Q.  And what is W -- the HSN?
 9   A.  HSN, again, is Home Shopping Network.
10   Q.  And below that we see several boxes.  Can you explain
11   what those are?
12   A.  Those represent servers within the AVDN or the
13   ActiveVideo platform.
14   Q.  And to your left, if we move to the left and blow it up.
15   What is this?
16   A.  These would be the components we tie into in the Verizon
17   network.
18   Q.  And it says SHE IF to IP over SONET, 10G.  Do you
19   understand what that means?
20   A.  Generally, it is their super headend, which is what SHE
21   is.  IF, I'm not sure.  I'm guessing it's --
22              THE COURT:  Don't guess, ma'am.  If you are
23   generally familiar, but don't guess if you don't know what to
24   make of it.
25              THE WITNESS:  It is generally describing how the
```

1   communication was going to happen between the super headend

2   and the equipment.

3   BY MR. JOHNSON:

4   Q.  All right.  Go down to the bottom, please.  And what is

5   that?

6   A.  This again is -- just part of the Verizon infrastructure

7   and the communication pieces between our equipment and

8   theirs.

9   Q.  Now, when you delivered this architectural drawing to

10  Mr. Paschetto -- before we proceed, it says,

11  "Verizon-ICTV-HSN-overview details (2/11/08)."  You see that?

12  A.  Yes.

13  Q.  And does that accurately describe the overview as far as

14  you were concerned?

15  A.  Yes.

16  Q.  Now, had you worked with Mr. Paschetto on this particular

17  drawing before it was sent?

18  A.  I can't recall.  I know that he had his own drawing, and

19  this was our interpretation.

20  Q.  Now, before we go any further, I'd like you to take a

21  look at Exhibit 342.  You got 342 in front of you?

22  A.  Yes.

23  Q.  Can tell us what it is.

24  A.  It's an e-mail exchange between my boss, Michael Taylor,

25  and Bill Garrett from Verizon and myself and Jim Paschetto

1    are on it, as well.

2    Q.   And your e-mail exchange, is that the second page?

3    A.   Yes.

4    Q.   And what were you trying to accomplish in or about

5    September of 2007?

6    A.   I was working with the Verizon attorneys to put a mutual

7    nondisclosure agreement in place.

8    Q.   And does this e-mail reflect the state of affairs as of

9    September 8th, 2007 with regard to that mutual nondisclosure

10   agreement?

11   A.   Yes.

12   Q.   And is it accurate?

13   A.   Yes.

14          MR. JOHNSON:  Move 342 into evidence, Your Honor.

15          THE COURT:  Any objection?

16          MR. KING:  No objection, Your Honor.

17          THE COURT:  342 will be admitted.

18          (The document was received in evidence and marked as

19   Plaintiff's Exhibit No. 342.)

20   BY MR. JOHNSON:

21   Q.   Now, had the original mNDA expired, if you know?

22   A.   I don't.

23   Q.   Did you have an understanding why you were being asked to

24   give a second mutual nondisclosure agreement in place?

25   A.   But, yes.  The original had expired.  These were a new

1    group of folks we were working with.

2            MR. KING:  Objection, Your Honor.

3            THE COURT:  Sustained.  Don't assume.

4            THE WITNESS:  This was a new group of folks we were

5    working with out of Massachusetts and so we were just -- I

6    was just -- I was in a new role, and my boss asked me to

7    follow up with the folks at Verizon to put this in place.

8    BY MR. JOHNSON:

9    Q.  Now, if you will, look at PX 341.  Can you tell us what

10   PX 341 is?

11   A.  It's an e-mail exchange, again, between my boss, Michael

12   Taylor, and Bill Garrett of Verizon regarding putting a lab

13   agreement in place.

14   Q.  And did that include another mutual nondisclosure

15   agreement?

16   A.  That was the request.

17   Q.  Okay.  And does this e-mail exchange reflect your

18   understanding of the situation at that time?

19   A.  Yes.

20   Q.  And was it done in the regular course of business?

21   A.  Yes.

22           MR. JOHNSON:  At this time we'd move 341 into

23   evidence, Your Honor.

24           THE COURT:  Any objection?

25           MR. KING:  No objection, Your Honor.

```
 1              THE COURT:  Be admitted.

 2              (The document was received in evidence and marked as

 3    Plaintiff's Exhibit No. 341.)

 4    BY MR. JOHNSON:

 5    Q.  Now, the bottom of the first page, the first e-mail on

 6    the first page, let's publish it, please.

 7              And this is a communication from a Mr. Garrett at

 8    Verizon?

 9    A.  Yes.

10    Q.  Who was he?

11    A.  Bill Garrett was their director of innovation out of the

12    Massachusetts office.

13    Q.  And you expressed concern to him about the fact that you

14    had a lab system that hadn't been returned?

15    A.  We did.

16    Q.  And this bottom paragraph says, "Your concern about your

17    equipment is independent of the need for an NDA (which

18    wouldn't protect your equipment), generally speaking VTO

19    doesn't sign NDAs."  Do you see that?

20    A.  I do.

21    Q.  And was that your understanding of the position they were

22    taking as of that date?

23    A.  It is.

24    Q.  Now, did you ultimately sign an NDA?

25    A.  We weren't able to get a blanket mutual nondisclosure
```

Regis, N.- Direct                                                      526

```
 1    agreement in place, but we were able to carve out a subset
 2    NDA for our PC client.
 3    Q.  When you say PC client, tell us what you mean.
 4    A.  It was a client that would be run on your personal
 5    computer and would allow you to stream to that computer from
 6    our infrastructure back in San Jose.
 7    Q.  If you will go to PX 97.  Have you seen Exhibit 97
 8    before?
 9    A.  Yes.
10    Q.  And did you receive it on or about November 28th, 2007?
11    A.  Yes.
12    Q.  And did you review it at that time?
13    A.  I did.
14         MR. JOHNSON:  We would like to introduce into
15    evidence PX 97.
16         THE COURT:  Any objection?
17         MR. KING:  No objection, Your Honor.
18         THE COURT:  Be admitted.
19         (The document was received in evidence and marked as
20    Plaintiff's Exhibit No. 97.)
21    BY MR. JOHNSON:
22    Q.  Now, let's put up the nondisclosure agreement.  Let's
23    blow up the top portion.
24         THE COURT:  Ladies and gentlemen, again, I don't
25    know that you can read this on the screen.  You will have an
```

1    opportunity to examine it in hand.

2            MR. JOHNSON:  Scan the top portion, just the top

3    portion, please.

4    BY MR. JOHNSON:

5    Q.  Bring it over a bit more to the right.  I need the

6    sentence, the whole sentence so we can get it.  Okay.  It

7    says that, "Matter of mutual interest described as follows:

8    ICTV IP-client application will be shared with Verizon and

9    runs on a PC enabling the PC to connect to and access ICTV's

10   servers via the Internet.  This application allows the PC to

11   act as a cable set-top box that can play IP-video streams

12   created on ICTV's servers and will be shown internally within

13   Verizon for ICTV video stream demonstration purposes only."

14   Have I read that correctly?

15   A.  The first sentence is ICTV PC client, not IP client, but,

16   yes.

17   Q.  All right.  Tell the jury what that means.

18   A.  Again, we had developed a PC client that you could run on

19   your personal computer that would allow you to access

20   applications similar to the way a set-top box would access

21   them from our servers in San Jose.

22   Q.  Now, does this mutual nondisclosure agreement cover your

23   ActiveVideo editor you told us about earlier?

24   A.  I was told that this could not cover anything that we had

25   previously given them already.  So, no, it does not.

Regis, N.- Direct                                                              528

