IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

- - - - - - - - - - - - - - - - - -

ACTIVEVIDEO NETWORKS, INC.,     )

        Plaintiff        )

v.                      )   CIVIL ACTION NO.
                       )   2:10cv248

VERIZON COMMUNICATIONS, INC.,  )
et al.,                  )

        Defendants.    )

- - - - - - - - - - - - - - - - - -

TRANSCRIPT OF PROCEEDINGS

Norfolk, Virginia

July 19, 2011

DAY 6, AFTERNOON SESSION

BEFORE:  THE HONORABLE RAYMOND A. JACKSON
        United States District Judge

```
1    APPEARANCES:

2            MORGAN, LEWIS & BOCKIUS, LLP
             By:  Daniel Johnson, Jr.
3                 Michael J. Lyons
                  Nathan W. McCutheon
4                 Ahren C. Hsu-Hoffman
                  Dion Bregman
5                      And
             KAUFMAN & CANOLES
6            By:  Stephen E. Noona
                  Counsel for the Plaintiff
7

8            SIMPSON THACHER & BARTLETT, LLP
             By:  Henry B. Gutman
9                 Noah M. Leibowitz
                  Patrick King
10                Jason M. Bussey
                       And
11           VERIZON CORPORATE RESOURCES GROUP
             By:  John P. Frantz
12                     And
             HUNTON & WILLIAMS
13           By:  Gregory N. Stillman
                  Justin T. Arbes
14                Counsel for the Defendants

15

16                    *      *      *

17

18

19

20

21

22

23

24

25
```

```
1                           I N D E X

2   PLAINTIFF'S
    WITNESSES                                        PAGE
3
      MICHAEL WAGNER (Cont'd)
4         Cross-Examination By Mr. Frantz           1024
          Redirect Examination By Mr. Johnson       1101
5

6   DEFENDANT'S
    WITNESSES                                        PAGE
7
      None
8

9

10

11                        E X H I B I T S

12  PLAINTIFF'S
    NO.              DESCRIPTION                      PAGE
13
      None
14

15  DEFENDANT'S
    NO.              DESCRIPTION                      PAGE
16
      None
17

18

19

20

21

22

23

24

25
```

```
 1                       AFTERNOON SESSION

 2                 (Hearing commenced at 2:32.)

 3           (Jury in at 2:32 p.m.)

 4           THE COURT:  You may be seated.  Let the record

 5   reflect that all jurors are present this afternoon.  Does

 6   counsel agree?

 7             MR. FRANTZ:  Yes, Your Honor.

 8             MR. JOHNSON:  Yes, Your Honor.

 9           THE COURT:  All right.  You may commence your

10   cross-examination.

11                       CROSS-EXAMINATION

12   BY MR. FRANTZ:

13   Q.  Good afternoon, Mr. Wagner.

14   A.  Good afternoon, Mr. Frantz.

15   Q.  My name is John Frantz, as you said.  I'm one of

16   Verizon's attorneys in this case.  I met you at your

17   deposition.  How are you today?

18   A.  I'm fine.  Thank you.

19   Q.  Verizon began offering FiOS video service in September of

20   2005, correct?

21   A.  Correct.

22   Q.  And Verizon came into the market as a new competitor

23   against established cable and satellite companies?

24   A.  That is also correct.

25   Q.  Verizon built a completely new fiber network to provide
```

1   video service?

2   A.   They did.

3   Q.   In forming your opinion, you referenced a number of

4   independent studies confirming that Verizon is the leader in

5   customer satisfaction for video service, correct?

6   A.   I did.

7   Q.   Surveys by J.D. Powers & Associates and the American

8   Consumer Satisfaction Index consistently rate FiOS TV as the

9   number one video service in the marketplace, correct?

10  A.   They do.

11  Q.   And another report concludes that Verizon FiOS TV is the

12  clear leader in overall satisfaction, ahead of cable and --

13          MR. JOHNSON:   Your Honor, objection.   No foundation

14  as to any of these reports are gone into on direct or in the

15  report at the moment.

16          MR. FRANTZ:   Right out of his report, Your Honor.

17          THE COURT:   All right.   Then I think you can make it

18  clear to your reference in something he said.   Overrule the

19  objection, otherwise overruled.

20  BY MR. FRANTZ:

21  Q.   Do you need to hear the question again?

22  A.   I think I remember the question.   You are correct.

23  Q.   Okay.   There are a number of factors that contribute to

24  the success of FiOS TV?

25  A.   I agree with that.

1  Q.  One of those is the quality of the programs that Verizon

2  delivers?

3  A.  That's correct.

4  Q.  Another is the volume of the programming that Verizon

5  delivers?

6  A.  That's true, as well.

7  Q.  And that includes high definition channels?

8  A.  Yes.

9  Q.  Another thing that affects the success of FiOS TV is

10 price?

11 A.  Clearly.

12 Q.  Service quality is also an important factor to the

13 success of FiOS TV?

14 A.  It is.

15 Q.  The reliability of Verizon's new network is an important

16 factor?

17 A.  It is.

18 Q.  Customer service is an important factor for the success

19 of FiOS TV?

20 A.  I thought we already addressed that but I agree with

21 that.

22 Q.  Advertising is an important factor?

23 A.  For attracting customers, not for retaining them.

24 Q.  The quality of Verizon's program guide is an important

25 factor for the success of FiOS TV?

1    A.   I would agree with that statement.

2    Q.   And the convenience of the product's features, that is

3    also an important factor?

4    A.   It is.

5    Q.   All of the factors you just mentioned affect whether

6    customers sign up for FiOS TV?

7    A.   I'd agree with that statement.

8    Q.   And they also affect whether Verizon's existing customers

9    choose to continue their relationship with the company?

10   A.   Everything except for what I told you before, I don't

11   think advertising does.

12   Q.   Okay.  And that is what you called churn?

13   A.   It is.

14   Q.   Okay.  Now, you reference a number of Verizon documents

15   talking about the importance of Video On Demand.  Let's take

16   a look at one.  This document is already in evidence.  It is

17   PX 264.  This is a document that you testified about in your

18   direct.

19   A.   It is.

20   Q.   Can we please take a look at Page 73 of the document.

21   This document discusses Verizon's strategy for FiOS TV,

22   correct?

23   A.   It does.

24   Q.   And it compares Verizon's FiOS TV offerings to the video

25   services of its largest cable and satellite competitors?

1  A.  As of this time, that is correct.

2  Q.  Okay.  And the first area of comparison -- I'm looking at

3  the blue lines -- is TV content, correct?

4  A.  Correct.  That is the first column.

5  Q.  Okay.  And Verizon has the strongest rating in that

6  category?

7  A.  Well, it's DirecTV has the same rating but they are the

8  two leaders.

9  Q.  Tied for first?  Okay.  The second focus area again is

10  quality and reliability, correct?

11  A.  It is.

12  Q.  And Verizon has the strongest rating in that category?

13  A.  It is number one in that category.

14  Q.  Okay.  The third category is anytime anywhere?

15  A.  It is.

16  Q.  And that would include Video On Demand, right?

17  A.  It would.

18  Q.  That could also include giving customers DVRs so they

19  have the ability to record the shows they want to watch and

20  watch them at their chosen time?

21  A.  It would be my belief that that would also be included in

22  that category.

23  Q.  And that would also include the ability of customers to

24  watch content on their mobile devices or their computers?

25  A.  It would.

1   Q.   And Verizon again is tied for the leading rating in that

2   category?

3   A.   Yeah, but not by a lot because four of the five have the

4   same rating.

5   Q.   The fourth category is user experience?

6   A.   It is.

7   Q.   And again, Verizon's tied for first in that category?

8   A.   It is.

9   Q.   The next category is customer service, correct?

10  A.   It is.

11  Q.   And on this one Verizon is tied for second with everybody

12  else?

13  A.   Well, that is characterizing like the other one, they are

14  tied for last, but yes.

15  Q.   Fair enough.  And then finally this document compares

16  Verizon's prices to those of its competitors, correct?

17  A.   It does.

18  Q.   Okay.  Let's take a look at Page 75, please.  This page

19  continues the discussion of Verizon's product strategy for

20  FiOS TV?

21  A.   That's what the title says.

22  Q.   The first headline is that Verizon plans to offer a huge

23  content selection?

24  A.   It does.

25  Q.   And part of this is Verizon's plans to offer extensive

1   channel lineups with most HD content including broadcast and

2   On-Demand?

3   A.   That is correct.

4   Q.   Okay.  Verizon strategy is also to offer a range of low

5   cost and premium package options?

6   A.   Yes.

7   Q.   It is also Verizon's strategy to provide superior

8   quality?

9   A.   It is.

10  Q.   As well as advanced set-top boxes with best in class

11  connections to TVs and home theatres?

12  A.   That is their strategy.

13  Q.   It is also Verizon's strategy to deliver a best-in-class

14  user experience?

15  A.   It is.

16  Q.   And you conclude that having VOD causes a big increase in

17  customer additions, correct?

18  A.   I do.

19  Q.   And you say that without VOD Verizon would have had 16

20  percent fewer new customers each and every month?

21  A.   I do.

22  Q.   You testified before, I believe, that that opinion is not

23  based on any data that you received from Verizon; is that

24  correct?

25  A.   That is accurate.

1   Q.   It is based solely on information from DirecTV?

2   A.   Correct.

3   Q.   Okay.  Now, DirecTV began offering Video On Demand in the

4   third quarter of 2008; is that right?

5   A.   That is correct.

6   Q.   And you studied the number of new customers who

7   subscribed to DirecTV in the quarters before June of 2008 to

8   the third quarter of 2008 compared to the number after?

9   A.   I did.

10   Q.   And you concluded that DirecTV's introduction of VOD

11   caused a 16 percent increase in customer base?

12   A.   On average, yes.

13   Q.   And that is your basis for concluding that without VOD

14   Verizon would have had 16 percent fewer new customers each

15   month?

16   A.   It is.

17   Q.   Okay.  Now, you reviewed information about DirecTV's

18   business in forming your opinions in this case, did you not?

19   A.   I did.

20   Q.   And you attached those materials to your report?

21   A.   I did that.

22   Q.   I believe you had a schedule in your report, schedule 5.2

23   where you pulled out a series of quotations from all of these

24   materials and you -- these were documents from DirecTV or

25   third parties that talked about DirecTV's business; is that

1  right?

2  A.  That's true.

3  Q.  And you considered the documents summarizing the schedule

4  to help form your opinion; is that correct?

5  A.  I did.

6  Q.  Let's take a look at some of the excerpts you quoted from

7  the time that DirecTV offered Video On Demand.  I have given

8  you a binder that has all of the documents we'll be

9  discussing today, and all of your schedules are attached if

10 you care to look at them.  Your report is at tab 1.  The

11 first one that I'd like to ask you about is on Page 58 of

12 schedule 5.2.

13         MR. FRANTZ:  Your Honor, I also have a demonstrative

14 of the relevant quotation from DirecTV that I'd ask be

15 published to the jury.  This is slide 4.

16         THE COURT:  You may.  Hold on a second.  It is all

17 on.

18         MR. FRANTZ:  Thank you.

19 BY MR. FRANTZ:

20 Q.  Okay.  This is a quote from a transcript of the

21 statements that DirecTV's president CEO made to its investors

22 about their first quarter results for 2009, correct?

23 A.  It is.

24 Q.  And this is after DirecTV launched Video On Demand,

25 right?

1    A.  It is.

2    Q.  This says, "The highlights from first quarter are clearly

3    the multi-year highs in gross and net subscriber growth.

4    That is what you are referring to, gross subscriber

5    additions, correct?

6    A.  I am.

7    Q.  And the CEO of DirecTV said, "These results were largely

8    driven by the competitive strength of DirecTV."  You see

9    that?

10   A.  I do.

11   Q.  He also said, first, there were also a few factors that

12   enhanced the results.  "First, our AT&T arrangement got off

13   to a solid start in February."  You see that?

14   A.  I do.

15   Q.  He said, "Second, the digital transition had a bit more

16   of a positive impact than we expected."  You see that?

17   A.  I see that statement.

18   Q.  This statement from DirecTV CEO says that subscriber

19   growth increased because of the competitive strength of

20   DirecTV, correct?

21   A.  It did.

22   Q.  And it says that subscriber growth increased in this

23   quarter because of a new marketing arrangement between

24   DirecTV and AT&T, correct?

25   A.  He doesn't say that but I think that is what he meant.

1    Q.   Okay.  And this was an arrangement that allowed DirecTV

2    subscribers to get a bundle telephone and internet services

3    from AT&T along with the DirecTV video?

4    A.   Right.  Their equivalent of a triple play.

5    Q.   Okay.  And it also says that the transition to digital TV

6    was the cause of their subscriber growth; is that correct?

7    A.   Well, he says digital transition.  It is, I think, more

8    digital content than they had before.

9    Q.   Okay.  When digital transition is at that point in time,

10   I believe it was in 2009, when everybody who had rabbit ears

11   on their TV had to take those away and either subscribe to

12   cable or buy the converter; is that correct?

13   A.   That's true.

14   Q.   VOD is not identified in here as a cause of DirecTV's

15   subscriber growth, is it?

16   A.   I don't see it on this page or in these two paragraphs.

17   Q.   Let's take a look at another one.  This one is from the

18   second quarter of 2009.  It's on Page 62 of your schedule

19   5.2.  And, Your Honor, I have a demonstrative that has the

20   relevant quotation that I ask be published to the jury.  Next

21   slide.

22          THE COURT:  You may.

23   BY MR. FRANTZ:

24   Q.   This is an announcement from DirecTV's interim chief

25   executive officer, correct?  I guess that is not clear from

1    the document.

2    A.   I don't know who it is.

3    Q.   But it is from DirecTv?

4    A.   I do know it is from DirecTV.

5    Q.   He is talking about the causes of their customer

6    additions now in the third quarter of 2009, correct?

7    A.   That is what he is talking about.

8    Q.   And he says, "The increase in growth additions was mainly

9    due to the first full quarter of marketing the AT&T DirecTV

10   bundle as well as higher demand for HD and DVR services."  Is

11   that correct?

12   A.   That's what he says, yes.

13   Q.   And he refers, if you look at the first sentence of that

14   document, he refers to a 17 percent increase in subscriber

15   additions, correct?

16   A.   He did.

17   Q.   That is very close to the 16 percent number that you

18   computed, correct?

19   A.   It is on average.

20   Q.   And he -- again, the first thing that DirecTV's interim

21   CEO identifies is the cause of the increase is the bundle

22   with AT&T that we talked about before, correct?

23   A.   It is?

24   Q.   And the second thing he references is higher demand for

25   HD services?

1    A.   That is the second thing he mentions.

2    Q.   And the third thing he references is higher demand for

3    DVR services?

4    A.   It is.

5    Q.   This doesn't say anything about VOD, either, does it?

6    A.   That particular quote does not.

7    Q.   Okay.  Let's take a look at another one, please.  This is

8    a document from the third quarter of 2009.  This is from

9    Credit Suisse analyst of DirecTV, and this quotation is on

10   Page 63 of your schedule 5.2, if you'd like to find it there.

11   Now, just a little background.  Credit Suisse is an

12   independent third-party doing market research for investors,

13   correct?

14   A.   Correct.  It is an investment advisory firm.

15   Q.   It is similar to the Merrill Lynch report that you showed

16   on your direct, correct?

17   A.   Yes.  They are a competitor of Morgan Stanley.

18   Q.   And this is a document that you relied on in forming your

19   opinions, as well?

20   A.   Right.  As you correctly noted, all these documents

21   you're citing from my report.

22   Q.   Okay.  Terrific.  So, again, I have a demonstrative with

23   the relevant language and I ask that it be published to the

24   jury.

25              THE COURT:  You may.

1    BY MR. FRANTZ:

2    Q.  This states from Credit Suisse, "We believe DirecTV's

3    strong gross ads performance was driven by DirecTV's new

4    marketing bundling alliance with AT&T, a compelling core

5    video product with differentiated content, a strong HD

6    offering and a solid user interface, and DirecTV's strong

7    marketing presence and brand equity."  Do you see that?

8    A.  Those are three items discussed in this bullet point.

9    Q.  And VOD, again, is not mentioned as a cause of DirecTV's

10   customer additions during this time, is it?

11   A.  Not in these statements, no.

12   Q.  Okay.  Now, your opinion is based on the conclusion that

13   ActiveVideo should only get a share of Verizon's profits

14   earned from any customers added as a result of VOD, correct?

15   A.  That is correct.

16   Q.  And your conclusion is that Verizon's profits from VOD

17   should be split roughly one-third/two-thirds with one-third

18   going to ActiveVideo; is that correct?

19   A.  That is almost exact, yes.

20   Q.  Okay.  Now, to figure out Verizon's profits, you had to

21   account for its costs?

