1

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF VIRGINIA
 2                       Norfolk Division

 3

 4  ACTIVEVIDEO NETWORKS, INC.,          )

 5                                       )

 6             Plaintiff,                )      CIVIL ACTION

 7                                       )
       V.                               )       2:10cv248
 8                                       )
    VERIZON COMMUNICATIONS, INC.,        )
 9  et al.,                              )
                                         )
10             Defendants                )

11

12

13

14

15                 TRANSCRIPT OF PROCEEDINGS

16                     Norfolk, Virginia

17                     October 24, 2011

18
           (Motion for Preliminary Injunction Hearing)
19

20

21  Before:  THE HONORABLE RAYMOND A. JACKSON
                 United States District Judge
22

23

24

25
```

```
 1  Appearances:

 2
            MORGAN, LEWIS & BOCKIUS, LLP
 3          By:  DANIEL JOHNSON, JR., ESQUIRE
                 MICHAEL J. LYONS, ESQUIRE
 4               Counsel for the Plaintiff
                      and
 5          KAUFMAN & CANOLES
            By:  STEPHEN E. NOONA, ESQUIRE
 6               Local Counsel for the Plaintiff

 7          SIMPSON THACHER & BARTLETT, LLP
            By:  HENRY B. GUTMAN, ESQUIRE, ESQUIRE
 8               NOAH M. LEIBOWITZ, ESQUIRE
                 JOHN P. FRANTZ, ESQUIRE
 9                    and
            VERIZON CORPORATE RESOURCES GROUP
10          By:  JOHN THORNE, ESQUIRE
                 Counsel for the Defendants
11                    and
            HUNTON & WILLIAMS
12          By:  GREGORY STILLMAN, ESQUIRE
                 Local Counsel for the Defendants

13

14

15

16                      *    *    *

17

18

19

20

21

22

23

24

25
```

```
 1              (Court convened at 10:05 a.m.)

 2              THE DEPUTY CLERK:  ActiveVideo, Inc. versus

 3  Verizon, Inc., et al.  Civil action, 2:10cv248.

 4              Are plaintiff's counsel ready to proceed?

 5              MR. JOHNSON:  Yes, we are.

 6              THE DEPUTY CLERK:  Are defense counsel ready to

 7  proceed?

 8              MR. GUTMAN:  We are.

 9              THE COURT:  Good morning.

10              Gentlemen, we are here on a couple of matters.

11  First, just some preliminary things I want to deal with.

12  I have ActiveVideo's motion, memorandum in support for

13  leave to file notice for supplemental authority in

14  support of the motion for a preliminary injunction, and

15  Verizon's response to the motion.  The motion will be

16  granted.  The Court will read and digest both parties'

17  reaction to the supplemental authority in the process of

18  considering what it will do about the injunction.

