**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**



**ACTIVEVIDEO NETWORKS, INC.,**

    **Plaintiff,**

    **v.**                              **CIVIL ACTION NO. 2:10cv248**

**VERIZON COMMUNICATIONS, INC.,**
**VERIZON SERVICES CORP.,**
**VERIZON VIRGINIA INC., and**
**VERIZON SOUTH INC.**

    **Defendants.**

## *MEMORANDUM OPINION & ORDER*

Before the Court is Plaintiff's, ActiveVideo Networks, Inc. ("ActiveVideo"), Motion for a

Permanent Injunction against Defendants, Verizon Communications, Inc., Verizon Services Corp.,

Verizon Virginia Inc., and Verizon South Inc. (collectively, "Verizon"). The parties have fully

briefed this matter, and it is now ripe for judicial determination. For the reasons stated herein,

Plaintiff's Motion for a Permanent Injunction is **GRANTED**.

## I. BACKGROUND

On May 27, 2010, Plaintiff ActiveVideo filed suit in the United States District Court for the

Eastern District of Virginia in which it alleged patent infringement on several of its patents.

Beginning on July 12, 2011, a three-week jury trial was held in the United States District

Court for the Eastern District of Virginia on ActiveVideo's claims and Verizon's counterclaims of

infringement and invalidity. During the trial, ActiveVideo asserted infringement of four of its

patents:  United States Patent Nos. 5,550,578 ("the '578 patent"), 6,100,883 ("the '883 patent"),

6,034,678 ("the '678 patent"), and 6,205,582 ("the '582 patent").  On August 2, 2011, the jury

rendered a verdict finding that Verizon had infringed the asserted claims of four of ActiveVideo's

patents:  the '578 patent, the '883 patent, the '678 patent, and the '582 patent. *See* Verdict Form,

Aug. 2, 2011, ECF No. 927.  The jury awarded ActiveVideo damages in the amount of

$115,000,000.00. *Id.*

As a result of this verdict, on August 12, 2011, ActiveVideo filed a Motion for Permanent

Injunction seeking to prohibit Verizon from using the adjudicated patents.  Specifically,

ActiveVideo asks the Court to enjoin further use of the '578 patent and the '582 patent in

connection with Verizon's Video On Demand ("VOD") services offered through its FiOS system.[1]

Verizon opposes this motion and asks in the event the Court deems it necessary to grant an

injunction, that the Court offer Verizon a sunset provision or extra time to implement a non-

infringing alternative.  Notwithstanding the sunset provision, Verizon also asks the Court to grant a

stay of any injunction pending appeal.

## II. LEGAL STANDARD

The Patent Act permits courts to "grant injunctions in accordance with the principles of

equity to prevent the violation of any right secured by patent, on such terms as the court deems

reasonable." 35 U.S.C. § 283.  When considering whether to award permanent injunctive relief to

a prevailing plaintiff in a patent infringement dispute, courts should apply the traditional four-

factor test used by courts of equity. *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).

The prevailing plaintiff must demonstrate:

---

[1] Two of the infringed patents are irrelevant to Plaintiff's motion as both the '883 patent and the '678 patent have expired.

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.* at 391. The Supreme Court held "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." *Id.* at 394.

## III. DISCUSSION

### A. Permanent Injunction

#### 1. Irreparable Harm Suffered by ActiveVideo

The first of the four *eBay* factors requires courts to consider whether a plaintiff has suffered an irreparable injury as a result of a defendant's infringement. "Although injunctions are tools for prospective relief designed to alleviate future harm, by its terms the first *eBay* factor looks, in part, at what has already occurred." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010). The essential attribute of a patent grant is that it provides a right to exclude competitors from infringing the patent, but that right alone does not necessarily result in irreparable injury. *See eBay*, 547 U.S. at 392. While there no longer exists a presumption that an injunction will issue when a patent is infringed, the right of the patent holder to exclude others from its patent is grounded in the Constitution and is still an important factor in the court's inquiry.

Although *eBay* abolishes our general rule that an injunction normally will issue when a patent is found to have been infringed, it does not swing the pendulum in the opposite direction. In other words, even though a successful patent infringement plaintiff can no longer rely on presumptions or other short-cuts to support a request for a permanent injunction, it does not follow that courts should entirely ignore the fundamental nature of patents as property rights granting the owner the right to exclude.

3

*Robert Bosch LLC v. Pylon Mfg. Corp.*, No. 2011-1096, 2011 WL 4834266, at *5 (Fed. Cir. Oct. 13, 2011). If a plaintiff can show that it has suffered harm which is difficult to quantify (e.g., losses to market share, profits, goodwill, or reputation), then the plaintiff is more likely to have been irreparably injured. *See, e.g., i4i*, 598 F.3d at 862. Regarding the first factor of the *eBay* test, the Court concludes that ActiveVideo has suffered, is suffering, and will continue to suffer irreparable harm that cannot be adequately compensated with monetary damages.

As irreparable injury, ActiveVideo contends that it has suffered irreparable harm in the form of a loss of its right to exclude, loss of market share, loss of business opportunities, loss of goodwill, loss of brand name, and loss of profits. Mem. Supp. Pl.'s Mot. Perm. Inj. 6. More specifically, ActiveVideo asserts that Verizon's infringement has negatively impacted ActiveVideo's current arrangement with Cablevision. *Id.* at 7. Under this agreement, ActiveVideo permits Cablevision to use its CloudTV platform to provide interactive television services. *Id.* While ActiveVideo does not argue that it is a direct competitor with Verizon, it does claim that Cablevision and Verizon are fierce competitors in many major cable markets, especially in the New York tri-state area. *Id.* at 2. ActiveVideo thinks that if Verizon ceased infringing, Cablevision's market share would increase and its subscriber base for CloudTV would also increase. *Id.* Precisely because the loss in market share would be difficult to quantify, ActiveVideo declares it has suffered irreparable harm. Finally, ActiveVideo claims that Verizon has damaged its business operations by forcing it to divert millions of dollars to cover the costs of this litigation and to protect its right to exclude others from using its patents. *Id.* at 9.