```
 1   Q.  By who?
 2   A.  Jim Paschetto.
 3   Q.  And did you send him the PC?
 4   A.  I don't believe we actually ever sent them the PC client.
 5   We ended up going down another path in trying a different
 6   demo strategy with them.
 7   Q.  Now, if you will, please look at the exhibit, -- well, go
 8   back to 48.  When you sent 48 to Mr. Paschetto, what, if
 9   anything, happened next?
10   A.  We continued to have our weekly meetings and continued to
11   put in a place a deployment checklist, all the items that we
12   would need to do in order to actually deploy HSN within the
13   Verizon network across our architecture.
14   Q.  Now, were you asked to remove the ICTV confidential
15   legend?
16   A.  I don't recall about this specific diagram, but on other
17   items, yes.
18   Q.  Please look at PX 300.  Do you have Exhibit 300 in front
19   of you?
20   A.  I do.
21   Q.  And did you receive this document in or about March 4,
22   2008?
23   A.  Yes.
24   Q.  Was it from Mr. Paschetto?
25   A.  It was.
```

1  Q.  And did you receive it in the regular course of business?

2  A.  I did.

3  Q.  And is this document accurate, as far as you know?

4  A.  Yes.

5        MR. JOHNSON:  I'd like to move 300 in evidence, Your

6  Honor.

7        THE COURT:  Any objection?

8        MR. KING:  No objection, Your Honor.

9        THE COURT:  Be admitted.

10       (The document was received in evidence and marked as

11  Plaintiff's Exhibit No. 300.)

12  BY MR. JOHNSON:

13  Q.  Publish it for the jury.  Now, this is March 4, 2008.

14  This is after the previous NDA was signed, correct?

15  A.  Yes.

16  Q.  Now, when he wrote, "Until we have a mNDA in place, we

17  really can't accept documents marked "ICTV confidential" or

18  "ICTV proprietary."  Could you send us an architecture

19  diagram without that notice?"  Do you see that?

20  A.  Yes.

21  Q.  What reaction did you have when you received it?

22  A.  I was surprised and went back to my architecture and made

23  sure that we could resend the diagram without confidentiality

24  on it.

25  Q.  Did you resend the diagram?

1    A.  I did.

2    Q.  Let's take a look at Exhibit 301.  Do you have Exhibit

3    301 in front of you?

4    A.  I do.

5    Q.  And this bears the date of March 31, 2008; is that

6    correct?

7    A.  It does.

8    Q.  And did you send this e-mail on or about the date it

9    bears?

10   A.  Yes.

11   Q.  And was that in the regular course of business?

12   A.  Yes.

13   Q.  As you look at this document, is it accurate to the best

14   of your knowledge?

15   A.  Yes.

16   Q.  And there are pictures accompanying this document?

17   A.  There are.

18   Q.  Did they accompany the document on or about the time you

19   sent it?

20   A.  They did.

21   Q.  And are they accurate to the best of your knowledge?

22   A.  Yes.

23        MR. JOHNSON:  Your Honor, at this time I move into

24   Exhibit 301.

25        MR. KING:  No objection, Your Honor.

JODY A. STEWART, Official Court Reporter

```
 1              THE COURT:  Be admitted.

 2              (The document was received in evidence and marked as

 3     Plaintiff's Exhibit No. 301.)

 4     BY MR. JOHNSON:

 5     Q.  Now, why did you write this e-mail that is published?

 6     A.  Again, we were having our weekly meetings, and as they

 7     advanced, we retouched the architecture added in, filled in

 8     some blanks, added in information that was necessary to keep

 9     the project moving forward.

10     Q.  And you sent this to Mr. Paschetto?

11     A.  I sent this to the meeting attendees, yes, including

12     Mr. Paschetto.

13     Q.  Now, you had been meeting at this time an entire year?

14     A.  Almost, yes.

15     Q.  Now, during the process of those meetings were you

16     teaching the Verizon personnel how to use your AVE?

17     A.  The tool kit, yes.  So we were having these weekly

18     discussions that included both the tool kit revisions and

19     updates as well as architecture and infrastructure

20     information.

21     Q.  And did that include the Home Shopping Network app you

22     showed us?

23     A.  We did share that with them in several demos.

24     Q.  Okay.  You said you shared it with them in several demos.

25     Tell us what you mean.
```

1    A.   We would bring along our own PC client and be able to

2    demonstrate the application to them.

3    Q.   Okay.  Now, did they share with you any of the

4    applications they were building?

5    A.   Not specifically.  They just showed us snippets of things

6    they were having trouble with.  They would send us pieces of

7    code that they couldn't get to work and asked us for feedback

8    on how to make them work better.

9    Q.   Now, when you say they were -- they showed you snippets

10   of code, explain to us what you mean.

11   A.   Just a little piece of the code, not the entire

12   application.

13   Q.   They ever ask you how to correct the problem they were

14   having?

15   A.   Yes.

16   Q.   Would they tell you why they were using this, what they

17   planned to use this for?

18   A.   Again, Jim and I were working toward getting the

19   infrastructure in place.  HSN happened to be the driver

20   application, but they were building a handful of other

21   applications in the background so that once the

22   infrastructure was in place, they could have a plethora of

23   applications to put out to the -- their subscribers.

24   Q.   Now, in the e-mail 301, in the communications there is

25   the drawings.  So if you look at the drawings, and let me

1   know if the legend, confidential legend has been removed in

2   the lower left-hand corner?

3   A.   It has.

4   Q.   Now, in looking at the Verizon-ICTV-HSN-overview, one

5   more time, the box in the middle, boxes in the middle, what

6   do they depict?

7   A.   They were the ActiveVideo platform.

8   Q.   And did it -- and to the left, what did that depict?

9   A.   That looks to be the Verizon infrastructure that we would

10  be tying into.

11  Q.   All right.  And then to the right, what did that depict?

12  A.   That would have been the content servers where HSN would

13  host their assets and all of their video clips that they

14  would then send down to the AV platform to be displayed on

15  the television.

16  Q.   Now, this Verizon-ICTV-HSN-overview, did Mr. Paschetto

17  participate in the drafting of this in any way?

18  A.   Yes.

19  Q.   This came from ICTV?

20  A.   This came from ICTV, yes.

21  Q.   Now, did there come a point when you became concerned

22  about Verizon's real interest in your product?

23  A.   Not me personally.  My boss had advised me.

24          MR. KING:  Objection.

25          THE COURT:  Objection sustained.

1    BY MR. JOHNSON:

2    Q.  At some point did you stop working with Verizon?

3    A.  We did.

4    Q.  All right.  When was that?

5    A.  Late 2008.

6           MR. JOHNSON:  Nothing further.

7           THE COURT:  Cross-examination.

8                      CROSS-EXAMINATION

9    BY MR. KING:

10   Q.  Hello, Mrs. Regis.  How are you?

11   A.  I'm okay.

12   Q.  I'm Patrick King, represent Verizon.  You were the field

13   service manager in 2005?

14   A.  Yes, I believe that was my title.

15   Q.  You didn't have any direct responsibility for the Verizon

16   relationship during this period, did you?

17   A.  No.

18   Q.  Did you help set up demonstrations for Verizon in 2005,

19   correct?

20   A.  I did.

21   Q.  And in your role as the field service manager in 2005,

22   you gave demonstrations for other companies, as well,

23   correct?

24   A.  I did.

25   Q.  You were giving demonstrations at least once a month?

1   A.  At least.

2   Q.  And you started doing these demonstrations for Verizon

3   what year?

4   A.  In 2005.

5   Q.  So in 2005 you started giving demonstrations for

6   potential customers about once a month?

7   A.  No.  In 2005 I started giving demonstrations to Verizon.

8   In 2001 I started with the company.  I began giving

9   demonstrations broadly to other companies, as well.

10  Q.  Okay.  So I'm talking about generally about your

11  demonstrations.  You began giving demonstrations on behalf of

12  ICTV in about 2001?

13  A.  2000, end of 2000, yes.

14  Q.  And how often would you give demonstrations to other

15  potential customers beginning in 2001?

16  A.  About once a month.

17  Q.  And about how many customers actually saw the ICTV demo

18  that you did for Verizon or something similar to it?

19  A.  I'd like to think all of our potential customers had seen

20  it at one point or another, whether it be at a trade show or,

21  you know, individual demonstrations.

22  Q.  And the demonstration you did for Verizon in 2005 was

23  essentially the same demonstration you did at trade shows, as

24  well?

25  A.  I believe it was, yes.

1    Q.   Public demonstrations?

2    A.   I believe so, yes.

3    Q.   You knew what test programs were installed in the racks

4    that you provided to Verizon?

5    A.   I can't recall off the top of may head.  It was six years

6    ago.  We've gone through a lot of applications.

7    Q.   You mentioned in your direct that there was an issue of

8    the scaleability of the ICTV system; is that correct?

9    A.   That was expressed to us, yes.

10   Q.   And did Verizon complain to you about the scaleability of

11   your HeadendWare system?

12        MR. JOHNSON:  Objection, hearsay.

13        THE COURT:  Objection overruled.

14        THE WITNESS:  No one complained directly to me.

15   BY MR. KING:

16   Q.   Okay.  But it was your understanding that Verizon had

17   complained to ActiveVideo about the scaleability of the

18   ActiveVideo system?

19   A.   Not specifically.

20   Q.   Had you heard any other customers complain about the

21   scaleability of the system?

22   A.   Yes.

23        THE COURT:  The Court is going to sustain that, but

24   other customers.  We are talking about Verizon.  The Court

25   permitted that.  But other customers, no.

Regis, N.- Cross                                                    537