22   A.  I do.

23   Q.  Okay.  And the number that you presented to the jury for

24   Verizon's incremental profit margin, I believe, is 26.3

25   percent; is that right?

1   A.   For the video services, yes.

2   Q.   Okay.  So what you're saying when you're referring to a

3   profit margin is that for every dollar in revenues that

4   Verizon earns, 26.3 cents of that is profit?

5   A.   It is incremental revenue, yes.

6   Q.   And it is that 26.3 percent that's being divided up in

7   your calculation, correct?

8   A.   That's accurate.

9   Q.   Okay.  Now, your analysis looks at two different sets of

10  customers, correct?

11  A.   I'm not sure what you're referring to.

12  Q.   Well, the first set of customers you look at is existing

13  customers that you say will leave?

14  A.   Now I know what you're talking about, yes.

15  Q.   And the second set of customers is new customers who

16  Verizon never would have signed up in the first place,

17  correct?

18  A.   That is correct.

19  Q.   Now, the customers who have already had their service

20  installed, the customers who might leave, you did not count

21  their installation expenses when you computed your profit

22  margin, correct?

23  A.   That is correct.

24  Q.   And the reason is that that money was already spent

25  because they were already customers and the installation had

1    already occurred, correct?

2    A.  Only partially correct.  The real main reason is that as

3    I said, the majority of customers are going to have their

4    equipment anyway because they are subscribers to other

5    services.  I'm sorry, I misstated that, that's correct.  I'm

6    sorry.  What I just said was not an accurate statement.

7    Q.  You can't use a Comcast box to access Verizon services?

8    A.  No, that is correct.  You are correct, I'm sorry.  I was

9    thinking about something else.

10   Q.  Okay.  Now, when Verizon signs up a new customer, it does

11   have to spend money to get that customer installed, correct?

12   A.  I agree with that.

13   Q.  I believe you said on your direct that if Verizon gets a

14   customer, it needs to keep it for a long time?

15   A.  I did say that.

16   Q.  And the reason that you said that is that there are

17   significant marketing and acquisition costs to get a new

18   customer, correct?

19   A.  Right.  I was including those set-top boxes in the

20   acquisition costs.

21   Q.  Okay.  Now, you used the same 26.3 percent profit margin

22   for existing customers and for new customers, correct?

23   A.  I did.

24   Q.  Okay.  That's wrong, isn't it?

25   A.  I don't think it's wrong.

1    Q.  Okay.  Well, let's look at it.  You use Verizon's monthly

2    video income statements to figure out what costs to consider

3    when you calculated the 26 percent, correct?

4    A.  I did.

5    Q.  Now, Verizon's expenses for 2006 and 2007 are summarized

6    in your schedule 8.10.  So that's -- excuse me.  Again, it's

7    in your binder, if you'd like to take a look at it.  Your

8    Honor, I have a slide that summarizes the relevant

9    information that I would ask be published to the jury as a

10   demonstrative.

11           So, Mr. Wagner, when you conducted your analysis you

12   looked at Verizon's expenses for 2006 and 2007, correct?

13   A.  I did.

14   Q.  And when you computed that 26.3 percent profit margin,

15   the only customer acquisition expenses that you counted were

16   under the category CPE & STB license fees, correct?

17   A.  I believe that's correct.

18   Q.  And you mentioned before that you did a regression

19   analysis on that one line item of cost, correct?

20   A.  That, among others, yes.

21   Q.  Okay.  But among Verizon's acquisition expenses you did

22   not perform an analysis on install and provisioning expenses,

23   did you?

24   A.  I'd have to have my memory refreshed, but I'm not

25   recalling doing that.

1   Q.   Okay.  Let's take a look at -- why don't you take a look

2   at Paragraph 82 of your report and see if that refreshes your

3   recollection.  It is at Tab 1 of the binder.

4   A.   I've read it.

5   Q.   Okay.  When you calculated Verizon's profit margin, you

6   did not analyze Verizon's install and provisioning expenses,

7   correct?

8   A.   I need to look at Schedule 6.1.

9   Q.   Sure.

10  A.   That is correct.

11  Q.   And when you computed Verizon's profit margin, you did

12  not analyze Verizon's sales channel acquisition expenses,

13  correct?

14  A.   You know, I can't remember whether it wasn't analyzed or

15  was it not statistically significant the variable component.

16  Q.   You have schedule 6.1 in front of you?

17  A.   I do.

18  Q.   Schedule 6.1 consists of five pages of regression

19  analysis summaries, correct?

20  A.   It does.

21  Q.   And for each category of expense that you analyzed, there

22  is a page, correct?

23  A.   There is.

24  Q.   Do you see a page in here for sales channel?

25  A.   I do not.

1   Q.  Does that refresh your recollection as to whether you

2   considered Verizon's sales channel expenses when you

3   calculated Verizon profit margin?

4   A.  Not completely.

5   Q.  What else would you need to see?

6   A.  Well, most of these are for the ones ended up being

7   statistically significant.  And it may be that those were

8   analyzed by my staff but did not raise the level of

9   statistical significance.

10  Q.  If the expenses were not statistically significant, that

11  wouldn't have bore mention in your report?

12  A.  To be complete it should have but not always.

13  Q.  And you did not consider Verizon's marketing expense when

14  you computed 26.3 percent profit margin, correct?

15  A.  I think there is some operating expenses in here.

16  Q.  Marketing expenses.  Sorry.  Not operating expenses.

17  Marketing expenses?

18  A.  Yeah, I thought I answered your question.

19  Q.  I'm sorry.

20  A.  I was waiting for another question.

21  Q.  Okay.  I didn't hear the answer.  You did not consider

22  Verizon's marketing expenses?

23  A.  No, I think those were in the revenue driven expenses.

24  Q.  We can pass over the marketing expenses for a second.

25  Let's focus on install and provisioning.  Someone has to

1   drive out the service truck and install the equipment in a

2   new subscriber's home every time Verizon signs up a new

3   customer, correct?

4   A.   They do.

5   Q.   They have to spend some number of hours out there

6   installing the service, correct?

7   A.   They do.

8   Q.   The truck needs gas, correct?

9   A.   I agree with that.

10   Q.   Verizon needs to have someone on the phone to take sales

11   calls, correct?

12   A.   They do.

13   Q.   And schedule installation appointments?

14   A.   They do.

15   Q.   Verizon needs managers to supervise all those people?

16   A.   I agree with that.

17   Q.   Okay.  Verizon has to pay for any promotional deals it

18   uses to attract new subscribers, correct?

19   A.   They do.

20   Q.   Those are all subscriber acquisition costs, correct?

21   A.   I agree with you.

22   Q.   Okay.  Now, you have a schedule that's the source of all

23   of this information.  I apologize.  Just give me one second

24   to find it.  It's your Schedule 8.10.  Okay.  Your Honor,

25   could I ask that this schedule be published to the jury?

1            THE COURT:  Is this for demonstrative purposes?

2            MR. FRANTZ:  Yes, Your Honor.

3            THE COURT:  You may.

4            MR. FRANTZ:  Page 105 of Tab 2.

5     BY MR. FRANTZ:

6     Q.  Apologies.  Just give us a second.  While we are looking

7     for that, let me ask you a different question, okay.  We will

8     come back to that.  If you could put that Page 105, schedule

9     8.2 in front of you and compare that to Paragraph 82 of your

10    report.

11    A.  Tell me again the first schedule you want me to put in.

12    Q.  Schedule 8.10.

13    A.  Okay.

14    Q.  Have that side by side, please, with Paragraph 82 of your

15    report.  Ready?  Your Paragraph 82 says, "I performed several

16    simple linear regression models of:  One, revenue driven

17    expenses on revenues."  Do you see that?

18    A.  No.  Where are you reading?

19    Q.  I'm reading from paragraph 82 of your report.

20    A.  It goes three pages.

21    Q.  It is on the second page of it, the top bullet.  You see

22    where I am?

23    A.  I'm sorry.  I still don't.  I know what you are saying as

24    to what I did.

25    Q.  That's okay.  I want to make sure you have it in front of

1    you.

2    A.  The very last sentence on Page 34.  I see it now.

3    Q.  Says, the sentence, "I performed several simple linear

4    regressions models of."  Do you see that?

5    A.  Yes.

6    Q.  It lists the things you did a regression analysis of,

7    correct?

8    A.  It does.

9    Q.  Okay.  The first one is revenue driven expenses, correct?

10   A.  It is.

11   Q.  Can you take a look at Schedule 8.10.  Do you have that?

12   A.  I do.

13   Q.  Okay.  Do you see the category of revenue driven

14   expenses?

15   A.  I do.

16   Q.  Is marketing in there?

17   A.  It's possible it is part of local channel AD insertion.

18   That is probably partially marketing.

19   Q.  Local channel advertising insertion?

20   A.  That would be marketing.

21   Q.  Take a look under acquisition expenses.  You see a line

22   that says marketing?

23   A.  Yeah.  There is also marketing expenses there, as well.

24   Q.  Okay.  The marketing expenses that are listed under the

25   heading acquisition expenses, you did not consider those in

1    computing your profit margin for Verizon's video service,

2    correct?

3    A.  That is correct.

4    Q.  Okay.  Now you said you were unsure about the sales

5    channel expenses.  Now, you see here from your exhibit that

6    the sales channel expenses are under the heading acquisition

7    expenses, correct?

8    A.  They are.

9    Q.  And so they are not anywhere else in this schedule?

10   A.  They are not.

11   Q.  Okay.  Now, in your Paragraph 82 where you list the five

12   things you considered, the only line item of acquisition

13   expenses that you counted in your profit margin is CPE and

14   set-top box license fees, correct?

15   A.  I agree with that statement.

16   Q.  You did not consider Verizon's sales channel expenses

17   when you computed your profit margin?

18   A.  No, I considered them.  I did not include them because I

19   don't think they will vary.

20   Q.  Oh, okay.  You don't think they will vary.  Let's talk

21   about the effect of that, then.  You said that Verizon would

22   sign up 16 percent fewer subscribers as a result of not

23   having Video On Demand, correct?

24   A.  I did.

25   Q.  Now, you had an exhibit or a schedule in your report

1    where you computed the number of subscribers we actually had

2    and the number of subscribers that we would have lost as a

3    result of this 16 percent change in subscriber acquisition,

4    correct?

5    A.   I did.

6    Q.   Now, I'm not going to expect you to remember this precise

7    number off the top of your head, but you can tell me if I'm

8    in the ball park, the number is 860,458.  Does that sound

9    about right?

10   A.   That sounds about right to me.

11   Q.   Now, your report computed the cost that Verizon incurs to

12   acquire each subscriber on average, correct?

13   A.   I do.

14   Q.   That is $531 per subscriber; is that right?

15   A.   That sounds about right.

16   Q.   Okay.  Can we have slide 15, please.  Again, this is a

17   demonstrative on this.  I ask it be published to the jury.

18            THE COURT:  You may.

19   BY MR. FRANTZ:

20   Q.   I'm going to hold marketing expenses aside because I

21   believe you testified at your deposition you didn't think

22   those would change.  Let's focus on install and provisioning

23   and sales channel expenses.

24            Okay.  During the time that we are looking at, these

25   expenses together add up to almost $350 million, correct?

1    A.   That looks about right.

2    Q.   Over two years?

3    A.   Yes.

4    Q.   In 2006 these were 58 percent of Verizon customer

5    acquisition expenses?

6    A.   I will accept your representation.

7    Q.   And in 2007 they were 65 percent of Verizon's customer

8    acquisition expenses?

9    A.   I assume your math is correct.

10   Q.   Okay.  And your position is that if Verizon had 860,000,

11   roughly, fewer subscribers, it wouldn't have needed one fewer

12   person to answer the telephone to take sales orders?

13   A.   I don't know if it is one but it -- this is a big

14   business.  I'm not calculating the majority of their sales.

15   They probably have the same infrastructure, in my opinion.

16   Q.   The exact same number of employees with 20 percent fewer

17   customers?

18   A.   I'm certainly right now they still have more employees

19   than they need to do the business that they do.

20   Unfortunately, that happens.

21   Q.   Well, let's look at the offers that we give people to

22   encourage people to sign up.  I recall an example where we

23   gave a hundred dollar gift cards to encourage people to sign

24   up.  If the customer doesn't sign up, we don't give them a

25   hundred dollars, do we?

```
 1   A.  You do not, I agree.
 2   Q.  So whatever incentive we give people to sign up, we
 3   wouldn't incur that cost if we had to sign up the customers,
 4   correct?
 5   A.  Oh, I agree with that.
 6   Q.  So those are variable expenses?
 7   A.  I would define those as a variable expense, yes.
 8   Q.  And there was an easy way, if these weren't variable
 9   expenses, for you to figure that out, correct?  You could
10   just run your regression analysis on it?
11   A.  I could do that.
12   Q.  You didn't?
13   A.  I did not.
14   Q.  You didn't?  You might could do it now but you didn't do
15   it then?
16   A.  Well, someone on my staff did do that but then we
17   discussed it and decided they were not variables for the
18   purposes of my calculation.
19        MR. FRANTZ:  Your Honor, I ask that that be
20   stricken.  That was not --
21        THE COURT:  No, denied.  That is his response.
22   BY MR. FRANTZ:
23   Q.  Okay.  All right.  Let's go on to another subject.  Let's
24   talk about churn.  Churn is just a fancy word for customer
25   cancellations, correct?
```

1   A.   That's fair.

2   Q.   And you say that if Verizon had not offered VOD, the

3   number of people who would have canceled their FiOS accounts

4   would have been 62.5 percent higher each and every month,

5   correct?

6   A.   Yes.   Than what actually happened.

7   Q.   I'm done with the binder if you don't want to keep it on

8   your lap the whole time.   You can set it aside.   There are a

9   lot of reasons why customers may cancel their video

10  subscriptions, correct?

11  A.   I agree with that.

12  Q.   And those reasons can include price?

13  A.   They do.

14  Q.   How well the technology works?

15  A.   That could be a reason.

16  Q.   Customer service?

17  A.   Yes.

18  Q.   The reliability of Verizon's network?

19  A.   That be could be a reason.

20  Q.   The quality of the programming?

21  A.   Yes.

22  Q.   The volume of the content?

23  A.   That's possible.

24  Q.   Access to high definition channels?

25  A.   I could see that being a factor.

1   Q.   The quality of the program guide?

2   A.   Yes.

3   Q.   The convenience of the product's features?

4   A.   Yes.

5   Q.   You know, isn't it true that the largest causes of

6   Verizon's churn or customer cancellations is that people

7   move, pass away or don't pay their bills?

8   A.   To answer your triple compound question, yes.

9   Q.   And according to your presentation, about 45 percent of

10  Verizon's customers don't even use VOD, correct?

11  A.   I think that's about right.

12  Q.   So, again, your conclusion is that eliminating VOD would

13  increase Verizon's churn by 62.5 percent, correct?

14  A.   Correct.

15  Q.   Let's take a look at how you got there.  Now, first of

16  all, you didn't use DirecTV data in this analysis, did you?

17  A.   I did not.

18  Q.   Now, DirecTV has had historically low related churn

19  compared to its competitors, has it not?

20  A.   You'd have to refresh my recollection.  I'm not aware of

21  that.

22  Q.   Let's take a look at Schedule 5.4, Page 71.  This exhibit

23  in line number three lists DirecTV's average monthly

24  subscriber churn by quarter and by year, correct?

25  A.   It does.

1   Q.   And it's in the neighborhood of 1.5 percent, yes?

2   A.   I think that's a good average.

3   Q.   Okay.  And that's very close to the rate that you

4   observed for Verizon, correct, about little bit above 1.5

5   percent?

6   A.   Again, you have to refresh my recollection.  I thought it

7   was closer to 2 but it may be at 1.5.

8   Q.   I don't know if you have a copy of the slides that you

9   presented to the jury up there, but it's your slide 25 you

10  have a churn rate for all users.  Your average churn rate is

11  1.53 percent, correct?

12  A.   Yes, for the three months that I have information for

13  there.

14  Q.   Okay.  Now, DirecTV's cancellation rate didn't go down

15  after it introduced VOD, did it?

16  A.   I don't think that it did.

17  Q.   Okay.  Your Honor, I have a demonstrative with the

18  relevant data that I ask be published to the jury?

19  A.   You may.

20  Q.   In 2007 before DirecTV launched VOD, its churn was 1.51

21  percent, correct?

22  A.   I'll accept your numbers.

23  Q.   Well, it's right out of your schedule.  I didn't come up

24  with that.  So if you'd like to check.  It is right there.

25  A.   I assume you are telling us the truth.

1   Q.  Okay.  And in 2008 when DirecTV launched VOD, its churn

2   was 1.47 percent, correct?

3   A.  I mean, my numbers are quarterly.  I'm just assuming that

4   you are correct.