19              With respect to the motion to waive or, in the

20  alternative, a proof of supersedeas bond, to stay

21  execution of judgment pending appeal, the Court has read

22  the memoranda of the parties.  I don't know that you have

23  a lot more to say about this matter, to be candid with

24  you.  But if you do, you certainly can tell me, but I

25  think you have made your position pretty clear in your
```

 1  pleadings, I'll be candid with you.  If there's something
 2  else you want to add, I will be glad to hear it.
 3          MR. STILLMAN:  Well, your Honor, as you know, if
 4  you ask a lawyer whether or not he has something to add,
 5  it's an irresistible invitation.
 6          THE COURT:  Well, that's all right.  The Court
 7  anticipated that.
 8          MR. STILLMAN:  May it please the Court.  I'm
 9  Greg Stillman, here on behalf of Verizon, and I would
10  like to address Verizon's motion with respect to the
11  bond, your Honor.  And I don't have very much to add
12  that's not in our briefs, but I would like to say this:
13          First of all, as you know, this whole matter is
14  soundly within the Court's discretion.  What does that
15  mean?  That means that, obviously, the Court has to look
16  at some factors.  This is not an automatic issue.  If it
17  were an automatic issue, then the opportunity for us to
18  make this motion would not be available.  So the Court
19  has to look at some factors.  And with respect to those
20  factors, we think it is entirely appropriate to look at a
21  balancing of harm.  There's been some suggestion in the
22  briefing that the Court should essentially do an
23  injunction-type analysis.
24          Well, if, in fact, the Court did that and if, in
25  fact, the Court engaged in any balancing-of-harm

1  analysis, I think that analysis would show quite clearly

2  that the Court should exercise its discretion and not

3  require a separate supersedeas undertaking by Verizon in

4  this case.  And the reason for that is quite simple.

5  Verizon has demonstrated, I believe, to the Court's

6  satisfaction that it has significant resources available

7  to satisfy any judgment.

8         The real question, in our mind, is whether

9  ActiveVideo has the resources to pay the cost of this

10  bond if, in fact, the case is ultimately reversed,

11  because, as you know, that is a taxable cost to the

12  loser.

13         There's no question but that Verizon has the

14  ability to satisfy this judgment, and, in fact, the

15  evidence would suggest that Verizon is in a better

16  position financially with its cash balance than, perhaps,

17  most of the said surety companies who would undertake

18  such a bond.

19         So the real question is why are we doing this?

20  And the simple answer from our perspective is that this

21  is nothing more than an effort to be punitive with

22  respect to Verizon, an effort to somehow extract every

23  pound of flesh that can be extracted, and there's no

24  reason for it.  It's a taxable cost that ultimately

25  ActiveVideo would have to bear if it's not successful in

1    the appeal of the case.

2           So for all of those reasons, it's our view that

3    the Court should exercise its discretion.  It's not going

4    to harm ActiveVideo not to require this unnecessary

5    expenditure, which is going to be in the hundreds of

6    thousands of dollars, and so we would respectfully ask

7    that our motion be granted.

8           THE COURT:  All right.  Mr. Johnson.

9           MR. JOHNSON:  Good morning, Your Honor.

10          There are two points.  Number one, in the ITC

11   action when Verizon was litigating against Cablevision

12   and it thought it was going to get, effectively, an

13   exclusion order, it didn't claim at that point that a

14   bond was necessary.  In fact, it argued that it was

15   entitled to a hundred percent bond because of its

16   irreparable injury suffered while Cablevision is

17   continuing to improperly utilize the '740 patent, which,

18   as we know, is invalid.

19          The reason the bond is proper in this case is,

20   in fact, Verizon has been found to be infringing.  While

21   I am very confident they may be around in the two-year

22   period it's going to take to complete the process, I'm

23   sure there were people that thought AIG was going to be

24   around prior to the point in time in which it went under.

25          We are not here to have to take any risks, your

1   Honor.  We don't want to take any risks.  The reality is

2   a bond is appropriate.  We know where the source of

3   revenue is going to come from.  We don't have to chase

4   it.  And the law is clear that it is the exception when a

5   bond is not required, and the only case cited involved a

6   public utility.

7            Nothing further.

8            THE COURT:  Okay, gentlemen.  The Court has

9   given considerable thought to the arguments of both

10  parties with respect to this question of whether a bond

11  should be required, and the argument that Verizon makes

12  that they should not be required to post a bond because

13  they are fully able to pay the bond and that it would be

14  a waste of time and a waste of resources to be paying

15  $350,000 a year has a certain amount of appeal to the

16  Court.

17           On the other hand, the argument that ActiveVideo

18  makes about the posting of a bond also has, I think,

19  solid ground.  What the Court has looked at, the Court

20  has looked at all of these issues.  The Court notes that

21  both parties have different approaches to analyzing the

22  question of whether the bond should be required, and

23  certainly the issue of balance of harms was raised.  The

24  Court did wonder about whether ActiveVideo wanted to take

25  the chance that if they should lose, they would be

1    subject to several hundred thousand dollars in taxable

2    costs to be paid, but the Court also understands at this

3    juncture that's not an issue that the Court should rely

4    on in trying to determine whether a bond should issue.

5    That's ActiveVideo's risk and their problem if they lose

6    and not obtain a bond.

7            The Court has read Rule 62(d) and the Court has

8    read a lot of the cases you have raised, and the Court

9    finds nothing in this circuit that carves out an

10   exception to the requirement that bond be posted for a

11   stay under these circumstances.

12           Now, in terms of costs, I do not believe that

13   the parties, and certainly Verizon has not, spared any

14   cost in litigating this case.  I read the submission with

15   the affidavits of Ms. Small and Mr. Stillman and note

16   that certainly, in fact, if Verizon had $6.1 billion of

17   cash on hand and a $6.1 billion line of credit, then the

18   capability of paying a bond is no question; they can do

19   it and are fully capable of doing it.  So that cuts

20   against Verizon's arguments about just wasted money.

21   Verizon hasn't spared any cost in litigating this case.

22   In fact, I think it's probably been a waste of money in

23   this case, from what the Court has observed, by both

24   parties.

25           The Court believes that when it balances all of

1  the considerations in this case that it will require that

2  a supersedeas bond be posted in this case.  The Court

3  further believes that the $115 million is inadequate.

4       The Court entered a supplemental order.  I

5  understand that you went to Liberty Mutual and got the

6  bond before the Court issued that opinion in October for

7  supplemental damages, for prejudgment interest, which

8  really brings the total amount of the judgment the Court

9  has before it now up to 139 million.  That doesn't even

10  include any taxable cost or potential post-judgment

11  interest.

12       So the Court believes that a $115 million bond

13  is inadequate and so the Court is going to do what it

14  should do here, and that is the Court is going to grant a

15  stay to Verizon in this case, but pending appeal, the

16  Court is going to require you post the $145 million

17  supersedeas bond, and that is probably on the low side.

18  The Court went and tried to just presumptively calculate

19  maybe the amount of time it might take for this appeal,

20  any taxable costs, that's probably low, but I think it's

21  reasonable.  So the Court is going to require that

22  Verizon post a $145 million supersedeas bond pending the

23  appeal in this case, and that's the order the Court will

24  enter in this case.

25       I thank you-all for your arguments, but it's

1   reasonable.  I think it's well-grounded.  It doesn't

2   matter that Verizon is capable of paying.  If it's

3   capable of paying, it should be no problem.  So that's

4   the Court's order.  You will get a written order to that

5   effect, and I will leave it to you when you post the

6   bond.  When you post the bond, then the stay in this case

7   will go into effect in accordance with Rule 62(d) pending

8   the appeal.

9           Is there anything else on this issue?

10          All right, fine.  Let's move to the injunction.

11          On this injunction, now, once again, the Court

12  has read the memoranda of the parties, gone backwards and

13  forwards to see who has the stronger side of the argument

14  in this case, and at this juncture the Court, again,

15  takes the same position it took with the bond.  The Court

16  is not going to be making any ruling on this injunction

17  from the bench.  I'm not going to do that.  I'm going to

18  hear your arguments to see if you have anything that's in

19  addition to what you have filed, and the Court will be

20  able to move pretty quickly.  Probably before the end of

21  the week you will get an opinion back out of here on this

22  issue.

23          I have spent considerable time looking at it

24  already, but there are some things that the Court does

25  not know about your positions, and the Court suspects

1  that you have probably refined your position or

2  supplemented your position in this hearing this morning,

3  and the Court has some questions about some of the things

4  that you are suggesting that are not clear for the

5  record, and so the Court remains to be educated on this

6  question of an injunction.

7       It's not a quick call after the *eBay* decision

8  about what the Court should, in fact, do.

9       So, all right, Mr. Johnson.

10      MR. JOHNSON:  Thank you, your Honor.

11      THE COURT:  Be mindful of the fact that you have

12  already written substantially about this issue.

13      MR. JOHNSON:  I am, your Honor, and I fully

14  intend to focus on certain specific issues.

15      THE COURT:  All right.

16      MR. JOHNSON:  We cited the *Bosch* decision to the

17  Court because it is the first, in my opinion,

18  pronouncement since *eBay* which we think properly

19  elucidates the requirements for the issuance of an

20  injunction and identifies factors for the Court to

21  consider.

22      The first point to be made is the question of

23  irreparable injury, then we have to address remedies, and

24  then, obviously, the balance of the hardship.  That's the

25  test.  But the *Bosch* court started off by saying, "One of

1  the critical issues in determining whether or not to

2  grant an injunctive relief is, is there competition by

3  the parties in the particular segment of this market?"

4  And *Bosch* went through and did an analysis of the market

5  segment.

6          In this case what Verizon says is, We don't

7  compete with ActiveVideo directly.  That is simply not

8  true.  ActiveVideo has its CloudTV technology.  The

9  CloudTV technology, as Mr. Miller set out in his

10 declaration, and as an aside, there has been no rebuttal,

11 is that CloudTV provides VOD and interactive services

12 using the software and professional services to

13 customers.  The customers then are able to provide the

14 VOD and interactive services to its clients.

15         Verizon provides VOD and interactive services to

16 its clients or its subscribers as well using software.

17 That software has been found to infringe.  So when

18 Verizon tells the Court we are not direct competitors,

19 they are saying, well, these two are not -- ActiveVideo

20 is not a cable company.  Well, it's true, but it doesn't

21 mean that there isn't direct competition, because without

22 the ActiveVideo software, neither Verizon or its

23 customers would be able to offer the VOD interactive

24 services.

25         In *Bosch* the Court identified one market, the

1  OEM market.  In that situation, *Bosch* provided the blades

2  to a third party, *Pylon* did not.  *Bosch* said, By using

3  our infringing technology, *Pylon* affects the amount of

4  money we can get, it affects the number of customers we

5  can secure, and finally, it erodes our business brand.

6  And the Court said that was sufficient to give rise to

7  injunctive relief.

8         What did Mr. Miller say in his declaration,

9  followed by the senior vice president of Cablevision?

10 One, we receive our money based upon supplying our

11 software to Cablevision, providing the professional

12 services to Cablevision, and then we get paid based upon

13 the number of streams, that is to say, the number of

14 subscribers that use the Cablevision service.  So,

15 therefore, if subscribers are lost to Cablevision, it

16 necessarily follows that ActiveVideo's CloudTV technology

17 is rendered less valuable.

18        Now, how do we know that?  We know that because

19 in the ITC Verizon made the identical argument.  In it,

20 it said, quote, If Cablevision -- and this is page 32 of

21 39.  In the situation where the argument was, Can you

22 calculate injury based upon potential loss to

23 subscribers?  Here's what Verizon said.  "If Cablevision

24 is able during the review period to continue importing

25 and infringing STB, set-top boxes, and provide them to

1   its customers, the competitive harm to Verizon will not

2   be limited to the difference between the monthly

3   equipment fee or service price charged by its company.

4   For example, Cablevision might acquire a new customer

5   during the review period and provide that customer with

6   fringing STB.  Through this unfair act, Cablevision will

7   have deprived Verizon of the opportunity to serve that

8   customer for an indefinite amount of time, however long

9   the customer remains with Cablevision and receives its

10  services.  The amount of that harm cannot be measured

11  before it occurs.  Indeed, Cablevision admits that these

12  unique circumstances make it impossible to fashion an

13  appropriate bond."

14          That's what they said in the ITC.  Here they

15  say, Oh, we could compensate ActiveVideo by money if

16  there was a reasonable royalty.  That's totally

17  inconsistent with that position I have just read to you,

18  your Honor, and the reason is you don't know how many

19  subscribers you've lost; you don't know if you will ever

20  get them back.

21          And here's what we do know.  Verizon's

22  technology it is using to deliver VOD and interactive

23  services has been found to infringe ActiveVideo's

24  technology and its patents.  Because of that, we then

25  say, Well, what is the impact if your technology is and

1  has, in fact, been infringed?  And what did Verizon say?

2         Quote, Here the ALJ found in Cablevision, which

3  competes against Verizon in the New York City

4  Metropolitan area, infringes Verizon's '740 patent by

5  incorporating Verizon's patent and technology.

6  Cablevision is, therefore, not only benefiting unfairly

7  from Verizon's investment and innovation as a general

8  matter, it is doing so to undermine Verizon in specific

9  markets where the two companies compete.  The public

10 interest is best served by requiring companies to compete

11 on fair terms, not by allowing one company to use the

12 patented technology of its direct competitor without

13 authorization."  That's what they said in the ITC.

14         They come here today and they are saying, Well,

15 just because this Court and a jury after a three-week

16 trial found that we infringed four patents, we ought to

17 be able to continue using the ActiveVideo technology

18 competing against Cablevision as well as the other ten

19 states in which we operate.  That's diametrically opposed

20 to what they told the ITC.  If the logic applied then, it

21 applies now.

22         It is fundamentally unfair, and the *Bosch* Court

23 made that point in saying injunctive relief is improper

24 under that circumstance.  The interesting thing about the

25 *Bosch* case, *Bosch* is a huge company and it was conceded

1   that wiper blades was not a major part of *Bosch's*

2   business.

3           In our case, all our business is CloudTV.  That

4   is our business.  So by allowing Verizon to continue to

5   behave in the fashion it is doing without injunction, our

6   core business is being fundamentally affected, and it's

7   being fundamentally affected in several ways.  As

8   Mr. Miller said and as Cablevision said, without using

9   ActiveVideo's technology, Verizon would have a difficult

10  time competing for subscribers, and it would have a

11  higher churn rate, that is to say, it would lose

12  customers.  That is incalculable in two ways:

13          Number one, Verizon continues to maintain its

14  advantage; and, secondly, ActiveVideo does not receive

15  the benefits of the money it invested in this particular

16  technology.

17          Moving on, your Honor.  On the question of

18  whether or not the granting of an injunction would

19  somehow unfairly harm Verizon, here's what Verizon had to

20  say in the ITC.  "Because Cablevision customers can

21  readily obtain comparable STBs and television services

22  from other service providers, including Verizon, a

23  remedial order would have no negative effect on

24  consumers."

25          They went on to say -- and that is at page 22 of

 1  28, your Honor.  Then at page 19 of 39 Verizon says,

 2  "Moreover, even if the Commission had authority to state

 3  a remedy in this investigation, it should decline to do

 4  so.  A stay would cause irreparable harm to Verizon.  The

 5  ALJ has determined, and the Commission has confirmed,

 6  that Cablevision violated Section 337.  If the Commission

 7  delays in remedying that violation, Cablevision will be

 8  able to continue violating the statute and Verizon's

 9  intellectual property and Verizon will have no recourse."

10        Stated another way, your Honor, the U.S.

11  Constitution and the statute gave my client the right to

12  exclude, and *Bosch* says that is a considerable factor

13  that must be considered in making a decision to grant or

14  deny injunctive relief.

15        In this case Verizon at every turn has made it

16  as expensive as possible for my client, has stated openly

17  and publicly that it's not going to pay a dime.  It went

18  into the ITC and made the following statement concerning

19  this Court's determination about the invalidity of the

20  '748:  "Cablevision has not offered any reason to import

21  conclusive preference to the District Court's decision,

22  which was reached without oral argument, without the

23  support of expert testimony, and without the full

24  evidentiary record."  In other words, your decision,

25  according to the Verizon and the ITC, was not entitled to

1   any weight because Verizon had not been afforded due

2   process of law.  That's what they told the ITC.

3          Now, we stand here today and I have just heard

4   the argument about Verizon being worth billions.  My

5   client was ridiculed during the trial for having spent

6   $300 million to keep their company afloat and not having

7   made a profit.  Now Verizon says, Well, they should

8   continue going forward while we use their technology and

9   struggle in the marketplace.  Injunction was designed to

10  protect the very situation you have here.

11         So what is Verizon's first argument?  They argue

12  we are not directly competitors because Gary Lauder says

13  everything is for sale except his children.  That,

14  besides being amusing, is irrelevant to the analysis.

15         They then say, Well, Mr. Wagner then said that

16  they were not competitors because he didn't do an

17  analysis on profit.

18         What we have here is Mr. Miller, who gave us a

19  declaration, and Mr. Miller is here today, in which he

20  said, Our technology, the cloud technology, is all we've

21  got and we are losing money, we are losing subscribers,

22  and he backed it up with the declaration from

23  Cablevision.

24         What do we have on the other side?  Nothing

25  other than what can only be described as a whimsical

1   argument by Dr. Carlton who said if there had been a

2   reasonable royalty and we had decided to go with

3   ActiveVideo, we would have created additional competition

4   and that would have benefited ActiveVideo; and,

5   therefore, they are not injured.

6          Well, first of all, A, it didn't happen;

7          B, at this point, having spent the multiple

8   millions of dollars we spent to defend our technology and

9   having Dr. Carlton make it clear that he wasn't conceding

10  that there was a reasonable royalty rate, despite what

11  the jury did, we are supposedly going to be made whole in

12  the very way that Verizon told the ITC we could not be

13  made whole.  How is that?  By losing customers that we

14  might get a royalty for of some unspecified amount.

15         If it wasn't proper in the ITC when they thought

16  they had the upper hand, it is certainly not proper here.

17         Now, obviously, we have gone, as I said, in