Verizon argues that ActiveVideo has not carried its burden of proving it has suffered irreparable harm from Verizon's infringement. At the core of Verizon's argument is their view

4

that Verizon and ActiveVideo are not direct competitors in the television market.  Verizon claims

that they do not compete with ActiveVideo because Verizon is a potential customer of

ActiveVideo.  Mem. Supp. Defs'. Opp'n Pl.'s Mot. Perm. Inj. 4.  Verizon cites to other district

court precedent holding that "[c]ourts awarding permanent injunctions *typically* do so under

circumstances where plaintiff . . . is a direct market competitor."  *See Advanced Cardiovascular*

*Sys. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d 554, 558 (D. Del. 2008), *appeal dismissed*, 356

F. App'x 389 (Fed. Cir. 2009) (emphasis added).  During the hearing on the instant motion,

counsel for Verizon argued that if the Court decided to grant an injunction, it would be the first

time any court entered such an injunction in the absence of a direct competitor market.  Hr'g Tr.

32:12-18, Oct. 24, 2011, ECF No. 1162.  Verizon asserts that the court would be making an

"unprecedented decision" by granting an injunction on the facts of this case, but the Federal

Circuit has ruled contrary to Verizon's position.

    In *Mytee Prods., Inc. v. Harris Research, Inc.*, the Federal Circuit held that direct

competition is not a prerequisite to a court's decision to grant a motion for permanent injunction.

*See, e.g.*, *Mytee Prods., Inc. v. Harris Research, Inc.*, Nos. 2010-1207, 2010-1226, 2010-1457,

2011 WL 3875232, at *4 (Fed. Cir. Sept. 2, 2011).  While the presence of direct competition

between a plaintiff and a defendant can be one factor in the analysis, it is not dispositive.  *Id.*  "We

have never held, however, that in order to establish irreparable harm a patentee must demonstrate

that it is entitled to lost profits or that it is in direct competition with the infringer."  *Id.*  The Court

is not aware of any precedent which *requires* direct competition in any form before an injunction

may be granted.  ActiveVideo can still prove irreparable harm in the absence of direct competition.

Courts must analyze the business effects of the infringement to determine if a plaintiff has suffered

5

irreparable injury. *Metso Minerals, Inc. v. Powerscreen Int'l Distrib. Ltd.*, No. 06-cv-1446, 2011 WL 2149629, at *2 (E.D.N.Y. May 26, 2011). The inquiry does not simply end in the absence of direct competition.

In *Mytee*, plaintiff's independent dealers and defendants' franchisees were competing using the defendants' technology. *Mytee*, 2011 WL 3875232, at *5. The court concluded that Mytee and Harris were indirect competitors "because Harris's patented technology was almost exclusively used by its franchisees. Moreover its franchisees used the technology as their primary tool for cleaning carpets." *Id.*

Similarly to Mytee and Harris, ActiveVideo and Verizon are indirect competitors. Their indirect competition hinges on ActiveVideo's agreement with Cablevision. Though Verizon sells the technology to customers and ActiveVideo licenses its services to companies like Cablevision, who then sell the technology to customers, there is still indirect competition. Verizon freely admits that Cablevision is one of its largest competitors. Mem. Defs'. Opp'n 9. Cablevision offers CloudTV services based exclusively on its agreement with ActiveVideo. In other words, ActiveVideo's technology is Cablevision's primary means for providing CloudTV services. Verizon was able to gain an edge in the marketplace when they released their VOD services because of technology that belonged to ActiveVideo. ActiveVideo agreed to permit Cablevision to lawfully use ActiveVideo's technology so that Cablevision (and ActiveVideo) could gain a competitive edge in the market. Verizon's unlawful infringement unquestionably impedes upon the portion of the market share which Cablevision could have, and thus it impedes on ActiveVideo's ability to introduce its patented technology to the portion of the market that Verizon

controls.  There is no doubt that ActiveVideo suffers indirect losses when Cablevision suffers direct losses from Verizon's infringement.

Next, Verizon considers ActiveVideo's previous willingness to grant a license to Verizon, in addition to its grants of licenses to Cablevision, Grande, and TVGuide as suggesting that money damages are adequate to compensate ActiveVideo for any harm it may have suffered.  Mem. Defs'. Opp'n 7-9.  They believe that ActiveVideo eradicated its right to exclude by licensing its patents.  The mere fact, however, that a patent holder licenses its patents does not by itself bar that patentee from obtaining injunctive relief.  The Supreme Court warned that "traditional equitable principles do not permit such broad classifications." *eBay*, 547 U.S. at 393.  In light of this warning, the Court has discretion to consider ActiveVideo's willingness to license its patents in determining whether injunctive relief is warranted. *See, e.g.*, *Cordance Corp. v. Amazon.com, Inc.*, 730 F. Supp. 2d. 333, 341(D. Del. 2010) (holding that the decision to forego patent rights is a factor the court can consider in its irreparable harm analysis).

ActiveVideo contends that it is in the business of commercializing its technology and not licensing its patents because the licensing agreements it formed with Cablevision and Grande were to use ActiveVideo's own commercial products and not to allow other companies to create products that competed with ActiveVideo's.  Reply Defs'. Opp'n Pl.'s Mot. Perm. Inj. 10.  With respect to its agreement with TVGuide, ActiveVideo indicates that the purpose of that agreement was to create a product that would be jointly developed. *Id.*  The Court is not persuaded that in licensing its patents to other businesses, ActiveVideo forfeited its right to exclude others from infringing on its patents.  ActiveVideo has never permitted any party to develop a competing product using its technology.   In at least one instance, ActiveVideo attempted to enter into an

7

agreement to create a jointly finished product and not purely to seek compensation for licensing its patents. ActiveVideo did not show a willingness to accept monetary compensation in exchange for giving up its right to exclude others from its patents.