```
 1   BY MR. KING:
 2   Q.  You modified your product at some point in about 2006,
 3   correct?
 4   A.  Yes.
 5   Q.  And the modification was part to address the scaleability
 6   issues, correct?
 7   A.  It was, indeed.
 8   Q.  And the system you gave to Verizon in 2005 was the system
 9   that -- was the system you had in place before you addressed
10   the scaleability issues, correct?
11   A.  Yes.
12   Q.  And you never gave Verizon a system after the
13   scaleability issues were fixed?
14   A.  Correct.
15        THE COURT:  Counsel, before you ask the next
16   question, perhaps you can explain the scaleability we are
17   talking about, Mrs. Regis.  What is scaleability?
18        THE WITNESS:  Oh, scaleability just means the amount
19   of consecutive sessions per server.
20   BY MR. KING:
21   Q.  I'm sorry.  Can you clarify that a little bit, little
22   more detail about what the scaleability issue was?
23   A.  Just the number of sessions per blade.  Depends on how
24   many rack -- servers, racks to scale, to a larger deployment.
25   Q.  So the product was not well suited for very large
```

1    deployments?

2            MR. JOHNSON:  Objection, lack of foundation.

3            THE COURT:  Overruled.

4            THE WITNESS:  It was perfectly suited for it.  It

5    would work.  It just meant that you needed more hardware in

6    place.

7    BY MR. KING:

8    Q.  If we could put up Plaintiff's Exhibit 48.  Oh, I'm

9    sorry.  Let me have a couple quick questions for you about

10   this document.  You mentioned that this was a document -- can

11   we have the whole document here for a second before you do

12   that.  You mentioned that this document was the result of

13   extensive conversation with folks at Verizon?

14   A.  Yes.

15   Q.  Okay.  I think I heard you say that the diagram was

16   created by ActiveVideo, ICTV, correct?

17   A.  Yes.

18   Q.  And it was created from some drawings provided by

19   Mr. Paschetto at Verizon?

20   A.  I believe there was some, yeah, diagrams that we had

21   shared back and forth.

22   Q.  Okay.  So you guys were exchanging information and

23   working together to design this system?

24   A.  Yes.

25   Q.  Well, it wasn't really a system, was it?  This was never

```
 1    built?
 2              MR. JOHNSON:  Objection, lack of foundation.  She
 3    can't testify to what Verizon did or didn't do about building
 4    the system.
 5              MR. KING:  She can --
 6              THE COURT:  You can rephrase the question, and I'll
 7    permit her to answer.
 8    BY MR. KING:
 9    Q.  Well, let me see if I can rephrase the question for you.
10    If you look at the bottom, and if you could zoom in on the
11    stuff in the corner.  That says "proposed," right?
12    A.  Correct.
13    Q.  That was the proposed architecture?
14    A.  Yes.
15    Q.  And it was the architecture that was designed
16    collectively by Verizon and ICTV?
17    A.  Yes.
18    Q.  Okay.  So let's turn to Plaintiff's Exhibit 301.  So this
19    was a document you discussed on direct, correct?
20    A.  Yes.
21    Q.  And if we turn to the attachment to this document, this
22    is a later version of the same diagram we were just looking
23    at?
24    A.  Yes.
25    Q.  I believe you testified that the confidential sticker was
```

1    removed from the corner?

2    A.  Yes.

3    Q.  And it was removed at Verizon's request because they

4    didn't want to have to say "ICTV confidential"?

5    A.  Correct.

6    Q.  And this is a diagram that was prepared by ICTV and

7    Verizon collectively, correct?

8    A.  Correct.

9    Q.  And they didn't want to have in their files stuff that

10   you were claiming to be ICTV confidential, that -- well, let

11   me rephrase the question.

12          I'll drop that.  May I offer this?

13          THE COURT:  What exhibit number is that?

14          MR. KING:  It is exhibit number, Defense Exhibit

15   566, Your Honor.  Mrs. Regis, can you take a moment to look

16   at this e-mail or this document.  Let me know if you

17   recognize it.

18          THE WITNESS:  I do.

19   BY MR. KING:

20   Q.  You do?  And what is this e-mail?

21   A.  It's an e-mail exchange between myself and some internal

22   folks regarding the Verizon network and infrastructure.

23   Q.  Okay.  So the internal folks you mention are Jim Gerlack,

24   correct?

25   A.  Yes.

Regis, N.- Cross                                                         541

```
 1    Q.   And Jeremy Edmonds?
 2    A.   Yes.
 3    Q.   And those are both ActiveVideo employees?
 4    A.   They are.
 5    Q.   And they were your colleagues at ActiveVideo, correct?
 6    A.   Yes.
 7    Q.   And you were all employees at ActiveVideo in 2008 --
 8    A.   Yes.
 9    Q.   -- the date of this e-mail?  And what is this e-mail
10    generally regarding?
11    A.   Um, we had had a call with Verizon and had gathered some
12    information, and I wanted to work with Jim Gerlack, who was
13    our network architect, and try to get a drawing put together.
14    Q.   So this e-mail was prepared in the normal scope of your
15    work at ActiveVideo?
16    A.   Yes.
17    Q.   And it was prepared in the normal scope of Mr. Gerlack's
18    work and Mr. Edmond's work, as well?
19    A.   Yes.
20    Q.   And do you have any reason to doubt this isn't an
21    accurate copy of the document?
22    A.   Excuse me.
23    Q.   Do you have any reason to doubt this isn't an accurate
24    copy of the document?
25    A.   No.
```

```
1              MR. KING:  I'd like to move this document into
2    evidence, Your Honor.
3              THE COURT:  Any objection?
4              MR. JOHNSON:  No.
5              THE COURT:  Shall be admitted.
6              (The document was received in evidence and marked as
7    Defendant's Exhibit No. 566.)
8    BY MR. KING:
9    Q.  If you take a look at the e-mail.  It begins from Jim
10   Gerlack.  He begins, "Verizon may very well be one of our
11   biggest opportunities, as well as our biggest challenge."  Do
12   you see that?
13   A.  I do.
14   Q.  And it says, "Because we have a Telco service
15   mentality" -- I'm sorry.  Let me rephrase that.  "Because
16   they have a Telco service mentality, before we can go to
17   production" -- "because they have a Telco service mentality,
18   before we can go to production, we would first need to comply
19   with high-availability standards."  Do you see that?
20   A.  I do.
21   Q.  It might be easier to follow if we can publish it for the
22   jury, please.
23   A.  All right.
24   Q.  So do you see where I was reading from the first three
25   lines there at the top?  And what do you understand that to
```

1   mean.

2   A.   That was Jim's opinion that he felt compelled to share

3   with me.

4   Q.   And did you -- what did you understand Jim to be saying

5   there?

6   A.   Just that we would need to look at what Verizon needed as

7   far as high availability and look to be able to comply with

8   that.

9   Q.   And if you see the sentence about the fifth line down, it

10  says, "I do not believe we will be fully ready for their lab

11  environment with respect to high-availability, until sometime

12  in 2009 (best case)."  You see that?

13  A.   Uh-huh.

14  Q.   What did you understand Mr. Gerlack to be saying there?

15  A.   Again, it was his opinion that perhaps the platform

16  wasn't going to be ready.

17  Q.   So who is Mr. Gerlack again?

18  A.   He was our network architect.

19  Q.   He was one of the more senior people on your design team?

20  A.   No.  He was just a network architect.

21  Q.   Okay.  It goes on, if you'll see the line about halfway

22  through that paragraph, it begins on the line, getting in.

23  Do you see that?

24  A.   Yes.

25  Q.   It says, "Getting in their lab too early with incomplete

```
 1   expectations could be very embarrassing."  Do you see that?
 2   A.   Uh-huh.
 3   Q.   That was in 2008, correct?
 4   A.   Yes.
 5   Q.   We also on your direct, we went through, we looked at a
 6   number of documents involved in Home Shopping Network?
 7   A.   Uh-huh.
 8   Q.   That engagement, that project with Verizon, when did it
 9   begin?
10   A.   I can't say for certain.
11   Q.   Do you have a sense of when it resolved, when it wrapped
12   up?
13   A.   No.  In 2008 probably when we stopped working with
14   Verizon.
15   Q.   2008 was about two years after FiOS went to market,
16   correct?
17   A.   Again, I don't know.
18   Q.   The Home Shopping Network application that ActiveVideo
19   prepared was developed jointly with the Home Shopping
20   Network, right?
21   A.   With HSN, yes.
22   Q.   And it was an application designed jointly by ActiveVideo
23   and Home Shopping Network to run ActiveVideo's network,
24   correct?
25   A.   HSN, yes.
```

Regis, N.- Cross                                                          545