5   Q.  Mr. Wagner, there is an annual tally, so I don't want any

6   speculation.  You can look at your schedule.  Right now I'm

7   on Page 70 of Tab 2, the last line says annual, 1.47 percent.

8   Do you see that?

9   A.  What page are you on?

10  Q.  Page 70 of your schedules, Schedule 5.4, Page 70, 110?

11  A.  You are correct.

12  Q.  You can turn to the next page, please, and again focus on

13  the annual lines in 2009, your after DirecTV launch VOD, its

14  churn was 1.53 percent, correct?

15  A.  It was.

16  Q.  That is higher than before it launched VOD, correct, by a

17  very small amount?

18  A.  A very small amount.

19  Q.  Okay.  And in 2010 the churn was the same, 1.53 percent,

20  correct?

21  A.  It was.

22  Q.  Now, for Verizon, you looked at three reports that

23  Verizon did for three months, I believe that's what you just

24  said, correct?

25  A.  I looked at more than that but those were the three that

1   were the ones I used.

2   Q.  Okay.  The three that are the basis of your opinion, and

3   those reports divided Verizon's subscribers into two groups,

4   correct, those that used VOD and those who do not use VOD,

5   correct?

6   A.  It did.

7   Q.  Everybody in the sample has access to VOD, some just

8   choose not to use it, correct, or don't know about it?

9   A.  That is an accurate statement.

10  Q.  Okay.  And the reports that you looked at compared the

11  cancellation rates of these two groups, correct?

12  A.  It did.

13  Q.  Okay.  And based on the data you considered the people

14  who did not use VOD canceled on average 62.5 percent more

15  than those who do use VOD, correct?

16  A.  You said that well.

17  Q.  Thank you.  Now, this data shows a correlation between

18  VOD use and churn, correct?

19  A.  It does.

20  Q.  It does not show that VOD causes the 62.5 percent

21  difference in churn rates between the two groups of

22  subscribers, correct?

23  A.  That analysis by itself does not.

24  Q.  But your analysis attributes all of this 62.5 percent

25  difference to VOD?

1   A.   It does, just as the statistics show.

2   Q.   Okay.  There could be other important differences between

3   the groups of people who do and do not use VOD, correct?

4   A.   Anything is possible.

5   Q.   Well, one explanation for the difference in cancellation

6   rates could be that people who use VOD are just more

7   interested in the FiOS product, correct?

8   A.   That's possible.

9   Q.   They could be more interested in television?

10  A.   Yes.

11  Q.   They could be more intense users of Verizon's high

12  definition services?

13  A.   I agree with that.

14  Q.   Or they could be more likely to have DVRs, correct?

15  A.   Maybe, maybe not.

16  Q.   Well, a DVR is something that you use to watch programs

17  at a time and place of your choosing, correct?

18  A.   That's true.

19  Q.   That is very similar to what Video On Demand is, isn't

20  it?

21  A.   It is similar but it is using a different technology to

22  do it.

23  Q.   Now, there is evidence in your own report that features

24  other than Video On Demand are correlated with reductions in

25  churn, correct?

```
 1    A.  I'm certain that's true.

 2    Q.  Okay.  Let's take a look at Schedule 5.2 again, this time

 3    on Page 58.  Again, this is from the DirecTV documents you

 4    cited.

 5    A.  I'm sorry.  I missed the first part of your question.

 6    What schedule did you say?

 7    Q.  I'm sorry, Schedule 5.2, which is your quotation of

 8    DirecTV documents, and I'm on Page 58 of that schedule.  I'm

 9    on slide 70, please.  Your Honor, I have a demonstrative with

10    the relevant text.  I ask that be published to the jury.

11           THE COURT:  You may.

12    BY MR. FRANTZ:

13    Q.  This states, "The decrease in average monthly subscriber

14    churn was primarily due to increased sales of HD and DVR

15    services."  Correct?

16    A.  That's true.

17    Q.  Let's take a look at another example.  Now on direct you

18    told the jury about Time Warner's experience in Wisconsin,

19    correct?

20    A.  I did.

21    Q.  And the source cited in your slide is in Volume 10, Tab

22    32 of your report.  It is in Tab 31 in that binder if you

23    care to look at it.  But that document talks about a long

24    statement by Time Warner chairman, Glenn Britt, during a

25    conference held by Merrill Lynch in September of 2005,
```

1  correct?

2  A.  I think that's correct.

3  Q.  Okay.  And Mr. Britt is the same person that you quoted

4  on your slide that you presented to the jury, correct?

5  A.  Yes.  He's the chairman of Time Warner Cable.

6  Q.  Now, I know you read the newspaper article.  Did you look

7  at Mr. Britt's actual remarks at this conference when you

8  formed your opinion in this case?

9  A.  First, I don't think it was a newspaper article, but --

10  Q.  Multi-channel news article?

11  A.  Right.  It is a trade publication.

12  Q.  Okay.  Did you look at Mr. Britt's actual comments before

13  you formed your opinion in this case?

14  A.  I did not read his original transcript.

15  Q.  Okay.  Well, you can find the transcript of Mr. Britt's

16  remarks at Tab 30 of your binder there.  Your Honor, and I

17  have the demonstrative with the relevant language that I ask

18  be published to the jury on slide 18, please.

19          THE COURT:  You may.

20  BY MR. FRANTZ:

21  Q.  Mr. Britt said, "Here are some examples of recent

22  innovation in video over the last few years.  VOD; high

23  definition TV, which we rolled out extensively; DVRs.  These

24  services lowered churn"; is that correct?

25  A.  That's correct.

1    Q.   Okay.   Let's turn to how you computed your 62.5 percent

2    churn rate.   The three reports that you used looked at

3    whether customers used Video On Demand in the same month that

4    they canceled, correct?

5    A.   Correct.

6    Q.   So if, for example, a FiOS customer canceled on November

7    8th, the reports you looked at considered only whether that

8    person used Video On Demand in November 1st through 7th,

9    correct?

10   A.   That would be accurate.

11   Q.   And if the customer used VOD every Saturday but they

12   canceled on the first Friday of the month, the reports you

13   used would classify that person as a VOD nonuser, correct?

14   A.   Not necessarily.

15   Q.   You have your deposition up there?

16   A.   Well, I don't want to be cute.   You could have a Saturday

17   before the first Friday.   So sometimes it would and sometimes

18   it wouldn't.

19   Q.   All right.

20   A.   Let's say the first day of the month is a Saturday, then

21   the first Friday would be --

22   Q.   Let's assume the first day of the month is Sunday and

23   they canceled on Friday, and they like to watch a movie with

24   their family on Saturday night.   In that situation, the

25   person in the studies you relied on would be counted as a VOD

1   nonuser, correct?

2   A.  I agree with that.

3   Q.  Even though they watch VOD every week?

4   A.  I agree with that statement.

5   Q.  Okay.  So the methodology in the reports you used over

6   counts the number of VOD nonusers, correct?

7   A.  It may or may not.  It is possible it does.  It's the

8   same way that your company analyzes this information.  That

9   is what I used.

10  Q.  Well, we'll get to that in a second.  If people are over

11  counted as VOD nonusers in your analysis, that would make the

12  difference in the churn -- between the two groups larger,

13  correct?

14        MR. JOHNSON:  Objection, argumentative, hypothetical

15  and assumes facts not in evidence.

16        THE COURT:  Well, I sustain the objection.  I think

17  once you got his answer, you certainly may argue that.

18  BY MR. FRANTZ:

19  Q.  Okay.  Now, there is another Verizon report that compared

20  churn rates of VOD users and nonusers that you rejected as

21  the basis for your calculation, correct?

22  A.  That was the December 2008 analysis, yes.

23  Q.  And that looked at VOD use for the entire month before

24  the customer canceled to determine whether the customer was a

25  VOD user, correct?

1    A.  It did.

2    Q.  So that gives the customer the entire month to use VOD

3    before looking at the next month to decide whether they

4    cancel?

5    A.  That's accurate.

6    Q.  Okay.  Now, I have a demonstrative comparing the

7    differences in the reports that I ask be published to the

8    jury, slide 19.

9            THE COURT:  Publish it.

10   BY MR. FRANTZ:

11   Q.  And, Mr. Wagner, your analysis is based on method A,

12   correct?

13   A.  It is.

14   Q.  And there is your 62.5 percent, correct?

15   A.  That's the last number in the first column.

16   Q.  Okay.  Now, the report that Verizon created that used the

17   method that gives everybody the whole month to decide whether

18   or not to use VOD, the difference in that report was only 18

19   percent, correct?

20   A.  I think that is accurate.

21   Q.  Okay.  Now, you said before that these analyses were good

22   enough for Verizon.  You don't know why these analyses were

23   prepared, do you?

24   A.  I don't.  No one told me that.  These were just the

25   business records of your firm.

1  Q.  Okay.  And you don't know what purpose Verizon used them

2  for?

3  A.  No.  My only intelligent guess but no one told me how

4  they used them.

5  Q.  Verizon was not preparing these reports to determine what

6  percentage of customers were churning because of VOD,

7  correct?

8            MR. JOHNSON:  Objection, lack of foundation.

9            THE COURT:  The Court has a question here.  Method

10 B, is this based upon facts in evidence or based upon what

11 would be if you are selling a customer with Verizon for a

12 month?  I'm trying to figure out where the method B comes

13 from.

14           MR. FRANTZ:  It is directly from Mr. Wagner's

15 report, Your Honor.  There was a month that had this study

16 methodology used and these numbers are taken directly from

17 that.

18           THE COURT:  Directly from.  Okay.  All right.

19 BY MR. FRANTZ:

20 Q.  And one last question before we move off the subject of

21 growth ads and churn.  Your analysis is based on the

22 assumption that Verizon would not have VOD anymore as part of

23 FiOS TV, correct?

24 A.  That's accurate.

25 Q.  And you testified that Verizon charges customers more

1    than $7 a month as part of their basic service for free Video

2    On Demand, correct?

3    A.  Well, it is a little more complicated than that but you

4    could say that is what I said.  It is really as the

5    equivalent of what they charge for Pay Per View if you did it

6    for free Video On Demand.  I'm really trying to equate the

7    profit streams of free video and paid video.

8    Q.  Well, you quoted Mr. Ambeault's deposition testimony

9    during your direct where he said it's not really free, we

10   charge for it as part of the product, correct?

11   A.  I did.

12   Q.  If Verizon does not have VOD anymore, then, by your

13   analysis, it could cut its price by as much as $7 a month to

14   reflect the fact that that it is no longer providing or

15   charging for a free VOD, correct?

16   A.  Not exactly.  You could take it that way but that's not

17   what I would do if I was going to make that calculation.

18   Q.  The feature would be removed from Verizon's product, all

19   the cost associated would be removed on an ongoing basis,

20   Verizon could cut its price, correct?

21   A.  It could.

22   Q.  And your analysis does not account for how that price

23   reduction would affect Verizon's customer acquisition or

24   churn, does it?

25   A.  Under price elasticity analysis, that is correct.

1   Q.  Let's take a look at the Grande we discussed.  You used

2   the amendment to this agreement as one of your two

3   benchmarks, correct?

4   A.  The First Amendment, yes.

5   Q.  Okay.  And you say this is the kind of deal that

6   ActiveVideo would have been able to negotiate with Verizon in

7   2005, correct?

8   A.  I do.

9   Q.  Let's talk about some of the differences between the

10  Grande agreement and the hypothetical negotiation with

11  Verizon.  The hypothetical negotiation is just for a patent

12  license, correct?

13  A.  It is.

14  Q.  And a patent license is when the owner of a patent lets

15  the licensee use it and promises not to sue the recipient for

16  its use, correct?

17  A.  I have heard it characterized that way before.  I agree

18  with that statement.

19  Q.  You get a patent license you don't actually get any

20  technology, do you?

21  A.  Well, you get the technology that is taught in the

22  patent.  It is not existing.  You have to then go out and

23  develop the software.

24  Q.  You don't get a product?

25  A.  You do not get a product.

1   Q.   You don't get software?

2   A.   You do not.

3   Q.   You don't get help designing or developing anything?

4   A.   Not in the hypothetical license agreement.

5   Q.   You still have to do everything yourself?

6   A.   You do.

7   Q.   Now, the Grande agreement was not just an agreement for a

8   patent license, correct?

9   A.   As I said in my direct examination, that is absolutely

10  true.

11  Q.   It was agreement for the sale of products and services?

12  A.   And software.

13  Q.   So as part of this agreement, Grande got hardware?

14  A.   It did and they paid for it.

15  Q.   Software?

16  A.   They did and they paid for it.

17  Q.   Hardware support?

18  A.   And software support, as well.

19  Q.   Installation of the hardware and software?

20  A.   Yes.

21  Q.   Training?

22  A.   They got training.

23  Q.   Network support?

24  A.   Yes, and they paid for that.

25  Q.   Technical support?

1    A.   Yes, and they paid for that.

2    Q.   Professional services?

3    A.   Yes, and they paid for that.

4    Q.   Warranty?

5    A.   They got a warranty.

6    Q.   And they got a license?

7    A.   And they got a license.

8    Q.   Now, the license included all of ActiveVideo's patents,

9    not just the patents in this case, correct?

10   A.   That's true.

11   Q.   And the license also included trade secrets and

12   copyrights, correct?

13   A.   Well, based on my discussions with management, there

14   weren't any, but they had -- if there were, they would have

15   gotten those rights, yes.

16   Q.   Okay.  Let's just explore that a little bit.  Now, you

17   testified on your direct that you had a conversation with

18   ActiveVideo CEO Mr. Miller about the value of ActiveVideo's

19   copyrights and trade secrets, correct?

20   A.   Yes.

21   Q.   When did that conversation take place?

22   A.   It occurred twice.  It's occurred before my report went

23   out and it also occurred recently.  I've had it twice.

24   Q.   Okay.  Now during this conversation Mr. Miller told you

25   that ActiveVideo does not have any trade secrets that have

1  value to ActiveVideo; is that correct?

2  A.  Correct.

3  Q.  And during this conversation Mr. Miller told you that

4  ActiveVideo does not have any copyrights that have value at

5  ActiveVideo, correct?

6  A.  That's fair.

7  Q.  And since these rights were conveyed to Grande under this

8  agreement, those trade secrets and copyrights did not deliver

9  any value to ActiveVideo's customer, either, did they?

10  A.  They by definition not create any value.

11  Q.  Okay.  ActiveVideo software is protected by copyright,

12  isn't it?

13  A.  You have to ask them.  I don't know.

14  Q.  Okay.  Now, the version of the agreement that you're

15  relying on is already in evidence, PX 147.  So let's take a

16  look, please, at the pricing schedule.  This is Exhibit 4.

17  Could you just blow up the part that says software-monthly

18  license maintenance fee and the points under that, please.

19        Now, the $0.70 for set-top box fee that you are

20  referring to is in this section of the agreement, correct?

21  A.  That is correct.

22  Q.  Now, this $0.70 is for the use of ActiveVideo software,

23  correct?

24  A.  It is.

25  Q.  And it's for the maintenance on that software, correct?

1    A.  It says that but actually if you blow up the section of

2    Exhibit 4 below that, actually, they charge $0.05 for set-top

3    box for the maintenance.  So I don't think it is really any

4    of that $0.70 related --

5    Q.  Okay.  Look at the contract, as well, on that.  Now, in

6    the pricing schedule -- sorry.  Just to focus back on this,

7    this agreement doesn't say anything about how the value of

8    the use of the software should be separated out from the

9    value of ActiveVideo's patents, correct?

10   A.  It does not.

11   Q.  You have no information to say, as between the patents

12   and the software, how much is allocated to each, correct?

13   A.  That's true.

14   Q.  Okay.  Now, in this pricing schedule the number that you

15   used was the maximum license fee of $0.70, correct?

16   A.  It is.

17   Q.  That is the maximum Grande could pay, not the amount that

18   was actually paid, right?

19   A.  That's true.  It's the maximum they would pay under this

20   agreement.

21   Q.  And this agreement also has volume discounts, doesn't it?

22   A.  It does.

23   Q.  The maximum volume discount listed in the agreement is 8

24   percent, right?

25   A.  I think that's correct.

1   Q.  And you didn't credit Verizon for that discount?

2   A.  No, because Verizon is not an early adopter.

3   Q.  Okay.  And this agreement also says the first year is

4   free, doesn't it?

5   A.  Because of the early adopter discount.

6   Q.  You didn't give Verizon the benefit of that discount,

7   either?

8   A.  I did not.

9   Q.  Okay.  Now, Cablevision is also a customer of

10  ActiveVideo, correct?

11  A.  I believe they are.

12  Q.  You reviewed ActiveVideo's contract with Cablevision to

13  help formulate your opinions in this case?

14  A.  I did.

15  Q.  In this agreement ActiveVideo granted Cablevision

16  exclusive rights to deploy the ActiveVideo technology in

17  Cablevision's market areas; is that correct?

18  A.  I think that's correct for some period of time.

19        MR. FRANCE:  Your Honor, I have a demonstrative with

20  the relevant language I ask be published to the jury.