18  great detail outlining the fact, but fundamentally, your

19  Honor, here's where this thing comes down to:  We tried

20  this case.  We got an injunction.  They fought us every

21  step of the way.

22         THE COURT:  A verdict, not an injunction.

23         MR. JOHNSON:  We got a verdict.  We need an

24  injunction, and we need an injunction because every day

25  they are in the market using our infringing technology,

1  and that's where we are now, they are using our

2  infringing technology to acquire subscribers who, as the

3  declaration from Cablevision makes clear, they would have

4  difficulty getting without our technology, and they are

5  able to compete unfairly.

6          Cablevision declaration, your Honor, paragraph

7  11.  "Without our technology, Verizon would have more

8  difficulty attracting customers and their churn rate

9  would go up."  So, in effect, what Verizon wants, they

10  didn't want to pay a bond.  They don't want to address

11  the consequences of this jury's decision or face the

12  consequences of this jury's decision, which is if you

13  have got technology that you can use that doesn't

14  infringe, it's incumbent upon you to use it.  If not,

15  what do you have to do?  In this case you can still have

16  your cable system.  You can still offer video.  You just

17  can't offer Video On Demand with interactive services.

18          In our view, that is perfectly appropriate and

19  proper, and it's the only way we are ever going to get

20  Verizon's attention.

21          Thank you.

22          THE COURT:  You made a reference to the fact

23  that you said that they are infringing with the use of

24  the technology --

25          MR. JOHNSON:  Yes.

1           THE COURT:  -- of the patent.

2           How many FiOS customers does Verizon have?  I

3  heard something about 4 million at one time.  Do you know

4  exactly how many?

5           MR. JOHNSON:  To our knowledge before trial it

6  was 3.9.  The latest number we heard was 4 million to 4.1

7  million.  Here's what else we know, because we proved it

8  at trial, at the beginning of 2005 their strategy to

9  attract customers to their new venture, because, as you

10 know, it was built from the ground up, was the use of VOD

11 and interactive services as the distinguishing

12 characteristic over the other cable companies.

13          THE COURT:  An argument, I believe, was made

14 that in the event the Court decided to issue an

15 injunction, a sunset provision should be considered and

16 Verizon could very well pay a certain amount per

17 subscriber.  I'm trying to remember, I have read so much

18 in this case I'm getting dizzy, whether you reacted in

19 your briefs to that suggestion by Verizon.  There's some

20 case law that talks about sunset provisions.

21          MR. JOHNSON:  That's true, and we did not for

22 two reasons:  Number one, Verizon's strategy is to delay

23 the inevitable for as long as it can, and so they will

24 say anything.  And when I say anything, here's what I

25 mean:  They talked about that sunset provision, but they

1   never told the Court this would be a royalty rate that we

2   would be prepared to accept.  In fact, they never set a

3   royalty rate.  That's even against the background.

4          My client's view is our right to exclude gives

5   us the right to determine if Verizon is going to be

6   permitted to use our technology or not.

7          THE COURT:  But the Court has to look at all the

8   potential options.

9          MR. JOHNSON:  Correct.

10          THE COURT:  The Court doesn't know what it's

11   going to do.  But let's assume, hypothetically, the Court

12   granted an injunction providing a sunset provision.  I am

13   aware there's some testimony about Verizon working on

14   alternatives that might take six to nine months or

15   something of that nature.

16          MR. JOHNSON:  Sure, correct.

17          THE COURT:  Has ActiveVideo given any

18   consideration to any such subscriber, what type of rate

19   it would want per subscriber in the event the Court

20   ordered a sunset provision?

21          MR. JOHNSON:  Two points, your Honor.  The

22   answer is no, because there was never a statement by

23   Verizon as to what that rate would be.

24          But if you were speaking of the rate, you have

25   to look at the rate in the following context:  Under the

 1  jury's verdict, the rate per subscriber was one thirteen.

 2          THE COURT:  One hundred thirteen bucks.

 3          MR. JOHNSON:  A dollar thirteen per subscriber.

 4          MR. GUTMAN:  Per subscriber per month.

 5          MR. JOHNSON:  Per subscriber per month.  Okay?

 6  So that rate was -- and the jury found there was no

 7  willful conduct.

 8          All right.  The rate we asked for was two twenty

 9  five per subscriber per month.  Obviously, the jury

10  divided it.  However, we are in post-judgment world now,

11  so now Verizon's conduct is willful.  Not only is it

12  willful, but we would be entitled to a post-judgment

13  royalty in an amount that reflects Verizon's ongoing

14  infringement.

15          The case law requires two things under those

16  circumstances:  Either an agreement of the parties or a

17  separate hearing to determine what the reasonable royalty

18  rate should be.

19          If you were to ask me today what I thought the

20  reasonable royalty rate should be, and again, I said my

21  view is our right to exclude, which, by the way, gives us

22  huge advantage with our customers and potential customers

23  because not having Verizon as a competitor increases our

24  ability to improve our contractual relationship with the

25  cable company such as Comcast, who competes head to head

1  with Verizon.  If Verizon can't offer VOD and interactive

2  services, we get a better deal with Comcast.  That's

3  simply the reality.

4          So if the Court were to say either have a

5  hearing to argue about what a royalty reasonable is -- if

6  so, we will come back and we will do that, but I want to

7  do it ASAP if that has to happen -- or, B, what's your

8  number?  It's not one thirteen.  We are now willful.  We

9  want two twenty-five per subscriber per month, and we

10 don't want to be in the situation where Verizon can

11 decide in six or nine months whether or not it has come

12 up with a noninfringing alternative.  We want there to be

13 a minimum of a one-year period, from August 2nd to August

14 2nd, because I have no doubt, and I'm sure the Court has

15 no doubt, the minute they come out with their so-called

16 noninfringing alternative, you are going to see us right

17 back here saying the proof of the pudding is in the ink,

18 and we are likely going to have to have another hearing

19 because I don't think they can do it, despite the

20 assertions to the contrary.

21         THE COURT:  Well, that's certainly

22 hypothetically.  That wouldn't be the Court's concern,

23 because if the Court put in a sunset provision, then it

24 would simply mean an injunction would become effective on

25 the date the Court said it would become effective, and

1 that's what the Court means.  It wouldn't be conditioned

2 on whether some alternative works or doesn't work.

3 That's not an issue the Court would be concerned about.

4          MR. JOHNSON:  Right.

5          THE COURT:  The Court would be concerned about

6 if the Court enters an injunction, the injunction is

7 effective when the Court says it's effective.

8          MR. JOHNSON:  Understood.  Understood, your

9 Honor.  I stand corrected.

10          THE COURT:  So that's one thing.

11          All right.  Anything else you want to add?

12          MR. JOHNSON:  Not at this point.  I would like

13 to reserve some time for rebuttal.

14          THE COURT:  All right.  I have a feeling we are

15 going to be doing a seesaw here.

16          MR. JOHNSON:  It wouldn't be the first time.

17          THE COURT:  What can you do to inform the Court

18 on these issues, Mr. Gutman?

19          MR. GUTMAN:  I would be happy to, your Honor.

20 Good morning, Hank Gutman.

21          THE COURT:  Good morning.

22          MR. GUTMAN:  Hank Gutman for Verizon.

23          Let me start with a couple of points that

24 Mr. Johnson put a lot of emphasis on.  He spoke a lot

25 about the right to exclude, and I would just remind the

1  Court, and I know the Court spent a lot of time with

2  these decisions and probably doesn't need the reminder,

3  but the right to exclude is both Justice Thomas's

4  decision for the Court in *eBay* and Justice Kennedy's

5  decision for a concurring opinion for four justices that

6  *eBay* is the right.  It says nothing about the remedy.  It

7  doesn't mean that an injunction is automatic.  The whole

8  point of the *eBay* decision was that an injunction is no

9  longer automatic, it's not presumed.

10         As the *Bosch* decision makes clear, it's not even

11  rebuttably presumed, and the right to exclude exists in

12  every patent case.

13         So if that is entitled to the kind of weight

14  that my friend, Mr. Johnson, has been arguing, then there

15  would be an injunction in every case, and we all know now

16  in the post-*eBay* world that is not even close to being

17  true.

18         They have to prove a number of things, four

19  factors.  The key ones here are irreparable injury and

20  that damages are not an adequate remedy of law, and they

21  can't do that.  Since *eBay* no commercial entity, none,

22  not one, has gotten an injunction unless it was against a

23  direct competitor.

24         And let me put an even finer point on it.  You

25  know, we get into the direct versus indirect and all of

1   that stuff.  We don't have to get that fancy.  There has

2   not been a single injunction post-*eBay* granted against a

3   customer or potential customer.

4          THE COURT:  Now, does that mean that one is not

5   warranted or that no judge exercised its decision to

6   grant one?

7          MR. GUTMAN:  It means none is warranted, your

8   Honor, because there's no irreparable injury in that

9   situation.  That's the basic point.  When you are dealing

10  between -- not between competitors.  I mean, the *BroadCom*

11  *and QualComm* case cited in the papers, those were direct

12  competitors.  The *Bosch* and *Pylon* those were direct

13  competitors.  Judge O'Malley's decision from the Federal

14  Circuit could not have been more clear on that point.

15         I am going to spend a little time on *Bosch,* and

16  we are going to walk through each of the distinctions at

17  a level Mr. Johnson didn't.

18         THE COURT:  Let me ask you this right now as you

19  get started:  Are there any cases out there that deal

20  with the factual situation that this Court is confronted

21  with here where you have indirect competitors?  You know,

22  there's a first time for everything.

23         MR. GUTMAN:  Well, what they are calling an

24  indirect competitor, your Honor, is a supplier-customer

25  relationship.  And, yes, I think *z4* was one of those

1  decisions.  There are a whole bunch cited in our briefs

2  where courts denied injunctions in those decisions

3  because there is an adequate remedy at law, namely

4  damages.

5         If we cut through all the terminology and just

6  think about it for a minute, it makes sense that that

7  would be true because the customer or potential customer

8  is something the patent holder would have been very happy

9  to make a deal with to provide them.  And if you make the

10  deal, what do you get?  You get money.

11         The reason why a direct competitor is different

12  is if you have got a patent that's significant, you might

13  not be willing to license that patent to your direct

14  competitor and give up your competitive advantage for any

15  amount of money.  That's the difference.  That's the

16  difference.  That's why no court has found, and I think

17  there's a reason for that, that there is that kind of a

18  irreparable injury when it's supplier and customer, and

19  that is clearly undeniably what the relationship is

20  here.  Every single witness of theirs at trial in this

21  case, at deposition in this case, and the testimony that

22  was read and played to the jury described the

23  relationship that way.

24         Let me just take Mr. Wagner.  I have got his

25  page handy.  "Is it your opinion that ActiveVideo would

1 not lose sales by licensing to Verizon?"  That's exactly

2 the question.

3          "I have not calculated any lost profits here, so

4 that's correct."

5          And if you look at his expert report where one

6 of the Georgia Pacific factors asks about that, he said,

7 "That factor is neutral because there's no evidence that

8 they would lose any sales."

9          It goes on:  "ActiveVideo doesn't participate in

10 the marketing and selling of video services as does

11 Verizon?"

12          "That's correct."

13          "Verizon is not in the business of selling VOD

14 hardware and software to other providers of video

15 services?"

16          "They are not."

17          "It is, therefore, your opinion that ActiveVideo

18 and Verizon are not competitors?"

19          "That's accurate."

20          This is the opinion their expert stated on the

21 witness stand under oath in this case subject to

22 cross-examination and direct examination.  He didn't say,

23 oh, but they are an indirect competitor; they are just

24 not a direct competitor.  All the explanations and

25 excuses and all of the wiggling that we see in the

1    injunction papers, none of that was there when the man

2    was on the stand.

3            And your Honor will see in our papers that we

4    have got a list of all of their witnesses.  Villalpando,

5    O'Callaghan, Mr. Miller himself, all of them testified

6    that we were a customer, or potential customer, or, gee,

7    we wish we could have them as a customer.  Nobody

8    described has as a competitor, either direct or indirect.

9            THE COURT:  Forget the direct and indirect for a

10   second.  The jury found that Verizon's patent infringes.

11   So, in effect, you are arguing that your infringement has

12   no impact on ActiveVideo?

13           MR. GUTMAN:  What I'm arguing is there's no

14   irreparable injury because we are not a direct

15   competitor.  We are not a competitor of any sort.  It's

16   not that there's no impact, your Honor, there is, but

17   it's one that's measurable by damages, as the jury did

18   and as your Honor subsequently did.

19           But in terms of whether our impact of our

20   presence in the market helps them or hurts them, their

21   own Mr. Taylor testified, and again, remember him, your

22   Honor, he was the sales guy or marketing guy, and this

23   was in some of his deposition testimony, he compared

24   himself to an arms merchant.  He said if Verizon is in

25   the market with their product which has nice features

1 that customers want, that makes it easier for him to sell

2 to Verizon's competitors because they need to arm up

3 with, you know, their CloudTV and the menuing system, and

4 things like that, that ActiveVideo sells in order to

5 compete with Verizon. So what he testified to under oath

6 was that far from hurting their sales, we helped them.

7      So the notion that we are irreparably injuring

8 them is just not true.

9      And then the further point on that is they

10 gladly would have licensed us at any point, even apart

11 from Gary Lauder's statement about how for the right

12 price they would have licensed, they would have sold us

13 the patents.

14      THE COURT: Case law cuts against you on that

15 argument, the fact that they might have been willing to

16 license you at some point.

17      MR. GUTMAN: What the case law says is that

18 issue is not outcome determinative, and we are not

19 arguing that that issue, standing alone, is outcome

20 determinative. But it's the natural state of things when

21 you have got a supplier and customer, it cuts against an

22 injunction. It doesn't alone mean there can't be an

23 injunction, but it certainly weighs on our side of the

24 equation. Case law doesn't quarrel with that, your

25 Honor.

1          But the law is clear, and again, if there was a
2  case that said supplier-customer, irreparable injury, I'm
3  sure we would have seen it, but they don't cite one and
4  we haven't found one.
5          THE COURT:  So, in other words, if the Court
6  sees fit to issue an injunction on this scenario, it
7  would be whole new ground?
8          MR. GUTMAN:  Your Honor would be making new law.
9          THE COURT:  It would be Daniel Boone and the
10  law, you would be cutting new territory.
11          MR. GUTMAN:  It would absolutely be new law,
12  your Honor.  It would be an unprecedented decision, which
13  is one reason why we would urge your Honor, as a court of
14  equity, which at this point you are sitting in inequity,
15  we would urge your Honor to not be too quick to decide to
16  do that.  There's a good reason other courts haven't done
17  it, and that's because in the supplier-customer situation
18  the injury is not irreparable.
19          And all of the stuff Mr. Johnson was quoting
20  from the ITC, all the statements there, that was a case
21  between Cablevision and Verizon.  They are direct
22  competitors.  They are direct competitors, absolutely.
23  Verizon competes with other cable companies.  It doesn't
24  compete with ActiveVideo.
25          They don't compete with us; we don't compete

1   with them.  Every witness in this case said that.  Nobody

2   said, Oh, yeah, we don't compete directly, but we compete

3   indirectly.  Not a single witness said that until we got

4   to the affidavit for this injunction proceeding.

5          THE COURT:  Now, if the evidence was that

6   Verizon's infringement of the patent deteriorated or

7   diminished the value of the patent to ActiveVideo, it

8   devalued it, it diminished it, wouldn't that be different

9   and significant, notwithstanding the fact that it's not a

10  customer, is not a supplier-customer relationship?

11         MR. GUTMAN:  Right.

12         THE COURT:  That's an "if."

13         MR. GUTMAN:  Right, and two things.  I

14  appreciate that your Honor said "if," and I appreciate

15  that particularly because there's zero evidence in this

16  record that the value of the patent has been diminished.

17         Indeed, I would suggest to the Court, and I

18  think it's just a matter of common sense as we stand now

19  based on the jury verdict, and the rather sizable award

20  of damages, and the supplementation of those damages, and

21  the subsequent decision by the Court, I would say that

22  patent is sitting pretty pretty in terms of its value.

23  There's been no diminution of the value, and if Verizon

24  were permitted to continue with its business, subject to

25  having to pay sizable royalties along the lines of what's

1   been established by the jury and implemented by your

2   Honor in the supplemental award, that would certainly

3   make those patents more valuable to them than they have

4   ever been before.

5          But the further point, your Honor -- so there's

6   no record that the value has been diminished and, if

7   anything, it's been enhanced by the jury verdict.  But if

8   there are damage awards that could compensate for that

9   injury, then you don't have an injunction.

10         THE COURT:  Okay.  That has always been the case

11  as far back as the Court can remember.  If there's a

12  valuable economic remedy, there's really no grounds for

13  an injunction.  But the thing that the Court is wondering

14  about even in the aftermath of *eBay* where there's no

15  automatic presumption that you get an injunction where an

16  infringement is established, what's the point almost of

17  even winning an infringement case in a patent case if the

18  remedy is always going to be that you simply pay if you

19  get caught?  What's the point?  Why not infringe?  Just

20  pay if you get caught.

21         MR. GUTMAN:  Well, I mean, that's a very good

22  question, your Honor, and let me respond to that.  First

23  of all, if you infringe willfully --

24         THE COURT:  It's still just more money.  That's

25  all, it's just more money.

1          MR. GUTMAN:  Oh, I understand, but that's a lot

2    more money.  And, again, we all recall the jury here.

3    Mr. Johnson talks about us behaving poorly.  The jury

4    here found against him on willfulness.  So, you know,

5    what the jury verdict shows is we bought products from

6    third parties, SeaChange and Cisco, that we implemented

7    in our system and the jury has now concluded, subject to

8    whatever the Court of Appeals may say, that that

9    infringes.  So, you know, we are where we are on that.

10   But if you go out and you intentionally, knowingly

11   infringe somebody's patents, then you are liable for

12   willfulness and that is a penalty beyond the economic

13   injury and that should be -- I think the law is designed

14   to make that a deterrent.

15          But, again, the point of the injunction, and

16   this is another point that gets lost in their papers, but

17   I think it's clear, crystal clear, in the case law and we

18   cites the cases on this, the point of an injunction is

19   not to punish.  It's not to punish.  And if you listen to

20   ActiveVideo's argument, your Honor, it's all about

21   punishing us.  It's making us pay for our --

22          THE COURT:  Let me assure you, Mr. Gutman, no

23   matter what this Court does, that's not and never been

24   the intent of any injunction this judge has ever issued.

25          MR. GUTMAN:  I appreciate that, your Honor.