Verizon cites two primary cases – *Advanced Cardiovascular Sys.* and *MercExchange* – as proof that ActiveVideo's willingness to license patents means monetary damages are adequate. In *Advanced Cardiovascular Sys.*, the plaintiffs had actually recaptured nearly the entire market share they lost and were the leading producers of the infringed product. *Advanced Cardiovascular Sys.*, 579 F. Supp. 2d at 560. Based upon those facts, *inter alia*, the court found that the plaintiffs had not proven irreparable harm. *Id.* ActiveVideo has not come close to recapturing the market from Verizon. It will not be able to do so unless Verizon's infringing activities are enjoined. As for *MercExchange*, the Court notes that the plaintiff in that case made frequent attempts to seek out parties who were already potentially infringing on their patents in order to "negotiate to maximize the value of a license, entered into as a settlement to, or avoidance of, litigation." *MercExchange, L.L.C. v. eBay, Inc.*, 500 F. Supp. 2d 556, 572 (E.D. Va. 2007). The *MercExchange* court believed that a "consistent course of litigating or threatening litigation to obtain money damages . . . indicates MercExchange has utilized its patents as a sword to extract money rather than as a shield to protect . . . its market-share, reputation, goodwill, or name recognition . . . ." *Id.* While Verizon may claim that ActiveVideo is using this litigation as an opportunity to seek leverage against Verizon in further licensing negotiations, the Court finds no such evidence to support Verizon's claim.[2] ActiveVideo's willingness to license its patents to Verizon is a factor which cuts against a showing of irreparable harm, but after the Supreme Court's admonishment to avoid categorical rules, willingness to license is merely one prong of the irreparable harm analysis. Even in its

---

[2] The Court will not infer from ActiveVideo's pursuit of Verizon as a customer, that it wants to seek an injunction to obtain undue leverage over them.

licensing deals with third parties, the Court is only aware of ActiveVideo issuing nonexclusive, nontransferable licenses. This Court will not treat ActiveVideo's willingness to grant such licenses as proof that money damages in this case would be adequate.

Verizon further states that the alleged competitive injuries ActiveVideo claims it is suffering can be compensated with money damages. Both parties provided the Court with diametrically opposed declarations from experts. Verizon's expert claims that ActiveVideo would be much better off obtaining a royalty from Verizon than it would be if Verizon were enjoined, unless and until Verizon implements an alternative system. *See* Decl. Dennis W. Carlton ¶ 1, ECF No. 1010. Verizon's expert believes that by combining ActiveVideo's current relationship with Cablevision to an ongoing royalty from Verizon, ActiveVideo would receive payment from a larger number of subscribers than if it were to rely exclusively on Cablevision. *Id.* Additionally, Verizon thinks that because other cable and satellite companies, such as DirectTV, offer similar services to Verizon and Cablevision, any damages that ActiveVideo suffers would be better compensated with monetary damages as there is no guarantee that customers who leave Verizon would turn to Cablevision.

To the contrary, ActiveVideo's expert disputes Verizon's analysis because he concludes that Verizon fails to account for the negative impact that a grant of a de facto, compulsory license to Verizon would have on ActiveVideo's bargaining position regarding its current and future potential licensees. *See* Decl. Michael J. Wagner ¶ 8, ECF No. 1087. Verizon has repeatedly ignored this impact. A jury found that Verizon infringed ActiveVideo's right to exclude others from its patents, a right that is "[t]he essential attribute of a patent grant . . . ." *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008). In spite of that, Verizon argues that there is

9

no way of knowing exactly how many customers Cablevision would have in the absence of Verizon's infringing use of ActiveVideo's patents. That is precisely the problem. It is this type of unquantifiable harm, the type that ActiveVideo has suffered, which cannot be adequately compensated with money damages. Without Verizon's added competition, Cablevision would have more subscribers and need an expanded CloudTV platform which would, in turn, generate more revenue and broader recognition for ActiveVideo. *See* Decl. Michael Schanman ¶ 11, ECF No. 981. The presence of Verizon's infringing product leads to a loss of market share for ActiveVideo and Cablevision. The presence of Verizon's FiOS TV system affects CloudTV's performance and notoriety in the market. If success in the cable television industry is indeed marked by the number of customers who employ a company's services, then Verizon's unmitigated market presence alone diminishes the reach of CloudTV.

Furthermore, Verizon relies on the Federal Circuit's opinion in *Voda v. Cordis Corp.* to argue that ActiveVideo cannot prove irreparable harm through alleged injuries suffered by one of its licensees, Cablevision. *See* Mem. Defs'. Opp'n 16 (citing *Voda v. Cordis Corp.*, 536 F.3d 1311, 1329 (Fed. Cir. 2008)) (deciding that patentee "had attempted to prove irreparable injury by alleging irreparable harm to his exclusive licensee, rather than himself."). However, the only relevant proposition for which *Voda* stands is that the plaintiff must show it has suffered irreparable injury. *Id.* If ActiveVideo was only pointing to harm that its licensee suffered, then the Court would agree with Verizon's invocation of *Voda*. Notwithstanding the fact that it is Cablevision who uses ActiveVideo's technology, ActiveVideo still suffers harm from Verizon's infringement. With every customer Verizon has unlawfully acquired, they have taken away ActiveVideo's ability to spread its brand name, to obtain references from potential customers, and

10

to expand its goodwill throughout the areas in which Verizon and Cablevision are fierce

competitors.[3]  It is this type of harm which the Court must prevent. *See, e.g., Metso*, 2011 WL

2149629, at *3 ("In the Court's view, this loss of market share is difficult to quantify, as it includes

a loss of unknown opportunities for positive references, repeat sales, and expanded goodwill.").