```
 1   Q.  And HSN also developed the applications to use on other
 2   platforms, correct?
 3           MR. JOHNSON:  Objection, lack of foundation.
 4           THE COURT:  What are you saying, Mr. Johnson?
 5           MR. JOHNSON:  I said objection, lack of foundation
 6   as to other platforms.
 7           THE COURT:  Sustained.
 8   BY MR. KING:
 9   Q.  Did HSN have any other applications that was already
10   provided to customers aside from the one that it had used
11   ActiveVideo platform to develop?
12   A.  I had seen an application at Cablevision that had been
13   developed by Gold Pocket.
14   Q.  So the answer is yes?
15   A.  Yes.
16   Q.  Were you aware of any applications that Home Shopping
17   Network was developing with Insequence?
18   A.  Not firsthand.
19   Q.  Ericsson?
20   A.  That would be the same as Gold Pockets, so, yes.
21   Q.  Now, do you recall in your deposition saying that you
22   were also aware of home shopping, HSN developing an
23   application with Insequence?
24   A.  I don't.
25   Q.  Do you know how similar or difference the Ericsson
```

JODY A. STEWART, Official Court Reporter

```
 1    platform was with the platform that Home Shopping Network

 2    designed with ActiveVideo?

 3             MR. JOHNSON:  Objection, lack of foundation.  It is

 4    also compound.

 5             THE COURT:  Wait a minute, now.

 6             MR. JOHNSON:  And it is also beyond the scope.

 7             THE COURT:  Well, the Court overrules.  It is not a

 8    compound question.  I overrule it.  There was some inquiry

 9    from the plaintiff about the Home Shopping Network capability

10    in one of these exhibits, close enough within the scope, so

11    it's overruled.

12             THE WITNESS:  I'm sorry.  Could you repeat the

13    question?

14    BY MR. KING:

15    Q.   Sure.  Do you know how similar or different the Ericsson

16    platform, the Home Shopping Network, Ericsson application was

17    for the ActiveVideo, HSN application?

18    A.   I don't.

19    Q.   Did you ever see screen shots of the Ericsson

20    application?

21    A.   I don't believe I have.

22    Q.   Do you know in your dealings with HSN that they -- did

23    they ever tell you that they wanted the application they were

24    developing with you?  Let me rephrase that.  Do you know if

25    in 2007 was HSN already providing an application to Verizon?
```

```
1    A.  I don't.
2    Q.  Sitting here today, do you know if HSN has ever jointly
3    developed an application with Verizon?
4    A.  I don't.
5    Q.  In the 2007 project you were doing with ActiveVideo --
6    with Verizon, was Verizon careful about sharing confidential
7    information near you?
8    A.  I would say yes, I guess.  I don't recall ever having
9    trouble.
10   Q.  And did you ever have any -- well, let me rephrase that.
11   Throughout the time you were working with Verizon, your
12   relationship with people at Verizon was professional,
13   correct?
14   A.  Yes.
15   Q.  And cordial?
16   A.  Yes.
17   Q.  And you've maintained a good relationship with Verizon
18   throughout the entire period that we've been discussing here,
19   correct?
20   A.  Yes.
21   Q.  And the employees from Verizon always cooperated with you
22   and treated you with respect?
23   A.  Yes.
24           MR. KING:  No further questions, Your Honor.
25           THE COURT:  Any redirect?
```

1           MR. JOHNSON:  None, Your Honor.

2           THE COURT:  Next witness.

3           (Witness excused.)

4           MR. JOHNSON:  Your Honor, we would call Mr. Michael

5    Taylor.

6           THE COURT:  Mr. Taylor.

7           (Witness was sworn.)

8           THE COURT:  All right.  You may go forward.

9           MICHAEL TAYLOR, called by the Plaintiff, having

10   been first duly sworn, was examined and testified as follows:

11                          DIRECT EXAMINATION

12   BY MR. JOHNSON:

13   Q.  Mr. Taylor, by whom are you employed?

14   A.  ActiveVideo.

15   Q.  And what's your current status?

16   A.  I am senior vice-president of business development.

17   Q.  And how long have you held that position?

18   A.  Since 2006.

19   Q.  Would you tell the jury your educational background?

20   A.  I graduated college from Georgia State University in

21   Atlanta with a degree in economics and southern literature.

22   Q.  All right.  And tell us briefly your employment history.

23   A.  Before ActiveVideo -- should I start at the closest to

24   and go back or the other way?

25   Q.  Let's start after college and go forward.

```
 1   A.   Sure.  After college I went to management consulting.
 2   After college I went into management consulting for a company
 3   called Telic, T-e-l-i-c.  After Telic I left and formed my
 4   first start-up, which is called Geotel.  From there I began
 5   another management consulting job with San Francisco
 6   Consulting Group.  I then did another startup called Instant
 7   Video Technologies which was -- then moved into guest serve
 8   systems, which was a hotel Video On Demand company.
 9          From there I consulted to a company called Sky
10   Connect, helped them become acquired by In Cube.  I joined In
11   Cube as head of business development.  Left In Cube in 2000
12   and joined Big Band Networks and where I was head of business
13   development there.
14          I left Big Band Networks in 2004 to form a company
15   called Switch Media, which was acquired by ICTV, which I
16   became an employee.
17   Q.   What was the business of Switch Media?
18   A.   Switch Media was a media processing company.
19   Q.   When you say media processing company, can you give us
20   more of an example of what you mean?
21   A.   Sure.  We were bringing out new innovations in media
22   processing, allowed us to manipulate video in the compressed
23   domain.
24   Q.   Where was this company located?
25   A.   ActiveVideo or Switch Media?
```

1    Q.   Switch Media.

2    A.   Switch Media was in San Jose.

3    Q.   All right.  Now, when you joined ActiveVideo, you'd been

4    in the business for about how long, 15 years?

5    A.   15, 20 years, yes.

6    Q.   Okay.  And you worked for how many startups?

7    A.   Four, I believe.  Three or four.

8    Q.   Now, your title at ActiveVideo 2006 was what?

9    A.   Senior vice-president of business development.

10   Q.   And were you involved, when you arrived, with the Verizon

11   relationship?

12   A.   I became involved, yes.

13   Q.   And tell us how that happened.

14   A.   Um, we were -- well, I was personally contacted by people

15   from Verizon, and I think it was Mr. Steven Whitehead.  At

16   the time it was in 2006, early 2006.  He had got my name from

17   somewhere.

18   Q.   And who was Steven Whitehead?

19   A.   I believe he is a director of technology out of their

20   Waltham, Massachusetts office.

21   Q.   And when did this contact take place?

22   A.   Early 2006, I believe.  Not long after I'd joined the

23   company.

24   Q.   And did you know Mr. Whitehead from a prior encounter?

25   A.   No, I had not.

Taylor, M. - Direct                                              551