21        THE COURT:  You may.  What exhibit number is this.

22        MR. FRANTZ:  I don't think this contract is in

23  evidence.

24        THE COURT:  Well, before you show it, hold up.

25  Let's cut it off.

 1          Before you show it, it has to be admitted.  If it is

 2   not admitted, it at least has to be tagged so we know what it

 3   is.

 4          MR. FRANTZ:  Again, this is just for demonstrative

 5   purposes, Your Honor.  The contract that we reviewed as part

 6   of it I'll be happy to mark this as DX 1051 simply for

 7   demonstrative purposes?

 8          THE COURT:  DX what?

 9          MR. FRANTZ:  1051.

10          THE COURT:  All right.  Put it up.

11   BY MR. FRANTZ:

12   Q.  If you look at the top you can see that this is an

13   agreement between Cablevision and ActiveVideo, correct, an

14   excerpt from it?

15   A.  It is.

16   Q.  And focus on Section 14, ActiveVideo is a company,

17   company for ActiveVideo agrees that for a period of 24 months

18   beginning with the execution of this agreement, which was in

19   April of 2009, it shall not sell or license company products

20   to any other wire-line and/or fiberoptic based multi-channel

21   video operator for use within the territory.  Do you see

22   that?

23   A.  I do.

24   Q.  That is Verizon, isn't it?  That would include Verizon?

25   A.  That would include Verizon for that period of time.

1   Q.   Cablevision's primary geographic markets are in New York

2   and New Jersey, correct?

3   A.   I believe that's correct.

4   Q.   Those are some of Verizon's market, as well?

5   A.   That is true.

6   Q.   And under this provision ActiveVideo cannot license both

7   Cablevision and Verizon for this 24 month period, correct?

8   A.   That is correct.

9   Q.   And the period began in April of 2009?

10  A.   It did.

11  Q.   And it ended in April of 2011, 24 months later, correct?

12  A.   Unless it was renewed, yes.

13  Q.   Okay.  And this exclusivity is not factored into your

14  analysis anywhere, is it?

15  A.   No.  The hypothetical agreement would be a nonexclusive

16  license, I agree with that.

17  Q.   But the agreement with Cablevision was exclusive, and in

18  your analysis ActiveVideo gets the benefit of both the

19  agreement with Verizon and the exclusive agreement with

20  Cablevision, correct?

21  A.   That's correct, because this hypothetical agreement with

22  your client never existed.  If it did then this contract

23  would never have been entered into in 2009.

24  Q.   Which means that it's possible that ActiveVideo never

25  would have had Cablevision as a customer, correct?

1              MR. JOHNSON:  Objection, calls for speculation.

2              THE COURT:  Sustained.

3    BY MR. FRANTZ:

4    Q.  Just said the contract wouldn't be in effect?

5              THE COURT:  Speculating even for an expert is

6    getting a little out of hand here.  Sustained.

7    BY MR. FRANTZ:

8    Q.  All right.  Let's look at the GemStar agreement.  The

9    other license you identified is a comparable, is in Verizon's

10   agreement with a company called GemStar TV Guide

11   International, correct?

12   A.  Correct.

13   Q.  Verizon entered into this agreement in 2007?

14   A.  They did.

15   Q.  And under this agreement Verizon is a customer of TV

16   Guide, correct?

17   A.  Yes.

18   Q.  And Verizon is also a licensee of TV Guide, correct?

19   A.  They are.

20   Q.  Now, this agreement includes licenses to two sets of

21   patents, right?

22   A.  It does.

23   Q.  In the first set of patents in this agreement is for

24   interactive program guides?

25   A.  Yes.

1   Q.  And the second is for advertising in interactive program

2   guides, correct?

3   A.  Correct.

4   Q.  Now program guide is a thing that comes up when you hit

5   the guide button on your remote that helps you find a movie,

6   right?

7   A.  If everything is working right, that's what happens.

8   Q.  And none of these patents cover Video On Demand?

9   A.  I don't believe they do.

10   Q.  Now, for this license you created a table that details

11   the royalties that are to be paid.  This is Figure 6 in your

12   report.  It is Paragraph 117.  Your Honor, I have a

13   demonstrative for the slide 21.  I ask it be published to the

14   jury.

15          THE COURT:  You may.

16   BY MR. FRANTZ:

17   Q.  Okay.  Given Verizon's current number of subscribers as

18   you computed it, Verizon is paying $0.28 per subscriber per

19   month for this license, right?

20   A.  Based on their current follow volume, I believe that's

21   correct.

22   Q.  And Verizon has actually made payments to TV guide under

23   this license, correct?

24   A.  I have no information about payments by your client on --

25   underneath this agreement.

1  Q.  Okay.  But you concluded that the license fee is not a

2  relevant bench mark, correct?

3  A.  Yes, and I stated the reasons in my report.

4  Q.  Now, the second license in this agreement is for a set of

5  patents related to advertising in a program guide, correct?

6  A.  In an interactive program guide, yes.

7  Q.  These patents cover situations where if you're looking at

8  your program guide and there is a little banner at the top or

9  a little corner you can run a TV ad or something like that,

10  right?

11  A.  It could be either of those, yes.

12  Q.  And none of these patents cover Video On Demand?

13  A.  I don't think they do.

14  Q.  And the license in the GemStar agreement is not for the

15  patents at issue in this case?

16  A.  Oh, clearly not.

17  Q.  In fact, none of these patents cover any of the

18  technologies that are accused in this case, correct?

19  A.  If they did, then I don't think my client could get their

20  patents.

21  Q.  Okay.  Now, you concluded that this license is a relevant

22  bench mark, correct?

23  A.  Based on my consideration, I think that part of the

24  GemStar agreement is relevant, yes.

25  Q.  So your conclusion is that a program guide license is not

```
 1    relevant but a license to advertising in a program guide,
 2    that is relevant?
 3    A.  That's correct, and the main reason is that this first
 4    license is not a one-way license.  It is a cross-license.  So
 5    GemStar also gets all of Verizon's patents, as well.  So this
 6    is what is called a balancing payment.  You can't really
 7    figure out what the value of the one-way patent license is by
 8    using this particular part of the agreement.  And also, as I
 9    said in my direct examination, that there are competitive
10    offerings to GemStar's program guide that Tribune company,
11    very big media company had an interactive program guide.
12            Microsoft, the most important and powerful software
13    company in the world developed an interactive program guide.
14    So there are other alternatives which also would lower the
15    rates.  Those are the reasons why I did not use that part of
16    the agreement.
17    Q.  Okay.  Now, based on the terms of the license for the
18    advertising in the program guide, you conclude that Verizon
19    would be willing to give ActiveVideo 50 percent of its VOD
20    profits for each subscriber per month?
21    A.  I did even though the contract actually -- this contract
22    said give 50 percent of their revenues which is significantly
23    higher than what I used in this agreement.
24    Q.  Mr. Wagner, if I give you half of my turkey sandwich,
25    does that mean I'll give you half of my bank account?
```

1          MR. JOHNSON:  Objection, Your Honor.  This is

2    supposed to be a statement of hypothetical.

3          MR. FRANTZ:  Just because --

4          THE COURT:  Hold on a second.  I'm going to overrule

5    the objection.  I permit him, Mr. Frantz, to try to rephrase

6    it to capture what -- the Court understands what he is trying

7    to ask.  Let him rephrase.

8    BY MR. FRANTZ:

9    Q.  Just because Verizon is willing to give someone half of

10   something doesn't mean it's willing to give someone else half

11   of anything else, correct?

12   A.  Oh, I agree with that, yes.

13   Q.  Okay.  How much revenue has Verizon earned from selling

14   program guide advertising?

15   A.  I have no idea, from a question like my deposition I can

16   infer they got nothing but that is not evidence.  No one

17   produced me what has been paid under this agreement.

18   Q.  Okay.  Now let's look at how you computed your numbers on

19   this.  Again, I have the demonstrative that shows

20   Mr. Wagner's calculation and ask if we can publish it to the

21   jury.  It is slide 23, and it's just a blow-up of a figure in

22   his report.

23          Now, the value that you ascribed to Video On Demand

24   here is $3.11, correct?

25   A.  For the paid Video On Demand, yes.

1  Q.  Now, that's the money that Verizon makes selling movies

2  to someone who wants to watch a Video On Demand basis,

3  correct?

4  A.  I think that is a principle component of that number.

5  There is also some small subscription VOD revenue.

6  Q.  So if I paid 4.99 to watch Avatar, that is what is in

7  this $3.11, right?

8  A.  That would be.

9  Q.  Okay.  Now, Verizon also gives free Video On Demand to

10  its customers, correct?  We talked about that.

11  A.  We do but I'll quibble with your word give but, yes, they

12  provide it.

13  Q.  Okay.  And most of this content consists of reruns and

14  programs on regular television, correct?

15  A.  I think that's correct.

16  Q.  These are shows that Verizon's customers could watch

17  without paying anything extra when they run on television,

18  correct?

19  A.  If they want to watch them when they are on linear TV,

20  that is correct.

21  Q.  And they could set the DVR to record it and watch it

22  later, correct?

23  A.  They could do that.

24  Q.  Okay.  And a lot of the shows that are on free VOD are

25  also available for free on the internet, correct?

```
1    A.   Today I think that's true.
2    Q.   So pay and free VOD content are not equally valuable,
3    correct?
4    A.   I think I've said that in my deposition, yes.
5    Q.   The value of a rerun of a children's show is not the same
6    as the value of a Hollywood movie, correct?
7    A.   I think in my deposition we talk about Barney, and I
8    would agree with that.
9    Q.   Now, the way that you get a $7 value for the free VOD is
10   to assume that each stream of paid Video On Demand is worth
11   the same as each stream of free Video On Demand, correct?
12   A.   I do.
13   Q.   But you agree with me that is not true, right?
14   A.   Well, it is more complicated than that.  If you want
15   explanation I'll give it to you.  Otherwise I'll wait for
16   redirect.
17   Q.   I'll let Mr. Johnson do that.  Let's focus on your --
18            THE COURT:  Well, gentlemen, I'll give you the same
19   explanation I gave the last witness.  Answer the question.
20   Then you may explain the answer.  You may continue to move
21   on, however.
22   BY MR. FRANTZ:
23   Q.   Do you have anything more you want to say?
24   A.   Well, I'll explain it now.  It's not directly responsive
25   to your question so that is why I don't like to be
```

1    nonresponsive, Your Honor.

2           THE COURT:  Then don't explain.  Keep moving.

3    BY MR. FRANTZ:

4    Q.  Let's look down at another number in your report, I'm

5    sorry, in this table.  Now, you said Verizon's profit margin

6    on Video On Demand is 56 percent, correct?

7    A.  I do.

8    Q.  Now that's not for the whole FiOS TV service, that's just

9    Video on Demand by itself, right?

10   A.  It is just Video On Demand.

11   Q.  Just so there is no confusion, the margin you said was

12   for the whole FiOS TV service was at 26.3 percent we talked

13   about at length before, correct?

14   A.  Yes.  Thank you for clarifying that.

15   Q.  Okay.  Now, I have a demonstrative that shows how this

16   margin was calculated, and I ask it be published to the jury.

17   This is our slide 26.  Again, this is a schedule.

18   Mr. Wagner, do you recognize this as the schedule?

19          THE COURT:  When you say slide 26, is that Exhibit

20   26?  On all your demonstrative exhibits, the Court wants an

21   exhibit number attached to these demonstrative exhibits so we

22   can track what was shown.

23          MR. FRANTZ:  Okay.  I apologize.

24          THE COURT:  You say slide 26.

25          MR. FRANTZ:  That was a cue to my operator, and I

```
 1    think those numbers would overlap some of the exhibit
 2    numbers.
 3            THE COURT:  I want to know what exhibit number these
 4    demonstrative exhibits are we are showing.
 5            MR. FRANTZ:  Well, I'll number them from here on out
 6    and we can fix the ones that have gone by.  We will call this
 7    DX 1052, please.
 8            THE COURT:  All right.
 9    BY MR. FRANTZ:
10    Q.  Now, I believe you testified to the jury before that
11    Verizon's actual profit margin on this service was 56
12    percent, correct?
13    A.  If I said that, I should have said that there are
14    incremental profits or how they defined it in their own
15    records the contribution margin was a technical terms which
16    means the same thing that I'm trying to calculate, what the
17    incremental profits are on this stream of business.
18    Q.  Okay.  And the higher the margin percentages, the more
19    damages claimed for ActiveVideo, correct?
20    A.  That is correct.
21    Q.  Now, elsewhere in your analysis, for example, in your
22    churn analysis, I noticed that you use Verizon's actually
23    numbers, correct?
24    A.  I believe I did, yes.
25    Q.  Now if you look back at this slide, look at the word
```

Wagner, M. - Cross                                                    1080

1    highlighted in the upper right-hand corner, this is a

2    forecast, correct?

3    A.  It is a forecast for 2007.  I would believe that the 2006

4    numbers are actuals and the 2007 are forecast.

5    Q.  Okay.  Now, I noticed something interesting about these

6    numbers, as well.  They appear to be declining every quarter,

7    correct?

8    A.  They are.

9    Q.  And the first line, the VOD profit projection for the

10   third quarter of 2006, is 62 percent?

11   A.  It is.

12   Q.  And when you get to the fourth quarter of 2007, it is 51

13   percent?

14   A.  That's correct.

15   Q.  And every quarter in between, it goes down, correct?

16   A.  That is based on these six quarters, yes.

17   Q.  That looks like a clear downward trend, doesn't it?

18   A.  It does.

19   Q.  Okay.  But you took the average of these six numbers and

20   you used that as your analysis, correct?

21   A.  I did.

22   Q.  Did you investigate to see whether Verizon's actual VOD

23   profitability ever matched the projections?

24   A.  I have never seen any information on this subject except

25   for this document.

1    Q.  Did you check to see whether the decline continued

2    through 2011?

3    A.  I have not seen any information past these dates, so, no,

4    I have not.

5    Q.  Now, there is actual VOD profitability data in the

6    information that was supplied to you, correct?

7    A.  You'd have to -- it was not brought to my attention so I

8    have not seen it.

9    Q.  Well, let's take a look at one of those documents.  It is

10   Tab 14 of your binder, if you can find it there.  Just look

11   at the first page.  You see the cover there labeled FiOS firm

12   profitability analysis March of 2011?

13   A.  I do.

14   Q.  This kind of -- it was produced as a native file so that

15   is why the Bates numbers are not on your page.

16   A.  This document looks familiar.

17   Q.  Okay.  These are the kinds of documents that you used to

18   gather the subscriber counts, the revenues, the costs and

19   such to do the work in this case, correct?

20   A.  It is.

21   Q.  Okay.  Take a look at Page 18, titled, content expense.

22   This page includes revenue, cost and margin information for

23   Video On Demand, correct?

24   A.  It does.

25           MR. FRANCE:  Your Honor, I have a demonstrative with

Wagner, M. - Cross                                              1082

1    relevant data that I ask be published to the jury, could be
2    marked DX 1053.
3                THE COURT:  All right.
4    BY MR. FRANTZ:
5    Q.  Okay.  Mr. Wagner, you can see the numbers there.  The
6    actual margin for VOD is listed for December of 2010 is 48.2
7    percent, correct?
8    A.  It is.
9    Q.  The actual margin that's listed here for January of 2011
10   is 35.8 percent, correct?
11   A.  It is.
12   Q.  The actual margin that's listed here for February of 2011
13   is 28.9 percent, correct?
14   A.  It is.
15   Q.  But the forecast that you used was 56 percent, correct?
16   A.  It was.
17   Q.  Okay.  Mr. Wagner, it is your opinion that ActiveVideo
18   would not lose sales by licensing to Verizon, correct?
19   A.  I have not calculated any lost profits here, so that is
20   correct.
21   Q.  ActiveVideo does not participate in the marketing and
22   selling of video services as does Verizon?
23   A.  That is correct.
24   Q.  Verizon is not in the business of selling VOD hardware
25   and software to other providers of video services?

1   A.  They are not.

2   Q.  It is therefore your opinion that ActiveVideo and Verizon

3   are not competitors?

4   A.  That's accurate.

5   Q.  You can put the book away.  I'm done with that now.

6   Let's talk about a couple of agreements that you examined

7   that you didn't talk about in your direct.  Now, Verizon had

8   an agreement to buy VOD services, equipment and software from

9   SeaChange, correct?

10  A.  That's correct.

11  Q.  And many of the largest cable companies purchased their

12  VOD equipment from SeaChange?

13          MR. JOHNSON:  Objection, lack of foundation.

14          MR. FRANTZ:  It's right in his report, Your Honor.

15          THE COURT:  Objection overruled.

16          THE WITNESS:  I know some did, yes.

17  BY MR. FRANTZ:

18  Q.  SeaChange has a dominant market share in VOD technology,

19  correct?