```
 1              THE COURT:  Punishment, that's not an issue.
 2              MR. GUTMAN:  I appreciate that, your Honor.  So
 3   the issue of whether the infringement was culpable some
 4   way rather than just innocent, because patent
 5   infringement can be innocent -- you can infringe a patent
 6   without even knowing it's there.  We did it, at least in
 7   the eyes of the jury.  -- obviously, we reserve our right
 8   to challenge them.  I don't want to be waiving anything
 9   here.  But that culpability thing has a standard or
10   issue, and it has nothing to do with whether or not an
11   injunction gets issued.  And the clearest indication of
12   that is if you look back at eBay, which was what gave
13   rise to this in the Supreme Court and then came back, and
14   Judge Friedman on remand again denied the injunction.
15   The jury found willfulness in eBay; that is, the jury
16   found in that case meeting the high standard for
17   willfulness, post-Seagate.
18              THE COURT:  So then willfulness had nothing to
19   do with whether an injunction should issue or not.
20              MR. GUTMAN:  Exactly right.
21              THE COURT:  So the Court understands that.
22   Culpability has nothing to do with that.
23              MR. GUTMAN:  Right.
24              THE WITNESS:  It's the balancing of these four
25   factors that the Court has been and still must wrestle
```

 1  with.

 2          MR. GUTMAN:  Exactly, your Honor.

 3          So moving to the second, we have talked about

 4  irreparable injury and the fact no court has found

 5  irreparable injury in a situation like this.

 6          The second point is, well, are damages an

 7  adequate remedy?  And I would suggest to your Honor that

 8  based on the size of the verdict in this case, damages --

 9  and relative to, again, I'm not trying to pick on them

10  for their failures in business in the marketplace, but

11  your Honor will recall the testimony.  The cumulative

12  total over 30 years of revenues they generated from their

13  business was $15 million.

14          THE COURT:  This sounds like an argument this is

15  big change for a small fee company is what you are

16  arguing now.

17          MR. GUTMAN:  What I'm arguing, your Honor, is

18  that looking at it in gross, looking at it in gross, it

19  is $100 million more than they ever made in 30 years of

20  business, which suggests that the damages are an adequate

21  remedy.

22          If you view it in terms of what they get per

23  subscriber, which is another measurement, under their

24  Cablevision view where they are arguing that if we aren't

25  enjoined, they are going to lose supplemental subscribers

1    in Cablevision, they get 17 cents per subscriber under

2    the Cablevision deal.

3         Under the royalty in the jury verdict as applied

4    by your Honor in the supplemental damages award, as

5    Mr. Johnson said, they get one thirteen per subscriber.

6    So not only is it measurable, but it works in their

7    favor.

8         So, again, I don't think on this record there's

9    any showing that damages are not an adequate remedy.  We

10   think more than adequate, we think excessive, but again,

11   the parties disagree with that and the Court has accepted

12   the jury's verdict as appropriate.

13        But that's relative to what they have done in

14   the real world.  Relative to what they are saying they

15   might get less of if we aren't enjoined, 17 cents per

16   incremental customer, and that's just in New York.  You

17   know, Cablevision is just in the New York area.  They are

18   looking for an injunction against us all across the

19   country.  We are paying royalties all across -- you know,

20   the jury verdict and supplemental judgment address

21   royalties on a nationwide basis, all 4 million

22   subscribers, not just the ones in New York.

23        So, again, the economics do not suggest that

24   they are somehow hurt in some noneconomic way, or

25   immeasurable way, or damages-can't-make-them-whole way by

1  us being allowed to continue.

2           Now let me talk about *Bosch* for a minute.   In

3  *Bosch* the Federal Circuit reversed the district court for

4  having denied an injunction based on two arguments that

5  we never made in this case.   So they aren't relevant to

6  the arguments we have made against the injunction here.

7           THE COURT:   They are or are not?

8           MR. GUTMAN:   Are not.   The two arguments the

9  district court in Delaware found sufficient to deny an

10 injunction are not arguments we have made here.   The

11 first is the argument that, well, you only have

12 irreparable injury.   And, again, this was a case against

13 direct competitors, unlike our case.   You can only have

14 irreparable injury if it's a two-player market where you

15 can say with certainty that every sale one loses, the

16 other gains.   The district court in Delaware found that

17 out from determining that -- in fact, I think there are a

18 line of cases in Delaware where the district judges have

19 found that as a basis for denying the injunction even

20 between direct competitors.   The Federal Circuit said no,

21 that's not outcome determinative.

22          And the second was the argument that it wasn't

23 their main product, that they have other core product,

24 that they had other products, that windshield wipers

25 weren't the whole deal.   Again, the Court of Appeals said

1  that doesn't mean you don't get an injunction.  It

2  doesn't mean you do, but it doesn't mean you don't.

3         So the Court reversed on two grounds, and

4  neither of those arguments were ever made by us here,

5  ever, and our briefing was all done before *Bosch*.  That's

6  just not our basis.

7         So what the Court did, though, was it decided in

8  that case, in *Bosch*, that an injunction should be granted

9  based on three factors, not one of which is present in

10  this case.

11        First, they found that in all three channels of

12  distribution it was undisputed, that each of these, Judge

13  O'Malley's opinion said undistributed fact or

14  unrebutted.  In each of the three distribution channels

15  which were defined and described, the companies were

16  direct competitors.  We are not direct competitors here

17  in any distribution channel.  We are a customer.  They

18  are a supplier.

19        Two, the Court found concrete evidence of a loss

20  of market share and a loss of sales and access to

21  customers.  There's none here.  There's no evidence of

22  that.  There's no proof of that.  They can't point to a

23  single sale.  Again, the evidence is that what we do

24  helps them sell to Cablevision, and ComCast, and others

25  so they can effectively compete with us better, but they

1   haven't shown a single customer they have lost based on

2   that, unlike, I think it was Wal-Mart was the biggest

3   customer in the *Bosch* case, direct proof of a loss of a

4   customer.  And since we don't compete for those

5   customers, they have lost nothing to us.  There's no

6   evidence of that.

7        And then the third point, which in *Bosch* may

8   have been, if you look at the transcript of the oral

9   argument or the tape of the oral argument, may have been

10  the most important factor.  It certainly was a major

11  factor in the decision.  *Bosch* or *Pylon*, the defendant in

12  *Bosch* had real serious questions about whether they could

13  satisfy the judgment, and you can't say that damages are

14  an adequate remedy and there's no need for an injunction

15  if the defendant can't satisfy the judgment.

16       And they were quite mushy.  They were asked, Can

17  you satisfy the judgment?  Are you good for it?  The

18  answer was, mma, mma, mma.  This is exactly the opposite

19  situation.  As your Honor has observed, Verizon does have

20  the resources.  So whatever we owe, assuming we don't

21  prevail on appeal, whatever we end up owing them for the

22  period of time in which we are still, by their theory,

23  continuing to infringe, we have the resources to satisfy

24  the judgment for that.

25       And with respect to those damages, at this point

1   your Honor has ordered that we enter a bond.  So they

2   have the belt and the suspenders in terms of that.  So in

3   the *Bosch* case the injunction was ordered because each of

4   these three factors was there as a matter of undisputed

5   fact, and in our case it's undisputed that none of those

6   factors are here.

7          Now, there are other problems with the issuance

8   of an injunction that I just raised to make sure that

9   your Honor has them in mind as you contemplate the

10  decision here.

11         First, an injunction under the federal rules has

12  to be specific in scope and definition, which makes

13  sense.  If you are going to be ordered by Court on pain

14  of intent to do or refrain from doing something, it can't

15  just be stop infringing the patent.  You know, it needs

16  to be --

17         THE COURT:  What was nonspecific about the

18  language?  The Court didn't understand that argument by

19  Verizon.  What's nonspecific about the language that

20  ActiveVideo has raised in the brief regarding the two

21  patents?  The Court didn't understand what was

22  nonspecific about that.

23         MR. GUTMAN:  Sure.  Well, first of all, your

24  Honor, it was only raised in their reply brief.  There's

25  no formal order or anything like that.  It was only --

1    THE COURT:  You say raised in their brief.  The
2  question still is what's nonspecific about it?
3    MR. GUTMAN:  Sure.  There are several problems.
4  The first is that it includes the word "including," and
5  there are a long line of cases -- I don't recall whether
6  they were in our original briefing, but I would be happy
7  to submit something supplemental pointing them out to
8  your Court -- where injunctions were bounced for having
9  included the word "including" because that suggests that
10  other things might be precluded.
11    Second, based on the jury verdict, there is no
12  clear finding as to which of our products infringed.
13  They accuse two separate products:  The product that we
14  got from SeaChange and the product that we now use from
15  Cisco.
16    The product from SeaChange we no longer use, so
17  that wouldn't be the proper subject of an injunction, you
18  know, under any circumstances.  But based on the way the
19  issue was presented to the jury, your Honor, where there
20  was no distinction between the old system of SeaChange
21  and the new system of Cisco, it's not clear from the
22  verdict whether they thought both systems infringed; they
23  thought one system infringed, but not the other.  That's
24  ambiguity and a problem.
25    The systems, obviously, had many similarities,

1   but they were not identical for infringement purposes,

2   and they were treated separately by the experts and they

3   were dealt with separately in the testimony and the

4   expert reports.  So the notion that they, based on this

5   verdict, are entitled to injunction under the current

6   system, the Cisco system has that additional problem.

7          And then the further problem is, your Honor,

8   that they don't claim -- well, maybe they claim for the

9   purposes of injunction, but this was an issue at trial.

10  What do they think the scope of the patents is?  Is it

11  all Video On Demand, or is it just Video On Demand done a

12  certain way?

13         In this case, again, we use products that we buy

14  from third parties that supply everybody else in the

15  industry.  So is it anything that those companies do in

16  those products that infringes, or is it something less

17  than that?  And we think were there to be an injunction,

18  and I hope have made clear we don't think there's any

19  basis under the law or in equity for an injunction --

20         THE COURT:  Listening to your argument, then a

21  Judge wouldn't be able to even address the question of an

22  injunction in this case, even though the jury says

23  there's an infringement, because you say you have to

24  relitigate what infringes.

25         MR. GUTMAN:  Well, your Honor, the issue, if

1   there's a single product and that single product is found

2   to infringe, and the injunction is drawn to that single

3   product, then there's not a problem.  But here there are

4   two products.

5         THE COURT:  How about any and all products?

6         MR. GUTMAN:  I'm sorry?

7         THE COURT:  Never mind.

8         MR. GUTMAN:  That, we would suggest, would be

9   inappropriate, but I know your Honor wasn't suggesting

10  that.

11        And, again, if we go back to the whole what is

12  it that they do that they say somehow gets affected by

13  this, they don't do Video On Demand.  They provide things

14  that are part of the Video On Demand system, but they

15  don't do the basic Video On Demand.  But they provide

16  Cablevision.  That's not Video On Demand.  They get that

17  from SeaChange.  So that's the scope issue, your Honor.

18  And I don't mean to belabor it because I don't think your

19  Honor needs to get there, but it is another issue for the

20  Court.

21        THE COURT:  Well, if there's an issue if the

22  Court gets there, now is the time to talk about it.  The

23  Court would hate to get there and then come back and

24  find, okay, now, what are we going to do about scope, or

25  about this problem, or that problem?

1      MR. GUTMAN:  Well, in the cases where this

2  arises, your Honor, there is often a second step to the

3  process where the parties confer and then, if necessary,

4  come back to see the Court on the scope of an

5  injunction.  So were we to get there, and, again, I don't

6  believe under the law we should, my suggestion would be

7  there be a second step in that process.

8      And, again, just as we have all that testimony

9  from their witnesses that they don't compete with us, the

10  same witnesses gave the same testimony that they don't

11  compete with SeaChange.

12      And, again, your Honor may recall a lot of this

13  from the trial.  They didn't submit an RFP response on

14  Video On Demand.  SeaChange did.  Both they and SeaChange

15  don't think of themselves as competitors.  That's what

16  the testimony said.  They and Cisco -- the Cisco

17  gentleman that was on the stand, Mr. Hughes, was asked do

18  you compete with ActiveVideo?  He said no.  ActiveVideo

19  witnesses were asked, Do you compete with Cisco?  No.

20  So, again, it puts this whole they-aren't-competitors

21  point into sharper focus.

22      So those are the points that I think would make

23  the entry of an injunction, if one were appropriate --

24  and it isn't here -- problematic on this record and under

25  these circumstances.

1          You know, again, Mr. Miller testified at trial

2    to the fact that Cablevision uses SeaChange to provide

3    Video On Demand, not them.  He testified that at pages

4    374 to 375 of the transcript.  So that would be a

5    problem.

6          But let me just talk briefly about the balancing

7    of equities and the public interest.  Even if there were

8    an irreparable injury, even if damages weren't an

9    adequate remedy of the law, and neither of those is the

10   case here, they waited five years before they filed this

11   lawsuit, and they did that with full knowledge of how

12   SeaChange worked and that we were using SeaChange.

13        THE COURT:  The Court has dealt with that,

14   Mr. Gutman, and the Court doesn't put a lot of stock in