In an effort to enforce its right to exclude patent infringers, ActiveVideo has diverted

millions of dollars into this litigation and away from developing other technologies and improving

its business. These lost opportunities are the type of past harm which a court can consider in

determining whether to issue injunctive relief. *See, e.g., ePlus, Inc. v. Lawson Software, Inc.*, No.

3:09cv620, 2011 WL 2119410, at *12 (E.D. Va. May 23, 2011); *i4i*, 598 F.3d at 861 (concluding

district court properly considered evidence of past harm to market share, revenue, and lost

opportunities). It is not the Court's opinion that harm related to litigation costs is solely a matter of

the money ActiveVideo has diverted into this action, but it is a matter of what ActiveVideo may

have been able to do in the absence of Verizon's infringement. Even if the Court did not consider

this past harm, the *ePlus* court also held that when the Court denies injunctive relief, the plaintiff

would still have to divert and expend future resources in order to monitor potential future

infringement from the defendant. *ePlus*, 2011 WL 2119410, at *12. In the absence of an

injunction, ActiveVideo would have to act similarly. Because ActiveVideo is such a small

company, this type of undertaking would prove costly. If the Court enters injunctive relief, any

such future harm is likely to be diminished since the power of a permanent injunction and the

---

[3] Verizon alleges that ActiveVideo's own expert testified at trial (and in his expert report) that if ActiveVideo granted
Verizon a license, it would not lose any sales. *See* Mem. Defs'. Opp'n 9-10. Upon review of the transcript, it appears
that ActiveVideo's expert did not offer any clear conclusion on this issue. He testified that he had not calculated lost
profits: "Q. Okay. Mr. Wagner, is it your opinion that ActiveVideo would lose sales by licensing to Verizon, correct?
A. I have not calculated lost profits here, so that is correct." *See* Trial Tr. 1082:17-20, July 19, 2011. Regarding
ActiveVideo's expert report, as of 2005, ActiveVideo had not entered into an agreement with Cablevision for the use
of its CloudTV services and was still seeking a major deployment. Therefore, the Court does not believe
ActiveVideo's previous statements are dispositive on the issue of whether ActiveVideo is losing sales because of
Verizon's infringement.

sanctions for a violation of such an injunction would work to help prevent Verizon from infringing in the future.  Verizon's actions stripped ActiveVideo of the opportunity to get a nationwide deployment which would have bolstered ActiveVideo's reputation in the cable television industry. This lost opportunity, which is also difficult to quantify, favors granting an injunction.

Verizon further argues that ActiveVideo's failure to seek a preliminary injunction and its delay in bringing this litigation both warrant denying a motion for permanent injunction. ActiveVideo's alleged delay in bringing suit does not prevent this Court from issuing a permanent injunction.  There is no evidence in the record to establish when ActiveVideo gained knowledge of the intricacies of the FiOS system that infringed its patents.  The Court finds that ActiveVideo's awareness of the identity of vendors, namely Motorola and SeaChange, does not alone establish knowledge that their patents were being infringed.

With respect to ActiveVideo's failure to seek a preliminary injunction, there is no requirement that a party must seek a preliminary injunction in order to obtain a permanent injunction. *See, e.g., ePlus*, 2011 WL 2119410, at *13 ("Indeed, principles of judicial efficiency and sound judicial administration strongly mitigate against such a rule, lest the courts be besieged with motions for preliminary injunction filed to preserve the right to permanent injunctive relief."). "While we have held that delay in seeking an injunction is a factor to be considered in determining whether to issue a preliminary injunction, we have never held that failure to seek a preliminary injunction must be considered a factor weighing against a court's issuance of permanent injunction." *Mytee*, 2011 WL 3875232, at *5 (citing *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988)).  The Court will not consider ActiveVideo's failure to seek a preliminary injunction as weighing against the issuance of a permanent injunction.

Even if the Court assumes, *arguendo*, that ActiveVideo's alleged delay and failure to seek a preliminary injunction favored Verizon, the Court still finds that in considering all the facts of this case, as they relate to the irreparable harm factor of the *eBay* test, ActiveVideo has suffered irreparable harm.

### 2. Adequacy of Remedies Available at Law

In many cases, the issues of irreparable harm and adequacy of remedies at law are inextricably linked. *See Humanscale Corp. v. CompX, Inc.*, No. 3:09-CV-86, 2010 WL 1779963, at *4 (E.D. Va. Apr. 29, 2010) ("It is firmly established that the evidence necessary to satisfy this factor is intertwined with the evidence relevant to the irreparable harm inquiry."); *see also MercExchange*, 500 F. Supp. 2d at 582 (overlapping the first and second factors of the *eBay* test). This case is no different. A violation of the right to exclude by itself does not mean that a patent holder cannot be adequately compensated with monetary damages. *eBay*, 547 U.S. at 392-93. A patent holder must provide the Court with evidence that monetary damages are inadequate. Many of the same factors supporting a finding of irreparable harm can be used to support a finding that monetary remedies are inadequate. *See, e.g., Acumed*, 551 F.3d at 1327-28.

For reasons similar to those which the Court has discussed in the first prong of the *eBay* test, ActiveVideo has proved that remedies at law are inadequate in this case. Because of Verizon's infringement, ActiveVideo's business opportunities have been significantly hampered. Verizon contends that a reasonable royalty would be sufficient to compensate ActiveVideo for the harms they have suffered; however, a reasonable royalty will only serve to provide ActiveVideo with a portion of the profits from Verizon's infringing use of ActiveVideo's technology. The Court cannot not predict how large of a share of the television market ActiveVideo would have

been able to control, and it cannot speculate as to how much ActiveVideo's brand name and recognition would have grown absent Verizon's infringement. When such difficulties arise, courts have viewed this as evidence that remedies at law are inadequate. *See, e.g., Broadcom*, 543 F.3d 683, 703-04 (Fed. Cir. 2008). Further, losses associated with market share or brand recognition are difficult to quantify. *See i4i*, 598 F.3d at 862. It would indeed be a difficult proposition for the Court to attempt to convert those harms into an estimate of monetary damages, and the Court does not believe that any such monetary award would adequately compensate ActiveVideo.