```
 1   Q.  And what, if anything, was Mr. Whitehead interested in
 2   doing with ActiveVideo?
 3   A.  Mr. Whitehead wanted to understand better our technology
 4   and our product set.
 5   Q.  And did he tell you why?
 6   A.  To explore the use of the product in the Verizon video
 7   delivery system.
 8   Q.  Now, at the time you had contact with Mr. Whitehead, had
 9   anyone at ActiveVideo advised you that Verizon had lab
10   equipment already on its premises?
11   A.  Yes.  After that --
12              MR. KING:  Objection.
13              THE COURT:  Hold on a second.  What is the
14   objection.
15              MR. KING:  The objection is leading the witness.
16              THE COURT:  I'm going to have to overrule that.
17              THE WITNESS:  Repeat the question, please.
18              MR. JOHNSON:  Can you read it back.
19              THE COURT:  We don't do that.
20              MR. JOHNSON:  Oh, we don't?
21              THE COURT:  Your have to remember it or move on.
22   BY MR. JOHNSON:
23   Q.  Had anyone advised you as of this early 2006 time frame
24   that there had been equipment already loaned by ICTV to
25   Verizon?
```

1   A.  Yes.  Yes.  When I got there, I asked, you know -- I did

2   an analysis on who we were currently working with, and it --

3   you know, it was in reports in the company that -- and I was

4   told by people working there, that we had been involved with

5   Verizon and that we had shared with them certain lab

6   equipment.

7   Q.  And what was your reaction to the sharing of this lab

8   equipment, if any?

9   A.  Well, I was new to the company, and I assumed it was --

10  we were continuing business as, you know, trying to explore

11  doing business with Verizon, and assumed it was a good

12  practice to do.

13  Q.  Now, did you look into whether or not there was an NDA in

14  place?

15  A.  Yeah.  I mean, as a standard practice of business, at

16  least the way I like to practice, is that if product is to be

17  shared, I would, you know, like to have a mutual

18  nondisclosure agreement, an agreement that says I'm going to

19  show you what we have, you're going to show us what they

20  have, and we agreed not to tell anybody.

21  Q.  Let me have you take a look at Exhibit 89.

22  A.  Am I looking --

23  Q.  Yeah.  You should have a book there with an exhibit in

24  it.

25  A.  89?

1   Q.  Yes.

2   A.  Yes, sir.

3   Q.  Do you have it in front of you?

4   A.  Yes, sir.

5   Q.  Have you even this document before?

6   A.  Yes, sir, I have.

7   Q.  Can you tell us what it is?

8   A.  It's a general presentation talking about the -- at the

9   time ICTV product set, the company, the technology or IP.

10  Q.  And what was this presentation used for in or about March

11  2006?

12  A.  To introduce our products and its capability to the

13  Verizon people.

14  Q.  And did you participate in the preparation of this

15  document?

16  A.  I oversaw it, yes.

17  Q.  And did you make the presentation in or about March 2006

18  to Verizon?

19  A.  I do believe so, yes, sir.

20          MR. JOHNSON:  At this time, Your Honor, we'd like to

21  move Exhibit 89 into evidence.

22          THE COURT:  Any objection?

23          MR. KING:  No objection, Your Honor.

24          THE COURT:  Then admitted.

25          MR. JOHNSON:  May I publish it, Your Honor?

```
1              THE COURT:  You may.

2              (The document was received in evidence and marked as

3    Plaintiff's Exhibit No. 89.)

4    BY MR. JOHNSON:

5    Q.  Okay.  Were you the person giving this -- we live now?

6    A.  Yes, sir.

7    Q.  All right.  Were you the person who gave this

8    presentation in March 2006?

9    A.  Yes, sir.

10   Q.  And where did the presentation take place?

11   A.  I believe this one was telephonically.

12   Q.  Where?

13   A.  We did it over the phone.  We distributed the PowerPoint

14   to them and then spoke to it over the phone, I believe.

15   Q.  Now, do you recall the names of the individuals you were

16   speaking with at Verizon?

17   A.  I believe it was Steven Whitehead and his team.  Um,

18   Sue -- no, Jim Paschetto, I think is one of the names.

19   Q.  Go to the second page.

20   A.  Yes.

21   Q.  There is a reference to 24 issued patents and 17 pending.

22   Do you see that?

23   A.  Yes, sir.

24   Q.  And why did you include that as part of the presentation?

25   A.  It's a standard app to take to underscore the work, the
```

```
 1   innovation and the -- you know, the intellectual property
 2   that goes behind the products that we are selling.  It shows
 3   the uniqueness of what we are doing.
 4   Q.   If you will, go over two slides to the ICTV approach.
 5   A.   Yes.
 6   Q.   And can you explain to the jury what this slide shows.
 7   A.   This is a high level overview of our products and how it
 8   fits within a network.
 9   Q.   And can you walk us through.
10   A.   Walk through, yeah.  So from left to right it -- we --
11   what we are doing is we are showing that our platform at the
12   time HeadendWare serves as a processing bridge, so to speak,
13   between the programming community, which could include
14   various types of programming, whether its video out server,
15   linear video, advertising, games, personalized services, you
16   know, transactional-type pieces and how they show up on the
17   TV set.
18        And in the middle is our box that says HeadendWare,
19   which is where it sits within the network operator, and on
20   that network operator we insert our technology.  We manage
21   the process and we enable those types of activities.
22   Q.   Now, on the right it shows an arrow broken down with key
23   strokes and then an arrow back with MPEG2/MPEG4 & AC-3 MPEG
24   audio.  Do you see that?
25   A.   Yes, sir.
```

1    Q.  Can you explain that to the jury.

2    A.  Yes.  We -- the way our system works, and the way I

3    explain it to our customers, is that we transmit the

4    experience, the interactive experience, the video stream to

5    the set-top box.  So it looks like any ordinary stream as it

6    hits the box.  So we take all the processing requirements off

7    the set-top box, bring it into the network itself.

8    Q.  Now, on the next page is a reference to the ICTV active

9    channels?

10   A.  Yes.

11   Q.  What are active channels?

12   A.  It's a name, a marketing name that we gave applications

13   that could be created on our platform.

14   Q.  And what did these active channels do?

15   A.  I mean, in a broad sense they could do pretty much

16   anything you wanted them to do.  But specifically, as we were

17   marketing them, we could enable certain things, a

18   personalized mosaic, which would be multiple video tiles on a

19   screen and which you could select and navigate to go to other

20   channels.  We could enable what we call VOD navigation or

21   Video On Demand navigation which would provide a richer

22   experience in when you go to select an on-demand instruction

23   like the cable operator may offer, it makes it easier to find

24   things on your TV set.

25          We also support transactions such as with Home

1    Shopping Network, and we enable the integration of text and

2    video, sort of like if you had CNN.com on the web, we would

3    replicate that on TV in a very easy to use, remote control

4    managed process.  So those are some of the prime examples.

5    BY MR. JOHNSON:

6    Q.  Now, on the next line it shows the content server.  Can

7    you explain that to us.

8    A.  Yeah.  Roughly it's a high level to say that, you know,

9    our technology, our platform enables from various content

10   servers the distribution of experiences such that on the

11   left-hand side you see what you would see on the web on your

12   PC.

13          Then on the right-hand side it shows how we would

14   translate that using our technology to appear on your TV,

15   sort of like I just explained with CNN.com.  On the left, if

16   you imagine that was CNN.com, we would replicate that

17   experience on the TV set, but instead of using a keyboard and

18   a mouse, you would use your remote control.

19   Q.  Okay.  Anyway, how long did this presentation take?

20   A.  You know, it really depends.  I don't remember the

21   specific -- that specific day, but when I gave these type of

22   presentations, it could go 45 minutes, it could go two hours.

23   It just depends on the depth of the question the particular

24   customer might have.

25   Q.  Let's go to Exhibit 23.

Taylor, M. - Direct                                    558

```
 1    A.  On the book?
 2    Q.  Yes.  You should be able to flip right to it.
 3    A.  Okay.  Looking.
 4    Q.  All right.  Let's go through it.  Did you receive a copy
 5    of this exhibit on or about December 15, 2006?
 6    A.  It seems to be a stream of e-mails, yes.
 7    Q.  And did you receive it in the regular course of your
 8    business?
 9    A.  Yes, I did.
10    Q.  And does it appear to be accurate, to the best of your
11    knowledge?
12    A.  As far as I can recall, yes.
13            MR. JOHNSON:  Your Honor, I move PX 23 into
14    evidence.
15            THE COURT:  Any objection?
16            MR. KING:  No objection, Your Honor.
17            THE COURT:  Exhibit 23 will be admitted.
18            (The document was received in evidence and marked as
19    Plaintiff's Exhibit No. 23.)
20    BY MR. JOHNSON:
21    Q.  Now, you had a conference call on or about December 15,
22    thereabouts?
23    A.  Yes.
24    Q.  And do you know who Walter is?
25    A.  I believe this is referring to Walter Delph.
```

Taylor, M. - Direct                                                559