20          MR. JOHNSON:  Same objection.

21          MR. FRANTZ:  Right out of his report.

22          THE COURT:  Well, I tell you what, on your

23  objections, you rise.  I think we can probably overcome some

24  of these objections by the form of the question.  You can

25  direct him a little better so we will know exactly where we

JODY A. STEWART, Official Court Reporter

1    are coming from.

2    BY MR. FRANTZ:

3    Q.  It is your opinion in this case that SeaChange has a

     dominant market share in VOD technology, correct?

5    A.  At one point in time at least they did.

6    Q.  And in documents you cited to form your opinion,

7    SeaChange identifies its competitors for providing Video On

8    Demand, correct?

9    A.  I have some recollections of that.

10   Q.  Let's take a look at Volume 12, Tab 15 of your report.

11   This is SeaChange's form 10K for the year ending January 31,

12   2011, which it filed with the Securities and Exchanges

13   Commission.  It is at Tab 15 of your binder?

14   A.  My binders are on this table there.  You probably put it

15   someplace in here.

16   Q.  It is in tab 15 in that binder, as well.  The tab numbers

17   match.

18   A.  Oh, thank you for telling me that.

19   Q.  Sorry about that.  That was a coincidence.

20   A.  It is a good coincidence.  It makes sense.

21   Q.  Do you recognize this as a document you relied on in

22   forming your opinions in this case?

23   A.  Yes.

24        MR. FRANTZ:  Your Honor, I have a demonstrative with

25   the relevant language and ask that it be published to the

1    jury.  It is PX 1054 and slide 29.

2          THE COURT:  You may.

3    BY MR. FRANTZ:

4    Q.  Now, in this document SeaChange identifies its

5    competitors in the VOD business, correct?

6    A.  They do.

7    Q.  In the market for long form video products including

8    Video On Demand we compete with various companies such as

9    Arris Group, Cisco Systems, Motorola Mobility, Inc. and

10   Ericsson.  Do you see that?

11   A.  I do.

12   Q.  ActiveVideo is not on that list, is it?

13   A.  They are not.

14   Q.  Now, Verizon purchased its original VOD system from

15   SeaChange, correct?

16   A.  That is my understanding.

17   Q.  And in forming your opinion you've reviewed Verizon's

18   agreement with SeaChange, did you?

19   A.  I did.

20   Q.  This agreement includes a license to use SeaChange's

21   technology?

22   A.  It does.

23   Q.  Which is patented?

24   A.  They have patents, yes.

25   Q.  You can put the binder down on your lap.  It also covered

```
 1    the equipment and services needed to deliver Video On Demand,
 2    correct?
 3    A.  Yes, it did.
 4    Q.  The report -- the agreement included a license fee,
 5    correct?
 6    A.  I believe that it did.
 7    Q.  And your report has a chart detailing the license fees
 8    that are paid to SeaChange and, again, I have a demonstrative
 9    with the relevant fees and ask it be published to the jury.
10    I will call this DX 1055, and that is slide 30.
11              THE COURT:  You may publish it.
12    BY MR. FRANTZ:
13    Q.  Now, this is a one-time fee, correct?
14    A.  It is a one-time fee.
15    Q.  Not per subscriber per month, one time?
16    A.  That is accurate.
17    Q.  And based on Verizon's current subscriber count, right
18    now Verizon is paying SeaChange 70 percent per subscriber one
19    time, correct?
20    A.  That would be correct.
21    Q.  Or when it had -- when Verizon was working with
22    SeaChange, I apologize.  Now, Your Honor, again, I have a
23    demonstrative on this that contrasts this to the rate
24    proposed by Mr. Wagner and ask it be published, DX 1056.
25              THE COURT:  All right.
```

1    BY MR. FRANTZ:

2    Q.   Slide 31.  There is the $0.70 charge.  That is the

3    lifetime of the customer owed to SeaChange, correct?

4    A.   For that one part of this agreement, that is correct.

5    Q.   Okay.  And your view is that ActiveVideo is entitled to

6    $2.25 per month for the same subscriber for 24 months if

7    Verizon keeps its customers for two years; is that correct?

8    A.   That would be accurate.

9    Q.   That is a total of $54, right?

10   A.   I think that is fair.

11   Q.   If Verizon keeps the same customer for four years, under

12   your analysis, Verizon would owe ActiveVideo $108 for the

13   same customer?

14   A.   That's true.

15   Q.   Now, you also in your report, you converted this

16   SeaChange license fee to a per subscriber per month now,

17   correct?

18   A.   I think I did, yes.

19   Q.   If you'd like to refresh your recollections, it is at

20   Schedule 3.7, Tab 2, but it amounts to $0.02 to $0.04 a month

21   per subscriber, correct?

22   A.   That is my recollection.

23   Q.   Okay.  I have another demonstrative on this that I ask be

24   published to the jury.  We will call it DX 1057.  Two the

25   four cents.  I put the maximum on there just so there is no

```
 1    confusion.  Four cents per subscriber per month to SeaChange,
 2    correct?
 3    A.  Correct.  That one part of the agreement, yes.
 4    Q.  This compares to $2.25 as the amount you're proposing for
 5    ActiveVideo, correct?
 6    A.  That is accurate.
 7    Q.  Now, Verizon paid SeaChange just a little bit over $6
 8    million in license fees over the entire time of its
 9    relationship, correct?
10    A.  I don't know if I have that information.  I'll have to
11    accept your representation.
12    Q.  Okay.  Verizon paid SeaChange a total of about $45
13    million for all the equipment and services it got, correct?
14    A.  I think I've heard that number before.
15    Q.  So Verizon paid SeaChange a total of approximately $51
16    million for a license to use its patents, a license to use
17    its software, for equipment and for service and support,
18    correct?
19    A.  Correct, for what I understand is an infringing system.
20    Q.  Okay.  Now, ActiveVideo also entered into an agreement
21    with the company named Scientific Atlanta, correct?
22    A.  They did, for set-top box.
23    Q.  Scientific Atlanta is one of the largest makers of
24    set-top boxes in the United States, correct?
25    A.  One of two.
```

1   Q.   Scientific Atlanta is now owned by Cisco?

2   A.   It is.

3   Q.   ActiveVideo's business plan involved getting its software

4   deployed on as many set-top boxes as possible?

5   A.   That was their strategy.

6   Q.   And ActiveVideo signed an agreement with Scientific

7   Atlanta in 1999, correct?

8   A.   They did.

9        MR. JOHNSON:  Objection, lack of foundation, dispute

10  over what agreement was entered into when they were

11  perfecting this.

12       THE COURT:  What are you saying?

13       MR. JOHNSON:  Better than approaching at the side

14  bar.

15       THE COURT:  Well, I tell you what, ladies and

16  gentlemen.  We are about four minutes from our break anyway.

17  I tell you what we are going to do.  We are going to be in

18  break for about 15 minutes, and I'm going to resolve this

19  while you start your break.  All rise.

20       (Jury out at 3:52 p.m.)

21       THE COURT:  You may be seated.  Now, Mr. Johnson,

22  you objected about the 1999 agreement?

23       MR. JOHNSON:  Yeah.

24       THE COURT:  Over here at the podium.

25       MR. JOHNSON:  I don't want to look at his notes,

 1   Your Honor.  I was going to try to stay away.

 2            MR. FRANTZ:  Thank you.

 3            THE COURT:  Look at the ceiling.

 4            MR. JOHNSON:  The situation where Scientific Atlanta

 5   agreement he was referring to was not executed by the

 6   parties.  And he's asking the witness if, in fact, it was

 7   signed and entered into, and it is simply not true.  If they

 8   want to litigate that issue, we can, but I think it's

 9   inappropriate for him to make assertions that he knows

10   there's a factual dispute over.

11            THE COURT:  All right.  Is it true, correct,

12   Mr. Frantz, that there is some question about whether the

13   parties actually signed this 1999 agreement?

14            MR. FRANTZ:  No, sir.

15            THE COURT:  I'm saying is there a question?

16            MR. FRANTZ:  There is no question, Your Honor.  The

17   1999 agreement was executed by both sides, and in your binder

18   you will find a signed copy of that agreement with

19   ActiveVideo's signature on it.

20            THE COURT:  What page?

21            MR. FRANTZ:  I'll find you the relevant tab.  Sorry.

22   Just give me one second.  The agreement that he is -- the

23   agreement that he is referring to was in 2005.  That renewal

24   of this agreement was signed only by ActiveVideo and not by

25   Scientific Atlanta.  Which one?  Sorry, 22.  Just flip to the

1   last page, you'll see the signature of Mr. Kaufman who was

2   ActiveVideo's CEO at the time.  This will resolve the

3   objection to the next one, Your Honor, because that is coming

4   up.  So I'm happy to discuss the agreement that is at Tab 23.

5          THE COURT:  Tell me where you are going with this

6   agreement, this 1990.  He didn't raise it but the Court wants

7   to know.  Where are you going with this 1999 agreement?  What

8   is the thrust of what you are getting ready to ask him?

9          MR. FRANTZ:  The agreement was in effect at the time

10  of the hypothetical negotiation, and the witness testified at

11  his deposition that it includes a license to the

12  patents-in-suit, therefore the terms of it are relevant, at

13  least I'm entitled to ask him about its relevance as one of

14  the potential comparable agreements as compared to the two

15  that he chose to rely on.

16         Likewise, with the 2005 agreement --

17         THE COURT:  What exhibit is that.

18         MR. FRANTZ:  That's Tab 23.  That also includes the

19  license to the ActiveVideo patent.  Now, this agreement was

20  signed by ActiveVideo.  You can -- the version that is in

21  here is the unsigned version.  So I'll find the signed one

22  for you before the break ends, but I think Mr. Johnson will

23  agree with me.  It was signed by ActiveVideo but not by

24  Scientific Atlanta, so it never became an effective

25  agreement, but it was an offer to license their patents on

```
 1    the terms set out in the contract.
 2            THE COURT:  The Court is going to do this, then.
 3    The Court is going to overrule Mr. Johnson's objection with
 4    respect to 1999 but it's going to sustain the objection to
 5    2005.
 6            MR. FRANTZ:  Okay.  Thank you.
 7            THE COURT:  All right.  We are going to break for 15
 8    minutes.  Approximately how many more minutes do you think
 9    you have?
10            MR. FRANTZ:  I would say 10 to 15.
11            THE COURT:  Counsel, I want you to keep this in
12    mind, but the Court is probably going to have to take back
13    something it said earlier in this case about going to 5:30,
14    and I think we are going to probably have to start maybe
15    tomorrow, suspend at 6 to be sure that we are going to be
16    able to get through this case within the time the Court has
17    allotted.  We are probably going to have to go from 9:30 to
18    6.
19            Yes, sir.
20            MR. JOHNSON:  Yes, Your Honor.  On the 1999
21    agreement, that is the three-year term.
22            THE COURT:  What now?
23            MR. JOHNSON:  It has a three-year term.  I mean, it
24    expired in 2002, not 2005.
25            THE COURT:  Well, I think -- what the Court said he
```

1   could question him on the 1999 agreement, and I think that

2   you can certainly cross-examine on that.  I still think he

3   can question on the 1999 agreement.

4           Okay.  Let's take a 15-minute break.

5           (Recess from 3:56 p.m. to 4:17 p.m.)

6           THE COURT:  You may have a seat.  For planning

7   purposes, is ActiveVideo calling another witness or

8   deposition after Mr. Wagner here?

9           MR. JOHNSON:  Put on to show seven minute tape, Your

10  Honor, which there was no objection to, it turns out.  That

11  is it.

12          THE COURT:  Okay.

13          MR. JOHNSON:  You asked for us to have Mr. Miller --

14  he asked us to have Mr. Miller and Mr. Brown here, and they

15  will be here.

16          THE COURT:  All right.

17          MR. JOHNSON:  They are flying in this afternoon.

18          THE COURT:  Okay.  And the reason I say that, I

19  wanted to find out because I want to be prepared to go with

20  something, Mr. Gutman, when they end because we are going to

21  at least keep on moving here.

22          MR. GUTMAN:  Your Honor, we have, since we were told

23  that they wouldn't be here till tomorrow morning, we have a

24  couple of short Verizon witnesses prepared ready to go.  We

25  are also going to have some motions at the -- I anticipate,

```
 1    barring some surprise in the last few minutes, we've got some
 2    motions to make.
 3              THE COURT:  Okay.  We will see how long all of it
 4    takes.  This give me an idea.
 5              All right.  Bring them in.  I have no idea how long
 6    redirect is going to take.  We may very well not end up
 7    getting to your witnesses.
 8              (Jury in at 4:18 p.m.)
 9              THE COURT:  You may be seated.  The record should
10    reflect that all jurors are now in the courtroom.  Is that
11    correct, Mr. Frantz, Mr. Johnson?
12              MR. FRANTZ:  Yes, Your Honor.
13              MR. JOHNSON:  It is.
14              THE COURT:  You may continue.
15    BY MR. FRANTZ:
16    Q.  So we left off talking about an agreement that
17    ActiveVideo signed with Scientific Atlanta in 2009, correct?
18    A.  In what period?
19    Q.  I'm sorry.  1999.  Thank you.
20    A.  Yes.  It is actually June 30th of 1999.
21    Q.  Okay.  Great.  And this is an agreement that you reviewed
22    in forming your opinions in this case, correct?
23    A.  It was.
24    Q.  Okay.  And this agreement allowed ActiveVideo to
25    participate in a joint product development program with
```

1    Scientific Atlanta?

2    A.  That was the purpose of the agreement.

3    Q.  And as part of this agreement, ActiveVideo granted

4    Scientific Atlanta a license to all of its patents, correct?

5    A.  It did.

6    Q.  Including the patents in this case?

7    A.  The ones that existed at the time, yes.

8    Q.  And this agreement also extended the license to

9    Scientific Atlanta's customers, didn't it?

10   A.  It did.

11   Q.  Okay.  I have a demonstrative with the relevant

12   provisions, ask that it be published to the jury, mark it DX

13   1058.

14           THE COURT:  All right.  You may.

15   BY MR. FRANTZ:

16   Q.  This is Section 12.8 of the agreement between

17   ActiveVideo, or ICTV it was then called, and Scientific

18   Atlanta and I focus your attention on the covenant not to

19   sue.  Is this what you were referring to as the patent

20   license?

21   A.  That would be the equivalent of a patent license, yes.

22   Q.  And this says developer, that is ActiveVideo, right?

23   A.  That would be ActiveVideo.

24   Q.  Covenants and agrees that it will not -- I'm just reading

25   the highlighted part -- that anytime commence against

1    Scientific Atlanta its parents, subsidiaries or customers any

2    claim arising out of any infringement of any patent owned or

3    controlled by developer; is that correct?

4    A.   That is correct.

5    Q.   This agreement did not call for the payment of any money

6    by Scientific Atlanta to ActiveVideo, did it?

7    A.   I don't believe that it did.

8    Q.   In fact, under the agreement ActiveVideo agreed to pay

9    Scientific Atlanta to participate in a joint development

10   program, correct?

11   A.   I think there was some payments made, yes.

12   Q.   Okay.  And you testified on your direct that

13   ActiveVideo's licenses to its patents are a good indicator of

14   the value of its patents, correct?

15   A.   They can be, yes.

16   Q.   Let's turn to the subject of non-infringing alternatives.

17   And non-infringing alternative is a way to offer the service

18   in the case without infringing the patents, correct?

19   A.   That is true.

20   Q.   And you would agree, from an economic perspective, that

21   the most a potential licensee would pay a patent owner is the

22   difference between the benefit of offering the service the

23   patented way and the benefit from doing it the next best

24   non-infringing way, correct?

25   A.   If it's computed correctly, I would agree with that

1    statement.

2    Q.  Okay.  If the non-infringing alternative is cheaper than

3    what is being demanded by the patent owner, at the

4    hypothetical negotiation, then the patent owner should not

5    expect to get more than that, correct?

6    A.  It depends.  It may be cheaper, but if it offers less

7    functionality, you take that into consideration.  It is still

8    cheaper, then I would say, yes.

9    Q.  And economically non-infringing alternatives are crucial

10   to establishing what the parties would have agreed to,

11   correct?

12   A.  I believe that's true, based on my expertise.

13   Q.  Okay.  Now, in this case you assumed that there were no

14   non-infringing alternatives, correct?

15   A.  No commercially acceptable non-infringing alternatives.

16   Q.  So your damage opinions are based on the assumption that

17   there are no commercially acceptable ways to provide VOD

18   without using ActiveVideo's patents, correct?

19   A.  Correct.

20   Q.  And if that assumption turns out to be wrong, that could

21   affect your damages opinion, correct?