15   that.  You have to give me a better argument than that,

16   that they waited five years.  The Court understands the

17   chronology of events here in this case, so the Court

18   doesn't find that argument to be too persuasive.

19        MR. GUTMAN:  All I would say, and I know that

20   your Honor rejected that as a latches argument, all I

21   would point out is that the case law on the entry of

22   injunctions in these kinds of circumstances, and again, I

23   know your Honor has looked at them and I know your Honor

24   is going to be spending more time with them before

25   deciding, but a number of those decisions talk about

1   factors for not granting an injunction being the fact

2   that with full knowledge of the infringement, and

3   defendant's 543 in evidence shows they knew exactly what

4   we were doing and how we were doing it before we even

5   launched the product, that that's a factor that cuts

6   against issuing an injunction.

7           Even if it doesn't put you out of court in

8   latches, it does come back into play for an injunction.

9           The failure to move for a preliminary

10  injunction, again, you will see in the decisions language

11  to the effect that, well, if this was such an irreparable

12  injury, you would have done something sooner.  You would

13  have filed litigation sooner.  You would have done

14  something once it was filed.

15          The two patents that are left in this case, and

16  again, this is another equitable consideration, one of

17  them expires, I think, in 2013.  The other lasts longer,

18  but they didn't accuse Video On Demand on that patent,

19  the '582.  They just accused Widgets and various things

20  that we used with Video On Demand.  That's another factor

21  that would go into the issue of whether or not on this

22  record as a matter of equity, balancing the equities,

23  which your Honor would be required to do, an injunction

24  is appropriate.

25          Another factor, you know, again, in the meantime

1   we would be running up a bill for damages for royalties.

2   I think it works out to the rate of about $4 million a

3   month.   That's a lot of money.   If we are wrong and the

4   Court of Appeals doesn't rule for us, that's a lot of

5   money, your Honor, and they would be getting that money,

6   and that exceeds any harm they would be suffering, and it

7   is measurable.

8          Another point to consider in weighing the

9   equities on an injunction is that they seek this

10  injunction to protect their ability to continue to market

11  the very products which the very same jury found

12  infringed our patents.   All of their argument is about

13  the stuff they are selling to Cablevision and their

14  ability to keep providing stuff to Cablevision.

15         Well, your Honor may recall, it was a very short

16  part of the trial at the end because the dollars involved

17  aren't that large, but they were found to have induced

18  Cablevision to infringe our patents with those very

19  products.   So, again, as a court of equity, if they are

20  saying, gee, you may hurt our sales, I mean, apart from

21  the fact they get royalties and damages for that if it's

22  true, the sales they are talking about are the sales

23  which infringed our patents.   That's the very same thing

24  the jury found.   There's certainly no equity in doing

25  that.

1          And the final point, and I'm sorry to have to

2     raise this, but I do think it's a factor that the Court

3     needs to take into account.  The *eBay* court talked about

4     one of the problems with granting injunctions in these

5     cases being the ability of the threat of the injunction,

6     the threat of the ability to disrupt somebody's business

7     on that kind of level as creating a disproportionate

8     amount of leverage for use in settlement negotiations.

9     And I do believe, your Honor, that that is what's going

10    on here.

11         We know.  The jury didn't know, because they

12    sought and got an in limine motion preventing this from

13    coming before the jury, that they filed this case to

14    retaliate for Verizon suing Cablevision in the ITC, and

15    you have heard an awful lot about the ITC today.  So

16    what's the interest in an injunction here that would

17    generate less money?  If what they say about its economic

18    impact is right, then we will be continuing royalties if

19    it turns out we are wrong about infringing?  I would

20    suggest to your Honor that this is for leverage in the

21    negotiation of a resolution of a case that is not before

22    this Court.

23         There's no equity in that, and that's another

24    reason why an injunction would be inappropriate under

25    the circumstances.  And I'm sorry to have to raise it,

1  your Honor, but --

2          THE COURT:  No, that's fine.  The Court has

3  heard this whole issue about what's going on in the ITC

4  between the parties before.  I think both parties have

5  some motives that are not clear to the Court for what

6  they are doing because of what's in the ITC, both

7  parties.

8          Now, the other thing is this, though:  To the

9  extent, let's say, Verizon manages to put, let's say,

10  Cablevision out of business, whether it's in the ITC or

11  another place, if what you are saying about their simply

12  being a big supplier to Cablevision, then you end up

13  cutting off their revenue stream in a sense, wouldn't

14  you?  If you put Cablevision out of business, then to a

15  certain extent, certainly indirectly it affects it,

16  ActiveVideo's revenue stream would be substantially

17  reduced or cut off, depending upon what happens to

18  Cablevision, right?

19          MR. GUTMAN:  Well, let's take this in pieces,

20  your Honor.  If Verizon were to prevail and before the

21  Administrator -- I'm not counsel in the ITC matter, so

22  I'm hoping in giving this response --

23          THE COURT:  I understand that.

24          MR. GUTMAN:  In the Cablevision action, the ITC

25  ruled that three of the patents were infringed by

1  Cablevision.  One of them met the other qualifications

2  for granting a preclusion order.  There aren't damages in

3  the ITC, so a preclusion order is the remedy that's

4  available.  And the status of that one is not terrific

5  for Verizon at this point.  So at this point there is no

6  preclusion order.  But assume that Verizon were able to

7  turn all of that around and get a preclusion order

8  against Cablevision and that that somehow hurt their

9  sales, ActiveVideo's sales to Cablevision, it would only

10  be because what Cablevision was doing with them or

11  without them was infringing Verizon's patents, which

12  violated the law, and the ITC decided that a remedy was

13  appropriate.

14         But that's not patent infringement by us.  That

15  would be my client enforcing their patent rights in a

16  separate forum.  So that might hurt their sales to

17  Cablevision, but in the meantime -- but that has nothing

18  to do with the injunction in this case, or the lack of

19  need for an injunction, because in this case at the very

20  same time if we were continuing to do what has been

21  adjudicated to infringe and if that weren't reversed on

22  appeal or we hadn't done something to change in the

23  meantime rather than keep running up the potential

24  liability of $4 million a month, we would still owe

25  them.  So they would still recover.

1           If anything, that's an argument against the
2    injunction because if we are enjoined and that tab for
3    ongoing royalty stops running and Cablevision ends up
4    being enjoined, then they are not doing business with
5    anybody and there's no one they can turn to for money on
6    that because both would be the result of actions by a
7    court.  So, if anything, that ends up being an argument
8    against the injunction because absent the injunction,
9    assuming that our conduct continues as it does, so does
10   the potential that if we are wrong and if we lose, we owe
11   them more money, which they wouldn't have under the other
12   scenario.
13           THE COURT:  It seems like it's a scenario where
14   the parties in this case probably should have gotten
15   together and resolved this matter sooner, to be candid
16   with you.  I mean, you are suing each other.  You are
17   litigating against Cablevision, and they are litigating
18   against you, and all the parties would have probably been
19   better off had you figured out a way to resolve this
20   matter short of all the money you are putting into
21   litigation in this case.  That's exactly what's clear to
22   the Court.
23           MR. GUTMAN:  You will get no disagreement from
24   us, your Honor, that if a settlement were doable, that
25   would be sensible and appropriate.

1          THE COURT:  You are talking about money and

2     maybe it was doable.  You-all should have worked the

3     figures in the case, but now the Court has to work the

4     figures.

5          MR. GUTMAN:  Right.  And your Honor has dealt

6     with the figures for the interim period.

7          I guess two points before I sit down.

8          THE COURT:  Yes.  I want you to talk about the

9     same thing I asked Mr. Johnson about having to do with

10    the sunset provisions and these royalties.

11         Once again, after listening to you-all, the

12    Court doesn't know where it's necessarily going to end up

13    here, but wherever it is, it hopes it has some

14    information so that it can deal with all of the issues.

15         MR. GUTMAN:  Right.  And were the Court to enter

16    an injunction, which, again, we believe the Court should

17    not, it would certainly be appropriate to have a sunset

18    provision, providing that the injunction did not take

19    effect until some period of time that allowed us to make

20    alternative arrangements.

21         Again, looking at the case law, your Honor, you

22    know, virtually all of these cases where there is an

23    injunction provides for that.  In the *BroadCom* versus

24    *QualComm* case which they cite in their brief, and I think

25    we cite too, the district court gave *QualComm* 20 months

based on the complexity of the issue in which to come up

with an alternative before the injunction would take

effect.

            -In-I'm forgetting which case it is for the

moment, but in one of the cases -- oh, I remember.  It

was *Eye For Eye*, one of the Microsoft cases in the

Federal Circuit, the Federal Circuit stayed the

injunction pending the appeal, which would be another

thing, stayed the injunction pending the appeal, ended up

affirming the injunction after the appeal, but the

district court from Texas, I think, put in a 60-day

sunset provision, and the Federal Circuit extended that

to five months because that was a period of time it was

going to take in order to come up with an alternative

version of the product that didn't infringe.

            THE COURT:  Correct me if I am wrong,

Mr. Gutman, but did the Court hear something in this case

from one of these many, many experts the parties had in

this case about Verizon having the capability to work up

some viable alternative within six to nine months, and

that was in August?

            MR. GUTMAN:  Well, your Honor, six to nine

months, your Honor did hear testimony about six to nine

months, and again, in terms of measuring were there to be

an injunction, and I get a chill every time I say that,

1   so were there to be an injunction, a sunset provision of

2   nine months to allow an alternative to be devised would,

3   I think, certainly be the minimum that is necessary.

4          THE COURT:  Counsel, the Court has been thinking

5   about all of these things here, now.  Verizon, from what

6   the Court has been able to ascertain here, just watching

7   the way Verizon operates, is a pretty capable and able

8   corporation, and it occurs to the Court with you-all

9   litigating this case so vigorously over the last months

10  and being in doubt what the end outcome of this

11  litigation was going to be, it's hard for the Court to

12  believe that Verizon, without you saying it, has not or

13  had not begun to look for viable alternatives, depending

14  upon which way the ball bounced --

15         MR. GUTMAN:  Right.

16         THE COURT:  -- instead of waiting around until

17  you had gotten out of the Court of Appeals, if you get

18  there, to figure out now what we are going to do.  So the

19  Court would tend to think that prudent business strategy

20  was to have someone in the laboratory trying to figure

21  out what we are going to do if we lose this thing instead

22  of starting now to think about this.

23         MR. GUTMAN:  No question, your Honor.  I mean,

24  you are correct.

25         The thing I would point out, though, is the

1  solution to the problem is not a Verizon solution.  These

2  are products we get from third-party vendors.  But,

3  absolutely, there are conversations underway with the

4  third-party vendor to what could you do to resolve this.

5          And, again, doing it, implementing it, all of

6  that would take time, which is why a sunset provision,

7  again, six to nine months, would certainly be

8  appropriate, whenever the injunction entered.  And it

9  wouldn't be easy and it would be expensive, but the fact

10  that this is something that's been under consideration

11  since the jury verdict is -- I mean, your Honor is

12  correct in your assumption.  But, again, it still takes

13  time.  And that was true in all these other cases.

14          And, again, in the Eye For Eye case, Judge Davis

15  in Texas gave 60 days.  The Federal Circuit stayed the

16  injunction pending the appeal.  By the time they had gone

17  through the entire appellate process and gotten a

18  decision affirming the injunction it's, I don't know, a

19  year and a half later, whatever, it was a significant

20  period of time, and the Federal Circuit, confirming the

21  injunction, still said that we are going extend the 60

22  days to five months.

23          So I understand your Honor's point, but even in

24  those circumstances the other courts, including the

25  Federal Circuit, have taken steps to make sure that there

1   is adequate time provided to make the change.  Again, the

2   idea is the injunction is not supposed to be punitive.

3           THE COURT:  The Court understands that.

4           Talk to the Court about this matter of what you

5   believe any subscriber rate should be if the Court were

6   put in the position where it has to deal with this

7   issue.  Mr. Johnson has argued it ought to be two

8   twenty-five and etc.  What are your views on these

9   matters?

10          MR. GUTMAN:  Sure.  Your Honor, I don't think

11  that it has become willful because we still believe --

12  and again, no disrespect is intended.  I mean, we

13  understand that your Honor has ruled, but we still

14  believe that on some of the grounds that we have asserted

15  we at least have a good-faith basis for believing that

16  the law may be otherwise and that the appellate court

17  will determine that.  So under those circumstances, it's

18  not at all clear to me that they would qualify for a

19  willfulness kicker.  That's something they could argue

20  when we got there.  We don't concede that that's the

21  case.

22          As to what would be an appropriate royalty, I

23  don't have a number.  I mean, our damages expert had a

24  number at trial.  I don't have the number here now, but

25  let me again suggest something that other courts have