For the foregoing reasons, ActiveVideo has carried its burden to show that no adequate remedy at law exists.

### 3. The Balance of Hardships

The third factor weighs the relative hardships of an injunction on both parties. *eBay*, 547 U.S. at 391. This factor also tips in favor of granting an injunction. In weighing the hardships, the Court is permitted to look at factors such as the parties' sizes, products, and revenue sources. *See i4i*, 598 F.3d at 862; *Cordance*, 730 F. Supp. 2d at 342. ActiveVideo argues that the balance of hardships favors granting an injunction because it is a small company that is largely reliant on the investments it makes in developing its technology. Mem. Supp. Pl.'s Mot. 14. ActiveVideo suspects that Verizon will not be significantly harmed by a permanent injunction because Verizon has a non-infringing alternative available that could be implemented in six to nine months. *Id.* at 13. ActiveVideo asserts that Verizon's investment in its infringing system is "irrelevant" by virtue of the Federal Circuit's view that "neither commercial success, nor sunk development costs, shield an infringer from injunctive relief." *i4i*, 598 F.3d at 863. Verizon counters by claiming that the balance of hardships overwhelmingly favors Defendants. Mem. Defs'. Opp'n 25. Verizon views

14

the court issuing a permanent injunction as a catalyst for immeasurable damage to its reputation, goodwill, and brand name. *Id.*

It is true that both parties will suffer hardship in this case, but the greater hardships lie with ActiveVideo. Because it is such a small corporation (with less than 150 employees), ActiveVideo will suffer serious hardship if an injunction is not granted, and Verizon is not ordered to cease and desist all use of its patents. Verizon is not a willful infringer; however, this does not change the fact that "one who is found to be an infringer cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Broadcom*, 543 F.3d at 704 (citation omitted). The majority of the hardship Verizon faces results from its infringing use of ActiveVideo's technology. Unlike ActiveVideo, Verizon is a large corporation that offers numerous services and products to its customers. ActiveVideo is significantly more reliant upon these two patents than is Verizon's corporate enterprise. Additionally, Verizon is working on a non-infringing alternative that will alleviate much of the hardship Verizon may face. Therefore, the Court finds that the relative importance of the patents at issue here and the balancing of hardships favors granting a permanent injunction.

### 4. The Public Interest

ActiveVideo argues that the public has an interest in upholding patent rights, and that an injunction in this case would support that interest. Reply Defs'. Opp'n 18. ActiveVideo contends that protecting the public interest would only weigh against granting an injunction when the technology involved affects public health or safety. *Id.* at 18 (citing *Mass Engineered Design, Inc. v. Ergotron, Inc.*, 633 F. Supp. 2d 361, 394 (E.D. Tex. 2009)) ("Where products do not relate to a

significant compelling public interest, such as health or safety, this factor weighs in favor of an injunction.").

The Court concludes that the public has an interest in protecting patent rights, and the Court acknowledges that public policy generally favors the enforcement of such rights. *See i4i*, 598 F.3d at 863. As such, courts give "considerable weight to the strong public interest in favoring entry of injunctive relief to protect . . . patent rights." *ePlus*, 2011 WL 2119410, at *17. The Court's inquiry does not stop here; however, because there is no presumption in favor of an injunction. *See MercExchange*, 500 F. Supp. 2d at 586. In fact, the "touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." *i4i*, 598 F.3d at 863. The question becomes whether the potential harm Verizon's customers will suffer outweighs the public interest in enforcing a patentee's right to exclude. While it is undoubtedly true that Verizon's customers will suffer some harm with the removal of their FiOS services, this harm to customers' entertainment systems does not outweigh the public interest in the maintenance of the patent system.

In order to outweigh the public interest in protecting patent rights, the harm should be of a unique or socially valuable type. *See, e.g., Presidio*, 723 F. Supp. 2d at 1339 (finding that defendant should not be enjoined from using ceramic capacitors dubbed technology of "unusual social interest"); *see also Advanced Cardiovascular Sys.*, 579 F. Supp. 2d at 561 ("A strong public interest in maintaining diversity in the coronary stent market has been previously recognized by this court and the Federal Circuit."). In the absence of some other key interest, the value of consumer entertainment is insufficient to outweigh the public interest in allowing patentees to

enforce their right to exclude. *See TiVo Inc. v. Echostar Commc'ns Corp.*, 446 F. Supp. 2d 664, 670 (E.D. Tex. 2006) (infringing products were related to entertainment and not "any issue of public health or safety or any other equally key interest"), *aff'd in part, rev'd in part on other grounds and remanded*, 516 F.3d 1290 (Fed. Cir. 2008). Verizon is not the only provider of VOD services. The presence of other providers of VOD services mitigates some of the potential harm to the public from losing Verizon's services. *See Commonwealth Scientific & Industrial Research Org. v. Buffalo Tech. Inc.*, 492 F. Supp. 2d 600, 607 (E.D. Tex. 2007) ("The public interest would not be disserved by a permanent injunction because . . . products are obtainable from multiple sources other than [defendant].").

Verizon also contends that the public interest does not weigh in favor of granting an injunction, because the Supreme Court held in *eBay*, "[w]hen the patented invention is but a small component of the product the companies seek to produce and the threat of an injunction is employed simply for undue leverage in negotiations, . . . an injunction may not serve the public interest." *eBay*, 547 U.S. at 396-97. The Court does not reason that ActiveVideo's technology is a "small component" of Verizon's FiOS TV service. Though Verizon does add other components to be able to offer the completed product, Verizon's FiOS system, and more specifically the VOD aspect of the FiOS system, could not function without the use of ActiveVideo's technology. Since VOD is a large part of what separates Verizon's FiOS system from many of its competitors, ActiveVideo's technology is a significant component of Verizon's FiOS system.