```
 1   Q.  And Maitrey?
 2   A.  Maitrey.  I would -- I fail to be able to pronounce her
 3   last name.  I apologize.
 4   Q.  Now, they indicated they planned to visit you in San
 5   Francisco?
 6   A.  We had discussed that possibility, yes.
 7   Q.  And there is a reference to item number four.  Do you see
 8   that?
 9   A.  Yes.
10   Q.  And can you tell the jury what that is all about?
11   A.  Well, as you recall earlier in the testimony, I became
12   aware of a couple of lab systems that ICTV had provided to
13   Verizon prior to my coming on board, and as of this e-mail
14   date, we still had not, to my knowledge, received them back.
15   And they had expressed that to us, at least this group in
16   Waltham, Massachusetts, had expressed to us that they didn't
17   know where the systems were and that, you know -- they didn't
18   know of their whereabouts.
19   Q.  Now, did one of the systems subsequently get returned in
20   or about December 2006?
21   A.  Yes, in that time frame, yes.
22   Q.  Did you see the system?
23   A.  Yes, I did.
24   Q.  And what, if any, reaction did you have when you saw that
25   system?
```

1   A.   Um, you know, I was both surprised and very disappointed,

2   to be honest with you.

3   Q.   Why were you surprised?

4   A.   I was surprised that a large public company would treat

5   someone else's property in such a manner.

6   Q.   And so you were disappointed?

7   A.   Well, yeah.  I mean, I want to do business with

8   companies, and it's sort of throws up my paranoia flag when I

9   see stuff like that happening.

10  Q.   You say -- did it flow up your paranoia flag?

11  A.   Absolutely.

12  Q.   And when you say it flew up your paranoia flag, tell us

13  what you mean.

14  A.   Well, I mean, the -- when I saw the system -- I mean, my

15  understanding is when we send a system out, we send the

16  system prewrapped, which means it's sitting in a rack that's

17  bolted together, and we take care to pack it very carefully

18  in a wooden crate.  It's all wired and it's ready to go so

19  that when it arrives at the destination, we roll it out of

20  the rack, we plug it in, we turn it on, it should work.

21        And when I looked -- went downstairs to look at this

22  system as it was returned, it was -- all the machines had

23  been taken out of the rack, looks like they had been tossed

24  into the box, randomly.

25        THE COURT:  Wait a minute.  Objection.

Taylor, M. - Direct                                              561

```
 1              MR. KING:  Objection, Your Honor, can I approach the
 2   bench?
 3              (Side-bar conference.)
 4              MR. KING:  I was concerned about this item the
 5   witness was going to testify, she was going to report that
 6   she got the picture, and you let it in.  Now, he's testifying
 7   that he was disappointed that Verizon --
 8              MR. JOHNSON:  Testifying that he went downstairs and
 9   saw the rack.
10              THE COURT:  I'm going to sustain the objection.  No
11   argument about it.  It's not all that relevant.  Testimony
12   always come in that we came back.  They should have the
13   picture there showing it in disarray and they didn't need to
14   grind into this.  So let's just move right on.  Sustained.
15              MR. KING:  Thank you, Your Honor.
16              (End of side-bar conference.)
17   BY MR. JOHNSON:
18   Q.  Now, after the rack came back, did you have discussions
19   with Verizon about mutual nondisclosure agreements?
20   A.  Oh, yes, I did have several conversations with them.
21   Q.  And what was the reason you had these conversations?
22   A.  Um, well, they were requesting that we provide them with
23   another lab system and more of our technology, and I was
24   hesitant to do so without a nondisclosure, a mutual
25   nondisclosure.
```

Taylor, M. - Direct                                                    562

1   Q.  Did you communicate that to Verizon?

2   A.  Yes, I did.

3   Q.  And who did you communicate it to?

4   A.  I -- the people that we were dealing with, there was

5   Brent Simon, there was Steven Whitehead, there was Walter

6   Delph, there was Jim Paschetto, pretty much Susan Twomey, I

7   think her name was, everyone I talked to.

8   Q.  Now, if you will, let's look at Exhibit 91.

9   A.  Yes, sir.

10  Q.  Have you seen this document before?

11  A.  Yes, sir.

12  Q.  And did you prepare it on or about March 31, 2008?

13  A.  This is -- Yes, I did.

14  Q.  And was it done in the regular course of your business?

15  A.  Yes, I did.

16  Q.  And as you sit here today, does it appear to be accurate,

17  to the best of your knowledge?

18  A.  To the best of my knowledge, yes.

19         MR. JOHNSON:  Move Exhibit 91 into evidence, Your

20  Honor.

21         MR. KING:  No objection, Your Honor.

22         THE COURT:  Be admitted.

23         (The document was received in evidence and marked as

24  Plaintiff's Exhibit No. 91.)

25  BY MR. JOHNSON:

1  Q.  All right.  What caused you to write this?

2        MR. JOHNSON:  Pardon.  Oh, Your Honor, I misspoke.

3  This is March 31, 2006.  I said 2008.

4        THE WITNESS:  Sorry, yes.  I read it as 2006.

5  BY MR. JOHNSON:

6  Q.  Okay.  What caused you to write this document?

7  A.  Um, I mean, the initial was -- actually, this doesn't

8  have my members are on there.  Oh, yeah.  The initial is just

9  standard practice.  I'm asking for a mutual nondisclosure,

10  and, you know, they responded that -- well, they responded --

11  they asked me to remove a confidentiality legend that we had

12  on the presentation, and I responded back, they being

13  Verizon, and I responded back saying that --

14        THE COURT:  Hold on.  Do you have an objection?

15        MR. KING:  He is testifying as to what Verizon says,

16  Your Honor.

17        THE WITNESS:  No, right here.

18        THE COURT:  Well, don't say anything.  He is getting

19  too far afield.

20        MR. JOHNSON:  He is expressing what's contained in

21  the e-mails, communication with Verizon.

22        THE COURT:  Overruled.  He is back to the e-mail.  I

23  think we are about where we are sitting all along.  I think

24  it might be helpful if we know who this e-mail is between

25  here and what communication was and we stick to the e-mails,

1   and I think that won't present a problem.

2   BY MR. JOHNSON:

3   Q.  Let's go to the top of the -- and identify the

4   individuals.  Who is Norman Brent?

5   A.  Norman is a person I'd never met personally, but my

6   understanding is that he works in either the legal group at

7   Verizon or it says Verizon strategic sourcing.  I'm not sure

8   what group that is.

9   Q.  Angel Cordero?

10  A.  Not sure.

11  Q.  Brent Simon?

12  A.  Brent Simon was my contact, one of my contacts in the

13  product management group.

14  Q.  And Christina Fyock?

15  A.  I believe Christina, if I remember correctly, worked in

16  the Waltham, Massachusetts technology group.

17  Q.  For Verizon?

18  A.  Yes.  Sorry.  Yes.

19  Q.  Well, see if we can make this easy.  Is everyone

20  mentioned in the block a Verizon employee?

21          THE COURT:  To you knowledge?

22          THE WITNESS:  Let me just cruise through this.

23  Everyone, yeah.  I do know that Stella Alvo was a contractor

24  at the time, I believe, not an employee.

25          THE COURT:  For sake of brevity here, Mr. Johnson, I

1   think he's addressed who you are dealing with and the Court

2   believes that we can save time and not going through

3   everybody in this e-mail address unless it has some

4   relevance.

5   BY MR. JOHNSON:

6   Q.  All right.  Now, was this the result of a meeting that

7   you told us about earlier, this e-mail?

8   A.  This e-mail was a result that they wanted me to remove a

9   legend from the slide deck that had confidentiality stamped

10  on it, on the information.

11  Q.  And do we see that?  We go over to the second page,

12  second e-mail from Norm Bryant?

13  A.  Yes.

14  Q.  Says Michael?

15  A.  Yes.

16  Q.  The slides you have submitted bear a legend that

17  indicates the information therein is proprietary and

18  confidential.  Please either remove the legend and resend or

19  remove the confidential and/or proprietary information from

20  the presentation and resend.  Thanks in advance for your

21  cooperation."  Do you see that?

22  A.  Yes, sir.

23  Q.  Were these the slide decks that I showed you earlier that

24  we are talking about here?

25  A.  I believe it is, yes, sir.

1  Q.  Okay.  And your response is found on the previous page?

2  A.  Yes, sir.

3  Q.  Norm - the thing is, these are confidential slides and

4  fall under our existing NDA with Verizon.  Additionally, as I

5  indicated at several junctures during the meeting, and which

6  I will reiterate now, the information which I provided to you

7  is also to be considered confidential."

8  A.  Yes, sir.

9  Q.  What, if anything, did Verizon say when you told them it

10 was confidential and you wanted it on the legend?

11 A.  I'm sorry.  Repeat the question.

12 Q.  What, if anything, did Norman say to you when you refused

13 to remove the legend?

14         MR. KING:  Objection, Your Honor, calls for hearsay.

15         THE COURT:  Well, we will sustain it in the past,

16 but I think if you have something here, Mr. Johnson, that is

17 responsive to the question, have anything to do with the go

18 to.  Do you have e-mails address in which you are concerning

19 now?

20         MR. JOHNSON:  No.  I'm asking him now for his

21 reaction to a communication we had with a party to this

22 action.

23         THE COURT:  Without saying what he said, you can get

24 a response in of what, if anything, did he do as a result of

25 your request.  Let's move on.

Taylor, M. - Direct                                          567