22   A.  I think it would affect my opinion.

23   Q.  Okay.  Now, you also assumed that each and every claim of

24   ActiveVideo's patents in this case, standing alone, is

25   required for Verizon to provide a commercially viable VOD

1    service, correct?

2    A.   I don't think that's quite my assumption, no.

3    Q.   If it turns out that some claims are not required to do

4    VOD, do you agree that your damage number is too high if only

5    those claims are found to be infringed?

6    A.   It is an incomplete hypothetical.  I need more facts to

7    know.

8    Q.   Okay.  You read ActiveVideo's patents before you formed

9    your opinions in this case, correct?

10   A.   I did.

11   Q.   And you have a general understanding of the invention

12   covered by the patents?

13   A.   I would say I have a lay person's understanding.

14   Q.   And your report includes a multi-page summary of the

15   patents in ActiveVideo's claim invention, correct?

16   A.   It does in my report.

17   Q.   Okay.  And you based your opinion on your understanding

18   that ActiveVideo did not invent Video On Demand, correct?

19   A.   I know they didn't invent Video On Demand.

20   Q.   And you based your opinion on your understanding that

21   Video On Demand existed before and could continue after

22   without practicing the claims of the asserted patents,

23   correct?

24   A.   That was my understanding.

25   Q.   And you also based your opinions on your understanding

1    that there are ways to provide Video On Demand to a large

2    customer base without using ActiveVideo's patents, correct?

3    A.  Yeah, but nothing -- no solution I've seen that's cost

4    effective to do it that other way.

5    Q.  Now, you identified a way to do it and that way you

6    describe as dramatically increased bandwidth, correct?

7    A.  Yes.

8    Q.  It is your understanding that if a system had enough

9    bandwidth, what you need in the way of a system taught by

10   this invention wouldn't be necessary?

11   A.  That's theoretically --

12          THE COURT:  Wait a minute.

13          MR. JOHNSON:  Well, Your Honor, I object.  Is the

14   damage expert, he's now offered as technical --

15          THE COURT:  And another thing is, has he offered

16   some expert opinion on bandwidth, and if so, that is beyond

17   the scope of what this Court judged authorized him to be

18   testifying on.  And the Court would, in fact, limit it

19   whether he had or has not.  The damages expert, he will not

20   be expressing an opinion on bandwidth and other matters of a

21   technical nature.

22          I can understand if he made some reference to the

23   patent and explained the patent, but his general

24   understanding of what is patent is, but he is not an expert

25   on patents.

1           MR. FRANCE:  Okay, Your Honor.

2    BY MR. FRANTZ:

3    Q.  Mr. Wagner, you are a professional consultant and witness

4    in litigation, correct?

5    A.  I am.

6    Q.  You derive 98 percent of your income from consulting and

7    litigation, approximately?

8    A.  Approximately.

9    Q.  And you testified at deposition about 300 times?

10   A.  294 times.  Thursday it will be 295.

11   Q.  And you've testified at trial over 120 times, I think you

12   said in your direct?

13   A.  I did.  This is now 122.

14   Q.  And you're being compensated in this case at a rate of

15   $795 an hour; is that correct?

16   A.  I'm not being compensated.  My firm is charging for my

17   time at that rate.

18   Q.  Okay.  And your company had been paid about $650,000 for

19   your work at the time of your deposition?

20   A.  I don't know if we had been paid but that is how much we

21   had billed.

22   Q.  Has your company reached a million dollars in billings in

23   this case?

24   A.  No, not even close.

25   Q.  And you've personally made about $4 million in consulting

```
 1   fees in the last two years?

 2   A.  I have personally, yes.

 3           MR. FRANTZ:  Okay.  No further questions.

 4           THE COURT:  Redirect.

 5           MR. JOHNSON:  Your Honor, he used some slides in his

 6   presentation.  I can -- I'll either have to use the Elmo or I

 7   can request that they put it up for me.

 8           MR. FRANTZ:  No objection.

 9           THE COURT:  They have agreed to put them up.

10                       REDIRECT EXAMINATION

11   BY MR. JOHNSON:

12   Q.  All right.  Let's start with your slide number 19.  Do

13   you have that on the screen, sir?

14   A.  I do.

15   Q.  All right.  You have on the right side, you have a method

16   B.  You see that?

17   A.  I do.

18   Q.  Could you explain method B?

19   A.  Yes.  Method B is looking at the prior months' number of

20   subscribers and then comparing it to turnover in the next

21   month rather than the way that they normally do it which is

22   based on the same month.

23   Q.  Now, did --

24   A.  They being Verizon.

25   Q.  All right.  These are from Verizon's methodology; is that
```

1   correct.

2   A.   These are both methods employed by Verizon.  They only

3   produced to us six different examples of how they do it.

4   Five of them were done the way that I do it.  They both

5   occurred before this one analysis and after.  But in one

6   period they did do an analysis this way.

7   Q.   So let's see.  So five of them did method A?

8   A.   Correct.

9   Q.   And one did method B?

10  A.   Correct.

11  Q.   Now, what, if any, opinion did you form by the fact that

12  of the six months five did method A?

13  A.   That that is the right way to the analysis.  It's the way

14  that Verizon does it, and if I did it a different way, I

15  would probably be criticized for doing it a different way.

16  Q.   And as far as -- are you satisfied that the number you

17  arrived at was accurate based upon the five out of six months

18  that Verizon chose to use method A?

19  A.   I do.

20  Q.   Now let's take a look at slide 16, please.

21           THE COURT:  Are those the ones that we have no

22  exhibit numbers on?

23           MR. JOHNSON:  Your Honor, I think it was used on the

24  slide.

25           MR. FRANTZ:  Yes, Your Honor.  I think we started

```
 1    numbering after the -- I kept track of the numbers but I
 2    don't correlate them to the slides.
 3            THE COURT:  The first slide, is slide number what,
 4    you referred to?
 5            MR. JOHNSON:  Slide 19.  If you just -- one second,
 6    small housekeeping.  I think we can write the numbers, and I
 7    will have them, and that way we will solve our record
 8    problem.
 9            THE COURT:  What I wanted to do is if you refer to
10    them, we need to correct it at some point.
11            MR. FRANCE:  Yes, Your Honor.  I didn't record -- I
12    just kept track.  I kept a running list of what number I was
13    on but I didn't correlate them to the slide.  After court
14    I'll fix it all.  I'd be happy to work it out.
15            THE COURT:  Tell you what.  Mr. Johnson refers to
16    them, we are going to fix them now.  That has no number on
17    it, what is the last exhibit number you used, demonstrative
18    number you used?
19            MR. FRANTZ:  DX 1058.
20            THE COURT:  That has nothing on it, and that is DX
21    1059.  We have to get these things straightened out here.
22            MR. JOHNSON:  So this on the screen now is DX 1059.
23            THE COURT:  That is the previous one where we were
24    looking at the methods, method A and method B.
25            MR. JOHNSON:  Yes.  And method A is DX 1058?
```

```
1              THE COURT:  9.

2              MR. JOHNSON:  All right.

3              THE COURT:  Now you put on the screen another one,

4    slide --

5              MR. JOHNSON:  This will be DX 10510.

6              MR. FRANTZ:  1060.

7              THE COURT:  That is the way they count.

8              MR. JOHNSON:  I ran out of fingers and toes here.

9    All right.

10   BY MR. JOHNSON:

11   Q.  So we now have 1060 on the screen.  Do you have that in

12   front of you?

13   A.  I do.

14   Q.  Okay.  Now, I believe you testified on cross-examination

15   about the trends that you see here.  Can you explain that for

16   the jury.

17   A.  Well, it shows that DirecTV had a low churn before and

18   they are able to maintain that churn after they introduced,

19   maintained after they introduced VOD.

20   Q.  And what, if anything, does that suggests to you?

21   A.  Well, what it suggests to me that if they did not

22   introduce the Video On Demand, they probably would have

23   increased their churn after that date.  They are able to

24   maintain it in the marketplace, and they did not have as good

25   a VOD offering as Verizon did.
```

1    Q.  Well, do you have an understanding of what the DirecTV

2    VOD offering was?

3    A.  I have some, yes.

4    Q.  Tell us what your understanding is.

5    A.  Well, hurt them with bandwidth, because they are a

6    satellite provider, but once they did cooperate with AT&T,

7    and they could sell this triple play with internet

8    connection, as well, you could get VOD services through the

9    internet, as well.

10   Q.  And does the trend line you see here change your opinion

11   in any way?

12   A.  No, not for Verizon.

13   Q.  Let's go to DX 1061.

14        THE COURT:  Let's be confident we are not giving

15   into new numbers, something he's already numbered.

16        MR. JOHNSON:  Your Honor, now that is not fair.

17        THE COURT:  No, I'm just saying.  I want to be sure

18   that we are not doing it.  I'm not suggesting that you do

19   that.  I want to be sure we are not.

20        THE CLERK:  What slide number is it?

21        MR. JOHNSON:  It's slide number 15 I have is DX

22   1061.  It's the right number.  Okay.

23   BY MR. JOHNSON:

24   Q.  Now, before we talk about DX 1061, did you -- were you

25   able to determine if Verizon was able to increase the number

1   of its customers after the VOD offering?

2   A.  Yes.

3   Q.  And what or what were you able to conclude?

4   A.  Well, that they were able to get more customers than they

5   would have based on my natural experiment of using DirecTV.

6   And it's not like they wouldn't be offering their video

7   service.  They would be offering FiOS.  They wouldn't be

8   offering Video On Demand.  They would still be trying to sell

9   just as many customers, be marketing just as hard.  They just

10  wouldn't be as successful, and that is why I didn't think

11  those costs were variable.

12          MR. JOHNSON:  One second.  Yes.  Put up DX 264, if

13  you will.

14          MR. FRANTZ:  PX.

15  BY MR. JOHNSON:

16  Q.  PX 264.  If you put up 73.  You were shown this on

17  cross-examination.  Do you see that?

18  A.  Yes.

19  Q.  Now, assuming I can read these pie charts, it would

20  appear that Verizon and DirecTV provide comparable quality

21  service as contrasted with the other three; is that correct?

22  A.  I would say that the top two in this industry grouping.

23  Q.  So one -- if the issue was quality, you would -- would

24  you believe that DirecTV's quality numbers would be

25  comparable, if not better?

1  A.  No, I wouldn't say DirecTV is better but I'd say they are

2  comparable, yes.

3  Q.  So in your -- when you chose DirecTV as the benchmark for

4  your analysis, were you able to rule out the issue of quality

5  based upon what this chart shows?

6  A.  Yes, I would say that quality was similar enough in these

7  two yardsticks to not have to adjust for that.

8  Q.  And what, if any, impact would that have on your analysis

9  that you would not have to adjust the quality?

10  A.  That I believe I've done a proper analysis.

11  Q.  Now, look at the price.  It shows $48 for Verizon for

12  video only and $40 for DirecTV, and then triple play the

13  prices are exactly the same.  Do you see that?

14  A.  Well, the prices are exactly the same for triple play for

15  everyone except for Cablevision is cheaper.

16  Q.  All right.  And I think that is it, for the video only,

17  do you know if that includes VOD?

18  A.  That would include the free VOD, yes, for Verizon.

19  Q.  And what, if any, impact would the fact that free VOD was

20  $8 cheaper per month for DirecTV have on your analysis?

21          MR. FRANTZ:  Objection, it misstates the document.

22          THE COURT:  What is that?

23          MR. FRANTZ:  I think it misstates the document.  He

24  said the VOD was cheaper.  It is referring to the service.

25          MR. JOHNSON:  The service, video service.  I

1   apologize.  I will rephrase the question.

2   BY MR. JOHNSON:

3   Q.  The video service offered by Verizon was $48 a month and

4   $40 a month for DirecTV; is that correct?

5   A.  That is correct, as of this point in time.

6   Q.  All right.  So would that affect your analysis as to

7   whether or not price was important in using DirecTV as a

8   benchmark?

9   A.  Well, I don't think price plays into that as a benchmark,

10  to be honest, but it is true that DirecTV was selling that

11  service only at a cheaper price than Verizon offered it.

12  Q.  And in comparable quality?

13  A.  Well, comparable quality but their Video On Demand was

14  not as good as Verizon's Video On Demand.

15  Q.  Now, if you go back to your -- the next letter I'd like

16  you to take a look at is DX 1061.  You have it on the right

17  page.  You were asked a series of questions about whether or

18  not you included certain marketing installation costs.  Do

19  you recall that?

20  A.  I do.

21  Q.  And did you include -- take that into account?

22  A.  Well, I took it into account, yes.

23  Q.  And tell the jury how you managed to do that.

24  A.  Well, I tried to think about what would happen in this

25  world but for Video On Demand.  I don't think -- I still

1    think that Verizon is going to be offering their FiOS

2    television services without Video On Demand.  They are still

3    going to have to market those services.  And they would do it

4    at the same level they did whether they have Video on Demand

5    or not.

6            And so those costs are not varied with the ability

7    to have Video On Demand order as one part of that offering.

8    So I don't think those costs vary.  I think the cost would be

9    exactly the same whether they offer Video On Demand or not.

10   Q.  And based upon that analysis, does that change your

11   opinion in any way?

12   A.  No.

13   Q.  Take a look at DX 1062.

14           THE COURT:  What slide is that?

15           MR. JOHNSON:  That's slide 28, actual versus

16   projected VOD margin.  DX 1062.

17           THE CLERK:  That has already been numbered, 1053.

18           MR. FRANTZ:  That one was numbered.

19           THE COURT:  1053.

20   BY MR. JOHNSON:

21   Q.  All right.  I misspoke.  It is DX 1053.  Now, you were

22   shown this on cross-examination, sir?

23   A.  I was.

24   Q.  And as you look at the chart, what does this tell you

25   with regard to your projections of 56 percent?

1   A.  Well, it appears that -- the only actual data point again

2   here is, I think -- no, actually these are all probably

3   actuals.  The margin was lower, I assume that their content

4   providers, the people that provide them the premium content,

5   which are probably first-run movies, are charging more.

6   Q.  And does that affect your analysis as of September 2005?

7   A.  As of September 2005, no, but during the damage period,

8   this does mean my projection is a little high.

9   Q.  All right.  And what, if any, impact would that have on

10  your final conclusion?

11  A.  Well, the only place I used that is in the GemStar

12  agreement, and actually, as I said before, the actual GemStar

13  agreement was a splitting of revenues.  I want to be

14  conservative and actually split the profits rather than the

15  revenues.  You've got to remember, revenues you have costs,

16  profits is the difference.  So I was doing a very

17  conservative assumption.  I don't think this affects my

18  opinion.

19  Q.  Now, let's look at -- I have DX 1063, SeaChange license

20  fee.

21          THE COURT:  Once again, let's see what the slide

22  number is and maybe --

23          MR. JOHNSON:  I think DX 1063, unless I have a --

24          MR. FRANTZ:  This is DX 1056.

25          MR. JOHNSON:  This is DX 1056, Your Honor.  Misspoke

1    again.

2    BY MR. JOHNSON:

3    Q.  Okay.  You were asked questions about the SeaChange

4    license fee versus the Wagner proposal, I think is how you

5    labeled it; is that correct?

6    A.  That's fair.

7    Q.  And on one side you see $0.04, and on the other side

8    2.25.  You see that?

9    A.  I do.

10   Q.  Now, the $0.04.  What does that reflect?

11   A.  That's just a license fee.  It is only a very small part

12   of the relationship between SeaChange and Verizon, and this

13   isn't where SeaChange is trying to monetize their value.

14   They are trying to sell more equipment and services than they

15   were trying to monetize the patents.  They have a way to get

16   more value than in this hypothetical negotiation that

17   ActiveVideo would have with Verizon.

18   Q.  So when you say you had a way to get more value, what do

19   you mean?

20   A.  That really what they are doing is trying to sell their

21   quilt and their system, and I think I was asked in my

22   cross-examination that there was like $45 million worth of

23   fees earned on that part of the agreement.  So it's really an

24   apples and oranges comparison.

25   Q.  And the -- you were shown a SeaChange financial statement

```
 1    that identified Cisco, Motorola, Arris as competitors of
 2    SeaChange.  And that would be DX 1054.  If you can put that
 3    up.  Is that the page number?
 4            MR. JOHNSON:  It says Arris, Motorola, Ericsson and
 5    Cisco.
 6    BY MR. JOHNSON:
 7    Q.  Now, are those hardware manufacturers?
 8    A.  They all manufacture hardware, yes.
 9    Q.  And why is that significant to you in any way?
10    A.  Well, first off, your public reporting, you only have to
11    disclose significant competitors to you, because that is what
12    you are required.  And, again, SeaChange is really trying to
13    sell hardware.  So they're focusing on companies that are
14    selling major hardware systems that might compete with them.
15    So that is what they are describing in this paragraph.
16            And that is not comparable to the relationship at
17    this hypothetical negotiation.  I agree that ActiveVideo was
18    not a competitor of SeaChange or of Verizon.
19    Q.  Now, you used the phrase on cross-examination of blocking
20    patents.  Do you recall that?
21    A.  I do.
22    Q.  Can you explain to the jury what a blocking patent is?
23    A.  What a blocking patent is a patent that says you don't
24    get a license to this, you are basically out of the market.
25    And the only market I'm talking about is not the television
```

1    FiOS system, it is in a cost effective Video On Demand

2    service for a very large installed base.