```
 1  done in this circumstance that might be of assistance to
 2  the Court here.  Were the Court, as we urged, to deny the
 3  injunction and your Honor did not want to be in the
 4  position of trying to determine later what the
 5  appropriate royalty was, one option is then not to
 6  address what the appropriate royalty is until after the
 7  appeal.
 8          I mean, there's $140 million right now if we are
 9  wrong, there is interest if we are wrong, and there is
10  some unknown exposure for the other money if we are wrong
11  on appeal.  That, in and of itself, I would think would
12  give the parties plenty of incentive and opportunity to
13  try to work something out while the case is on appeal.
14          If the Court, you know, felt the need to have an
15  interim royalty rate established, rather than not
16  addressing that issue unless we had to after the appeal,
17  that's the kind of thing where the *Pace* decision in the
18  Federal Circuit provides some guidance.  The parties were
19  sent out to try and negotiate a royalty and it was a
20  situation where it was basically you guys can come to an
21  agreement or the Court will settle it, and then there
22  would be a presentation as to what was appropriate, and
23  your Honor would make that decision.
24          So there are a lot of options available,
25  including not addressing that issue until we hear from
```

1   the Court of Appeals, which I, frankly, think is the

2   easiest approach here.  Because if it turns out that we

3   are right, or we are partially right, or any of this has

4   to be retried, we haven't spent a lot of time and energy

5   fighting over what the interim royalty rate is if there

6   wouldn't have been one that was appropriate.

7         But those are the options, your Honor, and I'm

8   sorry, I don't have a number now.  But, again, it would

9   be perfectly precedented for your Honor to send us out to

10  try and work one out or to come up with submissions to

11  the Court so that we could address that issue in a more

12  thoughtful way than I can do at the moment, and I

13  apologize for that.

14        The last point --

15        THE COURT:  Another hearing?

16        MR. GUTMAN:  We can do it on the paper.  Your

17  Honor, I like coming down.

18        Your Honor may find this surprising, considering

19  the way I last left your courtroom, but I actually enjoy

20  coming back here.  Everybody has been friendly and nice,

21  and the weather is much more pleasant now than when we

22  left in the summer, and the food is good, and I do like

23  being here.  So we would be happy to come back for

24  another hearing.

25        The last point before I sit down is were the

 1  Court to entertain an injunction, we would ask, and we

 2  mentioned this in our motion papers -- if your Honor

 3  requires a separate motion, please let me know and we

 4  will file it today to make sure we are on record, but we

 5  would ask that any injunction be stayed pending appeal.

 6  I think we made that clear in our papers, but I just want

 7  to make that clear.  And, again, if we need --

 8          THE COURT:  I think you did, and that's

 9  something the Court wondered about, what the effect, if

10  any, if the whole objective of an injunction is basically

11  to stop the running of the harm, what's the point of

12  staying the injunctive relief as opposed to a sunset

13  provision because you yourself said, you know, these

14  things can get up there in the Court of Appeals and hang

15  around there for a lifetime?  I mean, depending on what

16  is happening, you know, so that --

17          MR. GUTMAN:  And the standard, your Honor, for

18  the stay is set out in our papers and we argue it in the

19  papers, and basically, you know, if there are serious

20  issues going to the merits, and, again, I think whatever

21  the positions are as to the correctness of the decisions

22  before, I think there are at least serious questions

23  that -- and there would be the hardship to us in having

24  to change the system.

25          THE COURT:  I understand that, but if the Court

 1  is going to stay an injunction the other thing the Court

 2  could do is simply deny the injunction because, in

 3  effect, they cancel out each other.  It's a waste of time

 4  to enter an injunction, and then turn around and stay it.

 5  The better course is, of course, to deny the injunction

 6  so then you don't have further hearings, scope hearings.

 7  I mean, you know, the Court understands clearly what you

 8  are arguing here.

 9          MR. GUTMAN:  Well, denying it is certainly our

10  first choice, your Honor, by a lot.  But I think even if

11  the Court were to grant a stay, that issue has then been

12  resolved.  Unless the Court of Appeals takes a different

13  view, it doesn't necessarily have to be addressed, but

14  staying it means that if it turns out we were right and

15  that we shouldn't have been enjoined and that having to

16  change our product and do all this stuff was really not

17  appropriate, we can find that out from the Court of

18  Appeals before we have to do it.  So that's the effect.

19  But I agree with your Honor --

20          THE COURT:  On the other hand, what's the

21  contrary side of that?  The contrary side of that is if

22  the Court is right and it stays the injunction, what it

23  did was it permitted the infringing activity to continue

24  for a year, or year and a half, or whatever.

25          MR. GUTMAN:  Either party would have the right,

1  your Honor, to go to the Court of Appeals and ask them --

2          THE COURT:  You just appeal the stay, right?

3  They could appeal the stay, and you could certainly

4  appeal the denial of the stay.  Either way it goes,

5  there's going to be some appeals.

6          MR. GUTMAN:  And I can't ask the Court of

7  Appeals for the stay if I haven't first asked your Honor.

8          THE COURT:  Oh, I understand.  And the beat goes

9  on.

10          MR. GUTMAN:  Thank you, your Honor.

11          MR. JOHNSON:  Briefly, your Honor.

12          THE COURT:  All right.

13          MR. JOHNSON:  I promise.

14          The first question you asked him was about

15  whether there was something novel about this, quote,

16  indirect competition, and he said there were no cases.

17  Pages 8 and 9 of our brief, the *BroadCom* case involved

18  the very situation where the Court characterized it as

19  indirect competition.

20          The *CISRO* case at page 9 involved a research

21  company.  Some people would say that's a troll who had no

22  business, and an injunction was issued.

23          The Court, I am sure, is well aware of the cases

24  involving *TiVo* and *Dish* which have recently settled.  In

25  that case *TiVo* did not have a network.  It supplied a

1  recording system, and it got an injunction against *Dish*

2  and *Dish* was ultimately found to be in contempt and found

3  itself in a bit of hot water.

4          But in *Bosch*, as I pointed out, your Honor, in

5  the OEM situation they were not direct competitors.  The

6  issue was the technology, and in our case the technology

7  is the delivery of the interactive services and VOD.

8          Counsel has made two other points that I want to

9  address.  Number one, he said that the jury didn't find

10  whether or not it was Cisco or it was SeaChange.  The

11  proof at trial was that the infringement was identical,

12  so they didn't have to find -- once they found

13  infringement, it applied the legal force to both.

14          He then argued that the '582 didn't involve

15  VOD.  That's not true.  It does.  It involved both

16  because it's a specific delivery system.

17          Now, the final point I would like to make, your

18  Honor, is this.  By using our technology we continue to

19  lose customers, we continue to lose market share, and we

20  continue to suffer price erosion.

21          THE COURT:  He said there's no proof in the

22  record to any of that.

23          MR. JOHNSON:  Well, if that's true, he didn't

24  bother reading Mr. Miller's testimony and he didn't

25  bother reading the declaration of Mr. Schmandt from

1  Cablevision.  And I would direct the Court to those

2  declarations, and specifically to paragraph 8 and

3  paragraph 11 of the Cablevision.  The Court has it

4  right.  If they put Cablevision out of business, they put

5  us out of business.

6           In the ITC they went to great length to say we

7  are going after Cablevision and its supplier, and the

8  supplier was CloudTV.  So to argue that, oh, because we

9  are not direct competitors as he claims, that somehow

10 means no injunction can issue, that's just wrong, and

11 *Bosch* says that.

12          And the final point I want to make is this, your

13 Honor, and it's pretty straightforward.  We assumed the

14 Court was going to ask us what the appropriate rate

15 should be, and we were prepared to give the Court that

16 rate.  There is no way that counsel on that side of the

17 table didn't know that question was coming since they put

18 it straightforwardly in their brief and in the

19 declaration from Dr. Carlton.

20          The fact that they would come in here and tell

21 you they hadn't thought about it and didn't know just is

22 further evidence of what their strategy is, delay, delay,

23 delay.  We want to avoid at all costs having to address

24 the issue that that jury found we infringed, and we

25 submit that the facts of this case justify the issuance

1  of an injunction and we think the appropriate remedy

2  should be the one we asked for, two twenty-five.

3       Thank you.

4       MR. GUTMAN:  Even more briefly, your Honor, with

5  respect to *Bosch* and the subject of direct competitors,

6  reading from page 13 of the opinion:  "In this regard,

7  *Bosch* points to evidence of lost market share and access

8  to customers, *Pylon's* inability to satisfy a judgment

9  and, quote, direct -- well, all of this is a quote,

10  emphasized quote, direct competition between it and *Pylon*

11  in each and every distribution channel in the relevant

12  market."  That's what the Court wrote, and the Court

13  later describes that evidence as undisputed.  Direct

14  competitor case.

15       Two, *BroadCom* versus *QualComm*, also direct

16  competitors.  Both of them chip makers, both of them sold

17  chips to handset makers, etc., etc.  There is no question

18  they were direct competitors.  They weren't suing a

19  customer.  This was not *BroadCom* trying to enjoin

20  Motorola or Samsung or some other LG for using phones

21  that have infringing QualComm chips in them.  That's this

22  case.  That's the case here.

23       It was the chip maker against the chip maker,

24  direct horizontal competitors.  So that's exactly

25  supportive of the point we were making.

1          *CSIRO* is completely off point.  *CSIRO* was not a
2     competitor of any kind, direct, indirect, etc.
3          Again, in Justice Kennedy's concurring opinion,
4     in *eBay,* or it may have been in the Court's opinion, I
5     don't recall, there was reference to the fact that there
6     might be exceptions like a research institution.  *CSIRO*
7     is the state research institution of Australia and so
8     they fell within that exception, and the case ended up
9     being reversed on other grounds on the Court of Appeals
10    and I don't believe any court has followed *CSIRO* since.
11          *TiVo*, again, I don't recall the details, but I
12    believe there was evidence of direct competition in that
13    case.  I stand by what I said about no evidence here.  If
14    your Honor looks at the record and looks at what was
15    cited, there is no evidence of loss of direct
16    competition, loss of market share, loss of customers.
17    There's evidence directly to the contrary.
18          And the final point is, you know, again, the ITC
19    stuff has nothing to do with this.  If Cablevision ends
20    up out of business, it's because the ITC determined that
21    they broke the law and that that's the appropriate remedy
22    under the ITC.  It remains to be seen.
23          The final point, should the Court be in a
24    position of deciding what the royalty is, that decision
25    should be based on actual evidence submitted, probably

1   expert evidence submitted, whether live or by affidavit

2   or declaration or something, not by counsel making an

3   assertion in court, which is all we have heard so far for

4   the two twenty-five, or two thirty, or whatever.

5           THE COURT:  Well, you know something.  The Court

6   could take care of that right now.  I mean, the Court

7   could take care of it right now.

8           Gentlemen, I direct both parties, both parties,

9   to submit within the next ten days an affidavit

10  indicating what it concludes the appropriate royalty rate

11  should be in the event this Court issues an injunction

12  and provides a sunset provision regarding the effective

13  date of the injunction.  You can provide by declaration

14  what your viewpoint is.

15          All right?

16          MR. JOHNSON:  Thank you, your Honor.

17          THE COURT:  Okay.  That just means that it buys

18  the Court ten more days, because the Court will take time

19  to consider it.  And you-all say it's all a matter of

20  damages anyway, so within the next ten days I want both

21  parties to provide it from -- you say Mr. Miller has

22  addressed certain things already.  You give me a

23  declaration from both parties regarding that issue.  All

24  right?

25          MR. JOHNSON:  Yes, your Honor.

1           THE COURT:  And I will be in touch soon

2   thereafter.

3           Thank you for your argument.  And I'm not being

4   sarcastic when I say it was informative, and I think it

5   is certainly helpful, even though the Court still has to

6   figure out exactly how it will resolve the issues.

7           All right.

8           MR. STILLMAN:  Your Honor, also on your agenda

9   this morning is our motion regarding the '748 patent.

10          THE COURT:  Didn't I already rule on that?

11          MR. STILLMAN:  No, sir.

12          THE COURT:  I thought the Court had already put

13  out an order regarding reconsideration of the '748

14  patent.

15          MR. STILLMAN:  Well, your Honor, let me come to

16  the podium.  As you may recall, your Honor, this was not

17  a motion for reconsideration.  You had ruled on an

18  earlier motion for reconsideration.

19          THE COURT:  You-all can have a seat, gentlemen.

20          MR. STILLMAN:  This was a motion based upon

21  newly discovered evidence.

22          THE COURT:  Okay.  I remember now.

23  Mr. Stillman, you are right.  You are right.  That issue

24  is something that the Court has looked at, and the Court

25  has been in the process of resolving that issue.  The

 1   Court did not put out an opinion on that.  The Court has
 2   talked about so many things regarding this case, the
 3   Court did not assert an opinion on it.
 4        I think the Court can have an opinion
 5   forthcoming on it.  Is there something else you want to
 6   add other than what you have in the briefs?
 7        MR. STILLMAN:  Well, there are some things I
 8   would like to talk about since we have your attention.
 9        THE COURT:  Let's go right on, because the Court
10   has not issued an opinion on it.  The Court has it under
11   consideration and under evaluation on whether there's
12   truly newly discovered evidence.
13        MR. STILLMAN:  Yes, sir.
14        THE COURT:  The Court has some questions about
15   it.  The Court read the memoranda of the parties, but the
16   Court had not come down one way or the other on whether
17   this is truly newly discovered evidence or not, to be
18   candid with you.
19        MR. STILLMAN:  Well, that's exactly what I would
20   like to talk with the Court about.  And I understand that
21   you feel like you have been around the barn with respect
22   to the '748.  You have made your ruling with respect to
23   invalidity, and we were disappointed by that, but we made
24   our motion for reconsideration and you ruled on that.
25        But, as you know, we learned effectively after

1  the trial of this case about the existence of new

2  evidence, and that evidence now clearly creates a triable

3  issue with respect to the priority date that we are

4  entitled to.

5          And, as you know, whether or not the '689

6  patent, which is this web TV patent that the Court

7  believes anticipates the '748 patent, is prior art to the

8  '748 patent requires comparing the filing date of the

9  '689 with the invention date of the '748 patent.  We were

10  not able to offer to the Court an earlier invention date

11  simply because by virtue of their own independent

12  recollections, the inventors of the '748 patent did not

13  recall a specific time period that they were engaged in

14  the conception of this custom browser that was designed

15  to translate information from the Internet to a

16  television screen.

17          THE COURT:  The problem here, Mr. Stillman, you

18  remember during the trial Verizon cogently raised the

19  question.  We looked at the case law as to whether an

20  inventor for the purposes of establishing the invention

21  date could corroborate his own invention date, you know

22  what I mean?  And in this evidence that you have

23  submitted, these notes, these notes are notes from the

24  inventor that you are attempting to use to accomplish

25  something that we pretty solidly found you couldn't do.

1  I mean, he used his own, just notes, to attempt to

2  corroborate the invention date.

3          MR. STILLMAN:  Well, your Honor, first of all, I

4  don't agree that inventor's notes could not be used as

5  part of the evidence necessary to corroborate their own

6  invention.  But the point is, these are not inventor's

7  notes in the first place.  These are, in fact,

8  independent invoices that were sent that memorialize the

9  fact that work was, in fact, done.

10          THE COURT:  Who sent the invoices?

11          MR. STILLMAN:  Well, the inventor sent the

12  invoices.

13          THE COURT:  They are the inventor's invoices?

14          MR. STILLMAN:  Yes, sir, but they, nonetheless,

15  refresh the recollection in combination with that July 12

16  memorandum that we talked about in our motion about when

17  the work on that custom browser was, in fact, done.

18          We tried to locate those invoices or any

19  information about when that work on the custom browser

20  was done prior to the trial.

21          I'm sorry.  Obviously, you have got something on

22  your mind.

23          THE COURT:  It's all coming back into clear

24  focus.  Go on and finish that.

25          MR. STILLMAN:  And so our point simply is that

1   this evidence, this newly discovered evidence, clearly

2   creates a triable issue with respect to whether or not or

3   what the effective priority date for the '748 patent

4   actually is.  And we believe, your Honor, that if you go

5   back and you look at that evidence -- not that evidence

6   alone, but that evidence in conjunction with the July

7   memorandum which we laid out in our papers which shows

8   exactly that a prototype was finished in July of 2010,

9   which means the conception date has to occur sometime

10  prior to that.  We just didn't know precisely when.  When

11  you look at that evidence in combination, it creates a

12  triable issue where a jury could find that we were, in

13  fact, entitled to an earlier priority date.

14          THE COURT:  Here's my question.  You say it's

15  newly discovered.

16          MR. STILLMAN:  Yes, sir.

17          THE COURT:  This evidence was something that

18  existed all along.  It was within the control of agents

19  of Verizon.  It was there, but apparently no effort was

20  made to go search, do a thorough search for the

21  information.  Now, the Court found cases on record where,

22  you know, in circumstances even better than these facts

23  the Court has ruled it's not newly discovered evidence.

24          There's a situation where this doctor was

25  allegedly in China, was in China, and apparently came

1    back into the States and never did a thorough search of

2    the place these statements were supposed to be, and they

3    were right where they thought they might be, but no one

4    looked.  Now, you know, that's a problem.

5           MR. STILLMAN:  Well, let me engage that, if I

6    can, and I understand that argument, but the first thing

7    the Court has to understand is Mr. Wan is not under

8    Verizon's control.  He was an independent contractor when

9    this was going on.  And this is very important.  We

10   didn't control -- Verizon did not control Mr. Wan.

11   Believe me, if it did, we would have required that

12   Mr. Wan come back from China to engage in this search for

13   these documents.  We tried at length, and, in fact, the

14   chronology of those efforts is laid out in some

15   considerable detail in our papers.

16          You may recall that we talked to Mr. Wan.  He

17   was in China.  We actually asked Mr. Wan if it would be

18   possible for us to go to his home and search

19   independently for those documents?  Mr. Wan told us

20   categorically that he was not comfortable with that.

21          We then sort of lost communication with

22   Mr. Wan.  We found an e-mail address through Mr. Lin

23   where we might communicate with Mr. Wan.  We sent Mr. Wan

24   another e-mail.  We then subsequently learned that

25   Mr. Wan was back in California.

1          As soon as we found out about that, we called
2   Mr. Wan, and he agreed and we made arrangements for him
3   to go back to Boston to search.  He then searched and
4   produced an initial round of invoices.  We thought that
5   there were still some holes in that production.  We asked
6   him to go back again, and when he came back again, he
7   found confirmation that, in fact, the conception of this
8   custom browser was clearly made before May of 1996.
9          THE COURT:  Based on those invoices.
10         MR. STILLMAN:  That refreshed his recollection
11  that that's exactly when that happened.
12         We knew, your Honor -- if you go back and you
13  look at that July 12th memorandum which we have discussed
14  in our papers, we knew that the conception had to be
15  before July because a prototype had in fact been
16  completed by July, so sometime prior to that, there had
17  to be conception.  The problem is, neither of these
18  inventors were willing to author a declaration until they
19  saw those invoices that would specify with any level of
20  certainty that that conception had to occur before May of
21  1996.
22         When they went back and saw that they had, in
23  fact, billed for it, that refreshed their recollection.
24  And let me just say this, your Honor.  This is not sort
25  of inside-the-beltway patent law.  This is just common

1    sense.  If you asked me when I did something with my

2    people, I probably couldn't tell you three months ago

3    when I exactly did it unless I saw some written evidence

4    about what occurred.

5            In this case when they went back and saw the

6    invoice, it refreshed their recollection.  You know, you

7    mentioned this several times, and you are exactly right.

8    I think you have had the opportunity to observe Verizon

9    in its culture and the way that we went about trying this

10   case.  To suggest that we didn't exercise due diligence

11   about trying to find this evidence prior to the trial of

12   this case defies all of your experience with the way that

13   we tried this case.

14           I can promise you, and the evidence, I think, is

15   supported in the declarations that were filed, Verizon

16   left no stone unturned to locate this evidence prior to

17   all of this.  And you know, as well as I, that had we had

18   it prior to trial, we would have used it.  If there was a

19   motion that could have been filed in this case, we would

20   have filed it.  And I know we established at least that

21   credibility with you up until this time.

22           So the suggestion somehow that we just sat

23   around and couldn't locate this -- and this is

24   information, your Honor, that was not within our custody

25   and control.  It was in the inventor's house, and he was

1  unwilling to have us to search for.

2        The real question here, your Honor, is whether

3  or not, based upon this newly discovered evidence, a jury

4  should be able to look Mr. Wan in the eye and judge the

5  content of his character and say that based upon my

6  recollection now, having reviewed these documents, I

7  believe that I conceived this invention prior to May of

8  1996, which means that the web TV patent is no longer

9  prior art to the '748.  That's the question before us, as

10 to whether or not we are entitled to this priority date.

11       And I submit to the Court that if you go back

12 and look at the declarations that were filed, I don't

13 believe that you are going to make the determination,

14 number one, that this evidence was in our custody and

15 control; and number two, I don't believe you are going to

16 find when you look at that declaration that there's

17 anything other than material information that could help

18 a jury make a decision about all of this should be

19 resolved.

20       Now, there are a number of arguments that have

21 been advanced by ActiveVideo in their papers about why

22 you should deny this motion.  The first is that the

23 invoices by themselves contain insufficient detail for

24 each and every element of the claim.  Well, of course

25 they don't and that's not the law, and I think we have

1  supplied you the requisite authority for you to make that

2  determination.

3          The point simply is that these invoices are

4  corroborative only, corroborative.  In other words, they

5  helped refresh the recollection of the inventor as to

6  when something actually took place.

7          The second argument that ActiveVideo made here

8  is that Verizon didn't exercise due diligence.  Well,

9  again, I hope you appreciate the culture at Verizon with

10 respect to how it went about trying this case, and the

11 suggestion that we didn't do everything possible to

12 locate this information just simply defies common sense.

13 And, in fact, there's no evidence that we didn't.  All

14 the evidence in the declaration shows that we turned

15 every stone to locate these invoices prior to trial.

16         So the real question is whether or not the

17 evidence would allow a jury to find that Mr. Wan and

18 Mr. Lin conceived of this invention prior to May of 1996,

19 and I think we have laid out the chronology.

20         The final argument that ActiveVideo advanced in

21 this case, your Honor, is that the invoices themselves

22 were not created contemporaneously.  Once again, that's

23 not the law, and we have cited the *Hybritech* case, a

24 Federal Circuit case, found at 802 F.2d 1367, for the

25 proposition they don't need to be created

1  contemporaneously.  But, in fact, these invoices were

2  created virtually contemporaneously with the exception of

3  this custom browser, which Mr. Wan conceived clearly

4  prior to May of 1996.

5          Now, one final point that I want to leave with

6  the Court as you think about this very important motion.

7  There has been a lot of discussion in the papers about

8  Verizon's motives and how this all pertained to the ITC

9  case, and, yes, of course, it does.  We plead completely

10 guilty to that.

11         This is a very important patent to Verizon.

12 Now, the Court had made a decision that this patent is

13 invalid by virtue of this web TV patent.  Now, I

14 understand that ruling and the Court has made a number of

15 rulings that we haven't been happy about, but you have

16 been consistent in your strike zone.  So from our

17 perspective, we simply want the opportunity to convince a

18 trier of fact in this case that the conception of this

19 invention was in fact prior to May of 1996 and that as a

20 result, the '689 patent is not entitled to prior art

21 status.

22         You can sever this issue.  You can send the rest

23 of this case on to the Federal Circuit and be done with

24 it by simply allowing us the opportunity to go to trial

25 on this separate case.  Nothing will hold up the rest of