Therefore, the Court finds that the public interest favors granting an injunction.

Having found that all four of the traditional factors used to consider issuance of an injunction favor granting a permanent injunction, an injunction shall be issued.

## B. Scope of the Injunction

ActiveVideo asks for an injunction:

> (1) enjoining further infringement of U.S. Patent 5,550,578 ("the '578 patent"), including by use of SeaChange and NextGen VOD services and others not colorably different, until expiration of the '578 patent and (2) enjoining further infringement of U.S. Patent 6,205,582 ("the '582 patent"), including by providing VOD via SeaChange, NextGen, and others systems not colorably different, offered in conjunction with (a) widgets or (b) on-demand VOD catalogs, including post view navigation or others not colorably different, until expiration of the '582 patent.

Reply Pl.'s Mot. 19. Verizon has objected to ActiveVideo's proposed injunction as overly broad. Their basis for this argument is that, according to Federal Rule of Civil Procedure 65, "[e]very order granting an injunction . . . must . . . state its terms specifically; and describe in reasonable detail—and not by referring to the complaint or other document—the act or acts to be restrained." Fed. R. Civ. P. 65(d)(1). Citing to Federal Circuit precedent, Verizon urges the Court to reject "as overly broad a permanent injunction that simply prohibits future infringement of a patent." *See Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004). Under Rule 65(d), "the only acts the injunction may prohibit are infringement of the patent by the adjudication devices and infringement by devices not more than colorably different from the adjudicated devices." *Id.*

ActiveVideo's proposed injunction provides for the precise language which Verizon requests. It provides reasonable detail with respect to the relevant patents and only asks for the prohibition of future infringement of those devices and those not colorably different. The Court believes the abovementioned language of the injunction satisfies the requirements of Rule 65 and will issue an injunction in accordance with said language.

## C. Stay of the Injunction & Sunset Provision

### 1. Stay of the Injunction

The Court will not stay this injunction pending appeal.  In order for the Court to stay an injunction pending appeal, "a movant must establish a strong likelihood of success on the merits, or, failing that, nonetheless demonstrate a substantial case on the merits provided that the harm factors militate in its favor." *See Mytee Prods., Inc. v. Harris Research*, Nos. 2010-1207, 2010-1226, 2010 WL 3724587, at *1 (Fed. Cir. Sept. 16, 2010).  In deciding whether to grant a stay, courts will examine "the movant's chances of success on the merits and weig[h] the equities as they affect the parties and the public." *Id.* (citations omitted).   The Court believes that a sunset provision would more appropriately and substantially mitigate against the irreparable harm Verizon claims they will suffer or the public will suffer in the absence of a stay while protecting ActiveVideo's rights as well.  The VOD system does not comprise the core of Verizon's business. Verizon will still be able to sell many of its non-infringing products to consumers everywhere.  In contrast with Verizon's position, ActiveVideo will continue to suffer ongoing irreparable injuries if a stay is granted for the reasons detailed in this order.

While Verizon has identified a chorus of issues that they plan to appeal, the Court has considered many of these issues previously in great detail.  As such, the Court concludes that Verizon has not demonstrated a strong likelihood of success on appeal that would overturn a jury's verdict in its entirety on each claim of infringement.  Verizon has appealed substantial issues, but the Court does not find that this fact, standing alone, merits granting a stay of the injunction.

Based on the parties' submissions to this Court and without prejudicing the ultimate disposition of this case, the Court believes that Verizon has not met its burden to obtain a stay pending appeal.

## 2. Sunset Provision

As an alternative to staying the injunction pending appeal, Verizon asks the Court to grant a sunset provision of eight months from the date of Verizon's supplementary submissions. *See* Verizon's Supplemental Submission 11, ECF No. 1178 ("VZ Sub."). At trial, Verizon suggested that it would take six to nine months to implement a non-infringing alternative. *See* Trial Tr. 2027:8-18, July 25, 2011; Trial Tr. 2099:7-13, July 26, 2011. Verizon began discussing a design-around alternative as early as March 2011. Verizon claims that they have been working diligently to come up with an alternative, but eight months would be necessary to complete a successful transition to a non-infringing alternative. VZ Sub. 11.

The Court will grant Verizon six months from the date of this permanent injunction order as a sunset provision. On August 2, 2011, a jury found that Verizon infringed on a number of ActiveVideo's patents. Notwithstanding that Verizon began discussing non-infringing alternatives five months prior to the jury's verdict, Verizon knew since the beginning of August that they should be working towards implementing a non-infringing alternative. Using the initial six to nine month estimate provided at trial, the Court finds that six months and not eight months is an equitable amount of time for Verizon to design a non-infringing alternative in light of the time which the last three months has afforded Verizon.

"In general, the Federal Circuit has expressed a preference for injunctive relief that is tailored to minimize disruptions to businesses and consumers." *Metso*, 788 F. Supp. 2d at 77

20

(citing *Broadcom*, 543 F.3d at 704) (citations omitted). Granting Verizon this provision will mitigate harm to the public, protect ActiveVideo's rights, and provide Verizon considerable time to implement non-infringing alternatives. *See Broadcom*, 543 F.3d at 704 ("We agree that the sunset provisions mitigate the harm to the public and that the district court did not abuse its discretion in fashioning a remedy that protects [plaintiff's] rights while allowing [defendant] time to develop non-infringing alternatives.") (citation omitted). Allowing a sunset provision minimizes disruptions to businesses and consumers. *See. e.g.*, *Metso*, 2011 WL 2149629, at *5. Therefore, the Court finds it appropriate to delay implementation of injunctive relief until May 23, 2012.