```
 1          THE WITNESS:  Yes, sir.  He reiterated his position,
 2   I reiterated my position, and he was not on the business
 3   side.  He was from the sourcing/legal group side.
 4          THE COURT:  Not what he said, just what you did.
 5          THE WITNESS:  Well, and as a result I took that to
 6   heart and, you know, because I still wanted to do business
 7   with Verizon, I tried to figure out how to get around not
 8   giving them confidential information but still convincing
 9   them that we had good product, good technology.
10   BY MR. JOHNSON:
11   Q.  And what did you do?
12   A.  We provided, you know, verbal presentation.  We would
13   modify it such that it wasn't, you know -- sometimes our
14   precise, you know, technology, technical information.  I'm a
15   sales guy, and I'm trying to figure out how to sell these
16   guys, and I have ten customers I can sell to, I go after
17   them.  It is what I do.
18   Q.  Let's take a look at Exhibit 291.
19   A.  Yes, sir.
20   Q.  All right.  Have you seen this document before?
21   A.  Yes, sir.
22   Q.  Can you tell us what this document shows?  I'm sorry.  I
23   have the wrong number.  I don't need you to tell me about
24   that document.
25   A.  Okay.
```

Taylor, M. - Direct                                              568

```
1   Q.  In your employment with the company, did you receive
2   another system from Verizon in December 2007?
3   A.  You mean the second system, that we received that back?
4   Q.  Yes.  Right.
5   A.  December 2007, is that when you said?
6   Q.  Correct.
7   A.  Yeah, it was around that time frame.  It was December
8   2007 or January 2008.  It was in that holiday period.
9   Q.  All right.  And did there come a point in time in 2008
10  when you made the decision concerning your relationship with
11  Verizon?
12  A.  Yeah.  I mean, I -- as a sales guy, you know, we, under
13  the normal course of business, we have to -- we have so many
14  resources because we are, you know, we are a small company.
15  And there are, you know -- to engage with an operator of this
16  size requires a certain amount of resources, and it's
17  expensive to engage with such an operator.
18          And we -- you know, at the executive level, we made
19  certain decisions on, you know, in 2008, which was beginning
20  of the year, beginning of our year, physical year, to focus
21  on certain companies and to defocus others.  And we take a
22  number of things into consideration, and risk is a big
23  consideration that we have to take into play.  And we looked
24  at the risk of continuing to engage with Verizon versus our
25  upside vis-à-vis the other operators we were working with.
```

Taylor, M. - Cross                                          569

```
 1           MR. KING:  This is the same inflection that has been
 2   going on, continued objection.
 3           MR. JOHNSON:  What infection?
 4           THE COURT:  Don't respond.  Objection overruled.
 5   Don't give us a narrative, Mr. Johnson.  The witness will
 6   answer.  I don't want any narrative, just keep going on and
 7   on and on.  You ask a question and then answer, and then you
 8   ask another question if he wants to know something.
 9           THE WITNESS:  Yes, sir.
10   BY MR. JOHNSON:
11   Q.  Did you reach a decision about continuing to work with
12   Verizon?
13   A.  We decided to wind down.
14   Q.  And what was the reason?
15   A.  I thought that the risks were higher than the rewards,
16   the risk being I didn't trust them that much.
17           MR. JOHNSON:  Nothing further.
18           THE COURT:  You can start it.  Cross-examination.
19                        CROSS-EXAMINATION
20   BY MR. KING:
21   Q.  Good evening, Mr. Taylor.
22   A.  How you doing?
23   Q.  We've met before, haven't we?
24   A.  Yes, sir.
25   Q.  Nice to see you again.
```

1    A.  And you, too.

2    Q.  Let me start by asking you a few questions about some of

3    the documents that you've been talking about with your

4    counsel.

5    A.  Sure.

6    Q.  If we could see Plaintiff's Exhibit 91, please.

7    A.  Is it going to come up on the screen?  Oh, great, thank

8    you.

9    Q.  Let's go to the second page, please.  And highlight that

10   top paragraph there.  You testified about your reaction to

11   this e-mail, correct?

12   A.  Yes, sir.

13   Q.  So let me see if I understand.  You sent slides to

14   Verizon that were marked confidential, correct?

15   A.  Yes, sir.

16   Q.  And Verizon said either take off the confidential

17   designation or take out the confidential material and send it

18   back?

19          MR. JOHNSON:  Objection.  That is hearsay, and it

20   lacks foundation.

21          THE COURT:  Well, I'm going to sustain the objection

22   for another reason.  I need you to rephrase the question to

23   comport with exactly what was said on direct about that.

24   BY MR. KING:

25   Q.  Well, let's look exactly at what Verizon said.  They

1    said, "The slides you have submitted bear a legend that

2    indicates the information therein is proprietary and

3    conversational.  Please either remove the legend and resend

4    or remove the confidential and/or proprietary information

5    from the presentation and resend."  That is what it says,

6    right?

7    A.  Yes, sir.

8    Q.  And you responded by removing the confidential material

9    and resending the slides to Verizon, correct?

10   A.  I specifically did not, no.

11   Q.  You testified that some of the technical stuff was taken

12   out of the presentation and was resent to Verizon, correct?

13   A.  It has been, yes.  I don't know if it was that specific

14   one, but, yes, as a course of business, that is what we do.

15   Q.  So Verizon -- well, okay.  So let's talk a little bit

16   about the presentation that was at issue here.  Let's look at

17   Plaintiff's Exhibit 89, please.  So this slide deck is a

18   presentation you gave to Verizon, correct?

19   A.  Yes.  Yes, sir.

20   Q.  And it is similar to many slide decks you've given the

21   other customers over the years, right?

22   A.  With nondisclosure, yes.

23   Q.  Okay.  And, well, before we move on, let's talk for a

24   moment about the second slide, I think.  Yeah, this one here.

25   A.  Yes, sir.

1    Q.  You talk about -- we mentioned the third bullet point

2    there.

3    A.  Uh-huh.  Yes, sir.

4    Q.  It says that 24 issued and 17 pending patents?

5    A.  Yes, sir.

6    Q.  Is this a type of slide you would show potential

7    customers in presentations?

8    A.  Yes, it is.

9    Q.  And whether or not there was an NDA, you would show this

10   type of slide to potential customers, right?

11   A.  This particular slide, yes.

12   Q.  Okay.  And during the presentations, did you ever discuss

13   with potential customers specific patents?

14   A.  It's really not my bailiwick.

15   Q.  So the answer is no?

16   A.  Right.

17   Q.  And during the presentation with Verizon did you discuss

18   any of the specific patents?

19   A.  In detail, no.

20   Q.  Even generally?

21   A.  I stated that we haven't.

22   Q.  And did you discuss any of those specific claims in those

23   patents?

24   A.  With Verizon, no, I did not.

25   Q.  Did you discuss how the patents might potentially read on

1   Verizon products?

2   A.  No, I did not.

3   Q.  If you'd turn to -- the pages aren't marked so you're

4   just going to have to scroll through.  I'll tell you when to

5   stop.  There is no number on any of these.  Apologize about

6   this.  Keep going.  Getting closer.  Okay.  Here it is.

7   Actually the next slide, please.  So this is a slide you

8   discussed with Verizon, as well?

9   A.  It was a course of business.  Usually I would not discuss

10  this specific slide.  I would have someone technical there

11  with me.

12  Q.  But the person who was there with you would discuss this

13  slide with Verizon?

14  A.  Yes.

15  Q.  And you discussed STD integration and certification, you

16  see that?

17  A.  Yes, I do.

18  Q.  And did you discuss with Verizon that one of the STB

19  integrations that ActiveVideo was engaged in was TV Guide?

20  A.  Well, as a third party.

21          MR. JOHNSON:  Your Honor, beyond the scope and --

22          THE COURT:  Objection overruled.

23  BY MR. KING:

24  Q.  Can we go to the next page, please.  And did you discuss

25  with them, under cable infrastructure compatibility, the

Taylor, M. - Cross                                                      574

```
 1   third bullet point, there the TV Guide Iguide.  Do you recall
 2   discussing that with Verizon?
 3   A.   Yes, we discussed this with the clients that intend to
 4   integrate with, yes.
 5   Q.   And TV Guide was a client you integrated with?
 6   A.   Yes.
 7   Q.   I have a few questions about the rack that Verizon
 8   returned to you.
 9   A.   Okay.
10   Q.   You said the rack was in disarray when you received it?
11   A.   Yes.
12   Q.   Do you know who at Verizon packed the rack before it was
13   sent back to you?
14   A.   The specific individual?  No, I do not.
15   Q.   Do you know what kind of condition the rack was in when
16   Verizon put it in the box?
17   A.   No, I do not.
18   Q.   Do you know the shipping company that shipped the rack
19   from New Jersey to California?
20   A.   I do not.
21   Q.   Do you know what kind of shipping was used?  Was it sent
22   back truck, by train, by plane, by boat?
23   A.   It was --
24             MR. JOHNSON:  COURT:  Objection, compound.
25             THE COURT:  Objection overruled.
```

Taylor, M. - Cross                                            575