3    Q.  Do you make any assumptions about whether or not the

4    ActiveVideo patents are blocking patents?

5    A.  Yes.

6    Q.  And what is that belief?

7    A.  That they are blocking patents, the provisions of

8    interactive services on the FiOS network.

9         MR. JOHNSON:  One second, Your Honor.

10   BY MR. JOHNSON:

11   Q.  Now, having shown you the various slides, DX 1058, 59,

12   60, 61, 53 and 56, do they change your opinion in any way as

13   to your conclusion as to damages in this case?

14   A.  No.  My opinion is the same.

15   Q.  And the reason for that statement is?

16   A.  That number one, it took some of that -- most of that

17   information into consideration before, and based on the new

18   information, I think that my analysis accounts for those

19   differences.

20        MR. JOHNSON:  Nothing further.

21        THE COURT:  All right.  I want to make sure that the

22   parties -- make sure that the Court definitely has copies of

23   those demonstrative slides at some point --

24        MR. JOHNSON:  All right.

25        THE COURT:  -- before this case is over.

```
 1              MR. FRANTZ:  We will take care of it, Your Honor.
 2              THE COURT:  All right.  Thank you very much.
 3              MR. JOHNSON:  May the witness be excused, Your
 4    Honor?
 5              THE COURT:  Any objection to the witness being
 6    excused?
 7              MR. FRANTZ:  No, Your Honor.
 8              THE COURT:  You may be excused.  I'm saying
 9    permanently, that is?
10              MR. FRANTZ:  That is fine.
11              THE COURT:  All right.  You are free to go.
12              (Witness excused.)
13              MR. JOHNSON:  Now, Your Honor, we would like to play
14    the Paschetto video.
15              THE COURT:  We have all the issues ironed out?
16              MR. JOHNSON:  I'll never say never, Your Honor.
17              THE COURT:  All right.  Ladies and gentlemen, we
18    have another video, one we attempted to play earlier in the
19    case.
20              (Videotape deposition of James Paschetto was played
21    at this time. )
22              MR. JOHNSON:  After the video, Your Honor, at this
23    time plaintiff rests.
24              MR. GUTMAN:  Your Honor, we have some motions.
25              THE COURT:  All right.  Ladies and gentlemen, there
```

1   are matters that the Court has to take up with counsel, and I

2   can't estimate how long it is going to take me to take this

3   up with counsel, but I think what I'm going to do is this.

4   I'm going to simply let you go, and we are going to stay here

5   regarding these motions.

6           Tomorrow when you come back, you will be listening

7   to any evidence that Verizon wishes to produce, and then

8   anticipate tomorrow that we are going to stay here till 6.

9   We are going to have to pick up speed.  So feel free to

10  depart at this time and not discuss the case.  Leave your

11  materials, be back tomorrow morning.  We are going forward at

12  9:30 a.m.  Thank you for your time.

13          All rise.

14          (Jury out at 4:54 p.m.)

15          THE COURT:  You may be seated.

16          All right, Mr. Gutman.  The Court will hear what you

17  have to say.

18          MR. GUTMAN:  Thank you, Your Honor.  We have four

19  motions of judgment as a matter of law.  Obviously, written

20  motions on three of them.  The fourth goes to damages where

21  I'd like to state the grounds now and get Your Honor a brief

22  later this evening if we could.  This goes to his damage

23  testimony so obviously we didn't have that at the time.

24          May I?

25          THE COURT:  Okay.  I think one of you will have to

JODY A. STEWART, Official Court Reporter

1    walk up here.  The Court security officer is gone so walk up

2    here and pass it to Ms. Thompson.

3            MR. GUTMAN:  Make sure I've got one of each.

4            MR. JOHNSON:  Your Honor, before we proceed we've

5    never seen these motions before.

6            THE COURT:  Have you given him copies?

7            MR. GUTMAN:  Yeah.

8            MR. JOHNSON:  Just gave me him a copy right now, in

9    traditional fashion.

10           THE COURT:  Hold on.  Let me tell you what is going

11   to happen here.  I'll let you argue your motion, and you have

12   it in writing, and obviously the Court, even with the best

13   speed reading, can't digest everything that is in this

14   motion.  Pure and simple as that.  I will hear it, and if I

15   think that you are just plain off base, I will rule right

16   now.  If not, I'll reserve my ruling till tomorrow morning.

17   Get in here tomorrow morning at 9 o'clock, and I'll rule on

18   them, simple as that.

19           And meanwhile you can respond, if you can respond,

20   Mr. Johnson.  If not, I'll give you a few minutes to respond

21   in the morning, but one way or the other we are going to get

22   through this and we are moving on.

23           Okay.  Now, what is it that the Court has up here?

24   It has a whole tree up here.  What is this?

25           MR. GUTMAN:  Right.  I'm sorry about that, Your

1   Honor.  Let me run through them.  The three that are there in
2   writing, now that they've rested, are a motion for judgment
3   as a matter of law regarding the date of invention, a motion
4   for judgment as a matter of law regarding pre-suit damages,
5   and a motion for judgment as a matter of law dismissing the
6   willfulness claim.  The fourth, which isn't in writing,
7   because it depends on the testimony of the witness who just
8   left the stand, will be a motion for judgment as a matter of
9   law with respect to damages theory which is based on the
10  entire market value analysis and is inconsistent with Federal
11  Circuit teaching in Uniloc, Lucent, ResQnet, et cetera.
12       That is the one that is coming in writing based on
13  the testimony Your Honor just heard today.  The basic outline
14  of it is in the portion of our motion *in limine*.
15       THE COURT:  The Court just got another mobile idea.
16  The Court is going to take a brief recess, about 15 minutes.
17  Mr. Johnson, take these three motions, and the plaintiff
18  counsel, take these three motions, look through them.  Then
19  we will come back.  The Court is going to take them, look
20  through them, and then we will come back and hear what you
21  have to say.
22       (Recess from 4:59 p.m. to 5:40 p.m.)
23       THE COURT:  We took little bit more than 15 minutes
24  as the Court began to get into your motions.  The Court
25  understands the written motions you have raised, but the

1    Court has not had an opportunity to digest these motions in

2    the detail it wants.  I want to hear what ActiveVideo has the

3    say about these motions, and then the Court wants to go back.

4    So what the Court is going to do is we are coming in here

5    tomorrow morning.  We are going to convene court at 9

6    o'clock.  And then I'll give you anything else you want to

7    add, and then I will rule.  But right now I want to hear what

8    ActiveVideo has to say.  You're free to detail in writing.

9    And I don't know whether you want to file something in

10   writing or not.  I don't know.  But I need a little bit more,

11   and the Court wants to check some of this, more than a casual

12   glancing and a shoot from the hip.  I don't operate that way.

13          Okay.  Is there anything you want to add other than

14   what you put in writing, Mr. Gutman?  Because what you put in

15   writing is pretty detailed.  But is there anything else you

16   want to add to that before I hear anything else ActiveVideo

17   wishes to say about the matter?

18          MR. GUTMAN:  Sure.  Your Honor, I could walk through

19   the damages points.  Let me just --

20          THE COURT:  I will tell you I did read in detail

21   your motion.  So I know exactly what you are arguing.

22          MR. GUTMAN:  Okay.  I think one thing that's left

23   out on the -- I didn't see in the written brief on the filing

24   date, not getting an earlier consumption date from the filing

25   the applications, is the fact that when Your Honor dealt with

1    the notebooks, the bench memo, I'm sorry, yeah, the bench

2    memo from Mr. Johnson, it was promised they were going to

3    bring in Mr. Serlin to connect the dots and he was going to

4    corroborate those, and I don't think we pointed that out.

5         THE COURT:  You did.  You put the reference in

6    there.

7         MR. GUTMAN:  So he never showed up.  I guess the

8    other thing on the willfulness point is -- that may not be

9    fully laid out in here, is that they were talking about

10   making their willfulness case based on all this copying

11   business.  Your Honor will recall we had motion *in limine* and

12   they said that is how they are going to prove willfulness.

13   And I will just point out, they have rested, and there is no

14   evidence of copying.  We had all that source code stuff.

15   They had the source code.  The source code witness didn't

16   show up.  And Dr. Schonfeld expressed no opinion on copying,

17   none, not one.

18        He talked about infringement but he didn't say a

19   word about us having copied what they did.  Not a word.  None

20   of his opinions.  If you check the transcript from today and

21   from yesterday and Friday, not a word on copying from him.

22   The source code lady who went through all of our stuff in

23   exhaustive detail, if they had found a line of code copy --

24   remember we had to fight over the objection of the

25   evidentiary issues about the source code.  She never showed

1   up at trial, and they rested.  If they had found after -- I

2   think her expert report said she spent 2300 hours, she and

3   her team, 2300 hours reviewing our source code.  We all know

4   if they found a single line that was copied, she would have

5   been in here.  They would have had evidence of it.  There is

6   nothing.

7          We also know that the patents were filed before all

8   this.  I mean, it's -- they just didn't -- they promised a

9   lot on that, Your Honor.  The other were conversations, but

10  there was no proof that we actually, in the end, copied

11  anything, to the extent that that could be used to try and

12  prove willfulness, and as we pointed out in our motion

13  before, that is sort of a tenuous way to try to do it.

14         So I don't believe -- and, again, willfulness is --

15  this isn't in the paper but willfulness is clear and

16  convincing, and there is no way whatever they're going to

17  point to is going to meet the clear and convincing standard.

18  So I do think it would be a distraction and a mistake to put

19  it to jury when there has been no evidence of willfulness.

20  There is no evidence of corroboration, nothing to corroborate

21  the wording on an invention date earlier than the patent

22  filings.  The marking is fairly straightforward.  The law is

23  clear for two of the patents where it's systems claim only,

24  they don't get damages from a date earlier unless they put us

25  on notice, either by saying notice for these purposes is not

1    some low level employee having done a web search and found a

2    list of patents.  Notice is saying you infringed.  And not

3    only did they not do that, the evidence showed they knew all

4    about what we were doing based on these conversations.  They

5    knew we were using SeaChange.  They knew the structure of our

6    system.  They told us no problem, we can work with SeaChange.

7    We know how to integrate with SeaChange.

8           So they were fully on notice but they never said to

9    us, you know, if you do that, you infringed.  And they have

10   to either do that or they have to mark, and there is no

11   evidence of marking, and the burden is theirs.  The burden to

12   produce evidence of marking is on them, and they didn't.

13          I asked the question, I think of one of their

14   witnesses who had those little devices up in front of him.

15   You see any patent marks on there?  He said no.  But, you

16   know, it was their affirmative burden, if they wanted a date

17   earlier than the filing date of the case, which is May 27th,

18   2010, they had to produce evidence that they had put us on

19   notice, either by marking their products or by sending us a

20   letter, and there is no evidence on that.  So I think May 27,

21   2010 is when the damage clock starts running on three of the

22   four patents.

23          And, again, the law is clear in the Federal Circuit

24   that when a patent has both method and system claims, you

25   know, the method claims go with the system claims if they

1   didn't mark.  And so that just leaves one patent, which is

2   only method claims, and we were looking for -- and we may

3   still find the case -- that says that a method situation is

4   essentially the same invention.

5            THE COURT:  Going to the '678 patent?

6            MR. GUTMAN:  Right.  It is essentially the same

7   invention because it comes from a common spec, as this one

8   does, that it carries over.  But we haven't found that case

9   yet, which is why we only moved on three.  But we are still

10  looking.

11           THE COURT:  All right.

12           MR. GUTMAN:  And then the damages is just, apart

13  from the entire market value arguments, which we've laid out

14  in our motions *in limine* and the Daubert motions, just

15  highlighting some of the things Your Honor heard in testimony

16  here today.  DirecTV, he admitted that there were other

17  causes for their increases.

18           THE COURT:  That may be a little bit confusing.  I

19  thought that you had three motions here, and you had one

20  dealing with pre-suit damages?

21           MR. GUTMAN:  That's right.

22           THE COURT:  And that is all you are talking about.

23  But now you are talking about --

24           MR. GUTMAN:  Yes, I think what I said, and I'm sorry

25  if I wasn't clear.  There were three that we prepared in

1    advance in writing.

2             THE COURT:  And one you didn't?

3             MR. GUTMAN:  And one we didn't because it was

4    dependent on the testimony the witness just finished giving.

5             THE COURT:  Okay.

6             MR. GUTMAN:  So if I could outline the grounds for

7    that briefly.  DirecTV, he admitted that there were multiple

8    causes for their additions of customers.  But he still

9    attributed all of that, for purposes of his calculation and

10   his formula, he attributed all of that to having VOD.  That

11   doesn't work under the law.

12            Churn, he admitted that his data on which he based

13   his 62.5 percent number is based on a correlation, not a

14   causation.  And again, the case law is quite clear,

15   correlation doesn't do it, you have to prove causation.  He

16   didn't do that.

17            On the Grande deal, he admitted and attributed it to

18   Mr. Miller, as well, that it's a service agreement and that

19   the $0.70 license fee is for both the software and the

20   patents.  He also admitted there is no way to separate those

21   out.  But he nonetheless decided to attribute the whole $0.70

22   to the patents.  He can't do that.  The law doesn't work that

23   way.  If there are multiple causes, you can't just say -- in

24   each instance he made the choice to produce the higher

25   number.  There is -- that is the only thing on which he was

1   consistent here.

2          GemStar, which is his other comparable, you know,

3   doesn't involve the patents-in-suit here, and it doesn't

4   involve Video On Demand.  And he admitted -- he admitted that

5   basically all he was taking out of that was he agreed to give

6   50 percent of revenues for something.

7          THE COURT:  Some of that go to the weight that the

8   jury really wants to put on, the testimony, goes to the

9   weight that they want to put on his testimony?  And it is not

10  something that is a matter of law that I need to strike, but

11  it goes to the weight the jury want to give his testimony of

12  a flawed methodology, a flawed basis for his opinions, then

13  you persuade the jury.  They either accept it or they reject

14  it.

15         MR. GUTMAN:  Well, I think when it comes to damages,

16  and this is one of the themes of these Federal Circuit cases,

17  that following on on the principles that gave rise the

18  *Daubert*, the District Court -- the judge has a gatekeeping

19  function here, and you can't let any old damage theory get to

20  the jury and run the risk that they are going to fall for

21  some methodology that just doesn't work.  And I think under

22  the case law, Your Honor, we'd be happy to put in a short

23  memo on this if you'd like.

24         THE COURT:  Well, you know, there's the flip side of

25  that, too.  And the judge has to be very careful as

1    gatekeeper.  He's not to have everybody going over and

2    invading the province of the jury by snatching something from

3    the jury that the jury ought to be weighing.  So it's a kind

4    of fine line there.

5          MR. GUTMAN:  But it's, again, Your Honor, in

6    damages, the case law in patent cases from the Federal

7    Circuit has become a lot more refined.  There are a lot of

8    areas of the law, you know, where the law really hasn't

9    addressed these issues in this level of detail.  But if you

10   look at the recent line of Federal Circuit cases, Uniloc, et

11   cetera, I think there is a lot there that shows that you just

12   can't let a damage theory this flawed get to the jury, not in

13   a patent case.

14         One other case that I would bring to Your Honor's

15   attention, and I don't have the full citation, but I can get

16   it, we could get it to you, is one from this district that

17   Mr. Stillman brought to my attention, it's *Microstrategies v.*

18   *Business Objects*.  It started as a decision, I guess, by --

19   or recommendation by Judge Miller, Magistrate Judge Miller.

20   It became a decision by Judge Friedman and affirmed by the

21   Federal Circuit where, as here, there was more than one

22   identifiable cause for the alleged injury, and the Federal

23   Circuit's decision there, I think -- or any of the decisions

24   there, I think, would be most constructive on this, and we

25   could get copies of the decisions to the Court or --

```
 1            THE COURT:  I'm sure it's out of this court we can
 2    find it.
 3            MR. GUTMAN:  Okay.  Thank you, Your Honor.
 4            THE COURT:  Okay.  All right, Mr. Johnson.  I'll
 5    hear what you have to say and --
 6            MR. JOHNSON:  I'll will be brief.
 7            THE COURT:  -- the Court will deal with it again
 8    tomorrow morning.
 9            MR. JOHNSON:  All right.  We will, as usual, have
10    something in writing.  Let's start with the invention first,
11    Your Honor.  Their motions is premature.  We don't have to
12    have the rebuttal evidence or corroboration evidence until
13    they produce prior art, prior to a certain date.  They have
14    produced no such prior art.
15            So I'm assuming when -- Mr. Serlin will be here to
16    testify, as I said, in rebuttal, if and when they produce
17    prior art that needs to be sworn behind.
18            Secondly, the post-damage issues we've got to brief
19    it because we don't agree with their version of the facts
20    that '678 is obviously in.  We think that the law is
21    different than their claim as to the others, and we'll brief
22    that.  As to willfulness, I mean, it is an interesting
23    argument that I guess I can understand it, that we supposedly
24    have admitted or didn't prove anything.
25            And their argument is that somehow, one, the fact
```

1    that they had access to and utilized our material or all of

2    our systems over a period from 2005 until we finally stopped

3    in 2008 does not satisfy the test that, A, they acknowledge;

4    B, that there was a high risk of infringement.  Their product

5    looks exactly like ours.  Dr. Schonfeld certainly testified

6    each element of the claims as well as looking at their

7    systems, all of which were identical.