```
 1   the case.  The Court is entitled to certify the rest of
 2   the case and the final judgment.  And I think, as a
 3   practical matter, we could move forward in an expeditious
 4   way to get a resolution one way or the other as to
 5   whether or not this patent is valid or not.
 6           Thank you.
 7           THE COURT:  All right.
 8           MR. LYONS:  Good morning, Your Honor.  Mike
 9   Lyons on behalf of ActiveVideo.
10           As your Honor appreciates, this is extraordinary
11   relief.  They are asking for this Court to basically
12   throw out the judgment that's been entered on this
13   patent.  Before they can do that, they have got to show
14   that this evidence is newly discovered.  They have got to
15   show that they did exercise diligence in discovering this
16   evidence.  And unlike what was suggested repeatedly, the
17   showing isn't that, you know, a jury could have been
18   persuaded.  It's got to be a showing that this evidence
19   is likely to produce a new outcome.  And I would submit,
20   your Honor, they cannot meet any of these standards.
21           Let's start with the newly discovered standard.
22   First of all, their own papers provide ample evidence to
23   show that this is not newly discovered evidence.  What
24   their declaration reflects is that Mr. Wan told them
25   about this evidence in June 2010.  So that was 13 months
```

1  before trial.  He said, If I had files and documents

2  relating to my invention, they are in my house in

3  Boston.  They are in my files.  Now, that was in June

4  2010.

5          A month later Verizon's counsel is representing

6  Mr. Wan.  He's their client.  They are working hand in

7  glove.  Now, at any moment they could have -- and one

8  other part of the story, your Honor, Verizon's counsel is

9  also in communication with Mr. Wan's wife.  Why is that

10 important?  Because Mr. Wan's wife is in Boston and has

11 custody of documents.  At any time they could have

12 subpoenaed her for these documents.  They could have done

13 it at any time in 2010, they could have done it any time

14 in 2011, and they chose not to.

15         But what's even more troubling in this case is

16 they not only chose not to get the documents which were a

17 hand's reach away, they didn't tell anybody.  This is a

18 patent that was in three litigations.  It was being

19 asserted against ActiveVideo, it was being asserted in

20 Texas, and it was being asserted in the ITC.  As you can

21 imagine, it was a subject to discovery in all three of

22 these.

23         Now, counsel for Verizon knew there were

24 documents in a home in Boston, and they knew who had

25 those documents, and they knew they were relevant.  And