### 3. Sunset Royalty Rate

Because the Court has granted Verizon a sunset provision, ActiveVideo urges the Court to impose a royalty of $3.40 per FiOS TV subscriber per month payable directly to ActiveVideo. ActiveVideo's Supplemental Submission 1, ECF No. 1176 ("AV Sub."). In opposition, Verizon claims that, if the Court determines that a royalty is necessary, it should not exceed $0.17 per FiOS TV subscriber per month. *Id.* at 3. The Court believes that a royalty rate during the sunset period is appropriate and necessary.

The Federal Circuit has not provided exact guidance on calculating a royalty rate during a sunset period. Consequently, the Court will rely on the Federal Circuit's precedent in post-verdict royalty cases to determine the appropriate royalty during the sunset period.

> When a district court concludes that an injunction is warranted, but is persuaded to stay the injunction . . . the assessment of damages for infringements taking place after the injunction should take into account the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability—for example, the infringer's likelihood of success on appeal, the infringer's ability to immediately comply with the injunction, the parties' reasonable expectations if the stay

was entered by consent or stipulation, etc.-as well as the evidence and arguments found material to the granting of the injunction and the stay.[4]

*Amado v. Microsoft Corp.*, 517 F.3d 1353, 1362 (Fed. Cir. 2008).[5] Courts are permitted to award post-judgment royalties "to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314 (Fed. Cir. 2007).

The parties have provided the Court vastly dissimilar submissions regarding the appropriate royalty rate during a sunset period.[6] ActiveVideo claims that after August 2, 2011, Verizon became a willful infringer which justifies trebling the jury's verdict of $1.13 per FiOS TV subscriber per month to $3.40. *See Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d. 620, 626 (E.D. Tex. 2009) (holding that after verdict and judgment, Defendant's "continued infringement is willful"). The Court finds this view unpersuasive. ActiveVideo's argument ignores that in granting Verizon a sunset provision, the Court has effectively granted Verizon a temporary "stay" of its ruling. Verizon is permitted to continue to infringe on ActiveVideo's patent for the next six months *only* because of this Court's order. As such, Verizon should not be deemed a willful

---

[4] The *Amado* decision involved a stay of an injunction pending the completion of the appeals process, and the Court recognizes that the "stay" which it provided Verizon is only temporary insofar as it halts the issuance of the permanent injunction for six months. However, the Court believes that *Amado* provides the clearest test for determining an appropriate royalty rate during the temporary stay of the injunction during the sunset period.

[5] The Court used the *Amado* framework rather than the factors elucidated in *Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), in determining the appropriate royalty rate after the jury's verdict. The Court, however, finds the *Amado* post jury-framework to be more applicable to the instant motion. *See, e.g., Amado v. Microsoft Corp.*, No. CV 03-242, 2008 WL 8641264, at *11 (C.D. Cal. Dec. 4, 2008) ("In its published opinion, the Federal Circuit gave clear guidance as to the factors that should be considered. By not including any reference to the *Georgia-Pacific* factors, the Federal Circuit implicitly rejected this approach. In addition, the *Georgia-Pacific* analysis determines a royalty amount in a context prior to any finding of infringement. The Federal Circuit indicated that it was error for the Court to base the reasonable royalty on the pre-judgment award found by the jury. Instead, it indicated that the post-verdict analysis was a different analysis, and it set forth the factors the Court should consider related to the parties' bargaining positions. If the Court applies the *Georgia-Pacific* factors, it runs the risk of skewing the analysis towards a pre-judgment framework.").

[6] During the Court's October 24, 2011 hearing, the Court asked both parties for argument regarding the appropriate royalty rate during a sunset provision. Despite discussing reasonable royalty rates in its brief preceding the hearing, Verizon told the Court that they were not prepared to argue this issue at the hearing. Accordingly, the Court gave each party an opportunity to submit detailed submissions regarding the calculation of the appropriate royalty rate. After reviewing the parties' submissions, the Court then granted each party an opportunity to submit rebuttal arguments.

22

infringer when its infringement rests on a ruling from this Court. *See, e.g., Amado*, 517 F.3d at 1362 ("But willfulness, as such, is not the inquiry when the infringement is permitted by a court-ordered stay."). Therefore, the Court will not use the trebling for willful infringement as a guideline in calculating a reasonable royalty rate.

Verizon's arguments are similarly unpersuasive. Verizon hinges its argument largely on comparing ActiveVideo's 2009 agreement with Cablevision to the post-jury verdict hypothetical negotiations. Verizon asserts that the ActiveVideo and Cablevision agreement only nets ActiveVideo $0.07 per subscriber after costs.[7] Decl. Dennis W. Carlton ¶ 4, ECF No. 1178-2 ("Carlton Decl."). Because ActiveVideo accepted this agreement in 2009, Verizon believes that the Court should provide ActiveVideo royalties consistent with its agreement with Cablevision. It is the case, however, that once a verdict of infringement and validity issues, the bargaining position of the parties differs greatly than it would in a pre-judgment calculus. *See Amado*, 517 F.3d at 1362 ("Once a judgment of validity and infringement has been entered . . . the calculus is markedly different because different economic factors are involved.") (citation omitted). With respect to the relevant patents, ActiveVideo is in a better "bargaining position" with Verizon than it would have been with Cablevision in 2009. It would be improper to base a royalty rate on an agreement ActiveVideo reached two years prior to the jury's verdict when their bargaining position in any hypothetical negotiation post-verdict has clearly improved.[8]

In balancing the *Amado* factors, the Court will look first at Verizon's likelihood of success on appeal. As the Court mentioned in the portion of this motion regarding staying the injunction pending appeal, the Court has ruled (on some occasions, more than once) on many of the core

---

[7] Verizon contends that ActiveVideo gets $0.17 before costs in its agreement with Cablevision. Carlton Decl. ¶ 4.
[8] Merely because ActiveVideo's bargaining position in a hypothetical negotiation improved as a result of the jury's verdict does not negate the irreparable harm ActiveVideo suffered in losses to its brand name, market share, etc. Those losses still exist and are the basis for the Court's finding that it must grant a permanent injunction.

issues Verizon will present on appeal. The Court believes its rulings on those motions, as well as its claim construction, are correct. While the Court cannot conclude that Verizon has a high likelihood of success on appeal, Verizon will raise a substantial amount of complex issues to the Federal Circuit. These facts place Verizon in a better bargaining position than they would be but for the complex nature of many of the issues which they will appeal.