```
 1          THE WITNESS:  It was in a crate.
 2   BY MR. KING:
 3   Q.  But you don't know how it was shipped?
 4   A.  I don't know.  I mean, I assume it came to our office in
 5   a truck.  How it got from Verizon to that truck, I don't
 6   know.
 7   Q.  Do you know how the shipping company handled the box on
 8   the way across the country?
 9   A.  Seems to me -- well, I know that if it were bolted into
10   the rack, you would have to throw it off a cliff to have the
11   components fall into the disarray that it was in.
12   Q.  Unless one of the screws had come loose that had bolted
13   in the rack, one of the bolts had come loose?
14   A.  A number of screws would have to come loose, and if that
15   were the case then someone at Verizon would have had to
16   loosen them or taken the rack off, because when we delivered
17   it, it was tightened.  It was delivered in one piece.
18   Q.  But you don't know the condition of the rack when it went
19   in the box, do you?
20   A.  I was not present.
21   Q.  You don't know if some of the bolts had cracked or loose?
22   A.  No -- if it had, it would be a first.
23   Q.  Okay.  The question is do you know whether there were any
24   bolts that were cracked or loose when it went in the box?
25   A.  No, sir, I do not know the condition of those bolts.
```

Taylor, M. - Cross                                            576

1    Q.  Okay.  And when you received the box, did you check to

2    see whether the bolts were cracked?

3    A.  Did I personally?

4    Q.  Did you personally?

5    A.  No, sir, I did not do that.

6    Q.  Did you ask anyone to do that?

7    A.  No, sir, I did not ask someone to check the condition of

8    the bolts.

9    Q.  Were you concerned about the condition of the components

10   in the box?

11   A.  I was -- yes.  I was more concerned about the components

12   than I were about the bolts.

13   Q.  And did you ask anyone at Verizon to do a forensic

14   investigation to determine whether or not the components had

15   been tampered with in any way?

16   A.  A forensic investigation?

17   Q.  Any sort of --

18   A.  You mean like CSI?

19   Q.  That the box had been tampered with?

20        THE COURT:  All right.  We have gone on enough.

21   Let's move on to another question.  As a matter of fact, we

22   are going to terminate right here.  We are going to take up a

23   new subject on tomorrow morning.

24        Ladies and gentlemen, as I indicated, you have to

25   move a little earlier tomorrow morning so hopefully we can

1    get out of here earlier.  We are going to start at 9, and as

2    I indicated we are going to quit around 2 or 2:15.  So you

3    get breakfast so you can last.  We want to get out of here.

4    Remember the Court's precautions, and we'll see you in the

5    morning.  All rise.

6              (Jury out at 5:27 p.m.)

7              THE COURT:  You can step down, Mr. Taylor.

8    Remember, you are still doing this overnight.  You are still

9    on cross-examination.

10             THE WITNESS:  Yes, sir.

11             THE COURT:  All right.  Have a seat, everybody, for

12   one second.  We had a side-bar up here because, Mr. King, you

13   didn't want Mr. Johnson to get all into the condition of the

14   box and how it happened, et cetera, because you said it was

15   prejudicial under Rule 403.

16             The Court sustained your objection, made Mr. Johnson

17   move on.  You immediately got up on cross-examination and

18   jumped into the middle of the very thing you asked the Court

19   to stop Mr. Johnson from doing.  You got all into the details

20   of that.

21             Well, that is all I have to say is, gentlemen, pay

22   close attention to what you are doing here.  Don't shoot

23   yourself in the foot.  That is all I say to both of you.

24             The Court will see you in the morning.

25             MR. JOHNSON:  Your Honor, may I, before we leave,

1    you've asked us to get along, and I certainly --

2            THE COURT:  You will get along.

3            MR. JOHNSON:  I understand, Your Honor.  But here is

4    the will get along part.  We are going to put up our

5    technical expert, and we were hoping to avoid having to play

6    lots and lots of video to establish the existing documents

7    that were in Verizon's custody and control.

8            And the normal way -- well, there was normal but

9    typically the parties simply stipulate to the underlying

10   documents.

11           THE COURT:  Mr. Gutman, if you will have a seat

12   until he finishes and then I will call you back up.

13           MR. GUTMAN:  Thank you, Your Honor.

14           MR. JOHNSON:  So if we can avoid having to play

15   hours and hours.  Well, for whatever reason, we are

16   continuing to get hearsay objections, objections about

17   third-party documents that they produced to us like from

18   SeaChange.

19           So I don't want to play an hour and a half of

20   SeaChange video to have them describe or so that my expert

21   can base his opinion on some of those statements, Your Honor,

22   but I will be forced to.  So I would request the Court,

23   unless there's -- to suggest to the other side that we try to

24   eliminate a lot of this, we can do this by stipulation.  It

25   can be admitted.  He can testify to it, or we can spend all

1    morning.

2          THE COURT:  Anything you want to say?  The Court

3    will respond.

4          MR. GUTMAN:  Your Honor, we have made a whole number

5    of proposals from mutually eliminating these issues or

6    reducing them to the ones that really matter, and I think

7    Your Honor's seen the difficulties we have had with exhibits.

8    We have a contract.  They were objecting to the contract as

9    hearsay.  We are happy to work out something mutual but we

10   are not prepared to -- I mean, I don't think we should be

11   expected unilaterally to give it up.

12         And we have tried, Judge.  We have made a number of

13   proposals and the answer has been no.

14         THE COURT:  Thank you.  You gentlemen sound leak you

15   all are in Congress negotiating on the debt.

16         MR. GUTMAN:  As I was saying it sounded a lot like

17   that.  I would be happy to try and work -- if he's got

18   specifics, I'd be happy to try and work --

19         THE COURT:  I have a seat, please.  Look, in terms

20   of too many objections, the Court doesn't believe we have had

21   an unusual number of objections.  I think some of the

22   objections were well-founded, you know, regarding hearsay on

23   both sides.  So I don't think you had an unusual number of

24   objections.  That is not the Court's perception.  So I'm

25   going to approach it.  Some were made, the Court overruled.

1        But what it boils down to is you can work out an

2   agreement to make life work better for both of you.  You are

3   not getting any advantage.  You are just going to eat up you

4   time for both of you.  You got 30 hours.  Eat it up.  It is

5   not going to enure to the benefit of either party.  So your

6   best bet is to sit down and figure out a way to deal with the

7   problem.

8        Now, I know that is not resolved in telling you to

9   go deal with it, because what is going to happen is very

10  simple, that if you keep on, I may very well reduce the 30

11  hours.  I get the perception that you are wasting the Court's

12  time on frivolous objections over things you ought to agree

13  on as professionals, the Court will reduce your 30 hours, *sui*

14  *sponte*, and that's the way I'm going to leave it.

15       You've been in this case long enough so you know

16  which documents really matter and what it is really going to

17  come down to when your experts testify.  So stop jerking each

18  other around on things that really don't matter.  So I'm just

19  telling you.  I'll leave it to you be that is what the Court

20  will do.

21       You want to squabble, we can cut it back to 20 hours

22  and see how many documents you can get in and what you can

23  achieve.  That is not a threat.  That is a promise.  The

24  Court will be in recess till tomorrow morning at 9:00.

25       MR. GUTMAN:  I have one more thing before we recess.

```
1    Could we reserve Mrs. Regis for recall in our case.  Again,

2    she's on some of those documents.

3            THE COURT:  All right.  Mrs. Regis, where is she?

4    Mr. Johnson, make sure Ms. Regis --

5            MR. JOHNSON:  We will make her available when we are

6    asked to.

7            MR. GUTMAN:  She doesn't have to stay.

8            THE COURT:  As long as she is available upon

9    request.

10            MR. GUTMAN:  Exactly, Your Honor.  That is all we

11   need.

12            (Hearing adjourned at 5:33 p.m.)

13                        CERTIFICATION

14

15       I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17

18

19            X_____/s/_____x

20                     Jody A. Stewart

21                     X_____7/14/2011_____x

22                          Date

23

24

25
```

JODY A. STEWART, Official Court Reporter