8           Now, do I have a right to argue to the jury that

9    there is a reason for that?  Absolutely.  They then go on to

10   say, well, you should ignore the fact that we downloaded the

11   list of your patents.  And you should also ignore the fact

12   that we told you about our patents on several different

13   occasions.  That is simply not the law.

14          The fact of the matter is they were placed on

15   sufficient notice going back to '05 when they did have all of

16   our patents as well as various discussions in '06 and '07

17   that Mr. Taylor testified to.

18          The fact that they received technical information --

19   and I'm passing for the moment the various lab assistance.

20   But the fact that they received additional technical

21   information, which you heard Mr. Brown testify to, you heard

22   Mrs. Regis testify to, and you heard Mr. Miller talk about,

23   we believe, all accompanied in the necessary parameters to

24   show willfulness.  So this is not a situation where they

25   happened upon us.  They solicited.  They got the information,

1    they came back, they asked for more.  There is documentation

2    in the evidence, documentation, both written as well as oral,

3    to support those propositions.  So as a consequence that goes

4    to the jury.

5          Now, he can argue it's not clear and convincing.

6    I'm going to argue just the contrary.  I'm going to argue

7    that if you want to design a testimony in 2005, and you bring

8    in someone and suddenly your system ends up looking exactly

9    like theirs, performing exactly like theirs, and what did we

10   hear from their so-called cross-examination on infringement?

11   We got a bigger box.  There is nothing more irrelevant than

12   the size of that box to the issue of infringement.  But

13   because they didn't have a defense, they've got nothing to

14   say.

15         THE COURT:  I want to ask you, what in your proof do

16   you believe shows clear and convincing, at least the clear

17   and convincing standard with respect to both of them?

18         MR. JOHNSON:  I think the -- I'm sorry.

19         THE COURT:  I raise my finger as you tick them off.

20         MR. JOHNSON:  Okay.

21         THE COURT:  You respond.  If you give it to me, what

22   do you say it was?

23         MR. JOHNSON:  First, it was clear and convincing

24   that they, in fact, received our technology over a period of

25   years, the same technology starting with how to create a

1    session with Mr. -- with Mr. Brown testified to and pointed

2    out in the documents how to create a session.  They created

3    the session exactly the same way.  How do we know that?

4    Because they infringed.

5         The communications as far as going from the set-top

6    box to what they call their edge cards.  You heard the

7    testimony from Mr. Brown explaining how that happened, how

8    their MMUs worked.  And you heard Dr. Schonfeld testify

9    specifically they operated exactly the same way.

10        THE COURT:  So receipt of your technology over four

11   or five -- three or four years, that is the first thing you

12   named?

13        MR. JOHNSON:  That's correct.  The actual

14   implementation of the technology is the second thing.

15        THE COURT:  The actual what?

16        MR. JOHNSON:  That is the second thing.  It is one

17   thing to receive the technology; however, what we have here

18   is a situation where the technology that they received from

19   us is actually reflected in their products.  When we produced

20   the drawings, and you look at the drawings and you saw the

21   testimony of Dr. Schonfeld, our drawings mapped exactly to --

22        THE COURT:  That is just straight outright just

23   infringement?

24        MR. JOHNSON:  Well, it could be.

25        THE COURT:  Not willful.

1        MR. JOHNSON:  Well, no.  What makes it willful is
2   knowing that you are looking at someone's technology, in this
3   takes HeadendWare, and you are making sure that you
4   incorporate all aspects of that technology in your product.
5   That makes it willful.
6        THE COURT:  What do you contend is number three,
7   there is a number three, a third reason?
8        MR. JOHNSON:  Well, the third reason is their
9   evasive activities, that is to say, keeping our technology
10   and then deliberately refusing to accept the NDAs, and then
11   finally returning our technology.  And you saw from the video
12   testimony here that was played today, that, in fact, gave it
13   back to us, and then proceeded to act as if we didn't exist.
14   That goes, again, to their conscious disregard to our
15   client's technology.
16        THE COURT:  All right.  Now, let's go -- let me hear
17   what you have to say about -- you didn't say much about the
18   alleged failure to corroborate the -- the corroboration
19   testimony on the inventor's notebook.
20        MR. JOHNSON:  Yeah.  And that is because the issue
21   is ripe once they put in a piece of prior art that's prior to
22   a particular date.  In other words, I don't have a burden
23   until they establish that they have a piece of prior art that
24   I've gotten swear behind.  Then I've got to worry about the
25   corroboration.

1    It doesn't become my burden if they've got a bunch

2    of prior art that goes back to 1992.  You can assume you want

3    to call it prior art.  I don't have the burden to prove

4    anything until such time as that evidence is in the record,

5    and there is no such evidence.

6        THE COURT:  All right.  Switch to the failure to

7    mark the property.

8        MR. JOHNSON:  Now, on the failure to mark, the issue

9    there is simply what the case law shows, the '678 is

10   obviously in the case.  They didn't even bother.  As to the

11   other two, the issue for us is, have we got to check the case

12   law on what the law is vis-a-vis the method claim and the

13   system claim mix, and whether or not more is required than,

14   in fact, what we've done which was they downloaded our

15   patents, they received in numerous presentations about the

16   existence of our portfolio.

17       THE COURT:  That you mark your patent in some way,

18   what is the requirement that you mark your patent or you give

19   them notice of infringement?

20       MR. JOHNSON:  Correct, Your Honor.  And that is we

21   did not mark, no question about it.

22       THE COURT:  That is clearly didn't mark the patent?

23       MR. JOHNSON:  Right.  We didn't mark it.  We didn't

24   mark it.

25       THE COURT:  So the next question comes, did you give

JODY A. STEWART, Official Court Reporter

1   them notice?

2         MR. JOHNSON:  The question is if the course of

3   conduct gave them sufficient notice.  Now, what's the course

4   of conduct?  One, they downloaded our patents.  They say, oh,

5   somebody else did it.  That doesn't work.

6         THE COURT:  But you helped them access your patents.

7   I mean, you participated actively with them.

8         MR. JOHNSON:  Well, let's parse those two arguments.

9   First of all, they've downloaded the patents on their own.

10  We told them we had patents.  They downloaded the patents on

11  their own.  That evidence is uncontroverted.  Secondly, they

12  argued that we assisted them if they conflict two issues.

13  Yes, we provided them information about our technology.  Yes,

14  we gave them tools that they used, but it doesn't follow from

15  that that we somehow ratified or authorized their

16  infringement.  There is no evidence of that.

17        THE COURT:  Well, but you -- let's assume if you

18  knew they were infringing --

19        MR. JOHNSON:  Correct.

20        THE COURT:  -- then you have a responsibility to

21  tell them to crease and desist infringement.

22        MR. JOHNSON:  That's right, Your Honor.  But you

23  notice what the testimony was.  It wasn't what Mr. Gutman

24  said.  He got up in opening and said, we knew they were

25  fringing, we knew about SeaChange.  What was the testimony?

1   Greg Brown testified that he knew SeaChange had a video

2   server, that he did not know what their underlying source

3   code was.  He was then asked, did you get to see the lab?

4   Answer:  No.  I was kept in another room.

5         There is absolutely no evidence, other than the past

6   argument of counsel, that we knew how their system worked and

7   the calls that were being made.  What do the documents show?

8   They show only our calls.  They show only how our system

9   worked.

10         The argument that we somehow knew about how the

11   other code worked is wrong, except for one, and that's this.

12   When the Microsoft code failed in that box, we said, you need

13   to do a work around in order to solve that problem.

14   Microsoft didn't do the work around.  We were never given

15   access to their APIs.  So the argument that somehow we knew

16   is just wrong.  It is just not supported by the evidence.

17   That is all I have to say, Your Honor.

18         THE COURT:  Now, one question for you.

19         MR. GUTMAN:  Yes, sir.

20         THE COURT:  I take it you disagree with his position

21   that until you introduce some evidence of some prior art,

22   they are not required to come forward with any evidence

23   regarding the dates of an invention that is not really in

24   place in issue?

25         MR. GUTMAN:  It is, Your Honor.  If they want to

1    rely on a priority date earlier than the filing date of the

2    patent, they have the burden of production to come forward in

3    their case.  And if you think about it, it's got to be that

4    way.  Otherwise, when we put on our invalidity case, what

5    date are we shooting at?  Your Honor may recall, we have been

6    around the barn a few times on this.  We have had emergency

7    motions, postpone the trial because they kept changing their

8    priority date.

9           So, you know, but that was all pretrial, and we sort

10   of came into it with them not having taken a position and

11   having to do the best we could.  Now they have rested, and

12   they had to take the position and put in the proof, and they

13   didn't.

14          THE COURT:  Okay.  Couple of things you said in your

15   brief.  You took issue with the 1988 and the 1990 business

16   plan as being corroboration?

17          MR. GUTMAN:  Corroboration, right.

18          THE COURT:  Because you said that those plans didn't

19   lay out each and every limitation of the asserted claim.

20   They were not technical images, but I notice you didn't cite

21   any case for that proposition.

22          MR. GUTMAN:  Oh.

23          THE COURT:  Each time you never cited a case that

24   said that supported that proposition.

25          MR. GUTMAN:  We can fix --

1   THE COURT:  The Court is going to fix it.

2   MR. GUTMAN:  Oh, that is fine.

3   THE COURT:  You said it but you've never asserted

4   it.

5   MR. GUTMAN:  No, we'd be happy to -- I'm sure Your

6   Honor's going to look.  We would also be happy to submit case

7   law.  The point is to corroborate -- you have to corroborate

8   the invention, not that they were talking about something

9   general.  It's the same -- even the notebook if it had been

10  witnessed and didn't have the details essential to show that

11  you actually had the invention, doesn't prove an earlier

12  priority date.

13  So a business plan, you know, written in business

14  planese and not discussing the technical details also can't

15  corroborate, and I think only one of those documents even had

16  a third party on it, you know, a non-inventor on it who could

17  have conceivably corroborated had he done it.  I don't recall

18  specifically but that's the answer on that.

19  On the SeaChange thing that -- on the two things:

20  On the copying stuff again, access isn't the issue.  They've

21  got to show we did it, and there was no proof, no proof of

22  copying of anything.

23  As Your Honor pointed out, well, the fact that

24  Schonfeld can go and do this point by point thing just says

25  that he thinks we infringed.  He never said, after his

1    analysis, they didn't ask him to opine and he didn't opine

2    that we copied as opposed to infringing.  And on the

3    SeaChange business, I think if Your Honor looks at the

4    evidence in the record, their response, I believe Mr. Miller

5    admitted this, their response to our request, our five, I

6    guess it was, request for interest about possibly doing games

7    or something, they came in, they knew about SeaChange, and

8    they put in a document saying, oh, yeah, we've worked with

9    SeaChange, we've integrated with them before.

10         So I think Your Honor's got it exactly right.  Not

11   only did they never, ever put us on notice -- and notice

12   isn't some low level employee going to a website and getting

13   I list of patents.  Notice is some reason to believe you

14   infringed, typically by a letter from the other side.

15         But there is nothing like that here, and we do point

16   out in the brief that not every bit of information you can

17   imagine for a big corporation, not every bit of information

18   that somebody in the corporation knows is attributed to the

19   corporation.

20         THE COURT:  Want you to understand they contend that

21   the evidence of notice is circumstantial evidence of the

22   notice.  They cite circumstantial notice of evidence.

23         MR. GUTMAN:  Well, but we knew they were trying to

24   develop a problem.  We knew they had a demo.  That doesn't

25   mean that we knew there were patents, that people in the

1     position of the company to deal with it knew there were

2     patents and knew that there was a high likelihood of

3     infringement, which is the standard.  And there was certainly

4     nothing they did that would suggest --

5         THE COURT:  But they suggested that you already

6     downloaded their patents.

7         MR. GUTMAN:  Yeah, but that is not true, Your Honor.

8     The document he is talking about -- the document he is

9     talking about was the document -- the exhibit that I think

10     was admitted this morning, which was a list that some low

11     level guy did from the website, a list of patent numbers.  He

12     was a marketing guy, I think was the testimony.

13         There was zero evidence that any of that -- that any

14     of that -- certainly it wasn't notice of a risk of

15     infringement.  It was collecting information about the

16     industry by a low level marketing guy, and that doesn't count

17     as corporate notice under the law.

18         THE COURT:  Well, let me shift to something else

19     here to get an idea of how you're going to be operating once

20     we get past this motion tomorrow.  You're going to be calling

21     witnesses tomorrow, I'm sure, that will probably take up most

22     of the day.  Do you have an idea, of now having seen the

23     floor of this case, approximately how many days you are going

24     to need?

25         I know Mr. Johnson estimated alone he will take

1   five, and he took five complete days.  I'm wondering whether

2   you are going to be that accurate?

3           MR. GUTMAN:  We are looking, Your Honor, we are

4   looking to cut it, and I had three Verizon witnesses.  We are

5   going to be very brief.  I have the -- we've had to recall

6   their witnesses to get in some documents.

7           THE COURT:  Uh-huh.

8           MR. GUTMAN:  Because we have been --

9           THE COURT:  The Court's rules.

10          MR. GUTMAN:  So we are going to do that.  We are

11  going to get the documents in.  And we've got a few other

12  questions for those witnesses.  They aren't going to be long.

13  And then we've got two experts, invalidity and -- I'm sorry,

14  invalidity and non-infringement.  We've got one expert each

15  on our patents.  We've got a couple of small witnesses,

16  probably Cisco and Seagate.

17          I may be giving leaving somebody else, but we've

18  been kind of -- and then we've got our damages expert, of

19  course.  So we've been working hard to cut it back, Your

20  Honor, and we are going to be comfortably within the 30

21  hours, and I don't know what --

22          THE COURT:  By the way, Ms. Thompson may be able to

23  give you some idea of what balances you have.  Have you all

24  asked?

25          MR. JOHNSON:  Oh, yes.  We know how much we have.

```
 1              THE COURT:  You know you had.  Okay.
 2              MR. GUTMAN:  I haven't got the tally for today but I
 3   knew where we were yesterday.
 4              MR. JOHNSON:  I'm 45 minutes off, Your Honor.
 5              THE COURT:  How many hours have you used?  How many
 6   hour does ActiveVideo have left?  I'm get it at the end of
 7   the case.  Don't worry.
 8              MR. GUTMAN:  But we are looking to expedite.  I
 9   don't think -- based on what we are doing, Your Honor, I
10   don't think we are at risk in terms of finishing on time.  We
11   have been cutting.
12              THE COURT:  We are fine.  We can still make it
13   within the time of what the Court had allocated, so that's
14   fine.
15              All right.  Then, Mr. Johnson, you say you want to
16   give the Court something in writing.  You get in here early
17   tomorrow morning, you may not be able to get in the door, but
18   I'll tell the -- you think you can let Mr. Johnson in here
19   before 8:30?
20              COURT SECURITY OFFICER:  I'll get him in.
21              THE COURT:  Oh, you can file it electronically.
22              MR. JOHNSON:  That is what we plan to do.
23              THE COURT:  You all be up all night, you can file IT
24   electronically.
25              MR. JOHNSON:  Okay.
```

```
 1          MR. GUTMAN:  What TIME would you like us here

 2   tomorrow morning, Your Honor?

 3          THE COURT:  We are going to start 9.  Hopefully, we

 4   will go through within a half hour.  If not, the jury is just

 5   going to have to wait a half hour.  I don't want them to

 6   wait.  Let's make it 8:45.  That is going to push everybody,

 7   but 8:45.  We are going to be in here.  Recess.

 8          (Hearing adjourned at 6:11 p.m.)

 9                        CERTIFICATION

10

11       I certify that the foregoing is a correct transcript

12   from the record of proceedings in the above-entitled matter.

13

14

15       X_____/s/_____x

16               Jody A. Stewart

17               X_____7-19-2011_____x

18               Date

19

20

21

22

23

24

25
```

JODY A. STEWART, Official Court Reporter