```
 1  who did they tell?  Nobody.  They didn't tell anybody
 2  about these documents.
 3         Now, they have tried to lay the blame for
 4  everything on Mr. Wan and say, well, you know, he went to
 5  China.  He was in China, so we couldn't get these
 6  documents.  So putting aside for the moment the fact that
 7  Mr. Wan's wife was here the entire time in custody of the
 8  documents, but Mr. Wan was here virtually the entire time
 9  that these motions were pending in this case.
10         His testimony in his declaration was that he was
11  here in December of last year.  We think in Boston,
12  although he wouldn't tell us and counsel for Verizon,
13  even though they represent him, would not tell the Court
14  candidly if he was in Boston or somewhere else.  But then
15  he returned to the U.S. permanently in February.
16         Now, they have said, We lost his e-mail
17  address.  We couldn't find him.  Well, why didn't they
18  pick up the phone and call his wife?  I mean, that's how
19  they found him in the first place.  Or why didn't they
20  ask the inventor, his co-inventor, which is who they
21  eventually asked and say that's how they did find him the
22  second time.  Even the exercise of the most minimal
23  diligence would have located Mr. Wan and would have
24  allowed them to get these documents.
25         Now, your Honor pointed out, counsel pointed out
```

1  Verizon has put vast resources into this case and when

2  they wanted to get some information, if there was a stone

3  they wanted to turn over, they turned it over.  And the

4  reason this stone didn't get turned over is because they

5  didn't know what was underneath it.

6          They are assuming now that this is helpful

7  evidence.  Well, they were going to trial in three courts

8  on this patent, and a lot of times what's in the inventor

9  files is not all that helpful.  Maybe there was prior art

10  that should have been disclosed or maybe there was other

11  evidence that was unhelpful in how they were reading

12  these claims.  They weren't so interested in this

13  evidence.

14          That's why when we filed the motion for summary

15  judgment back in January, what does a party do when they

16  know about relevant discovery that they don't have?

17  Federal Rule of Civil Procedure 56(d) tells a party it's

18  very simple.  When you oppose that motion for summary

19  judgment, you tell the Court there's more information out

20  there that we don't have yet, and you don't have to tell

21  the Court we know exactly when we are going to be able to

22  get it or how we are going to get it, but you put that in

23  the papers.  They didn't do that.  They effectively

24  argued that this issue is ripe for determination based on

25  ActiveVideo's position that this was prior art and the

1  fact that Verizon never challenged whether it was prior

2  art in the summary judgment motion.

3         Now, they didn't challenge whether it was prior

4  art in their motion for reconsideration.  They didn't

5  invoke Rule 56(d) in their motion for reconsideration

6  which was pending before this Court until June 30.

7         They didn't even tell this Court when they

8  finally reconnected with Mr. Wan.  And just prior to

9  trial in conversations with him about how to get these

10  documents that had been requested by multiple parties in

11  litigation discovery and hadn't been turned over, they

12  didn't tell the Court.

13         They got the first set of documents from

14  Mr. Wan.  They didn't like those documents.  They weren't

15  helpful.  What did they do?  Did they come to court?  Did

16  they tell ActiveVideo?  No, they didn't tell anybody.

17  They said, Go back to Boston, Mr. Wan, and find us some

18  documents we can work with.

19         He went back.  It was only until he came back

20  the second time with something that they thought they

21  could make a motion out of that they decided to tell

22  anybody about what was going on, and we would submit,

23  your Honor, that this is just too late.  This is not

24  diligence, this is not newly discovered, and it was not

25  fair conduct.

1          The final issue, your Honor, is whether this
2    evidence is likely to produce a new outcome.  So it's not
3    a matter of whether this is some evidence that might have
4    some influence on some juror; it is likely to produce a
5    new outcome.
6          Now, every document that they are relying on is
7    later than the prior art that they say they concede
8    before.  The earliest document that they have unearthed
9    is from late June, and they have to show that they
10   actually conceived in May.  So they don't have even one
11   document in the relevant time period.
12         Now, the one document in late June is an invoice
13   that does refer to work that went on in May.  Now,
14   counsel did, candidly, concede that this invoice doesn't
15   actually show where the elements of the invention are,
16   and he's absolutely right about that.  I mean, this is an
17   invoice showing the work that was done, and it was not
18   intended to be a technical discussion of inventions or
19   ideas; it's just not there.
20         And we had focused on some of the specific
21   aspects of what they had argued was really a crux of
22   their invention was this transforming the interactive
23   elements on a web page from something like a hyperlink
24   that was something that you could work with a remote
25   control.  They have no evidence that could possibly show

1  that they conceived at that time, and the documents they

2  are relying on don't corroborate the invention.

3        And the standard is not, as counsel for Verizon

4  has suggested, it's enough that these documents refresh

5  your recollection and somehow that's corroboration.  No,

6  corroboration means there's an independent evidentiary

7  basis so that you are not relying exclusively on the

8  testimony of the inventor.  The reason for the

9  corroboration rule is because they don't want an inventor

10  to be tempted to remember, Oh, boy, if I could just say I

11  invented this in May rather than June, I can get behind

12  this one piece of prior art that's causing all this

13  trouble and so that's what I'm going to put in my

14  declaration.

15        And so they are essentially offering the exact

16  testimony and relying on the exact testimony that the

17  Court said is not enough.  We don't want to hear

18  inventors telling a tale about what they did.  We want to

19  see independent corroborating evidence of documents.  I

20  submit, your Honor, even if this stuff was timely, even

21  if they had been diligent in finding it, there is no way

22  this evidence is going to produce any kind of new result

23  in this case.

24        Thank you, your Honor.

25        THE COURT:  I will give you a short rebuttal,

1  Mr. Stillman.

2          MR. STILLMAN:  Yes, sir, very short.

3          Your Honor, first of all, with respect to

4  whether or not this evidence would likely produce a

5  different result, I think you can go back and put

6  yourself in a position that had you had access to this

7  evidence a year ago and the declaration from the inventor

8  about these invoices refreshing his recollection that in

9  fact he conceived of this in May of 1996, you would have

10 made the determination that there was a triable issue

11 with respect to the conception date and that a jury or a

12 finder of fact would be required to hear that testimony

13 and to weigh up Mr. Wan's demeanor and character on the

14 stand, to listen to what he said about when that was in

15 fact conceived.

16         And so, would there be a different result?

17 Obviously, nobody can sit here and tell you what a jury

18 would do, but the real question is whether or not they,

19 Verizon, would be entitled to its day in Court had this

20 evidence been available to it at the time.  And I promise

21 you had it been available, we would have presented it to

22 you.

23         Now, before you make your judgments about

24 whether I am right or whether Mr. Lyons is right with

25 respect to this due diligence, may I encourage you to go

1   back and look at the declarations that have been

2   submitted in this case by Verizon with respect to the

3   chronology and the detail and sequence of events which

4   led to the discovery of this information.

5           THE COURT:  The Court has already read the

6   declarations.

7           MR. STILLMAN:  And when you do that, I don't

8   believe that anyone could read that and say that Verizon

9   purposely sat on this or sat back because it was worried

10  about what it was going to discover.  We had nothing but

11  upside.  Our patent had been held to be invalid six

12  months earlier.  We had nothing to gain by sitting on

13  evidence that could somehow corroborate a conception date

14  in May of 1996.

15          Now, Mr. Gutman also reminded me you asked me

16  the question, you admitted the notebooks of the inventors

17  in this case that were offered, in fact, by ActiveVideo.

18  So that evidence did, in fact, come in, and it's exactly

19  the kind of evidence that we are talking about here that

20  would serve to corroborate a conception in May of 1996.

21          So we believe that there has been due diligence,

22  but, frankly, that's your call.  I mean, this is a

23  discretion, and I have to admit that.  You have to make

24  that judgment.  I can sit up here and argue that there's

25  been due diligence all day long, and Mr. Lyons can say

1   no, there hasn't.  But in your heart I think you have to

2   believe that Verizon, had it had access to this

3   information, would have presented it to you a long time

4   earlier.  And, in fact, if you look at those

5   declarations, you will see that we did everything

6   possible to get access to it at a prior time.

7        And for all of those reasons, your Honor, we

8   believe that the Court should exercise, in fairness, your

9   discretion, because it is your discretion.

10       THE COURT:  Let me ask you one question.

11  Mr. Lyons said that the wife -- I don't recall this from

12  the declaration.  I don't know whether it was there or

13  not, and the Court did read the declarations of each of

14  Verizon's counsel involved who worked on those issues.

15       Mr. Lyons made the statement that the wife was

16  available and that you did not approach the wife in an

17  effort to get in the house to find the documents.

18       MR. STILLMAN:  Right.

19       THE COURT:  I can't remember anything in the

20  declarations about efforts to approach the spouse.

21       MR. STILLMAN:  Well, there were conversations

22  with the wife, and the wife told us, as I recall, and I

23  believe this is set out in the declarations, the wife

24  told us that her husband was in China.

25       Now, did we subpoena the wife?  No, we didn't.

1   And, you know, hindsight being 20-20, maybe that would

2   have been a good thing to do.  I don't know.  The fact of

3   the matter is these were documents that were in the

4   custody and control of the husband, not the wife.  And,

5   you know, I suppose somebody can always second-guess what

6   we could have done to do something better, and I would be

7   happy to be criticized, but --

8           THE COURT:  The Court understands the argument

9   the documents belong to the husband.  What the Court does

10  wonder is in terms of having problems trying to contact

11  Mr. Wan, if the spouse is available, why didn't you get

12  some telephone numbers or contact numbers from the

13  spouse?

14          MR. STILLMAN:  Well, we did.  In fact, I think

15  if you read the declaration, you will find that we did

16  track him down in China and did have access to him in

17  China.  And that's when there were conversations about

18  whether he would allow us to go to the house and search

19  for the documents ourselves, and he told us when he was

20  in China that he was comfortable with doing that.

21          Then there was a period of time in which we sort

22  of lost communications with him, and we got an e-mail

23  that we thought was a good e-mail address for him from

24  Mr. Lin and then discovered that he was, in fact, in

25  California.

1          So all of that, the due diligence and the

2     chronology and sequence of events, is really not in

3     dispute.  It's all set out in the declaration.  The real

4     question is whether when you look at that and you

5     exercise your discretion, what do you think is fair?

6               THE COURT:  Got you.

7               MR. STILLMAN:  I put our motion, then, in your

8     hands because it's ultimately up to you to decide.

9               THE COURT:  Well, I thank you.

10              MR. STILLMAN:  Thank you.

11              THE COURT:  The Court will consider it along

12    with the injunction and other issues that we have here.

13              Thank you, gentlemen.  The Court will be in

14    touch.

15              (This hearing concluded at 12:10 p.m.)

16                        *     *     *

17                        CERTIFICATION

18          I certify that the foregoing is a correct

19    transcript of the record of proceedings in the

20    above-entitled matter.

21

22                    X_____/s/_____X

23                        Sharon B. Borden, RMR, FCRR

24                        X October 28, 2011 X

25                        Date