Secondly, the Court will determine Verizon's ability to immediately comply with the injunction. Aside from protecting the public, the Court found it necessary to grant Verizon a sunset period in large part because Verizon could not immediately comply with an injunction order without causing substantial damage to its reputation and to its customers. The extreme difficulty and expenses that Verizon claims are associated with designing a non-infringing alternative only highlight the importance of ActiveVideo's patents to Verizon and strengthen ActiveVideo's bargaining position.[9]

The Court finds the third factor – the parties' reasonable expectations if the stay was entered by consent or stipulation – to be inapplicable. The stay, or sunset period, in this case is Court ordered. As such, it does not strengthen or harm the parties' bargaining positions.

The fourth factor the Court should consider is the evidence and arguments found material to the granting of the permanent injunction. The Court believes that ActiveVideo suffered irreparable harm from Verizon's infringement which could not be compensated with monetary damages. Verizon was able to become a major player in the VOD market with technology belonging to ActiveVideo. ActiveVideo was unable to get the breakthrough it was looking for to improve its brand name and to get its technology to a more expansive number of customers. This

---

[9] The Court notes that this factor does not strengthen ActiveVideo's bargaining position as much as it would if Verizon had no alternatives available to it. Though the alternatives are both difficult and expensive to implement, the mere fact that alternatives exist mitigates ActiveVideo's bargaining power under the second factor.

Court will never be able to surmise how much ActiveVideo lost from Verizon's infringement. It is that unquantifiable harm and evidence which the Court relies on in granting a motion for permanent injunction. Additionally, the balance of hardships tipped in favor of ActiveVideo and the public interest in protecting the rights of patent holders also pointed toward entering an injunction. The arguments and evidence found material to the granting of an injunction further strengthen ActiveVideo's bargaining position.

Finally, the fifth *Amado* factor weighs the arguments and evidence found relevant to the Court's ruling to stay the injunction pending appeal. Because the Court did not find, based on the facts, that a stay pending appeal was warranted, the fifth factor strengthens ActiveVideo's bargaining position. Any argument regarding the bargaining position of the parties as it pertains to the sunset provision has previously been addressed with the second factor.

Taken collectively, the *Amado* factors prove that ActiveVideo was in a stronger bargaining position after the jury's verdict. That bargaining position is not as strong as ActiveVideo asserts. Nor is it as weak as Verizon proclaims. The sunset provision, which the Court has granted Verizon, permits Verizon to remove the infringing technology and design a non-infringing alternative to ActiveVideo's technology. Based on the evidence provided to the Court, Verizon believes they are capable of creating an alternative which mitigates some of the pressure Verizon would have to grant ActiveVideo a 50/50 profit split or more. Nonetheless, there is still danger in creating a design-around. Verizon knows precisely what benefits they have received from ActiveVideo's technology, and they do not know how effective a design-around would be. It is possible that a non-infringing alternative might result in a reduction in the quality of the services they provide to their customers. Though ActiveVideo's bargaining position is not a strong as it

25

would be if no alternative was available to Verizon, Verizon would still have a significant interest in maintaining their current technology to guarantee the same viewing quality for their customers and to eliminate costs associated with creating non-infringing technology, including testing the new design to ensure that it is somehow comparable to the infringing technology.

Overall, the Court believes there is an increase in bargaining power for ActiveVideo from their position in 2005. Verizon's ability to create a non-infringing alternative lessens the increase, but that in no way reduces ActiveVideo to the approximate position it was in during its first negotiations with Verizon. Thus, considering the relative bargaining positions of the parties, the Court determines that after the jury's verdict, it would have been reasonable for the parties to make an agreement whereby Verizon would receive 60% of the profits and ActiveVideo would receive 40% of the profits from the FiOS TV system.[10] Assuming that the incremental profit derived from Verizon's use of ActiveVideo's patents is $6.86 per FiOS TV subscriber per month, the Court concludes that the appropriate royalty rate for the six month sunset period is $2.74 per FiOS TV subscriber per month. *See* Wagner Decl. ¶ 13 ("Given that I considered all the data available to me up to the date of the trial when I reached my conclusion that the incremental profit from Verizon's use of ActiveVideo's patents is $6.86 per FiOS TV subscriber per month, my original analysis . . . remains unchanged.").

This amount shall be paid directly to ActiveVideo on the first day of every month beginning December 1, 2011.[11] However, the December 1, 2011 payment may be paid no later than December 16, 2011.

---

[10] The 60/40 split is reasonable via balancing ActiveVideo's increased bargaining power and Verizon's ability to create a non-infringing alternative.

[11] If, on appeal, the underlying liability determinations are reversed, either in whole or in part, Verizon retains the right to restitution of the sunset royalty payments, either in whole or in part, consistent with the Federal Circuit's determination.

## IV.  CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Permanent Injunction is **GRANTED.**

Verizon is **ORDERED** to pay sunset royalties of $2.74 per FiOS TV subscriber per month on the first day of each month beginning December 1, 2011.  The December payment may be paid by December 16, 2011.  Pursuant to the Court's grant of a sunset provision, this Permanent Injunction Order will take effect on May 23, 2012.

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record.

**IT IS SO ORDERED.**

Raymond A. Jackson
United States District Judge

Norfolk, Virginia
November 23, 2011

27